**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**NETCHOICE, LLC**                                                          **PLAINTIFF**

**v.**                        **CASE NO. _____**

**TIM GRIFFIN, in his Official Capacity**
**as Attorney General of Arkansas**                          **DEFENDANT**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, NetChoice, LLC, by and through its attorneys, for its Complaint against

Defendant, Tim Griffin, in his official capacity as Attorney General of Arkansas, states as follows:

**PRELIMINARY STATEMENT**

1.      Arkansas Senate Bill 396 is the latest attempt in a long line of government efforts

to restrict new forms of expression based on concerns that they harm minors.  Books, movies,

television, rock music, video games, and the Internet have all been accused in the past of exposing

youth to content that has deleterious effects.  But the U.S. Supreme Court has repeatedly held that,

while the government undoubtedly possesses "legitimate power to protect children from harm,"

"that does not include a free-floating power to restrict the ideas to which children may be exposed."

*Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 794-95 (2011).  "Speech that is neither obscene

as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect

the young from ideas or images that a legislative body thinks unsuitable for them."  *Erznoznik v.*

*City of Jacksonville*, 422 U.S. 205, 213-14 (1975).

2.      Accordingly, government efforts to restrict minors from accessing such materials,

including by requiring parental consent to do so, have reliably and repeatedly been struck down,

especially when (as is often the case) they impede the First Amendment rights of adults too.  *See,*

*e.g.*, *Brown*, 564 U.S. at 794-95 (invalidating law prohibiting distribution of violent video games

1

to minors without parental consent); *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004) (enjoining law restricting access to sexually explicit materials on the Internet); *Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997) (invalidating earlier law enacted to protect minors from "indecent" and "patently offensive" communications on the Internet); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual programing on television); *Erznoznik*, 422 U.S. at 213-14 (invalidating law prohibiting display of movies containing nudity at drive-in theaters); *Interactive Digital Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954 (8th Cir. 2003) (invalidating ordinance prohibiting distribution of violent video games to minors without parental consent); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir. 1992) (invalidating law prohibiting distribution to minors of videos depicting certain types of violence).

3.     S.B. 396 should meet the same fate.  The Act purports to protect minors from alleged harmful effects of "social media" by requiring the companies that operate these services to verify that any person seeking to create an account is at least 18 years old or has parental consent to create an account.  By restricting the access of minors—and adults (who now have to prove their age)—to these ubiquitous online services, Arkansas has "with one broad stroke" burdened access to what for many are the principal sources for speaking and listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

4.     Worse still, the Act does so by drawing a slew of content-, speaker-, and viewpoint-based distinctions—making clear that its purpose and effect is "to restrict the ideas to which children may be exposed" and "protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 794-95.  S.B. 396 restricts access to a website that

permits users to share videos of their newest dance moves or other acts of entertainment, but not to a website that provides career development opportunities.  Minors may readily access websites that provide news, sports, entertainment, and online shopping, but not those that allow them to upload their favorite recipes or pictures of their latest travels or athletic exploits.  Moreover, the Act does not even restrict access to supposedly harmful content in any sensible way:  It arguably applies to Facebook and Twitter, but not Mastadon, Discord, BeReel, Gab, Truth Social, Imgur, Brainly, DeviantArt, or Twitch.  The Act thus appears to restrict access to political expression on Twitter and photography on Instagram but places no restrictions on the exact same expression on Truth Social or DeviantArt.  While the state might think that some of those distinctions are sensible, the Supreme Court has long recognized that it is not the role of the government to decide what expressive materials minors should be allowed to access.  The First Amendment leaves "these judgments … for the individual to make, not for the Government to decree."  *Playboy*, 529 U.S. at 818.  And compounding the problems, the Act's definitions of "social media company" and "social media platform" are hopelessly vague, leaving companies to guess whether they are regulated by the Act.  The Act is also preempted in part by the Child Online Privacy Protection Act and contravenes the Commerce Clause too.

5.      For these reasons and others, the Court should declare S.B. 396 unconstitutional and enjoin the Attorney General of Arkansas from enforcing it.

## THE PARTIES

6.      Plaintiff NetChoice, LLC is a nonprofit based in the District of Columbia.  It is a trade association for Internet companies.  NetChoice's members include (among others) Meta Platforms, Inc., TikTok, Inc., Twitter, Inc., Snap Inc., Pinterest, Inc., and Nextdoor Holdings, Inc. A full list of NetChoice's members is located here: https://bit.ly/389bD0V.  NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through

3

the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful.  NetChoice serves the interests of its members, which share a commitment to the vital First Amendment protections that S.B. 396 undermines.  NetChoice brings this action on its members' behalf to vindicate First Amendment rights and to prevent the economic and other injuries that S.B. 396 will cause them absent judicial relief.

7.     Defendant Tim Griffin is the Attorney General of Arkansas.  S.B. 396 charges the Attorney General of Arkansas with its enforcement.  *See* S.B. 396, §1 (to be codified at Ark. Code Ann. §4-88-1103(b)(1)-(2)).[1]  Attorney General Griffin is a resident of Arkansas.  NetChoice sues Attorney General Griffin for declaratory and injunctive relief in his official capacity as the Attorney General of Arkansas.

## JURISDICTION AND VENUE

8.     NetChoice's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  The Court therefore has jurisdiction under 28 U.S.C. §1331.

9.     Venue is proper in this district under 28 U.S.C. §1391 because the defendant performs his official duties in the Western District of Arkansas and is therefore considered to reside in this district as a matter of law.

## BACKGROUND

**Adults and minors alike use online services to engage in a wide array of protected First Amendment activity.**

10.     NetChoice is an Internet trade association whose members operate many online services, including Facebook, Instagram, Twitter, TikTok, Snapchat, Pinterest, and Nextdoor.

---

[1] For ease of reference, this complaint cites provisions of S.B. 396, §1 based on the locations in Title 4, Chapter 88 of the Arkansas Code at which they are to be codified upon their effective date.  For simplicity's sake, the complaint omits the "§4-88-" prefix going forward.

Those services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. "[U]sers employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quoting *Reno*, 521 U.S. at 870). "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104. On Instagram, users can share photos of everyday moments and express themselves with short, fun videos. On "Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. On Pinterest, users can discover ideas for recipes, style, home decor, and more. On TikTok, users going through a difficult experience can find advice, support, and empathy. On Snapchat, users can communicate with friends and family in fun and casual ways. And on Nextdoor, users can connect with neighbors, share local news, and borrow tools.

11.     Online services are widely used by teens as well as adults. "Surveys show that ninety percent of teens have used social media." *Social Media and Teens*, American Academy of Child & Adolescent Psychiatry (updated Mar. 2018), https://archive.ph/LOY12. Seventy five percent of teens "report having at least one active social media profile, and 51% report visiting a social media site at least daily." *Id.*

12.     Like adults, minors use these websites to engage in a wide array of protected First Amendment activity on a wide range of topics. Minors use online services to read the news, connect with friends, explore new interests, and follow their favorite sports teams and their dream colleges. Some use online services to showcase their creative talents to others, including their artwork, photography, writing, or other forms of creative expression. Others use online services to raise awareness about social causes and to participate in public discussion on the hottest topics

of the day.  Still others use online services to build communities and connect with others who share similar interests or experiences, which is particularly helpful for minors who feel isolated or are seeking support from others who understand their experiences.

**Parents have myriad ways to restrict their children's access to online services and to keep their children safe on such services.**

13.     Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree online services are appropriate for minors.  While many minors use online services in wholesome and productive ways, online services, like many other technologies, can be abused in ways that may harm minors.

14.     Parents who wish to limit their children's access to online services or to control the websites and content to which their children are exposed have numerous options at their disposal. For starters, parents can decide whether and when to let their children use computers, tablets, and smartphones in the first place.  They can also determine whether, when, and how their children access the Internet by deciding to purchase a personal phone plan for their child or Internet service for their household.  Cell carriers and broadband providers provide parents with tools to block certain apps and sites from their kids' devices, ensure that they are texting and chatting with trusted contacts only, and restrict access to screen time during certain hours of the day.  *See, e.g.*, Verizon, Verizon Smart Family, https://tinyurl.com/ycyxy6x6 (last visited June 27, 2023); AT&T, Parental Controls, https://tinyurl.com/3ypvj7bv  (last visited June 27, 2023); T-Mobile, Family Controls and Privacy, https://tinyurl.com/57run7ac  (last visited June 27, 2023); Comcast Xfinity, Set Up Parental Controls for the Internet, https://tinyurl.com/5acdsnat  (last visited June 27, 2023).

15.     On top of that, most wireless routers (the devices that provide wireless Internet connectivity throughout a home) offer parental control settings.  *See* Molly Price & Ry Crist, *How*

*to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 11, 2021), https://archive.ph/wip/uGaN2.  Parents can use these settings to block certain websites or online services that they deem inappropriate, set individualized content filters for their children, and monitor the websites their children visit and the services they use.  *See* Netgear, Circle Smart Parental Controls, https://archive.ph/wip/0GbB5 (last visited June 27, 2023).  Parents can also use router settings to turn off their home Internet at particular times of day, pause Internet access for a particular device or user, or limit the amount of time that a child can spend on a particular website or online service.  *See id.*

16.     Additional parental controls are available at the device level.  For example, iPhones and iPads empower parents to limit the amount of time their children can spend on the device, choose which applications (*e.g.*, YouTube, Facebook, Snapchat, or Instagram) their children can use, set age-related content restrictions for those applications, filter online content, and control privacy settings.  *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://archive.ph/T68VI (last visited June 27, 2023).   Google and Microsoft similarly offer parental controls for their devices.  *See* Google Family Link, Help Keep Your Family Safer Online, https://tinyurl.com/mr4bnwpy (last visited June 27, 2023); Microsoft, Getting Started with Microsoft Family Safety, https://tinyurl.com/yc6kyruh (last visited June 27, 2023).  In addition, numerous third-party applications allow parents to control and monitor their children's use of Internet-connected devices and online services.  *See* Ben Moore & Kim Key, *The Best Parental Control Apps for Your Phone*, PCMag (Mar. 29, 2022), https://archive.ph/HzzfH.

17.     On top of all that, NetChoice members provide parents with many tools to decide for themselves what minors can see and do on their services, and have devoted extensive resources to developing policies and practices to protect minors who use them.  For starters, many services

operated by NetChoice members, including Facebook, Instagram, Twitter, Pinterest, Snapchat, and Nextdoor, require users in the United States to be at least 13 years old before they can create an account.  TikTok offers a limited app experience for users under 13 called TikTok for Younger Users where users are provided a viewing experience that does not permit sharing of personal information and puts extensive limitations on content and user interaction.  TikTok partners with Common Sense Networks to try and ensure content is both age-appropriate and safe for an audience under 13.  In this ecosystem, users cannot do things like share videos, comment on others' videos, message with users, or maintain a profile or followers.  NetChoice members also either encourage teenagers who are old enough to create an account to use private settings, or do so as a matter of default.  Snapchat, for example, defaults all users to private settings.  Facebook, Instagram, TikTok, and Pinterest likewise default teenagers under age 16 to private settings when they join and encourage them to choose more private settings through prompts and suggestions.

18.    NetChoice members expend significant resources curating the content that users post on their services to ensure that it is appropriate for adults and teens alike.  Members restrict the publication of violent and sexual content, bullying, and harassment.  Some prohibit content that encourages body shaming and promote content that encourages a positive self-image.  Several use "age gating" to keep minors from seeing certain content visible to adults, or younger teens from seeing content visible to older teens.  NetChoice members implement their policies through algorithms, automated editing tools, and human review.  If a member decides that a piece of content violates its policies, it can remove the content, restrict it, or add a warning label or a disclaimer to accompany it.  In addition, members can (and do) suspend or ban accounts that violate their policies.

19.    NetChoice members also provide users with tools to curate the content that they

wish to see.  Users can generally choose who they want to follow.  Users can generally block or mute other users and control who may see and interact with their own content.  Some members provide users with tools to exclude specific categories of content they wish to avoid.  TikTok users, for example, can opt into "restricted mode," which automatically filters certain content and permits users to tailor the content they see with keyword filters.  Facebook users can alter the content that Facebook recommends by hiding certain types of content or opting to see fewer posts from a specific person or group.  Instagram users can select a "not interested" button to filter out content they do not wish to see.  They can also use keyword filters (for example, "fitness" or "recipes" or "fashion") to do the same.

20.    NetChoice members empower parents to monitor teens' online activities.  Parents can use Instagram's "supervision tools," with the consent of their teen, to see how much time their teen spends on Instagram, set time limits and scheduled breaks, receive updates on what accounts their teen follows and the accounts that follow their teen, and receive notifications if a change is made to their teen's settings.  TikTok has a "family pairing" feature that allows parents to, among other things, set a screen time limit, restrict exposure to certain content, decide whether their teen's account is private or public, turn off direct messaging, and decide who can comment on their teen's videos.  Through Snapchat's "family center," parents can keep track of who their teen befriends and communicates with.

21.    NetChoice members also restrict communications between adults and teens on their services.  TikTok bans users under age 16 from sending or receiving direct messages, and allows parents and guardians of 16- to 18-year-old users to restrict who can send messages to their teen, or to turn off direct messaging completely through its family pairing feature.  For 16- and 17-year-olds, TikTok also turns off the direct messaging option by default.  Facebook, Instagram, Snapchat,

and Pinterest likewise take steps to limit adults from messaging teens to whom they are not connected. For example, Snapchat's default settings permit only messages between people who are already friends on the platform, and Snapchat does not recommend friend connections for minors unless the person is already in their phone contacts or shares mutual friends. Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected. Some NetChoice members also inform young people when an adult who has been exhibiting potentially suspicious behavior attempts to interact with them. If, for example, an adult is sending a large amount of friend or message requests to people under age 18, or if the adult has recently been blocked by people under age 18, Instagram alerts the recipients and gives them an option to end the conversation and block, report, or restrict the adult.

**S.B. 396 draws a slew of content-, speaker-, and viewpoint-based distinctions.**

22.     There has long been some speech that many adults would prefer minors not hear. Some are opposed to minors reading *The Adventures of Huckleberry Finn* because it contains racial epithets. Others object to minors playing *Grand Theft Auto* because it depicts violence and criminality. Even so, the government typically cannot require certain works to be kept in an "adults only" section of the mall just because it deems them controversial, or require minors to receive permission from their parents before buying works that carry messages that the government deems too sophisticated for them. *See, e.g.*, *Brown*, 564 U.S. at 786. Even when it comes to efforts to protect minors, the First Amendment commands that "esthetic and moral judgments about art and literature" and other forms of speech and expression "are for the individual to make, not for the Government to decree." *Playboy,* 529 U. S. at 818.

23.     The Internet is no different. "[W]hatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the

press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).  Indeed, the Supreme Court has repeatedly rejected efforts to subject the Internet to a unique set of First Amendment rules, even when those efforts are driven by a good-faith desire to protect children from potentially harmful content.  *See, e.g.*, *Ashcroft*, 542 U.S. 656, 665-66 (applying strict scrutiny to content-based regulation of Internet speech); *Reno*, 521 U.S. at 870-71, 874 (same).

24.     But in April 2023, Arkansas took it upon itself to decree what is appropriate for minors on the Internet:  It enacted S.B. 396, which dramatically restricts minors' access to "social media platforms," significantly curtailing their ability to engage in core First Amendment activities on many of the most popular online fora.  In particular, the law prohibits minors from creating accounts and accessing "social media platforms" without first obtaining parental consent and requires "social media companies" to verify the age of every individual who attempts to sign up to use their services.  Notably, S.B. 396 does not apply to *all* online services, or even all services that one might think of as "social media platforms."  The law instead draws a whole host of nonsensical distinctions based on content, speaker, and viewpoint, imposing its onerous requirements on online services associated with speech that Arkansas apparently disfavors while entirely exempting speech on myriad other services.

25.     S.B. 396 defines "social media company" as a company that offers "an online forum" in which individuals may "establish an account … for the primary purpose of interacting socially with other[s]"; "create posts or content"; "[v]iew [others'] posts or content"; and "establish[] mutual connections through request and acceptance."  §1101(7)(A).  But the Act excludes from the definition of "social media company": (i) a "[m]edia company that exclusively

offers subscription content in which users follow or subscribe unilaterally and whose platforms' primary purpose is not social interaction"; (ii) a "[m]edia company that exclusively offers interacting gaming, virtual gaming, or an online service, that allows the creation and uploading of content for the purpose of interacting gaming, entertainment, or associated entertainment, and the communication related to that content"; (iii) a company that offers an enumerated service, such as "cloud storage" or "enterprise collaboration tools for kindergarten through grade twelve (K-12) schools," and derives less than 25% of its revenue "from operating a social media platform, including games and advertising"; and (iv) a "[c]ompany that provides career development opportunities, including professional networking, job skills, learning certifications, and job posting and application services." §1101(7)(B)(i), (iii)-(v).  The Act then creates an exception-to-an-exception, stating that a "[s]ocial media company that allows a user to generate short video clips of dancing, voice overs, or other acts of entertainment in which the primary purpose is not educational or informative, does not meet the [first] exclusion." §1101(7)(B)(ii).

26.   S.B. 396's definition of "social media platform" is similarly riddled with exceptions based on content, speaker, and viewpoint.  "Social media platform" is defined as "a public or semi-public internet-based service or application," a "substantial function" of which "is to connect users in order to allow users to interact socially with each other within the service or application." §1101(8)(A).  But the term does not include any "online service," "website," or "application if [its] predominant or exclusive function" is (i) email; (ii) private, direct messaging; (iii) streaming of media content licensed by someone other than "a user or account holder"; (iv) "[n]ews, sports, entertainment, or other content that is preselected by the provider and not user generated"; (v) "[o]nline shopping or e-commerce"; (vi) "[b]usiness-to-business software that is not accessible to the general public"; (vii) "[c]loud storage"; (viii) "[s]hared document collaboration";

(ix) "[p]roviding access to or interacting with data visualization platforms, libraries, or hubs"; (x) "[t]o permit comments on a digital news website, if the news content is posted only by the provider of the … website"; (xi) "obtaining technical support for [a] social media company's social media platform, products, or services"; (xii) "[a]cademic or scholarly research"; and (xiii) certain other types of research.  §1101(8)(B).  The Act does not define the phrase "substantial function," leaving online services to guess what it means.

27.     S.B. 396 imposes onerous obligations on "social media companies" that severely burden both minors' and adults' First Amendment rights to speak, listen, and associate without government interference on the widely used online services that it covers.  The Act specifies that "a social media company shall not permit an Arkansas user who is a minor to be an account holder on the social media company's social media platform unless the minor has the express consent of a parent or legal guardian."  §1102(a).  "A social media company shall verify the age of an account holder," and "[i]f an account holder is a minor, the social media company shall confirm that a minor has [parental] consent … to become a new account holder, at the time an Arkansas user opens the account."  §1102(b)(1)-(2).  In addition, "[a] social media company shall use a third party vendor to perform reasonable age verification before allowing access to the social media company's social media platform."  §1102(c)(1).  The Act specifies that "reasonable age verification methods" include providing a "digitized identification card," "[g]overnment-issued identification," or "[a]ny commercially reasonable age verification method."  §1102(c)(2).

28.     A "social media company" that fails to comply with those restrictions faces civil and criminal liability.  An individual may sue to recover "[d]amages resulting from a minor accessing a social media platform without his or her parent's or custodian's consent," or "[a] penalty of [$2,500] per violation," as well as court costs and attorney's fees.  §1103(c)(1).  S.B.

396 also authorizes the Arkansas Attorney General to bring civil enforcement actions, §1103(b)(2), and to prosecute a willful and knowing violation of the Act as a Class A criminal misdemeanor, §1103(b)(2) (citing Ark. Code Ann. §4-88-103).

29.     The Act also forbids any "commercial entity" from "retain[ing] any identifying information of an individual after access to the social media platform has been granted." §1104(a); *see also* §1101(3)(A) (defining "commercial entity").  This provision is so broadly written that it risks being misconstrued to cover adults and minors alike, regardless of whether they have any ties to Arkansas, and regardless of whether they go through the Act's age verification process and sign up for an account.  An entity that knowingly violates this prohibition "is liable to the individual for damages resulting from the retention of the identifying information, including court costs and reasonable attorney's fees."  §1104(b).

30.     S.B. 396 takes effect on September 1, 2023.  *See* S.B. 396, §2.

## CLAIMS FOR RELIEF

### COUNT ONE
### First Amendment
### (42 U.S.C. §1983)

31.     NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

32.     "The most basic" principle of First Amendment law is that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91.  Under the First Amendment, "esthetic and moral judgments about art and literature" and other forms of speech and expression "are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority."  *Playboy*, 529 U.S. at 818.  Accordingly, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves

that they are narrowly tailored to serve [a] compelling interest[]." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)).

33.     While a law that "singles out specific subject matter for differential treatment" is deeply problematic, *Reed*, 576 U.S. at 169, one that "targets … particular views taken by speakers on a subject" is even worse, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  As the Supreme Court has explained, viewpoint discrimination is an "egregious form of content discrimination."  *Id*.  The government must "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Id.*; *see also Iancu v. Brunetti*, 139 S.Ct. 2294, 2299 (2019).  Viewpoint-discriminatory laws thus receive the strictest of scrutiny.  *Rosenberger*, 515 U.S. at 830.

34.     As a corollary of those principles, the First Amendment generally forbids "restrictions distinguishing among different speakers, allowing speech by some but not others," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010), because laws that draw speaker-based distinctions pose a particularly acute risk of content and viewpoint discrimination.  After all, a "speaker" and her "viewpoints" are so frequently "interrelated" that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id*. And "[s]peaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'"  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S.Ct. 2361, 2378 (2018) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)).  Accordingly, "[the Supreme] Court's precedents are deeply skeptical of laws that 'distinguis[h] among different speakers, allowing speech by some but not others.'"  *Id.* (quoting *Citizens United*, 558 U.S. at 340).  And "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."  *Reed*, 576 U.S. at 170.

35.     S.B. 396 is replete with distinctions based on content, speaker, and viewpoint that trigger strict scrutiny multiple times over.

36.     First, a law "is facially content based … if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022) (quoting *Reed*, 576 U.S. at 163).  Content-based laws include not only those that "'defin[e] regulated speech by particular subject matter,'" but also "subtler forms of discrimination that achieve identical results based on function or purpose." *Id.* at 1474 (quoting *Reed*, 576 U.S. at 163).  In *Reed*, for example, the Court held that distinctions between signs serving certain "noncommercial purposes," those "designed to influence the outcome of an election," and "temporary directional signs relating to a qualifying event" were content based.  *See* 576 U.S. at 159-60 (capitalization altered).  Similarly, in *Barr v. American Association of Political Consultants, Inc.*, 140 S.Ct. 2335 (2020), the Court held that a general prohibition on robocalls, with an exception for calls "made solely to collect a debt owed to or guaranteed by the United States," was content based because it "favor[ed] speech made for collecting government debt over political and other speech." *Id.* at 2346.

37.     S.B. 396 is a content-based restriction on speech because it "singles out specific subject matter for differential treatment," including by using the "function or purpose" of speech as a proxy for its content.  *Reed*, 576 U.S. at 163, 169; *see City of Austin*, 142 S.Ct. at 1472-73.  In general, the Act restricts expression that serves "the primary purpose of interacting socially," §1101(7)(A), while treating expression that serves other purposes more favorably.  *See also* §1101(7)(B)(i), (8)(A)(ii)(a), (v)(c), (xiii)(2).  For example, the Act's definition of "social media company" generally excludes companies that "exclusively offer[] subscription content," §1107(7)(B)(i)—provided that they do not "allow a user to generate short video clips of dancing,

voice overs, or other acts of entertainment in which the primary purpose is not educational or informative," §1101(7)(B)(ii)—as well as companies that "exclusively offer[] interacting gaming [and] virtual gaming" or "provide[] career development opportunities," §1101(7)(B)(iii), (v). Thus, the Act restricts access to gaming-related communications on Facebook but does not restrict the exact same communications if facilitated by a different company "exclusively" devoted to gaming.  Likewise, the Act's definition of "social media platform" carves out online services if their "predominant or exclusive function" is not social interaction but rather "[n]ews, sports, [and] entertainment," "online shopping or e-commerce," "technical support," "[a]cademic or scholarly research," or a host of other enumerated purposes.  *See* §1101(8)(B)(v)-(xiii).  There are also carveouts for user-to-user communications (even if primarily social) that are "not posted publicly," §1101(8)(B)(i)-(ii), as well as those that are "directly related to" or "focused on" legislatively preferred subjects such as news and shopping, §1101(8)(B)(iv), (v); *see also* §1101(8)(x), (xiii), §1103(d).  Thus, S.B. 396 singles out myriad forms of speech based on their subject matter and treats them more favorably than other forms of First Amendment-protected speech, including political advocacy.  "That is about as content-based as it gets."  *Pol. Consultants*, 140 S.Ct. at 2346.

38.     Moreover, the practical effect of S.B. 396's parade of exceptions is to single out a few online services for disfavored treatment, triggering another First Amendment problem.  As the Supreme Court has explained, laws that "discriminate among media, or among different speakers within a single medium," present very real "dangers of suppression and manipulation" of the medium and risk "distort[ing] the market [of] ideas."  *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60, 661 (1994).  And when "the basis on which [the government] differentiates between" media is "its content," the law is "particularly repugnant to First Amendment principles."  *Ark.*

17

*Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987) (emphasis omitted).

39.     S.B. 396 facially "distinguish[es] among different speakers." *Citizens United*, 558 U.S. at 340.  In addition to carving out specific favored companies based on content, the Act imposes arbitrary size and revenue requirements that have the effect of targeting just a handful of companies for disfavored treatment.  The Act does not apply to any "social media platform that is controlled by a business entity that has generated less than one hundred million dollars … in annual gross revenue." §1101(8)(C).  Thus, the exact same speech that Arkansas restricts on Facebook or Twitter is unrestricted if it appears on "smaller platforms such as Parler, Gab, and Truth Social." *See* Jess Weatherbed, *New Arkansas Bill to Keep Minors Off Social Media Exempts Most Social Media Platforms*, The Verge (Apr. 13, 2023), https://archive.ph/KMmKe (noting that the latter three platforms "don't meet the annual gross revenue requirement of $100 million").  And a service generating $90 million in revenue could be regulated by the Act if owned by a somewhat larger enterprise, but entirely unregulated if spun off, even though the content available to minors on the service remained entirely unaltered.  It could also escape regulation if it were purchased by a much larger enterprise with more than $270 million in unrelated revenue, as the Act carves out companies with over $100 million in revenue if they derive "less than twenty-five percent … of [their] revenue from operating a social media platform" and also offer "cloud storage services, enterprise cybersecurity services, educational devices, or enterprise collaboration tools for [K-12] schools." §1101(7)(iv).

40.     Those distinctions make no sense in theory or in practice.  For example, a "short video clip[] of dancing" or "other acts of entertainment" is arguably restricted if it appears on Instagram, Reddit, or Twitter, *see* §1101(7(B)(ii), but not if it appears on Parler, Gab, or Truth Social, which generate less than $100 million in annual revenue, *see supra* ¶39, or on YouTube,

which generates less than 25% of Google's total revenue.  *See* Emily Dreibelbis, *Arkansas Limits Social Media Access for Kids Under 18, With One Major Exception*, PCMag (Apr. 13, 2023), https://archive.ph/dEowc (citing statement by co-sponsor of S.B. 396 that the Act does not apply to Google); Daniel Howley, *Alphabet Misses on Earnings Expectations as Ad Revenue Falls*, Yahoo! (Feb. 2, 2023), https://tinyurl.com/4eecwthw (noting that YouTube ad revenue makes up only about 13% of total ad revenue).  This is doubly nonsensical when "multi-homing"—use of multiple digital services for similar purposes—and cross-posting content grows only more popular. Simply put, S.B. 396 repeatedly draws arbitrary lines in an area that requires careful tailoring.

41.    Even worse, S.B. 396 discriminates among viewpoints, as it suppresses speech "based on the ideas or opinions it conveys."  *Iancu*, 139 S.Ct. at 2299 (ban on registering "immoral" or "scandalous" trademarks was impermissibly viewpoint-based); *see, e.g.*, *Sorrell*, 564 U.S. at 565 (restrictions on speech "promot[ing] brand-name drugs" were impermissibly "aimed at a particular viewpoint").  For example, the Act treats "video clips of dancing, voice overs, or other acts of entertainment" more favorably if their primary purpose is educational than if their "primary purpose is not educational or informative."   §1101(8)(B)(ii); *see also* §1101(8)(B)(xiii)(c) (favoring speech "used by and under the direction of an educational entity"). The Act similarly favors speech reflecting the viewpoints of whoever provides the online service, *e.g.*, "news, sports, entertainment, or other content that is *preselected by the provider*," §1101(8)(B)(iv) (emphasis added), over ideas generated by users.  *Compare* §1101(7)(A), (B)(ii), (8)(B)(ii)(c), (iii) (disfavoring public posting by individuals and other "user generated" content), *with* §1101(8)(B)(x) (favoring content "posted only by the provider of [a] digital news website"), (8)(B)(xiii)(a) (similar), §1103(d) (carveout for "news-gathering organization[s]").  The First Amendment does not permit Arkansas to regulate private speech based on its perception of the

value of the views expressed—particularly where that value is assessed based on who the speaker is.  Indeed, the Supreme Court has "emphatically rejected" the notion that a legislature may "weigh[] the value of a particular category of speech against its [perceived] social costs" and restrict speech that it deems low-value.  *Brown*, 564 U.S. at 792 (citing *United States v. Stevens*, 559 U.S. 460, 470, 472 (2010)).

42.    S.B. 396's private enforcement mechanism creates yet another First Amendment problem.  The Act authorizes any private individual to sue over alleged violations of its parental-consent and age-verification requirements, and to recover "[a] penalty of two thousand five hundred dollars … per violation," plus court costs and attorney's fees—even if the individual has not personally sustained any damages.  *See* §1103(c)(1)(A).  To the extent the state has any interest in restricting online speech, that interest "extends no further than compensation for actual injury." *Cf.  Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974) (discussing state interest in proscribing defamation); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964) (expressing concern about Alabama defamation law that imposed liability "without the need for any proof of actual pecuniary loss").  Moreover, Arkansas' private-enforcement scheme lacks the institutional checks that accompany government-enforced restrictions on speech, including prosecutorial discretion, legislative oversight, and public accountability, thus inevitably encouraging vexatious and abusive litigation.  *Cf. Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 775-776 (2000) (noting historical abuse of "informer statutes").  Accordingly, the threat of private lawsuits under S.B. 396, accompanied by potentially massive liability, is likely to severely burden the core First Amendment activities that take place on online services.  *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 794 (1988) (such a chilling effect is "in direct contravention of the First Amendment's dictates").

43.     The final section of the Act, §1104, forbids any "commercial entity" from "retain[ing] any identifying information of an individual after access to the social media platform has been granted" and imposing civil liability for "knowing[]" retention of such information. This provision, too, seriously burdens protected speech. The text of §1104 is so broad that it risks being misunderstood as prohibiting online services' longstanding, common-sense practice of requiring everyone who signs up for an account to provide their first and last name and either a valid email address or a phone number. But it simply would not be feasible or responsible for services such as Facebook, Instagram, and Twitter to maintain millions of user accounts without "retaining" any "identifying information" about who holds them. Moreover, core features of these services include attributing speech to named individuals and allowing account holders to search for their friends and family by name so that they can establish a mutual connection. Thus, §1104 could potentially be misread as a sweeping prohibition on retention of "any identifying information" about any "individual" (whether a teen or an adult) who is granted access to a "social media platform," which could threaten these services' very existence. Because §1104 restricts speech only on "social media platform[s]," as defined by §1101(8), it incorporates the content-, viewpoint-, and speaker-based elements of that statutory term. *See supra* ¶¶37-41. It should therefore receive strict scrutiny. But even if §1104 were somehow deemed content neutral, it would still be subject to intermediate scrutiny. *See Packingham*, 582 U.S. at 105.

44.     S.B. 396 cannot survive any level of heightened scrutiny, let alone strict scrutiny. Strict scrutiny requires a law to be narrowly tailored to advance a "compelling" governmental interest. *Reed*, 576 U.S. at 171. Intermediate scrutiny demands that a law be narrowly tailored "to serve a significant governmental interest," meaning that it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham*, 582 U.S.

at 106; *see also Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373 (2021) (reaffirming that intermediate scrutiny requires narrow tailoring).

45.     S.B. 396 contains no legislative statement of purpose or findings of fact that could shed light on why it was enacted.  To the extent Arkansas seeks to justify S.B. 396 on the ground that it has a compelling interest in "assisting parents to be the guardians of their children's well-being," that argument is squarely foreclosed by Eighth Circuit and Supreme Court precedent. *Interactive Digital Software Ass'n*, 329 F.3d at 959.  As the Eighth Circuit has concluded, "the government cannot silence protected speech by wrapping itself in the cloak of parental authority." *Id.* at 960. To accept such a "broadly-drawn interest as a compelling one would be to invite legislatures to undermine the first amendment rights of minors willy-nilly under the guise of promoting parental authority."  *Id.*; *see also Brown*, 564 U.S. at 802 (expressing "doubts that punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority").

46.     To the extent Arkansas seeks to justify S.B. 396 on the ground that it has a compelling interest in protecting minors from alleged harmful effects of "social media," that does not work either.  To begin, any such argument is undermined by the fact that many of the online services at issue already preclude minors under 13 years old from accessing them, and that parents can restrict their children's access to online services by directly restricting or monitoring their use of the Internet, computers, and mobile devices.  *See supra* ¶14-16.  On top of that, the companies regulated by S.B. 396 already take many steps to keep teens safe on their services, including by providing parents with tools to monitor their teens' use of those services.  *See supra* ¶17-21.

47.     Tellingly, the Arkansas legislature compiled no evidence that parents who wish to prevent their children from accessing online services are unable to do so.  *Cf. Brown*, 564 U.S. at

803 (California parental-consent requirement did not "meet a substantial need of parents who wish to restrict their children's access to violent video games but cannot do so" where industry had already taken voluntary measures that facilitated parental control).  At any rate, even if Arkansas had gathered evidence that the alleged harms it claims to address "are real, not merely conjectural," *Interactive Digital*, 329 F.3d at 958, the law is both wildly over- and underinclusive.

48.     S.B. 396 is overinclusive because it restricts minors from creating accounts and accessing certain disfavored "social media platforms," regardless of whether the content on them is innocuous or dangerous.  As the Supreme Court has recognized, "[s]ocial media allows users to gain access to information and communicate with one another about it on any subject that might come to mind."  *Packingham*, 582 U.S. at 107.  Teens use these services for many legitimate and productive purposes that lie at the core of what the First Amendment protects.  *See supra* ¶¶10-12. S.B. 396 dramatically impinges upon these core First Amendment activities by barring teenagers from creating accounts and accessing a "social media" service unless they obtain parental consent. S.B. 396 makes no effort to distinguish between 13-year-olds and 17-year-olds.  And again, the exact same content that is restricted on one service is left unrestricted on competitor services: As a further illustration, S.B. 396 limits access to listings of goods available on Facebook Marketplace but permits identical listings on other services that focus "predominant[ly]" on "[o]nline shopping or e-commerce."  *See* §1108(B)(v).

49.     The Act also makes no effort to show that less restrictive alternatives, such as readily available content-filtering tools, are insufficient.  *See Ashcroft*, 542 U.S. at 667 (explaining that "[f]ilters are less restrictive" than age-verification requirements because "[t]hey impose selective restrictions on speech at the receiving end, not universal restrictions at the source").  The Act is therefore the polar opposite of the sort of "narrow and well-defined" restriction on "public

dissemination of [First-Amendment] protected materials to [minors]" that might withstand constitutional scrutiny. *Cf. Erznoznik*, 422 U.S. at 212 (holding that prohibition on public "display of films containing nudity" was overinclusive, even with respect to minors). S.B. 396 limits teens' access not only to potentially harmful content, but to entire services that are among "the most important places (in a spatial sense) for the exchange of views," and that "users employ … to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 107 (quoting *Reno*, 521 U.S. at 870). That is breathtakingly overbroad.

50.     S.B. 396 is also overinclusive because it chills the exercise of First Amendment rights by adults. Just as the laws in *Ashcroft* and *Reno* burdened adult speech by requiring websites to verify visitors' age through use of a credit card or other means, *see Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57, S.B. 396 burdens adult speech by requiring anyone who wants to access a "social media platform" to first verify their age via digitized identification. §1102(c)(2). The Supreme Court has held that identification requirements impose a burden, especially for individuals with "economic or other personal limitations." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198-99 (2008); *cf. Reno*, 521 U.S. at 856 (requiring age verification via credit card on Internet sites "would completely bar [access by] adults who do not have a credit card and lack the resources to obtain one").

51.     Conversely, the Act is underinclusive because it includes a slew of exemptions, undermining the state's contention that it is addressing a serious issue. *See Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546-47 (1993); *Brown*, 564 U.S. at 802. The law exempts from coverage any online companies that exclusively provide "interacting gaming" and related content even though numerous studies have documented cyberbullying among gamers. *See*

24

*One in Two Young Online Gamers Bullied, Report Finds*, BBC (May 31, 2017), https://bbc.in/3Lw6bKl.  It appears to exclude online services like YouTube, Discord, Mastadon, BeReel, Gab, Truth Social, Imgur, Brainly, DeviantArt, and Twitch, even though minors presumably may come across virtually indistinguishable material on those services (and even though Twitch, TikTok, Twitter, Snapchat, Instagram, and YouTube are all among the most popular services with teens).  And the state is willing to let minors sign up for any online service that provides this supposedly harmful material "so long as one parent … says it's ok."  *Brown*, 564 U.S. at 802.  "That is not how one addresses a serious social problem."  *Id.*

52.     In sum, S.B. 396 warrants strict scrutiny because it imposes content-, speaker-, and viewpoint-based restrictions on speech and association protected by the First Amendment.  But the Act cannot pass even intermediate scrutiny, as it is not supported by a substantial governmental interest and, in any event, is wildly over- and underinclusive in relation to any interests the state could plausibly assert.  S.B. 396 violates the First Amendment.

## COUNT TWO
## Unconstitutional Vagueness
## (42 U.S.C. §1983)

53.     NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

54.     "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Fox*, 567 U.S. at 253-54.  After all, vague laws

risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

55.     S.B. 396 fails to provide a person of ordinary intelligence with fair notice of what is prohibited.  The Act defines "social media company" as "an online forum that a company makes available for an account holder" to "[c]reate a public profile, establish an account, or register as a user *for the primary purpose* of interacting socially with other profiles and accounts," "[u]pload or create posts or content," "[v]iew posts or content of other account holders," and "[i]nteract with other account holders or users, including without limitation establishing mutual connections through request and acceptance." §1101(7)(A) (emphasis added).  That definition is hopelessly vague.  The statute does not define the phrase "primary purpose" or provide even minimal guidelines about what it is supposed to mean, leaving numerous companies to choose between risking unpredictable and arbitrary enforcement (backed by civil penalties and attorneys' fees and potential criminal sanctions to boot) and trying to implement S.B. 396's onerous requirements.  Does a music service like Spotify or Pandora qualify?  While many people use those services primarily to listen to music, others use them primarily to share music with others.  What about Pinterest?  While some people create Pinterest accounts to "interact[] socially with other profiles," others create Pinterest accounts just to browse content on the site without ever interacting with anyone.  Similarly, some people create Nextdoor accounts to "interact[] socially" with other users, while others create accounts to stay abreast of the happenings in their neighborhood without ever interacting with another user.

56.     Other provisions of the law are similarly vague.  The law exempts a "[m]edia

company that exclusively offers subscription content in which users follow or subscribe unilaterally and whose platforms' *primary purpose* is not social interaction," but a "[s]ocial media company that allows a user to generate short video clips of dancing, voiceovers, or other acts of entertainment in which *the primary purpose* is not educational or informative does not meet" that exclusion.  §1101(7)(B)(i)-(ii) (emphasis added).  Here, too, the statute does not define the phrase "primary purpose," leaving companies to guess what it means.  After all, "video clips of dancing" can be both "educational" and entertaining in a way that encourages "social interaction."  It is unclear how a company is supposed to know whether the primary purpose of user-generated content is educational or something else.  And that is especially true as "social media platforms" evolve over time.

57.    Likewise, the statute defines "social media platform" to mean an "internet-based service or application … [o]n which a *substantial function* of the service or application is to connect users in order to allow users to interact socially with each other within the service or application," and it excludes from that definition services, websites, and applications in which "the *predominant* or exclusive function is" email, direct messaging, and the like.  §1101(8)(A)-(B) (emphasis added).  Again, the statute does not define the phrase "substantial function" or "predominant … function," leaving companies unsure whether their online services are covered by the law's demands.  For example, many services allow users to send direct, private messages consisting of text, photos, or videos, but also offer other features that allow users to make content that anyone can view.  S.B. 396 provides no guidance on how to determine which function is "predominant," leaving services to guess as to whether they are regulated.  This is not the "narrow specificity" that the Constitution requires of government regulations that restrict speech.  *Cf. Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012) (invalidating speech-restricting law

because it did not "provide fair notice of what constitutes a violation").

## COUNT THREE
### Preemption
### (42 U.S.C. §1983)

58.     NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

59.     The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §6501 *et seq.*, regulates online services' collection and use of personal information from children.  COPPA defines a "child" as an "individual under the age of 13."  15 U.S.C. §§ 6501(1).  The Federal Trade Commission ("FTC") has authority to enforce COPPA and has promulgated regulations implementing it.  *See* 16 C.F.R. §312.1 *et seq.*

60.     COPPA makes it "unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed" by the FTC.  15 U.S.C. §6502(a)(1).  These regulations generally require a website operator "to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children."  16 C.F.R. §312.5(a).  But the regulations also enumerate several circumstances in which a child's or parent's personal information may be collected and used without parental consent.  *See id.* §312.5(c).

61.     COPPA expressly precludes any state from "impos[ing] any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in [COPPA] that is inconsistent with the treatment of those activities or actions under" §6502 and the FTC regulations promulgated under it.  15 U.S.C. §6502(d).

62.     S.B. 396's imposition of liability for "retain[ing] any identifying information" about any "individual after access to [a] social media platform has been granted," §1104, squarely

conflicts with COPPA's statutory and regulatory "treatment of those [same] activities," 15 U.S.C. §6502(d). COPPA expressly *permits* website operators to retain "personal information from children" if they first "obtain verifiable parental consent," 16 C.F.R. §312.5(a), but S.B. 396 imposes liability for retaining such information even if there is consent, *see* §1104. COPPA also permits website operators to retain children's personal information for certain enumerated purposes *without* parental consent. *See* 16 C.F.R. §312.5(c)(1)-(8). For example, parental consent is not required if an online service collects certain information from children to "[p]rotect the security or integrity of its Web site or online service," "take precautions against liability," "[r]espond to judicial process," or, under certain circumstances, "provide information to law enforcement agencies." *Id.* §312.5(c)(6). In addition, an online service may collect a form of "individually identifiable information" known as a "persistent identifier"—*e.g.*, "a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier," any of which "can be used to recognize a user over time and across different Web sites or online services"—without parental consent, so long as the information "is used for the sole purpose of providing support for [the online service's] internal operations." *Id.* §§312.2, 312.5(c)(7).

63. Because S.B. 396's prohibition on "retain[ing] any identifying information" about individuals (including children) squarely conflicts with the COPPA scheme, it is expressly preempted under §6502(d).

## COUNT FOUR
### Unconstitutional Extraterritorial Regulation
### (42 U.S.C. §1983)

64. NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

29

65.     The Constitution restricts the power of states to directly regulate conduct that takes place entirely in another state.  That bedrock principle of equal sovereignty among the states is inherent in the plan of the Constitutional Convention, embedded in several of the Constitution's structural protections, and deeply rooted in our nation's historical tradition.  *See Nat'l Pork Producers Council v. Ross*, 143 S.Ct. 1142, 1157 & n.1 (2023); *id.* at 1175 (Kavanaugh, J., concurring in part and dissenting in part).

66.     To be sure, the Supreme Court recently clarified that "dormant commerce clause" principles do not erect a per se bar against laws that regulate conduct *within* one state in ways that have an "extraterritorial *effect*" in others.  *Id.* at 1155 (majority opinion) (emphasis added).  But in doing so, the Court went out of its way to emphasize that it was not dealing with a law that "*directly* regulated out-of-state transactions."  *Id.* at 1157 n.1.  And it emphasized the importance of looking to "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces" when it comes to laws "testing the territorial limits of state authority under the Constitution's horizontal separation of powers" in that manner.  *Id.* at *1156-57 & n.1.

67.     Those principles make clear that a state may not directly regulate conduct that neither occurs nor is directed within its borders.  After all, it is axiomatic that "all States enjoy equal sovereignty."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013).  Indeed, "the constitutional equality of the states is essential to the harmonious operation of the scheme upon which the Republic was organized."  *Coyle v. Smith*, 221 U.S. 559, 580 (1911).  When a state reaches beyond its own borders to "directly regulate[] out-of-state transactions by those with no connection to the State," *Ross*, 143 S.Ct. at 1157  (emphasis omitted), it invades the sovereignty and impinges on the equality of other states.  Accordingly, the plan of the Convention necessarily bars one state

from directly regulating conduct that neither occurs nor is directed within its borders, as a union of several *equal* states subject to the overarching regulation only of one federal sovereign could not succeed if each state could trump the others' sovereign powers whenever and however it saw fit. *Cf. PennEast Pipeline Co. v. New Jersey,* 141 S.Ct. 2244, 2259 (2021); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction.").

68.     Consistent with that understanding, several provisions of the Constitution impose or presuppose limits on the ability of one state to override the regulatory powers of another. *See, e.g.*, U.S. Const. art. I, §10; art. IV, §1; art. IV §2, cl. 1; art. IV, §3, cl. 1; art. IV, §4; U.S. Const. amend. X.  And consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," the Supreme Court has held that the Commerce Clause (U.S. Const. art. I, §8, cl. 3) prohibits any state from "control[ling] commerce occurring wholly outside [its] boundaries." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989) (footnote omitted); *see also, e.g.*, *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982).

69.     S.B. 396 violates that bedrock constitutional constraint insofar as it can be read to regulate online services everywhere.  While some aspects of the law contain language endeavoring to limit its extraterritorial application, *see* §§1101(2), 1102(a)-(b) (limiting parental-consent requirements to Arkansas residents who "us[e] an Arkansas internet protocol address" or are "otherwise known or believed to be in this state while using the social media platform"), other

provisions lack such language, *see* §1102(c) (vague language that risks being misunderstood as requiring "age verification" even for those outside Arkansas), §1104 (broad language that could be read as prohibiting information retention without any connection to Arkansas). Therefore, S.B. 396 could potentially be construed to regulate commercial and speech-related activities that occur wholly outside Arkansas, such as by forbidding an Internet service based in California to from retaining identifying information of users in New York.

70.     Multiple courts have struck down state efforts to regulate the Internet on the ground that they regulate conduct wholly beyond the state's borders. *See, e.g.*, *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1152 (10th Cir. 1999); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99-104 (2d Cir. 2003); *Backpage.com, LLC v. McKenna*, 881 F.Supp.2d 1262, 1285-86 (W.D. Wash. 2012); *Am. Libraries Ass'n v. Pataki*, 969 F.Supp. 160, 169 (S.D.N.Y. 1997). There is no reason for a different outcome here.

71.     S.B. 396 also violates the Commerce Clause under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), and its progeny because the law imposes an unreasonable and undue burden on interstate commerce that is clearly excessive in relation to any local benefit conferred on Arkansas. As explained, S.B. 396 risks being construed in a manner that would burden interstate commerce by limiting the types of services available within and across the United States. Arkansas' generalized interest in protecting minors from potential harm is patently insufficient to justify these onerous impositions on interstate commerce. Even if that generalized interest were deemed sufficiently local, moreover, S.B. 396's drastic impositions on interstate and online commerce far outweigh anything that S.B. 396's patchwork of content-, speaker-, and viewpoint-based regulations might do to further that interest.

### PRAYER FOR RELIEF

NetChoice prays for the following relief from the Court:

1.     A declaration, pursuant to 28 U.S.C. §2202, that S.B. 396 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to NetChoice and its members.

2.     A preliminary injunction enjoining Attorney General Griffin, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing or otherwise bringing suit against NetChoice and its members under S.B. 396.

3.     A permanent injunction enjoining Attorney General Griffin, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing or otherwise bringing suit against NetChoice and its members under S.B. 396.

4.     Such costs and reasonable attorneys' fees to which NetChoice may be entitled by law, including under 42 U.S.C. §1988.

5.     Any further relief Court deems just and proper.

Respectfully submitted,

*Katherine Campbell*

Marshall S. Ney, Ark. Bar No. 91108
Katherine C. Campbell, Ark. Bar No. 2013241
FRIDAY, ELDREDGE & CLARK, LLP
3350 South Pinnacle Hills Pkwy., Suite 301
Rogers, AR 72758
(479) 695-6049
mney@fridayfirm.com
kcampbell@fridayfirm.com

AND

Paul D. Clement*
Erin E. Murphy*
James Y. Xi*
Joseph J. DeMott*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com
*pro hac vice application forthcoming