# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| NETCHOICE, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>TIM GRIFFIN, in his official capacity as Attorney General of Arkansas,<br><br>*Defendant*. | Civil Action No. 5:23-cv-05105-TLB |

**DECLARATION OF CARL SZABO IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

I, Carl Szabo, declare as follows:

1. I am the Vice President and General Counsel of NetChoice, LLC. I submit this declaration in support of NetChoice's Motion for a Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

2. In addition to providing legal counsel to NetChoice, I coordinate NetChoice's advocacy before legislative bodies, courts, and government agencies to promote NetChoice's mission of advancing free enterprise and free expression on the Internet.

3. NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and "engages at the local, state, national, and international levels

1

to ensure a bright digital future."[1]  In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas.  When adults and teens are free to use online services without government-enacted restrictions, the public discourse is enriched.  And the absence of such restrictions leaves parents free to choose whether, when, and how their teens use online services such as Facebook, Snapchat, Twitter, and Tiktok.  All in all, NetChoice strongly believes in giving Americans choices in how they use the Internet.

4.      For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers.  Our members span a broad array of companies that offer popular online services, including but not limited to: Amazon, AOL, eBay, Etsy, Expedia, Facebook, Instagram, Nextdoor, Lyft, Pinterest, Snap, TikTok, and Twitter.[2]

5.      Although it is difficult to know with certainty which companies Senate Bill 396 regulates given its confusing structure and vague terminology, several NetChoice members appear to be regulated.  Some appear to meet the Act's definition of "social media company" because they provide online forums on which individuals may (i) create a public profile, establish an account, or register as a user for the purpose of interacting socially with other account holders, (ii) upload or create posts or content, (iii) view posts or content of others, and (iv) interact with other users, including by establishing connections through request and acceptance.  *See* S.B. 396, §4-88-1101(7)(A). And some of the online services these NetChoice members offer appear to meet the Act's definition of "social media platform" because they are public or semipublic Internet-based

---

[1] Home, NetChoice, https://perma.cc/3NPH-KH2T.
[2] About Us, NetChoice, https://perma.cc/4NPV-PLU7.

services (i) that have users in Arkansas, and (ii) on which a substantial function of the service is to connect users to each other socially. *See* S.B. 396, §4-88-1101(8)(A). Moreover, many of these NetChoice members do not appear to fall under the Act's exceptions, which are set forth in §4-88-1101(7)(B) (for "social media companies") and §4-88-1101(8)(B)-(C) (for "social media platforms"). Further, Arkansas legislators responsible for S.B. 396 have stated publicly that the Act is meant to apply to at least some NetChoice members. *See, e.g.*, Jess Weatherbed, New Arkansas Bill to Keep Minors Off Social Media Exempts Most Social Media Platforms, The Verge (Apr. 13, 2023) (quoting statement by State Senator Tyler Dees). Thus, NetChoice members risk facing liability under the Act, should it take effect. Several NetChoice members have submitted declarations attesting to the irreparable harms they will suffer if the Act is allowed to go into effect.

6. Minors regularly use online services, including those operated by NetChoice members, to engage in a wide variety of speech-related activities. Many minors use online services to read the news, connect with friends, explore new interests, and follow their favorite sports teams and their dream colleges. Some minors use online services to showcase their creative talents to others, including their artwork, photography, writing, or other forms of creative expression. Other minors use online services to raise awareness about social causes and to participate in public discussion on the hottest topics of the day. Still others use online services to build communities and connect with people who share similar interests or experiences, which is particularly helpful for minors who feel isolated or are seeking support from others who understand their experiences. If the Act is allowed to go into effect, it will burden or eliminate the ability of many minors to engage in certain types of speech and access certain types of information by making it difficult or impossible for them to sign up for widely used online services.

7. NetChoice members actively implement measures to protect children who use their

online services. Members restrict sexual content, harassment, and bullying. Many members place age restrictions on who is able to create an account. Several use "age gating" to ensure that users are only able to view age-appropriate content. NetChoice members also provide tools parents can use to manage the time their children spend on their services, the content that they see, and the people with whom they interact. For example, Instagram's "supervision tools" allow parents to see how much time their teens spend on Instagram, set time limits and scheduled breaks, receive updates on what accounts their teens follow and the accounts that follow their teens, and receive notifications if a change is made to their teens' settings. TikTok has a "family pairing" feature that lets parents monitor screen time, restrict time spent on the app, and adjust settings. And Snapchat's "family center" allows parents to monitor who their teens befriend and communicate with.

8. In addition to restricting the speech of minors, the Act would also burden the speech of adults. Adults will be required to provide "age verification"—e.g., "a digital copy of a driver's license" or other "[g]overnment-issued identification," §4-88-1102(c)(2)—before creating an account on a covered online service. *See* §4-88-1102(c)(1).

9. Whether it is to discuss their religious and political beliefs, engage in cross-cultural dialogue, or learn new skills, adults regularly use these online services as a vital source of information and means of communication. On Facebook, adults associate and assemble with like-minded individuals for countless purposes, including by taking part in religious services. On Twitter, adults can directly engage with their elected representatives, including by watching a politician launch a presidential campaign. On Pinterest, users can discover ideas for recipes, style, home decor, and more. On TikTok, users going through a difficult experience can find advice, support, and empathy. *See, e.g.*, Kate Wells, On #dementia TikTok, Family Caregivers Find Support and Bring the Disease to Light, NPR (Oct. 11, 2022), https://archive.ph/wip/CyqMJ. On

4

Snapchat, users can communicate with friends and family in fun and casual ways. And on Nextdoor, users can connect with neighbors, share local news, and borrow tools. The Act, should it take effect, would burden adult access to ubiquitous online services through age-verification requirements and would completely bar access by adults who lack digitized identification.

10. NetChoice has over two decades of experience advocating for online businesses and the principles of free speech and free enterprise on the Internet, so we are intimately familiar with the business models our members use and rely on to provide services to users and advertisers alike. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that the Act, should it take effect, would irreparably harm our members and their business models by repelling both adult and non-adult users. This could lead advertisers—the main source of revenue for many online services—to reduce or curtail their spending on advertisements on these websites.

11. If the Act takes effect on September 1, 2023, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially impaired.

12. Additionally, many of NetChoice's members will face significant difficulty in implementing the Act's provisions, hindering their business interests. Implementing the age-verification and parental-consent requirements, as well as its restrictions on information retention, will be costly for members. And the vagueness of the law's provisions will make it difficult for members to determine whether the requirements apply to them in the first place and exactly what compliance entails. For example, the Act is unclear as to whether minors who hold an existing "social media" account prior to the law's September 1, 2023 effective date must obtain parental consent, as §4-88-1102(a) suggests, or whether the parental-consent requirement is limited to "new account holder[s]," as §4-88-1102(b) suggests. There is also ambiguity about the extent to which

the law purports to apply outside of Arkansas. *Compare* §4-88-1102(a), (b)(2) (limiting regulation to "Arkansas user[s]"), *with* §4-88-1102(b)(1), (c) (containing no such limitation). In addition, the text of §4-88-1104 is so broad that it could potentially be construed as prohibiting online services' longstanding, common-sense practice of requiring everyone who signs up for an account to provide their first and last name and either a valid email address or a phone number (although other parts of the Act counsel against such a broad reading). These ambiguities in the Act compound the difficulty and expense of efforts to comply with it.

13. In short, NetChoice members would incur substantial, unrecoverable costs in complying with S.B. 396's burdensome requirements. These costs could not be recouped if NetChoice's challenge to the law is ultimately successful on the merits.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing to be true and correct to the best of my knowledge. Executed on July 6, 2023 in Washington, DC.

_____

Carl Szabo