# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**NETCHOICE, LLC**                                                                                          **PLAINTIFF**

v.                              **CASE NO. 5:23-CV-05105-TLB**

**TIM GRIFFIN, in his Official Capacity**
**as Attorney General of Arkansas**                                                                **DEFENDANT**

**NEXTDOOR DECLARATION IN SUPPORT OF**
**PRE-ENFORCEMENT CHALLENGE TO ARKANSAS SENATE BILL 396**

I, Justyn Harriman, hereby declare as follows:

1. I am over 18 years of age and am competent in all respects to make this Declaration. I possess personal, firsthand knowledge of the assertions made herein.

**Background information on Nextdoor & Nextdoor Users**

2. I serve as the Senior Engineering Manager for Trust & Safety and Verification at Nextdoor. I have worked at Nextdoor for nearly 8 years, and founded the fraud, misinformation, and safety framework at Nextdoor. I oversee Nextdoor's verification framework, including the testing and implementation of new verification methods. I also have experience launching multiple new international markets for Nextdoor.

3. Nextdoor operates www.nextdoor.com and the Nextdoor app, a platform where neighbors around the world turn daily to receive trusted information, give and get help, get things done, and build real-world connections with those nearby — neighbors, businesses, and public services. By fostering these connections, both online and in the real world, Nextdoor builds stronger, more vibrant, and more resilient neighborhoods. Today, over 80 million verified users (hereafter, "users") rely on Nextdoor in more than

305,000 neighborhoods across 11 countries. In the US, 1 in 3 households uses the network. Nextdoor is in 26% of households in Arkansas.

4. On Nextdoor, users are placed in a neighborhood based on their address and automatically receive updates from nearby neighbors, businesses, and public services.

5. Since Nextdoor launched in 2011, Nextdoor has required individuals to register with and use their real names and addresses on the platform to foster mutual accountability and ensure that connections and conversations are authentic.

**Steps Nextdoor takes to Foster a Positive On-Platform Experience**

6. Nextdoor verifies that each individual signing up on Nextdoor is a real person (as opposed to an Internet "bot") with a tie to a real address. More specifically, Nextdoor verifies individuals and businesses based on a number of signals, including device location and third-party data vendors. If Nextdoor cannot verify an individual or business and they cannot be verified with a phone call or text, additional verification steps are taken. An individual may be verified using a postcard (mailed by Nextdoor to the individual's address, which includes a code for the user to input). Alternatively, individuals may remain unverified (hereafter, "unverified users"), with limited functionality.

7. Nextdoor is committed to developing leading-edge product technology that facilitates constructive neighborhood connections and conversations, and a safe experience for users online. Our active in-product features include:

   a. Kind Neighbor Pledge: Upon joining Nextdoor, all users must agree to our Kind Neighbor Pledge, which is a commitment to be helpful, treat everyone in the

Nextdoor community with respect, and to do no harm. It's an opportunity to establish norms and expectations for our platform, and encourage prosocial behavior.

b. Kindness Reminder: The Kindness Reminder appears when a user drafts and attempts to publish a post that may violate Nextdoor's Community Guidelines. The tool automatically detects potentially offensive language that may violate Nextdoor's Community Guidelines and encourages the author to edit their content before they publish. It was the first of our core product features to introduce moments of friction aimed at slowing people down and combating bias. In 2022, users who received the reminder edited or withheld their post 36% of the time (up from 35% in 2021).

c. Feed Choice: Nextdoor provides users with the option to view their feeds in reverse chronological order (sorted by recent activity or posts) rather than curated by feed-ranking technology.

8. Nextdoor sets clear Community Guidelines that are designed to keep interactions on the platform safe and productive. These guidelines help promote thoughtful conversations and explicitly forbid racism, discrimination, misinformation, and other types of harmful content.

9. There are three main categories of guideline-violating content:

a. **Harmful**: Content that Nextdoor considers fraudulent or unsafe, e.g., violent or graphic, or illegal content.

b. **Hurtful**: Content that users consider uncivil, e.g., insults, rudeness, name-calling.

    c. **Other:** Non-local content, spam, content posted in error.

10. Efforts to address guideline-violating content include:

    a. Tools to automatically detect and report harmful content.

    b. Product features that enable users to report guideline-violating content.

    c. Volunteer community moderators who monitor community discussions and help keep dialogue on the platform civil.

    d. Our internal Neighborhood Operations Team of trained specialists who review content and accounts that have been flagged and take appropriate action to support the neighbors involved.

11. We work regularly with leading experts including our Neighborhood Vitality Advisory Board[1] to refine our Community Guidelines, iterate on our features and tools, and develop strategic research teams that further our work to create and maintain a welcoming platform.

12. Our annual transparency report discusses metrics around reported content from the year prior. In our recent report, published in February 2023[2], we disclose that in 2022:

    a. The subset of content reported for being harmful was reduced to 0.2% of total user-generated content, a 35% reduction from 2021.

    b. Nextdoor made only 1 cybertip report of suspected child sexual abuse material to National Center for Missing and Exploited Children.

---

[1] <https://about.nextdoor.com/advisory-boards/#vitality>

[2] <https://help.nextdoor.com/s/article/Nextdoor-Transparency-Report-2022?language=en_US>

    c. Nextdoor's 210,900 volunteer community moderators reviewed 92% of all reported content (1.7% of all pieces of content), and removed 57% of reported content in a median time of 5.1 hours. The remaining reported content was reviewed by paid Nextdoor Operations staff or automatically removed.

**Teenagers on Nextdoor**

13. Nextdoor's Member Agreement requires minors to be 13 years old or older in the United States to join Nextdoor.[3]

14. Nextdoor estimates that approximately 99% of its users are legal adults. Further, only approximately 1% of its users are between the ages of 13 and 17, and less than 10% are under 25 years of age. In contrast, Nextdoor estimates that approximately 40% or more of Nextdoor users are 55 and over.

15. The overarching utility offered by Nextdoor does not, by nature, appeal to minors. Nextdoor lacks games, cartoonish elements, child-oriented music or activities, child celebrities or celebrities who appeal to children, and is not advertised to children. It is used overwhelmingly by legal adults who are looking to connect with other nearby residents. Nevertheless, Nextdoor has observed teenagers engage on Nextdoor to seek or offer after-school or summer jobs. For example, teenagers on Nextdoor have sought dog-walking or cat sitting, selling crafts, gardening, snow shoveling, tutoring, babysitting, and

---

[3] <https://help.nextdoor.com/s/article/Nextdoor-Member-Agreement?language=en_US>

offering technical computer assistance to neighbors, including a class on how to use the latest generative Artificial Intelligence technology.

**Challenges of Arkansas Senate Bill 396**

*Cost of Document-based Verification*

16. While Nextdoor has not attempted to require identity-based age verification, Nextdoor does use identity-based verification in two other circumstances. Both circumstances place a significant burden on Nextdoor and its users.

17. First, Nextdoor, per its Community Guidelines, requires users to use their real name and address on the platform. On occasion, users have been reported for using either a different name than their real name, or as not residing in the Neighborhood to which they belong on platform.

18. When a user is reported for one of these reasons, the user is suspended and may be required to submit to Nextdoor identity documentation showing their real name/address. Nextdoor Support agents review the user's identity documentation and, if needed, help the user update their name/address before unsuspending the user.

19. These reports are relatively rare. However, if Nextdoor Support agents were required to process identity documentation, for every new Arkansas user, Support agent costs would increase by approximately $100,000-200,000 per year (assuming no growth in the number of Arkansas users joining).

20. Second, Nextdoor offers *business* verification to users who have claimed business pages. From 2020-2022, in order to be a verified business, the business operator needed to contact Nextdoor using a phone number or email address that matched an external

database, or submit documentation showing the existence of the business and its address (such as a business permit, tax notice, or bank statement). Verified businesses benefited from increased ability to post to neighborhoods and badging on the platform to indicate the business was verified, and other features.

21. During this time period, only 7% of claimed businesses obtained verification, approximately 77% of whom did so through documentation.

22. Because businesses are public-facing entities with the potential to earn revenue from engaging on Nextdoor, we would expect fewer businesses to have concerns, such as privacy concerns, about submitting documentation for verification purposes, as compared to individual consumers. Further, because verification helps protect businesses against false claims by others on their business pages, and verified businesses gained additional features unavailable to unverified businesses, such as the ability to offer gift cards, we would expect that business operators had motivation to verify their businesses. Nevertheless, we found that requiring documentation or matching to an external database presented a substantial barrier to businesses and prevented many businesses from becoming verified.

23. In 2022, based on considerations of these barriers, Nextdoor attempted to simplify and automate the verification process, introducing a tiered verification process. This updated process allowed many businesses to access some additional features through an automated risk assessment process similar to the process Nextdoor uses for individuals. By taking these measures, including reducing document-based verification, Nextdoor saw a 10-fold increase in successful business verification.

24. Nextdoor still processes document-based verification for some businesses at a cost of approximately $2.50 per case.

25. Third party verification of documents has been even less successful. In 2020, Nextdoor attempted an experiment in Europe by which it offered individual verification through a third party using a utility bill. For individuals unable to verify by phone, Nextdoor gave the individual the option of submitting a utility bill to be matched by a third party vendor. Unfortunately, less than 1% of additional individuals verified using this method, and Nextdoor discontinued the experiment.

*Experiments and Challenges with Collecting Age*

26. Nextdoor conducted testing and found that users are reluctant to provide their date of birth; in fact, only 10-20% of users were willing to share their date of birth on a voluntary basis.

27. If date of birth were required from prospective users, we would expect a significant number of prospective users to decline to join the platform. If date of birth were required from current users, we would expect a significant number of users to be unable or unwilling to provide it in order to continue on the platform.

28. Further, if verification of date of birth using government identification were required, we would expect even higher numbers of prospective and current users to decline to join the platform or be unable or unwilling to provide government identification, for a number of reasons.

8

a. First, privacy- and security-conscious individuals are likely to consider government ID to be a more sensitive piece of information than simply date of birth.

b. Second, it is far more cumbersome to provide a photo of a government ID than to enter in a date of birth. Most people know their own birth dates from memory, but not everyone carries IDs around constantly. If an ID is not within easy reach, an individual may find verification too much work to continue. Further, collecting ID from users using a desktop Web (more than half of new Nextdoor users) presents a unique challenge: many desktop users do not have webcams attached to their computers and would not have an easy way to capture a government ID, even if it was within easy reach. And even if a prospective or current user does have ID within reach and is on a mobile device, the prospective or current user may be in a location where they do not feel comfortable pulling out and setting down their ID to photograph, such as on a public street.

29. If verification by a third party were required, then the number of prospective and current users willing and able to verify date of birth to join Nextdoor could further be reduced. Prospective users who are unfamiliar with Nextdoor and have yet to experience its value proposition may be unwilling to submit identity verification documentation just to try out the platform. Further, prospective and current users who trust Nextdoor with their information may be unwilling to trust an unfamiliar third party. Submission to a third party system is an added layer of integration, which could lead to additional user

9

frustration. If there were an error or other problem, Nextdoor Support agents may not directly have the information to help the user resolve the issue.

*Time & Cost Associated with Implementing the Verification Process Described in SB 396*

30. Should the Arkansas law go into effect and apply to Nextdoor, Nextdoor would suffer immediate and irreparable harm to its business.

31. *Time:* It would take Nextdoor at least six months of work to implement a third-party verification process. Nextdoor would be unable to implement this by the September 1, 2023, effective date.

32. *Cost*

   a. Nextdoor has thus far developed an effective verification system that balances trust with friction and cost of onboarding new users.

   b. Nextdoor has researched partnering with a third party for ID-verification, and received information from the third party that the cost per user verification would increase by up to 3000% (from $0.03-0.05 per user registration attempt to between $0.75-1.50 per user registration attempt).

   c. In Nextdoor's Shareholder Letter for Q1 2023, Nextdoor disclosed that its global average revenue per weekly active user was $1.17.

   d. A smaller and still growing platform like Nextdoor has less revenue per user and is less able to take advantage of economies of scale. Age verification is likely to be far more costly for Nextdoor versus a bigger mature platform, both on a relative and an absolute basis.

  e. If Nextdoor were required to use a third-party verification system to verify the ages of all Arkansas-based users, the per-user costs of implementing and maintaining such a system would significantly impact our per user profitability.

33. State-by-state regulations, like SB 396, only compound the implementation costs listed above.

34. Based on Nextdoor's experiences with document-based verification, third party verification, and age data collection, it expects the percentage of users able and willing to complete Arkansas mandated third-party verification process to be dismally low, so low that Arkansas may be an unviable market for two reasons.

  a. One, the above-listed costs would dwarf possible revenue on a per-user basis, making the Arkansas market as a whole cost-prohibitive.

  b. Two, Nextdoor thrives on local neighbors interacting on the platform, posting information such as local events, sharing recommendations for the best plumber, or helping each other find an escaped pet or lost keys. If a large percentage of locals do not join the platform because of the difficulties imposed by third party verification, the synergy that powers this positive ecosystem is lost, depleting the usefulness and attraction of the platform for all users.

*Access to Nextdoor's Visitor Website*

35. Starting in 2020, Nextdoor permitted users to make some content visible off platform to unregistered users (hereafter, "visitors") and unverified users. However, in

order to engage with the content or with other neighbors, unverified users or visitors must register, login with Nextdoor, and pass verification. Visitors have only limited ability to read some content, including some posts, such as recommendations for local businesses or an announcement about an art festival in the park, and to see some information about features available in their neighborhood, such as the existence of an "Avid Gardeners" group. The interface for persons who are not logged into Nextdoor (hereinafter "Visitor Website") does not show the full names of posters, and does not include any mechanism for unverified users and visitors to communicate with each other or users. In this respect, the Visitor Website is more similar to a static, rather than interactive, website. Similarly unverified users have access to only limited features rather than the full suite of interactivity.

36. The Arkansas law is unclear as to how it would apply to visitors. As a whole, a substantial function of Nextdoor is to connect users in order to allow those users to interact socially with each other within Nextdoor. However, connection and interaction are not functions of the Visitor Website. It is thus unclear whether Nextdoor's Visitor Website qualifies as a "social media platform" and whether the Arkansas law would obligate Nextdoor to verify the age of all visitors to the Visitor Website.

37. Verifying the age of all visitors of the Visitor Website would be impossible. First, while Nextdoor collects addresses for registered account holders, and therefore knows which account holders declared themselves to be residents of Arkansas, Nextdoor cannot know where unlogged-in visitors are located.

38.   While IP addresses can be used as a proxy for approximating geographic location, it is an imperfect proxy and by no means 100% accurate. Nevertheless, if the Arkansas law were to apply to Nextdoor's Visitor Website, the only method with which Nextdoor could attempt to comply would be to block IP addresses estimated to be geolocated in Arkansas from accessing the Visitor Website entirely.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this \_1st\_ day of \_July\_, 2023.

_____
Justyn Harriman

13