**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

| | |
|---|---|
| NETCHOICE, LLC,<br><br>       *Plaintiff*,<br><br>       v.<br><br>TIM GRIFFIN, in his official capacity as<br>Attorney General of Arkansas,<br><br>       *Defendant*. | Civil Action No. 5:23-cv-05105-TLB<br><br>**MEMORANDUM IN SUPPORT OF<br>MOTION FOR PRELIMINARY<br>INJUNCTION** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.    Adults And Minors Alike Engage in First Amendment Activity on Online Services Covered by the Act. ............................................................... 3

    B.    Government Attempts to Decree What Minors Can Hear or See Have Almost Always Been Struck Down. ................................................. 4

    C.    Parents Already Have Many Ways to Control What Their Children See on the Internet. ....................................................................................... 7

    D.    Arkansas Enacts S.B. 396. ............................................................... 12

ARGUMENT .......................................................................................................... 15

I.    NetChoice Is Likely To Succeed On Its First Amendment Claim. ................... 16

    A.    S.B. 396 Triggers Strict Scrutiny Multiple Times Over. ...................... 16

        1.    S.B. 396 restricts a breathtaking amount of core First Amendment activity. ............................................................................. 16

        2.    S.B. 396 restricts speech based on content, speaker, and viewpoint. ....... 23

    B.    S.B. 396 Cannot Survive Any Level of Heightened Scrutiny, Let Alone Strict Scrutiny. .............................................................................. 29

II.    NetChoice Is Likely To Succeed On Its Claim That S.B. 396 Is Unconstitutionally Vague. ............................................................................................................. 34

III.    The Other Preliminary Injunction Factors Overwhelmingly Support Maintaining The Status Quo. ...................................................................................... 37

CONCLUSION ....................................................................................................... 38

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta,*
  141 S.Ct. 2373 (2021) ................................................................................... 29

*Ark. Writers' Project, Inc. v. Ragland,*
  481 U.S. 221 (1987) ...................................................................................... 27

*Ashcroft v. Am. Civil Liberties Union,*
  542 U.S. 656 (2004) .............................................................................. *passim*

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ...................................................................................... 35

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
  140 S.Ct. 2335 (2020) .............................................................................. 24, 25

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus,*
  482 U.S. 569 (1987) ...................................................................................... 22

*Brandt ex rel. Brandt v. Rutledge,*
  47 F.4th 661 (8th Cir. 2022) ......................................................................... 38

*Brandt v. Rutledge,*
  551 F.Supp.3d 882, 892 (E.D. Ark. 2021) .................................................. 38

*Brown v. Entm't Merchants Ass'n,*
  564 U.S. 786 (2011) .............................................................................. *passim*

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
  508 U.S. 520 (1993) ...................................................................................... 31

*Citizens United v. FEC,*
  558 U.S. 310 (2010) .................................................................................. 26, 27

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  142 S.Ct. 1464 (2022) .............................................................................. 23, 24

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ...................................................................................... 29

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ...................................................................................... 22

*Elrod v. Burns,*
  427 U.S. 347 (1976) ................................................................................... 2, 37

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975) ............................................................................ *passim*

*FCC v. Fox TV Stations, Inc.*,
   567 U.S. 239 (2012) .................................................................................... 34

*FCC v. Pacifica Found.*,
   438 U.S. 726 (1978) .................................................................................... 20

*Gelling v. Texas*,
   343 U.S. 960 (1952) .................................................................................... 35

*Ginsberg v. New York*,
   390 U.S. 629 (1968) .................................................................................... 19

*Hispanic Interest Coal. of Ala. v. Governor of Ala.*,
   691 F.3d 1236, 1249 (11th Cir. 2012) ....................................................... 38

*Iancu v. Brunetti*,
   139 S.Ct. 2294 (2019) ................................................................................. 28

*Interactive Digital Software Ass'n v. St. Louis Cnty.*,
   329 F.3d 954 (8th Cir. 2003) ...................................................... 6, 21, 30, 32

*Interstate Circuit, Inc. v. City of Dallas*,
   390 U.S. 676 (1968) .............................................................................. 20, 35

*Johnson v. Minneapolis Park & Rec. Bd.*,
   729 F.3d 1094 (8th Cir. 2013) ............................................................... 15, 37

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952) .......................................................................... 5, 6, 20, 35

*Little Rock Family Planning Servs. v. Rutledge*,
   397 F.Supp.3d 1213, 1322 (E.D. Ark. 2019) ............................................ 38

*Mahanoy Area Sch. Dist. v. B.L.*,
   141 S.Ct. 2038 (2021) ................................................................................. 19

*McCullen v. Coakley*,
   573 U.S. 464 (2014) .................................................................................... 29

*Morse v. Frederick*,
   551 U.S. 393 (2007) .................................................................................... 19

*NAACP v. Button*,
   371 U.S. 415 (1963) .................................................................................... 35

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
  138 S.Ct. 2361 (2018) ............................................................................ 26, 31

*NetChoice, LLC v. Attorney General*,
  34 F.4th 1196 (11th Cir. 2022) .................................................................... 20

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ............................................................................ *passim*

*Phelps-Roper v. Nixon*,
  509 F.3d 480 (8th Cir. 2007) ..................................................................... 37, 38

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ............................................................................. 23, 24

*Reno v. Am. Civil Liberties Union*,
  521 U.S. 844 (1997) ............................................................................ *passim*

*Sable Commc'ns of Cal., Inc. v. FCC*,
  492 U.S. 115 (1989) ................................................................................. 20

*Shipley, Inc. v. Long*,
  454 F.Supp.2d 819 (E.D. Ark. 2004) .............................................................. 21

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ............................................................................. 26, 28

*Stahl v. City of St. Louis*,
  687 F.3d 1038 (8th Cir. 2012) ..................................................................... 37

*Superior Films, Inc. v. Dep't of Educ. of Ohio*,
  346 U.S. 587 (1954) ................................................................................. 35

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ................................................................................. 17

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994) ................................................................................. 26

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000) ........................................................................... *passim*

*United States v. Williams*,
  553 U.S. 285 (2008) ................................................................................. 34

*Video Software Dealers Ass'n v. Webster*,
  968 F.2d 684 (8th Cir. 1992) ..................................................................... 6, 21

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ................................................................................ 17

*Winters v. New York*,
  333 U.S. 507 (1948) ................................................................................ 35

**Statutes**

Ark. Code Ann. §4-88-103 ........................................................................ 15, 37

Ark. Code Ann. §4-88-1101(1) .................................................................. 14

Ark. Code Ann. §4-88-1101(7) .................................................................. 27

Ark. Code Ann. §4-88-1101(7)(A) ............................................ 13, 24, 29, 35

Ark. Code Ann. §4-88-1101(7)(B) ............................................................. *passim*

Ark. Code Ann. §4-88-1101(8)(A) ............................................... 14, 24, 36

Ark. Code Ann. §4-88-1101(8)(B) ............................................................. *passim*

Ark. Code Ann. §4-88-1101(8)(C) .............................................................. 27

Ark. Code Ann. §4-88-1102(a) .................................................................. 14

Ark. Code Ann. §4-88-1102(b)(1)-(2) ........................................................ 14

Ark. Code Ann. §4-88-1102(c)(1) .............................................................. 14

Ark. Code Ann. §4-88-1102(c)(2) .............................................................. 15, 22

Ark. Code Ann. §4-88-1103(b)(1) .............................................................. 37

Ark. Code Ann. §4-88-1103(b)(2) .............................................................. 15

Ark. Code Ann. §4-88-1103(c)(1) .............................................................. 15

Ark. Code Ann. §4-88-1103(d) ................................................................... 29

Ark. Code Ann. §4-88-1103(d)(1)-(2) ........................................................ 26

**Other Authorities**

Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch,
  https://archive.ph/T68VI (last visited June 27, 2023) ................................ 8

AT&T, Parental Controls, https://tinyurl.com/3ypvj7bv (last visited June 27, 2023) ................... 7

Cincinnati Bengals, Year 4 Awaits, Instagram (June 20, 2023),
    https://tinyurl.com/4f2np3dj .................................................................... 28

Cincinnati Bengals, Year 4 Awaits, TikTok (June 20, 2023),
    https://tinyurl.com/44m7rkr4 .................................................................... 28

Cincinnati Bengals, Year 4 Awaits, YouTube (June 20, 2023),
    https://tinyurl.com/y969z2pd ..................................................................... 28

Comcast Xfinity, Set Up Parental Controls for the Internet, https://tinyurl.com/5acdsnat
    (last visited June 27, 2023) ......................................................................... 7

Alexa Corse, Ron DeSantis to Launch 2024 Presidential Run in Twitter Talk with
    Elon Musk, Wall St. J. (May 23, 2023), https://tinyurl.com/484z3kfc .................... 16

Elizabeth Dias, Facebook's Next Target: The Religious Experience, N.Y. Times
    (July 25, 2021), https://tinyurl.com/2p8jfyfy ............................................... 16

Emily Dreibelbis, *Arkansas Limits Social Media Access for Kids Under 18, With
    One Major Exception*, PCMag (Apr. 13, 2023) ............................................... 28

Google Family Link, Help Keep Your Family Safer Online, https://tinyurl.com/mr4bnwpy
    (last visited June 27, 2023) ......................................................................... 8

Google, Safety Center (last visited June 16, 2023), https://tinyurl.com/kwkeej9z ........................ 9

Graphic 'Private Ryan' Not For Kids, Chicago Tribune (Aug. 6, 1998),
    https://tinyurl.com/44tf6jfr .......................................................................... 4

Daniel Howley, *Alphabet Misses on Earnings Expectations as Ad Revenue Falls*,
    Yahoo! (Feb. 2, 2023) ............................................................................... 28

H.R. Rep. No. 105-775 (1998) ............................................................................ 5

John Inazu, *Virtual Assembly*, 98 Cornell L. Rev. 1093 (2013) .................................. 16

Juvenile Delinquency (Television Programs): Hearings Before the Subcommittee to
    Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 83d Cong.,
    2d Sess. (1954) ........................................................................................ 5

Jin Kim, *The Institutionalization of YouTube: From User-Generated Content to
    Professionally Generated Content*, 34 Media, Culture & Society (2012) ................. 25

Microsoft, Getting Started with Microsoft Family Safety, https://tinyurl.com/yc6kyruh
    (last visited June 27, 2023) ......................................................................... 8

Microsoft, Learn More About Kids Mode in Microsoft Edge (last visited June 16, 2023),
    https://tinyurl.com/59wsev2k ....................................................................... 9

Irvin Molotsky, Hearing on Rock Lyrics, N.Y. Times (Sept. 10, 1985),
https://tinyurl.com/yrknwwf8 .............................................................................. 5

Ben Moore & Kim Key, The Best Parental Control Apps for Your Phone, PCMag
(Mar. 29, 2022), https://archive.ph/HzzfH ........................................................ 8

Mozilla, Block and Unblock Websites with Parental Controls on Firefox
(last visited June 16, 2023), https://tinyurl.com/6u6trm5y ................................ 9

In-Soo Nam, A Rising Addiction Among Youths: Smartphones, Wall St. J.
(July 23, 2013), https://tinyurl.com/535d42kw ................................................ 5

Netgear, Circle Smart Parental Controls, https://archive.ph/wip/0GbB5
(last visited June 27, 2023) ............................................................................... 8

One in Two Young Online Gamers Bullied, Report Finds, BBC (May 31, 2017),
https://bbc.in/3Lw6bKl ................................................................................... 32

Alvin Powell, Fight Over Huck Finn Continues: Ed School Professor Wages Battle
for Twain Classic, Harvard Gazette (Sept. 28, 2000), https://tinyurl.com/ye2xwphb ............... 4

Molly Price & Ry Crist, How to Set Up and Use Your Wi-Fi Router's Parental Controls,
CNET (Feb. 11, 2021), https://archive.ph/wip/uGaN2 ............................................ 7

William Siu, I Make Video Games. I Won't Let My Daughters Play Them, N.Y. Times
(Oct. 2, 2022), https://tinyurl.com/muakc2hh .................................................. 4

Social Media and Teens, American Academy of Child & Adolescent Psychiatry
(updated Mar. 2018), https://archive.ph/LOY12 ................................................ 4

Testimony of Dr. Frederic Wertham, Juvenile Delinquency (Comic Books), Hearings
Before the Subcommittee to Investigate Juvenile Delinquency, 83rd Cong.,
2d Sess. (1954) ................................................................................................. 5

T-Mobile, Family Controls and Privacy, https://tinyurl.com/57run7ac
(last visited June 27, 2023) ............................................................................... 7

James B. Twitchell, Preposterous Violence: Fables of Aggression in Modern Culture (1989) ..... 5

Verizon, Verizon Smart Family, https://tinyurl.com/ycyxy6x6 (last visited June 27, 2023) ......... 7

Jess Weatherbed, New Arkansas Bill to Keep Minors Off Social Media Exempts Most
Social Media Platforms, The Verge (Apr. 13, 2023), https://archive.ph/KMmKe ................... 27

World of Warcraft Forums, Blizzard Entertainment, https://archive.ph/wip/mCc1a (
last visited June 19, 2023) ............................................................................... 25

## INTRODUCTION

Arkansas Senate Bill 396 is the latest attempt in a long line of government efforts to restrict new forms of expression based on concerns that they harm minors.  Books, movies, rock music, video games, and the Internet have all been accused in the past of exposing youth to content that has deleterious effects.  But the Supreme Court has repeatedly held that, while the government undoubtedly possesses "legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed."  *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 794-95 (2011).  "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them."  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975).  Accordingly, government efforts to restrict minors from accessing such materials, including by requiring parental consent to do so, have repeatedly been struck down, especially when (as is often the case) they impede the First Amendment rights of adults too.

S.B. 396 should meet the same fate.  The Act purports to protect minors from the harmful effects of "social media" by requiring the companies that operate these services to verify that any person seeking to create an account is at least 18 years old or has parental consent to do so.  By restricting minors—and adults (who now must prove their age)—from accessing these ubiquitous online services, Arkansas has "with one broad stroke" burdened access to what for many are the principal sources for speaking, listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge."  *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

Worse still, the Act does so by drawing a slew of content-, speaker-, and viewpoint-based distinctions—making clear that its purpose and effect is "to restrict the ideas to which children

may be exposed" and "protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 794-95. S.B. 396 restricts access to a website that permits users to share videos of their newest dance moves or other acts of entertainment, but not to a website that permits users to share video gaming content. Minors may readily access websites that provide news, sports, entertainment, and online shopping, but not those that allow them to upload their favorite recipes or pictures of their latest travels or athletic exploits. Nor does the Act restrict access to supposedly harmful content in any sensible, let alone tailored, way: It appears to apply to Facebook and Twitter, for example, but not YouTube, Mastadon, Discord, BeReel, Gab, Truth Social, Imgur, Brainly, DeviantArt, or Twitch, meaning that it restricts access to political expression on Twitter and photography on Instagram but places no restrictions on the exact same expression if it appears on Truth Social or DeviantArt. While the state might think that those distinctions are sensible, the Supreme Court has long recognized that the government may not discriminate between speakers or decide what expressive materials minors should be allowed to access. The First Amendment leaves "these judgments … for the individual to make, not for the Government to decree." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000). And even worse, the Act's definitions of "social media company" and "social media platform" are hopelessly vague, such that the law violates the Fifth Amendment as well.

A preliminary injunction is all the more necessary because of the lopsided equities here. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And the harm here is especially acute because the Act imposes severe sanctions for violations. NetChoice members who are arguably covered by the Act will face a perilous choice between exposing themselves to massive liability for disseminating speech to minors or taking costly and burdensome steps that

will drastically curtail access to their services, all before a court can decide the merits of their claims.  On the other hand, the state will not be harmed by maintaining the status quo.  The state has no legitimate interest in enforcing an unconstitutional law, and it has not proceeded as if its interests demand immediate enforcement, as the legislature delayed the effective date of S.B 396 by more than four months.  Maintaining the status quo will not harm the state in the slightest.

The Court should preliminarily enjoin the Attorney General, as well as all officers, agents, and employees subject to his supervision, direction, or control (including prosecutors charged with enforcing the criminal provisions of the Act), from enforcing S.B. 396 against NetChoice or its members.  NetChoice respectfully asks the Court to issue the injunction before the law goes into effect on September 1.

## BACKGROUND

### A.   Adults And Minors Alike Engage in First Amendment Activity on Online Services Covered by the Act.

NetChoice is an Internet trade association whose members operate a variety of online services, including Facebook, Instagram, Twitter, TikTok, Snapchat, Pinterest, and Nextdoor.  Those services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind."  *Packingham*, 582 U.S. at 107.  "[U]sers employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'"  *Id.* at 105 (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997)).  "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos."  *Id.* at 104.  On Instagram, users can share photos of everyday moments and express themselves with short, fun videos.  *See* **Exhibit B**, Davis Decl. ¶8.  On "Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner."  *Packingham*, 582 U.S. at 104-05.  On Pinterest, users can discover ideas for

recipes, style, home decor, and more.  *See* **Exhibit A**, Szabo Decl. ¶9.  On TikTok, users going through a difficult experience can find advice, support, and empathy.  *Id.*  On Snapchat, users can communicate with friends and family in fun and casual ways.  *See* **Exhibit C**, Boyle Decl. ¶¶3-4. And on Nextdoor, users can connect with neighbors, share local news, and borrow tools.  *See* **Exhibit D**, Harriman Decl. ¶15.

Like adults, minors use these websites to engage in a wide array of expressive activity on a wide range of topics.  *See* Szabo Decl. ¶6.  Minors use online services to read the news, connect with friends, explore new interests, and follow their favorite sports teams and their dream colleges. *Id.*  Some use online services to showcase their creative talents to others, including their artwork, photography, writing, or other forms of creative expression.  *Id.*  Others use online services to raise awareness about social causes and to participate in public discussion on the hottest topics of the day.  *Id.*  Still others use online services to build communities and connect with others who share similar interests or experiences.  *Id.*  These services are ubiquitous: Ninety percent of teens have used social media, seventy five percent report having at least one active profile, and more than half report visiting a social media site at least once a day.  *See* Social Media and Teens, American Academy of Child & Adolescent Psychiatry (updated Mar. 2018), https://archive.ph/LOY12.

### B. Government Attempts to Decree What Minors Can Hear or See Have Almost Always Been Struck Down.

People inevitably have different opinions about what material is appropriate for minors. Some believe that Mark Twain's *Adventures of Huckleberry Finn* is inappropriate because it contains racial epithets; others think it is a uniquely valuable piece of literature.  *See* Alvin Powell, Fight Over Huck Finn Continues: Ed School Professor Wages Battle for Twain Classic, Harvard Gazette (Sept. 28, 2000), https://tinyurl.com/ye2xwphb.  Some think *Saving Private Ryan* is too violent for minors; others think it imparts valuable lessons.  *See* Graphic 'Private Ryan' Not For

Kids, Chicago Tribune (Aug. 6, 1998), https://tinyurl.com/44tf6jfr.  Some think that video games are addictive.  *See* William Siu, I Make Video Games. I Won't Let My Daughters Play Them, N.Y. Times (Oct. 2, 2022), https://tinyurl.com/muakc2hh.  Others say the same about smartphones.  *See* In-Soo Nam, A Rising Addiction Among Youths: Smartphones, Wall St. J. (July 23, 2013), https://tinyurl.com/535d42kw.  And opinions differ greatly when it comes to whether and to what extent it is appropriate for minors to use online services like Facebook, Twitter, and YouTube.  But while those services are relatively recent arrivals, concerns that new means of communication harm children are not.  The same basic concerns have been raised repeatedly in the past about other types of speech and other mediums of expression.

In the 1800s, for example, "penny dreadful" publications (so named because of their price and content) were condemned for glorifying criminals and "were blamed for youthful delinquency by the media and parents alike."  James B. Twitchell, Preposterous Violence: Fables of Aggression in Modern Culture 169 (1989).  Decades later, comic books were derided as "particularly injurious to the ethical development of children."   Testimony of Dr. Frederic Wertham, Juvenile Delinquency (Comic Books), Hearings Before the Subcommittee to Investigate Juvenile Delinquency, 83rd Cong., 2d Sess. 86 (1954).  Movies were also accused of "possess[ing] a great[] capacity for evil, particularly among the youth of a community."  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952).  Television too.  *See, e.g.*, Juvenile Delinquency (Television Programs): Hearings Before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 83d Cong., 2d Sess. (1954).  In the 1980s, "partly clad, long-haired rockers who sing about sex, sado-masochism, suicide, murder and other things" were the problem.  *See* Irvin Molotsky, Hearing on Rock Lyrics, N.Y. Times (Sept. 10, 1985), https://tinyurl.com/yrknwwf8.  A decade later, families and lawmakers alike raised concerns about the harmful effects of the

Internet.  *See* H.R. Rep. No. 105-775, p.7 (1998).  Concerns about violent video games followed

soon after.  *See Brown*, 564 U.S. at 789-90.

These concerns sometimes led to government efforts to restrict minors from accessing

content or mediums that some considered inappropriate for them.  But courts have almost

invariably invalidated such efforts as inconsistent with the First Amendment.[1]  As courts have

explained in striking down such laws, *parents* have "the power to control what their children hear

and say," but legislatures do not have the same license.  *Brown*, 564 U.S. at 795 n.3.  Laws that

prohibit minors from accessing speech without their parents' permission "do not enforce *parental*

authority over children's speech."  *Id.*  "[T]hey impose *governmental* authority, subject only to a

parental veto."  *Id.*  Even when it comes to efforts to protect minors, the First Amendment

commands that "esthetic and moral judgments about art and literature" and other forms of speech

and expression "are for the individual to make, not for the Government to decree."  *Playboy,* 529

U.S. at 818.  The Internet is no different.  "[W]hatever the challenges of applying the Constitution

to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the

First Amendment's command, do not vary' when a new and different medium for communication

appears."  *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn*, 343 U.S. at 503).  Indeed, the Supreme

---

[1] *See, e.g.*, *Brown*, 564 U.S. at 794-95 (invalidating law prohibiting distribution of violent video games to minors without parental consent); *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004) (enjoining law restricting access to sexually explicit materials on the Internet); *Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997) (invalidating earlier law enacted to protect minors from "indecent" and "patently offensive" communications on the Internet); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual programing on television); *Erznoznik*, 422 U.S. at 213-14 (invalidating law prohibiting display of movies containing nudity at drive-in theaters); *Interactive Digital Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954 (8th Cir. 2003) (invalidating ordinance prohibiting distribution of violent video games to minors without parental consent); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir. 1992) (invalidating law prohibiting distribution to minors of videos depicting certain types of violence).

Court has repeatedly rejected efforts to subject the Internet to a unique set of First Amendment rules, even when those efforts are driven by a good-faith desire to protect children from potentially harmful content.  *See, e.g.*, *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004) (applying strict scrutiny to content-based government regulation of Internet speech); *Reno*, 521 U.S. at 874 (same).

### C. Parents Already Have Many Ways to Control What Their Children See on the Internet.

In a Nation that values the First Amendment, the preferred response to such concerns is to leave it to parents to decide what material or technology is appropriate for their children, including by using market-driven tools that make it easier for them to restrict access to what they consider harmful.  The movie, music, and video game industries, for example, have developed sophisticated ratings systems to assist parents.  The same is true of the Internet.  The tech industry has developed sophisticated filtering tools and technologies that allow parents to restrict what their children see, often in response to consumer demand.  Parents who wish to limit their children's access to online services like Facebook and Twitter or to filter or monitor the content to which their children are exposed thus have many options at their disposal.

*Network-level restrictions.*  For starters, cell carriers and broadband providers provide parents with tools to block certain apps and sites from their kids' devices, ensure that they are texting and chatting with trusted contacts, and restrict screen time during certain hours of the day.  *See, e.g.*, Verizon, Verizon Smart Family, https://tinyurl.com/ycyxy6x6 (last visited June 27, 2023); AT&T, Parental Controls, https://tinyurl.com/3ypvj7bv (last visited June 27, 2023); T-Mobile, Family Controls and Privacy, https://tinyurl.com/57run7ac (last visited June 27, 2023); Comcast Xfinity, Set Up Parental Controls for the Internet, https://tinyurl.com/5acdsnat (last visited June 27, 2023).  Most wireless routers (the devices that provide wireless Internet throughout

a home) contain parental control settings as well. *See* Molly Price & Ry Crist, How to Set Up and Use Your Wi-Fi Router's Parental Controls, CNET (Feb. 11, 2021), https://archive.ph/wip/uGaN2. Parents can use those settings to block specific websites and applications (including Facebook, Twitter, TikTok, etc.) if they find them inappropriate for their children. *See* Netgear, Circle Smart Parental Controls, https://archive.ph/wip/0GbB5 (last visited June 27, 2023). They can limit the time that their children spend on the Internet by turning off their home Internet at specific times during the day, pausing Internet access for a particular device or user, or limiting how long a child can spend on a particular website or online service. *Id.* Parents can also set individualized content filters for their children and monitor the websites they visit and the services they use. *Id.*

*Device-level restrictions.* Additional parental controls are available at the device level. Parents can decide whether to let their children use computers, tablets, and smartphones in the first place. Those who choose to let their kids use such devices have many ways to control what they see and do. Apple, for example, provides parents with tools to limit how long their children can spend on their iPhones, iPads, and MacBooks. *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://archive.ph/T68VI (last visited June 27, 2023). It also provides them with tools to control what applications (*e.g.*, Facebook, Twitter, and TikTok) their children can use, set age-related restrictions for those applications, filter online content, and control privacy settings. *Id.* Google and Microsoft similarly offer parental controls for their devices. *See* Google Family Link, Help Keep Your Family Safer Online, https://tinyurl.com/mr4bnwpy (last visited June 27, 2023); Microsoft, Getting Started with Microsoft Family Safety, https://tinyurl.com/yc6kyruh (last visited June 27, 2023). In addition, many third-party applications allow parents to control and monitor their children's use of Internet-connected devices

and online services.  *See* Ben Moore & Kim Key, The Best Parental Control Apps for Your Phone, PCMag (Mar. 29, 2022), https://archive.ph/HzzfH.

**Browser-level restrictions.**  Parental controls on Internet browsers offer another layer of protection.  Apple Safari, Google Chrome, Microsoft Edge, and Mozilla Firefox all offer parents tools to control which websites their children can access.  *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox (last visited June 16, 2023), https://tinyurl.com/6u6trm5y.  Microsoft offers "Kids Mode," which allows children to access only a pre-approved list of websites.  *See* Microsoft, Learn More About Kids Mode in Microsoft Edge (last visited June 16, 2023), https://tinyurl.com/59wsev2k.  Google has a similar feature.  It also provides parents with "activity reports," allowing them to see what apps and websites their children are accessing the most.  Google, Safety Center (last visited June 16, 2023), https://tinyurl.com/kwkeej9z.

**Application-level restrictions.**  NetChoice members themselves have expended significant resources to ensure that their services are appropriate for adults and teens alike.  For starters, many services operated by NetChoice members, including Facebook, Instagram, Twitter, Pinterest, Snapchat, and Nextdoor, require users in the United States to be at least 13 years old before they can create an account.  *See, e.g.*, Harriman Decl. ¶13.  TikTok offers a limited app experience for users under 13 called TikTok for Younger Users where users are provided a viewing experience that does not permit sharing of personal information and puts extensive limitations on content and user interaction.  Compl. ¶17.  TikTok partners with Common Sense Networks to try to ensure content is both age-appropriate and safe for an audience under 13.  *Id.*  In this ecosystem, users cannot do things like share their videos, comment on videos shared by others, message other users, or maintain a profile or followers.  *Id.*  NetChoice members also encourage teenagers who are old

9

enough to create an account to use private settings, or do so as a matter of default.  Snapchat, for example, defaults all minor users to private settings.  Boyle Decl. ¶6.  Facebook, Instagram, TikTok, and Pinterest likewise default teenagers under age 16 to private settings when they join and encourage them to choose more private settings through prompts and suggestions.  Compl. ¶17; *see* Davis Decl. ¶31.

NetChoice members expend significant resources curating the content that users post on their services.  *See, e.g.*, Harriman Decl. ¶9.  Members restrict the publication of violent and sexual content, bullying, and harassment.  *See* Szabo Decl. ¶7.  Some prohibit content that encourages body shaming and promote content that encourages a positive self-image.  Compl. ¶18.  Several use "age gating" to keep minors from seeing certain content visible to adults, or younger teens from seeing content visible to older teens.  Szabo Decl. ¶7.  NetChoice members implement their policies through algorithms, automated editing tools, and human review.  *See* Davis Decl. ¶¶27, 36.  If a member decides that a piece of content violates its policies, it can remove the content, restrict it, or add a warning label or a disclaimer to accompany it.  *See* Harriman Decl. ¶10.  Members may (and do) suspend or ban accounts that violate their policies.  *See* Compl. ¶18; Davis Decl. ¶27.

NetChoice members also provide users with tools to curate the content that they wish to see.  *See* Szabo Decl. ¶7.  Users can generally choose who they follow and who can follow them.  Some members provide users with tools to exclude content they wish to avoid.  TikTok users, for example, can opt into "restricted mode," which automatically filters certain content and permits users to tailor the content that they see with keyword filters.  Compl. ¶19.  Facebook users can control the content that Facebook recommends to them by hiding a post or opting to see fewer posts from a specific person or group.  Davis Decl. ¶41.  Instagram users can use a "not interested"

button or keyword filters (for example, "fitness" or "recipes" or "fashion") to filter out content they do not wish to see. *Id.*

NetChoice members also empower parents to monitor their teens' online activities. *See* Szabo Decl. ¶7. Parents can use Instagram's "supervision tools" to see how much time their teens spend on Instagram, set time limits and scheduled breaks, receive updates on what accounts their teens follow and the accounts that follow their teens, and receive notifications if a change is made to their teens' settings. Davis Decl. ¶28. TikTok has a "family pairing" feature that allows parents to, among other things, set a screen time limit; restrict exposure to certain content; decide whether their teen's account is private or public; turn off direct messaging; and decide who can comment on their teen's videos. Szabo Decl. ¶7. Through Snapchat's "family center," parents can keep track of who their teens are friends with and who they communicate with. Boyle Decl. ¶7.

NetChoice members also restrict communications between adults and teens on their services. TikTok bans users under 16 from sending or receiving direct messages and allows parents and guardians of 16- to 18-year-old users to restrict who can send messages to their teen, or to turn off direct messaging completely through its family pairing feature. Compl. ¶20. For 16- and 17-year-olds, TikTok also turns off the direct messaging option by default. *Id.* Facebook, Instagram, Snapchat, and Pinterest also take steps to limit adults from messaging teens that they are not connected to. Snapchat, for example, permits only messages between people who are already friends on the platform and does not recommend friend connections for minors unless the person is already in their phone contacts or they share mutual friends. Boyle Decl. ¶6. Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected. Davis Decl. ¶30. Instagram also informs young people when an adult who has been exhibiting potentially suspicious behavior tries to interact with them. *Id.* If

an adult is sending a large amount of friend or message requests to people under age 18, for example, or if the adult has recently been blocked by people under age 18, Instagram alerts the recipients and gives them an option to end the conversation and block, report, or restrict the adult. *Id.*

### D.   Arkansas Enacts S.B. 396.

Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech is appropriate for minors, and the wealth of tools available to help parents restrict their children's Internet access should they choose to do so, Arkansas took it upon itself in April to decree what is appropriate for minors on the Internet.  It enacted S.B. 396, a law that dramatically hinders minors from accessing "social media platforms," significantly curtailing their ability to engage in core First Amendment activities on many, but not all, of the most popular online services.  In particular, S.B. 396 prohibits minors from creating new accounts on "social media platforms" without first obtaining parental consent.  It also requires "social media companies" to verify the age of every individual who attempts to create an account and access their services.  That said, S.B. 396 does not apply to *all* online services, or even all services that many think of as "social media platforms."  Nor does it include any legislative findings or an explanation for the kinds of harm that it seeks to address.  The law instead draws a whole host of vague and nonsensical distinctions based on content, speaker, and viewpoint, imposing its onerous requirements on online services that Arkansas views as associated with speech that it disfavors while exempting other services associated with speech that it favors.

*Definition of "social media company."*  S.B. 396 defines "social media company" as a company that offers "an online forum" in which individuals may "establish an account … for the primary purpose of interacting socially with other[s]"; "create posts or content"; "[v]iew [others'] posts or content"; and "establish[] mutual connections through request and acceptance."  S.B. 396,

12

§1 (to be codified at §4-88-1101(7)(A) of the Arkansas Code).[2]  But the Act includes multiple exceptions to the definition of "social media company" that are arbitrary and do not map onto any sensible concerns.  The Act exempts from its definition of "social media company" (i) a "[m]edia company that exclusively offers subscription content in which users follow or subscribe unilaterally and whose platforms' primary purpose is not social interaction"; (ii) a "[m]edia company that exclusively offers interacting gaming, virtual gaming, or an online service, that allows the creation and uploading of content for the purpose of interacting gaming, entertainment, or associated entertainment, and the communication related to that content"; (iii) a company that offers an enumerated service, such as "cloud storage" or "enterprise collaboration tools for kindergarten through grade twelve (K-12) schools," and derives less than 25% of its revenue "from operating a social media platform, including games and advertising"; and (iv) a "[c]ompany that provides career development opportunities, including professional networking, job skills, learning certifications, and job posting and application services."  §1101(7)(B)(i), (iii)-(v).  The Act then creates an exception-to-an-exception, stating that a "[s]ocial media company that allows a user to generate short video clips of dancing, voice overs, or other acts of entertainment in which the primary purpose is not educational or informative, does not meet the [first] exclusion."  §1101(7)(B)(ii).

   ***Definition of "social media platform."***  S.B. 396's definition of "social media platform" is similarly riddled with arbitrary exceptions based on content, speaker, and viewpoint.  The Act defines "[s]ocial media platform" as "a public or semipublic internet-based service or application," a "substantial function" of which "is to connect users in order to allow users to interact socially

---

[2] For ease of reference, this brief cites provisions of S.B. 396, §1 based on the locations in Title 4, Chapter 88 of the Arkansas Code Annotated at which they are to be codified upon their effective date.  For simplicity's sake, the brief omits the "§4-88-" prefix going forward.

with each other within the service or application." §1101(8)(A).  But the term excludes any "online service," "website," or "application if [its] predominant or exclusive function" is (i) email; (ii) private, direct messaging; (iii) streaming of media content licensed by someone other than "a user or account holder"; (iv) "[n]ews, sports, entertainment, or other content that is preselected by the provider and not user generated"; (v) "[o]nline shopping or e-commerce"; (vi) "[b]usiness-to-business software that is not accessible to the general public"; (vii) "[c]loud storage"; (viii) "[s]hared document collaboration"; (ix) "[p]roviding access to or interacting with data visualization platforms, libraries, or hubs"; (x) "[t]o permit comments on a digital news website, if the news content is posted only by the provider of the … website"; (xi) "obtaining technical support for [a] social media company's social media platform, products, or services"; (xii) "[a]cademic or scholarly research"; and (xiii) certain other types of research.  §1101(8)(B).

**The Act's burdensome requirements.**  S.B. 396 imposes onerous obligations on "social media companies" that burden the First Amendment rights of adults and minors alike to speak, listen, and associate without government interference.  The Act specifies that "a social media company shall not permit an Arkansas user who is a minor to be an account holder"—an "individual who creates an account or a profile"—"on the social media company's social media platform unless the minor has the express consent of a parent or legal guardian."  §§1101(1), 1102(a).  "A social media company shall verify the age of an account holder," and "[i]f the account holder is a minor, the social media company shall confirm that a minor has [parental] consent … to become a new account holder, at the time an Arkansas user opens the account."  §1102(b)(1)-(2). In addition, "[a] social media company shall use a third party vendor to perform reasonable age verification before allowing access to the social media company's social media platform." §1102(c)(1).  The Act specifies that "[r]easonable age verification methods" include providing a

"digitized identification card," "[g]overnment-issued identification," or "[a]ny commercially reasonable age verification method."  §1102(c)(2).

A "social media company" that violates those restrictions faces civil and criminal liability. An individual may sue to recover "[d]amages resulting from a minor accessing a social media platform without his or her parent's or custodian's consent," or "[a] penalty of [$2,500] per violation," as well as court costs and attorney's fees.  §1103(c)(1).  S.B. 396 also authorizes the Arkansas Attorney General to bring civil enforcement actions, §1103(b)(2), and to prosecute a willful and knowing violation of the Act as a Class A criminal misdemeanor, §1103(b)(2) (citing Ark. Code Ann. §4-88-103).

S.B. 396 takes effect on September 1, 2023.  *See* S.B. 396, §2.

## ARGUMENT

NetChoice is entitled to a preliminary injunction if it shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest.  *Johnson v. Minneapolis Park & Rec. Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013).  A preliminary injunction is amply warranted here. NetChoice is likely to succeed on its First Amendment claim.  S.B. 396 restricts a breathtaking amount of First Amendment activity, and it does so on the basis of content, speaker, and viewpoint to boot.  The Act cannot survive any level of heightened scrutiny, let alone strict scrutiny, and its definitions of "social media company" and "social media platform" are also hopelessly vague. And the other preliminary injunction factors tip decidedly in favor of maintaining the status quo given the threatened irreparable injury, the absence of any harm to the state, and the fact that preserving the status quo will serve the public interest.

I.      **NetChoice Is Likely To Succeed On Its First Amendment Claim.**

      A.      **S.B. 396 Triggers Strict Scrutiny Multiple Times Over.**

            1.      **S.B. 396 restricts a breathtaking amount of core First Amendment activity.**

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more" without government interference.  *Packingham*, 582 U.S. at 104.  That includes the Internet generally and online services like those provided by NetChoice members specifically.  Online services like Facebook, Twitter, Snap, and TikTok offer "relatively unlimited, low-cost capacity for communication of all kinds."  *Id.* (quoting *Reno*, 521 U.S. at 870).  And "users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought,'" including everything from "debat[ing] religion and politics with their friends and neighbors" on Facebook to "petition[ing] their elected representatives" on Twitter.  *Id.* at 104-05.  Users can watch church services, *see* Elizabeth Dias, Facebook's Next Target: The Religious Experience, N.Y. Times (July 25, 2021), https://tinyurl.com/2p8jfyfy, associate and assemble with like-minded individuals, *see* John Inazu, *Virtual Assembly*, 98 Cornell L. Rev. 1093 (2013), watch presidential candidates launch their campaigns, *see* Alexa Corse, Ron DeSantis to Launch 2024 Presidential Run in Twitter Talk with Elon Musk, Wall St. J. (May 23, 2023), https://tinyurl.com/484z3kfc, and more.

It is thus no surprise that the Supreme Court has held that the First Amendment limits the government's ability to restrict people from accessing those services, even with the aim of protecting minors.  In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment.  The state tried to justify the law on the ground that it served the state's interest in

keeping sex offenders away from vulnerable minors.  582 U.S. at 106.  While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment.  *Id.* at 107-08.  By barring sex offenders from accessing "social networking" websites altogether, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens."  *Id.* at 107.  Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge."  *Id.* at 107.  For the government to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."  *Id.* at 108.

Just as the First Amendment constrains the government's authority to restrict adults from accessing online services like Facebook and Twitter, it constrains the government's authority to restrict minors from accessing those services as well.  The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13, and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).  In fact, when the Supreme Court stated that "if there is any fixed star in our constitutional constellation it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," it did so in service of enforcing the right of *minors* not to salute the American flag.  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Accordingly, as a general rule, "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik*, 422 U.S. at 214.  Just as "the First Amendment strictly limits [the government's] power" when it

"undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others," *id.* at 209, the First Amendment prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable to them," *id.* at 213-14.  While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95.  When it comes to both adults and minors, the "Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik*, 422 U.S. at 210.

In fact, the Supreme Court has squarely held that "persons under 18 have [a] constitutional right to speak or be spoken to without their parents' consent." *Brown*, 564 U.S. at 795 n.3.  Of course, "parents have traditionally had the power to control what their children hear and say." *Id.* And the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* Otherwise, the state could make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors"—or make it "criminal to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent." *Id.* Such laws "are obviously an infringement" upon the First Amendment rights of "young people and those who wish to proselytize young people." *Id.* They

"do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

To be sure, there are some exceptions to those general principles. But the Court has emphasized that exceptions are rare, and "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to minors." *Erznoznik*, 422 U.S. at 212-13. The government may, for example, "adjust the boundaries of an existing category of unprotected speech" like obscenity "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. After all, something that is not obscene for adults may still be obscene for children. *See, e.g.*, *Ginsberg v. New York*, 390 U.S. 629, 636 (1968). But that does not give the government carte blanche to restrict wide swaths of obviously protected speech or "to create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 794.

The government also has more leeway to regulate *student* speech "in light of the special characteristics of the school environment." *Mahanoy Area Sch. Dist. v. B.L.*, 141 S.Ct. 2038, 2044 (2021). But the government's authority to regulate student speech does not displace "ordinary First Amendment standards" when the "special characteristics of the school environment" are not at stake. *Id.* at 2045; *see also id.* at 2047-48 (holding that school violated the First Amendment by punishing student for sending Snapchat message criticizing the school off campus and on her own time); *Morse v. Frederick*, 551 U.S. 393, 405 (2007) (clarifying that, although a school can regulate a student's use of sexual innuendo in a speech given within the school, if the student "delivered the same speech in a public forum outside the school context, it would have been protected"). Similarly, the government has greater leeway to regulate broadcast content to protect minors because of the "invasive" nature of broadcasting. *See FCC v. Pacifica Found.*, 438 U.S. 726, 748-

49 (1978).  But the "special justifications for regulation of the broadcast media" have been narrowly construed, and the Supreme Court has held that they are "not applicable to other speakers," including speakers on the Internet.  *Reno*, 521 U.S. at 868; *see also id.* at 870 (finding "no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet]"); *NetChoice, LLC v. Attorney General*, 34 F.4th 1196, 1120 (11th Cir. 2022) (similar); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 127-28 (1989) (distinguishing *Pacifica*'s "emphatically narrow holding" because it involved "the 'unique' attributes of broadcasting").

Outside of those "relatively narrow and well-defined circumstances," courts have routinely struck down government efforts to protect children from the purportedly harmful effects of new forms of media.  In *Brown*, for example, the Supreme Court held that a California law that prohibited the sale of violent video games to minors without parental consent violated the First Amendment.  564 U.S. at 804-05.  In *Reno*, the Court held that a federal statute that prohibited the dissemination of "indecent" material to minors over the Internet violated the First Amendment.  521 U.S. at 849.  In *Ashcroft*, the Court upheld an injunction prohibiting the government from enforcing a federal statute that prohibited the dissemination of material that is "harmful to minors" over the Internet without first verifying the recipient's age.  542 U.S. at 673.  In *Playboy*, the Court held that a federal statute restricting sexual programming on cable television violated the First Amendment.  529 U.S. at 807.  And in *Erznoznik*, the Court held the First Amendment prohibited the city from enforcing a local ordinance barring the display of movies containing nudity at drive-in theaters.  422 U.S. at 217-18; *accord Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 689-91 (1968) (invalidating ordinance restricting dissemination of films that are "not suitable for young persons"); *Joseph Burstyn*, 343 U.S. at 501-02 (invalidating law authorizing denial of license to show films deemed "sacrilegious").  The Eighth Circuit has likewise recognized and

20

applied these same principles.  *See Interactive Digital Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 956 (8th Cir. 2003) (invalidating ordinance prohibiting the sale of violent video games to minors without parental consent); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 687 (8th Cir. 1992) (invalidating law prohibiting sale of videos depicting violence to minors); *see also Shipley, Inc. v. Long*, 454 F.Supp.2d 819, 831 (E.D. Ark. 2004) (invalidating law restricting materials deemed "harmful to minors").

Just like the laws struck down in *Brown*, *Ashcroft*, *Playboy*, *Reno*, *Erznoznik*, *St. Louis County*, and *Webster*, S.B. 396 plainly restricts core First Amendment activity.  By restricting access to online services like Facebook and Twitter, Arkansas has "prevent[ed] the user from engaging in the legitimate exercise of First Amendment rights."  *Packingham*, 582 U.S. at 108.  In fact, S.B. 396 is in many respects even more obviously unconstitutional than the laws invalidated in *Brown*, *Reno*, *Ashcroft*, *Playboy*, and *Erznoznik*.  Some of those cases at least involved an attempt to "adjust the boundaries of an existing category of unprotected speech" (like obscenity) "to ensure that a definition designed for adults is not uncritically applied to children."  *Brown*, 564 U.S. at 794.  S.B. 396 does not even endeavor to confine its restrictions to speech that could arguably be said to approach a constitutional line.  It instead restricts minors from creating accounts and accessing material on websites like Facebook and Twitter even if all they want to do is to attend church services, watch the launch of a presidential campaign, or simply communicate with friends or family.  Arkansas has thus restricted wide swathes of protected First Amendment activity based on a concern that minors *may* encounter harmful material on those services.  If California had restricted access to *all* video games based on a concern that *some* video games may be addictive or violent, that would have made the First Amendment violation even more glaring.  *See*

*Packingham*, 582 U.S. at 108-09; *cf. Bd. of Airport Comm'rs of L.A. v. Jews for Jesus*, 482 U.S. 569 (1987) (invalidating ban on all "First Amendment activities" in airport's main terminal).

On top of that, by requiring all users to verify their age before creating an account, S.B. 396 burdens the right of *adults* to access those websites too.  In *Ashcroft*, the Court concluded that a statute requiring Internet users to "identify themselves or provide their credit card information" before accessing certain sexually explicit websites burdened the right of adults to "gain access to speech they have a right to see."  542 U.S. at 667; *see also Reno*, 521 U.S. at 856 (similar).  Here too, S.B. 396 burdens adult speech by requiring all Arkansas users to verify their age via digitized identification before creating an account.  §1102(c)(2).  Identification requirements "discourage users from accessing" online services, and they "completely bar" adults who do not possess identification.  *Reno*, 521 U.S. at 856 (requiring age verification via credit card on Internet sites "would completely bar adults who do not have a credit card and lack the resources to obtain one"); *cf. Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198-99 (2008) (requiring voters to present identification before voting imposes burdens, particularly where "economic or other personal limitations" may prevent potential voters from obtaining identification); *see also* Harriman Decl. ¶¶16-29.

The unique aspects of online services like Facebook and Twitter only heighten the First Amendment values at stake.  While government restrictions on books, magazines, movies, and video games prohibit people from *receiving* speech, restrictions on accessing online services have the additional effect of restricting people from engaging in their own speech and associating with like-minded individuals.  The Internet and "social media" are some of the "most important places … for the exchange of views."  *Packingham*, 582 U.S. at 104 (quoting *Reno*, 521 U.S. at 868).  "Social media allows users to gain access to information and communicate with one another

about it on any subject that might come to mind." *Id.* at 107.  Government restrictions on "the exercise of First Amendment rights on websites integral to the fabric of our modern society and culture" thus unquestionably trigger First Amendment scrutiny, *id.* at 109, which S.B. 396 cannot survive.

### 2.    S.B. 396 restricts speech based on content, speaker, and viewpoint.

S.B. 396 not only restricts an unprecedented amount of First Amendment activity, it does so on the basis of content, speaker and viewpoint, triggering strict scrutiny multiple times over.  It is the "most basic principle" of First Amendment law that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91.  Under the First Amendment, "esthetic and moral judgments about art and literature" and other forms of speech and expression "are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority." *Playboy,* 529 U. S. at 818.  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve [a] compelling interest[]." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*.  In assessing whether a regulation of speech is content based, courts consider "whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id*.  "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter." *Id.*  Others "are more subtle," and "achieve[] the same result" through distinctions based on "function or purpose." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1474 (2022).  In *Reed*, for example, the Court held that distinctions between signs serving certain "noncommercial purposes," those "designed to influence the outcome of an election," and "temporary directional signs relating

23

to a qualifying event" were content based.  *See* 576 U.S. at 159-60 (capitalization altered).

Similarly, in *Barr v. American Association of Political Consultants, Inc.*, 140 S.Ct. 2335 (2020),

the Court held that a general federal statutory prohibition on robocalls, with an exception for calls

"made solely to collect a debt owed to or guaranteed by the United States," was content based

because it "favor[ed] speech made for collecting government debt over political and other speech."

*Id.* at 2346.

S.B. 396 is a content-based restriction on speech because it "singles out specific subject

matter for differential treatment," including by using the "function or purpose" of speech as a

proxy for its content.  *Reed*, 576 U.S. at 169; *see also City of Austin*, 142 S.Ct. at 1472-73.  In

general, the Act targets expression that serves "the primary purpose of interacting socially,"

§1101(7)(A), while treating expression that serves other purposes more favorably.  *See also*

§§1101(7)(B)(i), (8)(A)(ii)(a), (8)(B)(v)(c), (xiii)(2).  For example, the Act's definition of "social

media company" generally excludes a company that "exclusively offers subscription content in

which users follow or subscribe unilaterally and whose platforms' primary purpose is not social

interaction."  §1101(7)(B)(i).  But a company that "allows a user to generate short video clips of

dancing, voice overs, or other acts of entertainment in which the primary purpose is not educational

or informative does not meet the exclusion."  §1101(7)(B)(ii).

Similarly, the Act exempts a company that "exclusively offers interacti[ve] gaming, virtual

gaming, or an online service, that allows the creation and uploading of content for the purpose of

interacti[ve] gaming, entertainment, or associated entertainment, and the communication related

to that content," §1101(7)(B)(iii), but not other types of content, including political content.  The

Act also exempts certain companies that offer "educational devices" or "enterprise collaboration

tools for kindergarten through grade twelve (K-12) schools."  §1101(7)(B)(iv).  And it exempts a

24

company that offers "career development opportunities, including professional networking, learning certifications, and job posting and application services." §1101(7)(B)(v). Thus, under S.B. 396, a company that permits users to share content for the purpose of gaming (like Activision Blizzard) is exempt, but a company that permits users to share content for the purpose of persuading others to vote for their preferred candidate (like Twitter) is not. Likewise, a service that permits users to share job postings and engage in professional networking (like LinkedIn) is exempt. But a service that permits users to share dance videos or engage in social networking (like Facebook, Instagram, and Twitter) is not. "That is about as content-based as it gets." *Barr*, 140 S.Ct. at 2346.

S.B. 396's definition of "social media platform" is also riddled with arbitrary content-based distinctions. The marketplace does not feature a clear dividing line between services that provide their own content and those that facilitate the sharing of user-generated content. Services that started off as content creators subsequently facilitate discussion of that content or discussions among users with a shared interest in the topic. *See, e.g.*, World of Warcraft Forums, Blizzard Entertainment, https://archive.ph/wip/mCc1a (last visited June 19, 2023). Similarly, services that initially focused on allowing users to share their own content may shift toward providing professionally generated content. *See, e.g.*, Jin Kim, *The Institutionalization of YouTube: From User-Generated Content to Professionally Generated Content*, 34 Media, Culture & Society 53-67 (2012).

That reality forces the Act to employ an imprecise and content-based definition that excludes a service "if the predominant or exclusive function is," among other things, "[n]ews, sports, [and] entertainment," "[a]cademic or scholarly research," and some "[o]ther research." §1101(8)(B)(iv), (xii), (xiii). The Act favors speech "focused on online shopping or e-

commerce"—including "collections of goods for sale or wish lists," product "reviews," and related comments—as well as communications "[f]or the purpose of providing or obtaining technical support." §1101(8)(B)(v), (xi); *see also* §1101(8)(B)(xiii)(b) (carve-out for "classified advertising service[s]"). It also exempts "a news or public interest broadcast, website video, report, or event," and a "news-gathering organization." §1103(d)(1)-(2). Users can therefore leave product reviews on Amazon, post comments on law review articles published on SSRN, and engage in competitive banter while playing fantasy football on ESPN. But they cannot reply to a friend's Twitter missives or comment on Instagram posts without first verifying their age or obtaining parental consent. S.B. 396 thus singles out some speech for favorable government treatment based on subject matter, while subjecting other speech to unfavorable treatment based on subject matter.

What is more, the practical effect of S.B. 396's parade of exceptions is to single out a few online services for disfavored treatment, triggering another First Amendment problem. Courts are deeply skeptical of laws that "distinguish[] among different speakers," as "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). "Speaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own.'" *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S.Ct. 2361, 2378 (2018) ("*NIFLA*") (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)). And when a law "discriminate[s] among media, or among different speakers within a single medium," the First Amendment problem is even worse. Such laws present very real "dangers of suppression and manipulation" of the medium and risk "distort[ing] the market [of] ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60, 661 (1994). And when "the basis on which [the government] differentiates between" media is "its content,"

the law is "particularly repugnant to First Amendment principles." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987).

S.B. 396 facially "distinguish[es] among different speakers." *Citizens United*, 558 U.S. at 340. On top of carving out specific favored companies based on content, the Act imposes arbitrary size and revenue requirements that have the effect of targeting just a handful of companies for disfavored treatment. The Act does not apply to any "social media platform that is controlled by a business entity that has generated less than one hundred million dollars … in annual gross revenue." §1101(8)(C). Thus, the same user-generated speech that Arkansas restricts on Facebook or Twitter is unrestricted if it appears on "smaller platforms such as Parler, Gab, and Truth Social." *See* Jess Weatherbed, *New Arkansas Bill to Keep Minors Off Social Media Exempts Most Social Media Platforms*, The Verge (Apr. 13, 2023), https://archive.ph/KMmKe (noting that the latter three platforms "don't meet the annual gross revenue requirement of $100 million"). And a service generating $90 million in revenue could be regulated by the Act if owned by a somewhat larger enterprise, but entirely unregulated if spun off, even though the user-generated content available to minors on the service remained entirely unaltered. It could also escape government regulation if it were purchased by a much larger enterprise with more than $270 million in unrelated revenue, as the Act carves out companies with over $100 million in revenue if they derive "less than twenty-five percent … of [their] revenue from operating a social media platform" and also offer "cloud storage services, enterprise cybersecurity services, educational devices, or enterprise collaboration tools for [K-12] schools." §1101(7)(iv).

Those distinctions make no sense in theory or in practice. For example, a "short video clip[] of dancing" or "other acts of entertainment" is restricted if it appears on Instagram or Twitter, *see* §1101(7)(B)(ii), but not if it appears on YouTube, which generates less than 25% of Google's

total revenue.  *See* Emily Dreibelbis, *Arkansas Limits Social Media Access for Kids Under 18, With One Major Exception*, PCMag (Apr. 13, 2023) (citing statement by co-sponsor of S.B. 396 that the Act does not apply to Google), https://archive.ph/dEowc; Daniel Howley, *Alphabet Misses on Earnings Expectations as Ad Revenue Falls*, Yahoo! (Feb. 2, 2023) (noting that YouTube ad revenue makes up only about 13% of Google's total ad revenue).  This is so even though those services are among the most popular with teens.  *See supra* 4.  The Act places no restrictions on professional networking on LinkedIn, but requires adults to verify their age before engaging in professional networking on Twitter or Facebook.  Users can share gaming content on Xbox Live, but cannot share the same content on Facebook or Twitter.  That makes especially little sense because people often "cross-post"—i.e., post the same content on multiple online services.  *See, e.g.*, Cincinnati Bengals, Year 4 Awaits, Instagram (June 20, 2023), https://tinyurl.com/4f2np3dj; Cincinnati Bengals, Year 4 Awaits, TikTok (June 20, 2023), https://tinyurl.com/44m7rkr4; Cincinnati Bengals, Year 4 Awaits, YouTube (June 20, 2023), https://tinyurl.com/y969z2pd. Simply put, S.B. 396 repeatedly draws arbitrary lines in an area that requires careful tailoring.

Worse still, some of the Act's distinctions discriminate among viewpoints, suppressing speech "based on the ideas or opinions it conveys."  *Iancu v. Brunetti*, 139 S.Ct. 2294, 2299 (2019); *see, e.g.*, *Sorrell*, 564 U.S. at 565 (restrictions on speech "promot[ing] brand-name drugs" were impermissibly "aimed at a particular viewpoint").  For example, the Act treats "video clips of dancing, voice overs, or other acts of entertainment" more favorably if their primary purpose is educational or informative than if their "primary purpose is not educational or informative." §1101(8)(B)(ii); *see also* §1101(8)(B)(xiii)(c) (favoring speech "used by and under the direction of an educational entity").  The Act similarly favors speech reflecting the viewpoints of whoever provides the online service, *e.g.*, "[n]ews, sports, entertainment, or other content that is *preselected*

*by the provider*," §1101(8)(B)(iv) (emphasis added), over ideas generated by users.  *Compare* §1101(7)(A), (B)(ii), (8)(B)(ii)(c), (iii) (disfavoring public posting by individuals and other "user generated" content), *with* §1101(8)(B)(x) (favoring content "posted only by the provider of [a] digital news website"), (8)(B)(xiii)(a) (similar), §1103(d) (carveout for "news-gathering organization[s]").  The First Amendment does not permit Arkansas to regulate private speech based on its perception of the value of the views expressed or who expresses them.

> **B.**   **S.B. 396 Cannot Survive Any Level of Heightened Scrutiny, Let Alone Strict Scrutiny.**

Because the government cannot suppress constitutionally protected speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them," *Brown*, 564 U.S. at 795, states bold enough to attempt such regulation must overcome strict scrutiny, which is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).  To satisfy strict scrutiny, Arkansas must demonstrate that S.B. 396 is "the least restrictive means of achieving a compelling state interest."  *McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *see also Playboy*, 529 U.S. at 827.   Even intermediate scrutiny would require Arkansas to demonstrate that S.B. 396 is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 103; *see also Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2383-84 (2021) (reaffirming that intermediate scrutiny requires narrow tailoring).  S.B. 396 cannot survive any level of heightened scrutiny, let alone strict scrutiny.

First, to the extent Arkansas seeks to justify S.B. 396 on the theory that it has an interest in helping parents control their children, Supreme Court and Eighth Circuit precedent foreclose that argument.  In *Brown*, the Supreme Court expressed "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority."  564 U.S. at 802.  "Accepting that

position would largely vitiate the rule that only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to minors." *Id.* (brackets omitted).  And in *Interactive Digital*, the Eighth Circuit rejected the county's argument that its interest in "assisting parents to be the guardians of their children's well-being" justified an ordinance prohibiting the sale of violent video games to minors without a parent's consent.  329 F.3d at 959.  The Eighth Circuit explained that "the government cannot silence protected speech by wrapping itself in the cloak of parental authority." *Id.* at 960.  "To accept the County's broadly-drawn interest as a compelling one would be to invite legislatures to undermine the first amendment rights of minors willy-nilly under the guise of promoting parental authority." *Id.*

Moreover, strict scrutiny demands "an 'actual problem' in need of solving." *Brown*, 564 U.S. at 799.  In *Brown*, the Supreme Court explained that the video-game industry's voluntary rating system "does much to ensure that minors cannot purchase seriously violent games on their own," and concluded that "[f]illing the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id.* at 803.  "Even if the sale of violent video games to minors could be deterred further by increasing regulation, the government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9.  So too here.  Just as in *Brown*, Arkansas "cannot show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to [social media platforms] but cannot do so," *id.* at 803, because parents already have many tools at their disposal to help them.  They may refuse to give their children smartphones, tablets, or computers in the first place. Cell service providers, broadband internet providers, and routers provide network-level controls that parents can use to block their kids from specific websites and apps—including Facebook, Twitter, Instagram and the like.  *See supra* 7.  Virtually all smartphones, tablets, and computers

provide parents with tools to control which websites they can visit and what apps they can access. *See supra* 8. Parental controls on Internet browsers like Apple Safari, Google Chrome, and Microsoft Edge provide another layer of protection. *See supra* 8. And the "social media platforms" covered by the Act offer many features that empower parents to monitor their minors' activities on those services and to filter out harmful content. *See supra* 9-12. Because parents already have many ways to prevent their children from accessing "social media" services, and because such tools will only become more sophisticated as technology evolves, "[f]illing the remaining modest gap" in their control is hardly a sufficient interest to justify S.B. 396's burden on speech.

Making matters worse, SB 396 is both wildly over- and under-inclusive, which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 138 S.Ct. at 2376; *see also, e.g.*, *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546-47 (1993). It is overinclusive because it restricts minors from accessing wide swaths of speech on certain "social media platforms," even if the content is entirely innocuous. As the Supreme Court has recognized, online services like Facebook and Twitter "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. Teens use those services for many legitimate and productive purposes that lie at the First Amendment's core. S.B. 396 dramatically impinges upon those activities by restricting minors from accessing content on covered services unless they obtain parental consent to create an account. The Act restricts, for example, minors from joining a Facebook group devoted to "support of laws against corporal punishment of children, or laws in favor of greater rights for minors," without parental consent. *Brown*, 564 U.S. at 795 n.3. It restricts minors from attending worship services streamed

live on Instagram without parental consent.  It even restricts minors from watching and participating in a presidential candidate's launch announcement on Twitter without parental consent.  And on top of that, the Act has the practical effect of hindering adults from accessing the same online services, even though the state has no legitimate reason to do so.  *See supra* 22; *Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57.  S.B. 396 thus hinders access not just to potentially harmful content, but to online services that for many are the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge."  *Packingham*, 582 U.S. at 107.  That is breathtakingly overbroad measured against any conceivable interest the state could assert.

Conversely, S.B. 396 is "wildly underinclusive when judged against" any purported justification.  *Brown*, 564 U.S. at 802.  The law exempts companies that exclusively offer "interact[ive] … gaming" and related content even though numerous studies have documented concerns about cyberbullying among gamers.  *See One in Two Young Online Gamers Bullied, Report Finds*, BBC (May 31, 2017), https://bbc.in/3Lw6bKl.  It appears to exclude online services like YouTube, Discord, BeReel, Mastadon, Gab, Truth Social, Imgur, Brainly, DeviantArt, and Twitch, even though minors regularly use those services and may come across virtually indistinguishable material on those services.  And just as the law in *Brown* was "seriously underinclusive" because California was "perfectly willing" to allow minors to play violent video games "so long as one parent … says it's OK," S.B. 396 is seriously underinclusive because Arkansas is willing to let minors access supposedly harmful websites so long as one parent says it is okay.  *Brown*, 564 U.S. at 802.  "That is not how one addresses a serious social problem."  *Id.*

In all events, even if Arkansas could muster evidence that whatever harms S.B. 396 purports to address "are real, not merely conjectural," *Interactive Digital*, 329 F.3d at 958—even

though the Act was adopted without any legislative findings—the state's chosen solution is patently not the "least restrictive means" to achieve its goal. *Playboy*, 529 U.S. at 827. When it comes to purportedly harmful content on the Internet, the Supreme Court has emphasized that enabling people to voluntarily filter content at the receiving end, as many tools already enable parents to do, is less restrictive than restricting content at the source. In *Ashcroft*, for example, the Court struck down a federal statute that required users to verify their age with a credit card or other means before accessing certain pornographic websites on the Internet. The Court held that offering "[b]locking and filtering software is an alternative that is less restrictive than" an age-verification requirement because it "impose[s] selective restrictions on speech at the receiving end, not universal restrictions at the source." 542 U.S. at 666-67. "Under a filtering regime, adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information," while those who wish to block access to such sites can do so. *Id.* at 667. Similarly, in *Playboy*, the Court struck down a law restricting sexually explicit programming on television during certain hours of the day, explaining that cable systems "have the capacity to block unwanted channels on a household-by-household basis," and that such "targeted blocking is less restrictive than banning." 529 U.S. at 815. After all, "targeted blocking enables the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners—listeners for whom, if the speech is unpopular or indecent, the privacy of their own homes may be the optimal place of receipt." *Id.*

The same is true here. Arkansas has provided no evidence that blocking and filtering technologies cannot achieve their goal of helping parents protect their children from the supposedly harmful effects of social media. Parents can refuse to give their children smartphones, tablets, or laptops in the first place. They can also restrict access to content on the Internet at the

network level (parental controls through their service provider or on the router), the device level (parental controls on smartphones, tablets, and computers), and the application level (parental controls on web browsers like Chrome and Safari and apps like Instagram and TikTok).  To the extent Arkansas thinks those tools are insufficient because some children might skirt them or because some parents might fail to exploit them, the Supreme Court has squarely held that "[i]t is no response that voluntary blocking requires a consumer to take action, or may be inconvenient, or may not go perfectly every time."  *Playboy*, 529 U.S. at 824.  The far less speech-restrictive path is to "publicize" the existence of those tools and to teach parents how to prevent their kids from circumventing them.  *Id.* at 825.  "A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."  *Id.* at 824.

In short, S.B. 396 burdens far too much and furthers far too little.  It flunks any level of heightened scrutiny.

## II.   NetChoice Is Likely To Succeed On Its Claim That S.B. 396 Is Unconstitutionally Vague.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Fox*, 567 U.S. at 253-54.  After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they otherwise would "if the boundaries of the forbidden areas were clearly marked."  *Baggett v. Bullitt*,

34

377 U.S. 360, 372 (1964).  For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).  That is equally true when it comes to government speech restrictions aimed at protecting minors, which the Supreme Court has repeatedly struck down on vagueness grounds.  After all, "[i]t is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Circuit*, 390 U.S. at 689; *see also Joseph Burstyn*, 343 U.S. at 497; *Winters v. New York*, 333 U.S. 507, 518-19 (1948); *Gelling v. Texas*, 343 U.S. 960 (1952) (per curiam); *Superior Films, Inc. v. Dep't of Educ. of Ohio*, 346 U.S. 587 (1954).

S.B. 396 fails to provide a person of ordinary intelligence with fair notice of what is prohibited because it is unclear to whom S.B. 396 applies.  The Act defines "social media company" as "an online forum that a company makes available for an account holder" to "[c]reate a public profile, establish an account, or register as a user *for the primary purpose* of interacting socially with other profiles and accounts," "[u]pload or create posts or content," "[v]iew posts or content of other account holders," and "[i]nteract with other account holders or users, including without limitation establishing mutual connections through request and acceptance."  §1101(7)(A) (emphasis added).  That definition is hopelessly vague.  The statute does not define the phrase "primary purpose" or provide even minimal guidelines about how to interpret it, leaving companies to choose between risking unpredictable and arbitrary enforcement (backed by civil penalties, attorneys' fees, and potential criminal sanctions) and trying to implement S.B. 396's onerous requirements.  Does a music service like Spotify or Pandora qualify?  While many people use those services primarily to listen to music, others use them primarily to share music with others.

What about Pinterest?  While some people create Pinterest accounts to "interact[] socially with other profiles," others create Pinterest accounts just to browse content on the site without ever interacting with anyone.  Similarly, some people create Nextdoor accounts to "interact[] socially" with other users, while others create accounts to stay abreast of the happenings in their neighborhood without ever interacting with another user.

Other provisions of the law are similarly vague.  The law exempts a "[m]edia company that exclusively offers subscription content in which users follow or subscribe unilaterally and whose platforms' *primary purpose* is not social interaction," but a "[s]ocial media company that allows a user to generate short video clips of dancing, voiceovers, or other acts of entertainment in which *the primary purpose* is not educational or informative does not meet" that exclusion.  §1101(7)(B)(i)-(ii) (emphasis added).  Here, too, the statute does not define the phrase "primary purpose," leaving companies to guess what it means.  After all, "video clips of dancing" can be both "educational" and entertaining in a way that encourages "social interaction."  It is unclear how a company is supposed to know whether the primary purpose of user-generated content is educational or something else.

Likewise, the statute defines the phrase "social media platform" to mean an "internet-based service or application … [o]n which a *substantial function* of the service or application is to connect users in order to allow users to interact socially with each other within the service or application," and it excludes from that definition services in which "the *predominant* or exclusive function is" "[d]irect messaging consisting of messages, photos, or videos" that are "[o]nly visible to the sender and the recipient or recipients" and "[a]re not posted publicly."  §1101(8)(A)-(B) (emphasis added).  Again, the statute does not define "substantial function" or "predominant … function," leaving companies to guess whether their online services are covered

by the law's demands.  For example, many services allow users to send direct, private messages consisting of text, photos, or videos, but also offer other features that allow users to make content that anyone can view.  S.B. 396 provides no guidance on how to determine which function is "predominant," leaving those services to guess as to whether they are regulated.  This is not the "narrow specificity" that the Constitution requires of government regulations that restrict speech.  And the prospect of setting up courts as de facto censor boards to define and enforce these vague provisions is not one the First and Fifth Amendments tolerate.  *Cf. Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012) (invalidating speech-restricting law because it did not "provide fair notice of what constitutes a violation").

## III.    The Other Preliminary Injunction Factors Overwhelmingly Support Maintaining The Status Quo.

"In a First Amendment case … the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007).  But the other preliminary injunction factors favor maintaining the status quo as well.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Johnson*, 729 F.3d at 1101-02.  And the harm here is especially acute because the Act imposes severe sanctions for violations of its vague and sweeping provisions.  Violators face potential criminal liability for knowingly and willfully violating the Act, on top of $2,500 in statutory damages per violation (plus attorney's fees and costs) for the many times that people create accounts each day.  *See* §1103(b)(1); Ark. Code Ann. §4-88-103.  NetChoice members who are covered by the Act will face a perilous choice between exposing themselves to massive liability for disseminating speech to minors or taking costly and burdensome steps that will drastically curtail access to their online services, all before a court decides the merits of their claims.  As

NetChoice members explain in their declarations, complying with S.B. 396's burdensome requirements will require significant changes to existing services and impose significant costs that cannot be recouped.  *See* Harriman Decl. ¶¶18-34 (explaining that it would take Nextdoor "at least six months" to implement S.B. 396's requirements and would increase costs "by up to 3000%"); Davis Decl. ¶¶50-53 (explaining that S.B. 396 requires "substantial and burdensome changes to the design and operation of the Facebook and Instagram services").

The balance of equities and the public interest both favor granting a preliminary injunction as well.  "The balance of the equities … generally favors the constitutionally-protected freedom of expression," and "it is always in the public interest to protect constitutional rights."  *Phelps-Roper*, 509 F.3d at 485.   The "State has no interest in enforcing laws that are unconstitutional ... [and] an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the State."  *Little Rock Family Planning Servs. v. Rutledge*, 397 F.Supp.3d 1213, 1322 (E.D. Ark. 2019) (citing *Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012)); *Brandt v. Rutledge*, 551 F.Supp.3d 882, 892 (E.D. Ark. 2021), *aff'd*, *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022).  And the state has not proceeded as if its interests demand immediate enforcement, as the legislature delayed the effective date of S.B 396 by more than four months.  Maintaining the status quo until the glaring constitutional problems with S.B. 396 can be fully adjudicated will cause little if any harm to the state.  The remaining preliminary injunction factors thus favor maintaining the status quo.

## CONCLUSION

For these reasons, the Court should preliminarily enjoin the Attorney General, as well as all officers, agents, and employees subject to his supervision, direction, or control (including prosecutors charged with enforcing the criminal provisions of the Act), from enforcing S.B. 396 against NetChoice or its members.

Date: July 7, 2023                              Respectfully submitted,

Marshall S. Ney, Ark. Bar No. 91108
Katherine C. Campbell, Ark. Bar No. 2013241
Friday, Eldredge & Clark, LLP
3350 S. Pinnacle Hills Pkwy, Suite 301
Rogers, AR 72758
Telephone: (479) 695-6049
Facsimile: (501) 244-5389
mney@fridayfirm.com
kcampbell@fridayfirm.com

Paul D. Clement (admitted *pro hac vice*)
Erin E. Murphy (admitted *pro hac vice*)
James Y. Xi (admitted *pro hac vice*)
Joseph J. DeMott (admitted *pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com

## <u>CERTIFICATE OF SERVICE</u>

I, Marshall S. Ney, certify that a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system this 7th day of July, 2023, and that a copy of the same will be served via process server to the following:

Tim Griffin
Attorney General of Arkansas
323 Center Street
Suite 200
Little Rock, AR 72201


  /s/ Marshall S. Ney
Marshall S. Ney