## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

NETCHOICE, LLC,

*Plaintiff*,

v.

TIM GRIFFIN, in his official capacity as
Attorney General of Arkansas,

*Defendant*.

Case No. 5:23-cv-05105-TLB

## BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION,
## AMERICAN CIVIL LIBERTIES UNION OF ARKANSAS,
## AND ELECTRONIC FRONTIER FOUNDATION
## IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Holly Dickson, Ark. Bar No. 98137
THE ARKANSAS CIVIL LIBERTIES UNION
FOUNDATION, INC.
904 West Second Street, Suite 1
Little Rock, AR 72201
(501) 374-2842
holly@acluarkansas.org

Vera Eidelman
Laura Moraff
Ben Wizner
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
veidelman@aclu.org

David Greene
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 7.1, counsel for amici curiae American Civil Liberties Union, American Civil Liberties Union of Arkansas, and the Electronic Frontier Foundation certifies that amici are non-profit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in amici curiae.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

STATEMENT OF INTEREST .......................................................................................... 1

INTRODUCTION ............................................................................................................. 2

ARGUMENT .................................................................................................................... 3

I.  Core First Amendment activity takes place on social media. ................................... 3

    A.  People use social media to engage in political expression. ......................................... 4

    B.  People use social media for artistic expression. ......................................................... 7

    C.  People use social media for religious worship and fellowship ................................... 8

    D.  People use social media to share minority views and experiences ............................. 9

II.  Requiring age verification will impermissibly burden users, including adults. ................... 11

    A.  Age verification will rob users of anonymity. ........................................................... 11

    B.  Age verification will raise additional privacy and security concerns ........................ 14

    C.  Age verification will prevent some users from accessing social media at all. ........... 15

    D.  S.B. 396's age verification requirement will impermissibly burden adult speech. .... 16

III.  Requiring parental consent for minors will impermissibly burden users ........................... 18

    CONCLUSION ..................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Gonzales*,
     478 F. Supp. 2d 775 (E.D. Pa. 2007) ............................................................................ *passim*

*ACLU v. Johnson*,
     194 F.3d 1149 (10th Cir. 1999) ................................................................................. 1

*ACLU v. Johnson*,
     4 F.Supp.2d 1029 (D.N.M.1998) ............................................................................. 13

*ACLU v. Mukasey*,
     534 F.3d 181 (3d Cir. 2008)............................................................................ *passim*

*American Amusement Machine Association. v. Kendrick*,
     244 F.3d 572 (7th Cir. 2001) .......................................................................... 19, 21

*American Booksellers Foundation for Free Expression v. Sullivan*,
     799 F. Supp. 2d 1078 (D. Alaska 2011) .................................................................. 16

*American Booksellers Foundation v. Dean*,
     342 F.3d 96 (2d Cir. 2003)................................................................................ 11, 15, 16

*Ashcroft v. ACLU*,
     542 U.S. 656 (2004)................................................................................... 16, 17

*Brown v. Entertainment Merchants Association*,
     564 U.S. 786 (2011).................................................................................... *passim*

*Calzone v. Summers*,
     942 F.3d 415 (8th Cir. 2019) ........................................................................... 12

*Counts v. Cedarville School District*,
     295 F. Supp. 2d 996 (W.D. Ark. 2003).................................................................. 22

*Cyberspace, Communications, Inc. v. Engler*,
     55 F. Supp. 2d 737 (E.D. Mich. 1999)................................................................. 12, 13, 14

*Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.*,
     518 U.S. 727 (1996)................................................................................... 15

*Erznoznik v. Jacksonville*,
     422 U.S. 205 (1975).................................................................................. 18, 19, 20

*Garnier v. O'Connor-Ratcliff,*
41 F.4th 1158 (9th Cir. 2022) ................................................... 6

*In re Anonymous Online Speakers,*
661 F.3d 1168 (9th Cir. 2011) ................................................... 12

*Interactive Digital Software Association v. St. Louis County, Missouri,*
329 F.3d 954 (8th Cir. 2003) ................................................. 11, 21

*Lowry v. Watson Chapel School District,*
540 F.3d 752 (8th Cir. 2008) ..................................................... 1

*Mahanoy Area School District v. B. L. by & through Levy,*
141 S. Ct. 2038 (2021) ........................................................ 1, 18

*McIntyre v. Ohio Elections Commision,*
514 U.S. 334 (1995) ........................................................... 12, 14

*Minneapolis Star & Tribune Company v. Minnesota Commissioner of Revenue,*
460 U.S. 575 (1983) .............................................................. 17

*NetChoice, L.L.C. v. Paxton,*
49 F.4th 439 (5th Cir. 2022) ................................................... 3, 7

*Packingham v. North Carolina,*
582 U.S. 98 (2017) .......................................................... *passim*

*PSINET, Inc. v. Chapman,*
362 F.3d 227 (4th Cir. 2004) ................................................ *passim*

*PSINET, Inc. v. Chapman,*
167 F. Supp. 2d 878 (W.D. Va. 2001) ........................................... 14

*Reno v. ACLU,*
521 U.S. 844 (1997) ........................................................ *passim*

*Rowan v. U.S. Post Office Department,*
397 U.S. 728 (1970) ............................................................. 18

*Shipley, Inc. v. Long,*
454 F. Supp. 2d 819 (E.D. Ark. 2004) ....................................... 1, 16

*State v. Weidner,*
235 Wis. 2d 306 (2000) ......................................................... 12

iv

*Talley v. California,*
  362 U.S. 60 (1960) .................................................................................. 14

*Tinker v. Des Moines Independent Community School District,*
  393 U.S. 503 (1969) .................................................................................. 1

*United States v. Playboy Entertainment Group,*
  529 U.S. 803 (2000) ................................................................................ 17

*Winters v. New York,*
  333 U.S. 507 (1948) ................................................................................ 11

**Statutes**

Act 689 of 2023 ("S.B. 396") ................................................................ *passim*

S.B. 396 § 4-88-1102(c)(2)(B) ................................................................ 11

S.B. 396 § 4-88-1101 (4) ........................................................................ 11

S.B. 396 § 4-88-1102 (b)(2) .................................................................... 18

S.B. 396 § 4-88-1102 (c)(1) .................................................................... 11

S.B. 396 § 4-88-1102 (c)(2)(A) .............................................................. 11

S.B. 396 § 4-88-1102(a) .......................................................................... 18

S.B. 396 § 4-88-1102(b)(1) ...................................................................... 11

S.B. 396 § 4-88-1102(c)(2)(C) ................................................................ 11

S.B. 396 § 4-88-1103(2) .......................................................................... 15

**Other Authorities**

#drawingtips, Instagram ............................................................................ 7

@IamTravisNelson, Twitter (June 13, 2023, 10:02 PM) .......................... 6

@SarahHuckabee, Twitter (April 11, 2023, 6:41 PM) .............................. 6

"The Violin Channel," Facebook ................................................................ 7

Aaron Smith & Sono Shah, *Though Not Especially Productive in Passing Bills, the 116th
  Congress Set New Marks for Social Media Use,*
  Pew Rsch. Ctr. (Jan. 25, 2021) ................................................................ 6

Agape Church LR, Facebook ............................................................................................ 9

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'*
    BBC (Nov. 29, 2020) .................................................................................................. 10

Andrew Perrin, *23% of Users in U.S. Say Social Media Led Them to Change Views on an*
    *Issue; Some Cite Black Lives Matter,*
    Pew Rsch. Ctr. (Oct. 15, 2020) .................................................................................. 4

Bentonville Arkansas Temple, Facebook ........................................................................ 9

Brooke Auxier & Monica Anderson, *Social Media Use in 2021,*
    Pew Rsch. Ctr. (Apr. 7, 2021) ................................................................................... 3

Brooke Auxier, *Activism on Social Media Varies by Race and*
    *Ethnicity, Age, Political Party,*
    Pew Rsch. Ctr. (Jul. 13, 2020) .................................................................................. 4

Brooke Auxier, *Social Media Continue to Be Important Political*
    *Outlets for Black Americans,*
    Pew Rsch. Ctr. (Dec. 11, 2020) ................................................................................ 5

Carrie Back, *How Indigenous Creators Are Using TikTok To Share Their Cultures,*
    Travel and Leisure (Oct. 21, 2022) ........................................................................... 9

Chenda Ngak, *Occupy Wall Street Uses Social Media to Spread Nationwide,*
    CBS News (Oct. 13, 2011) ......................................................................................... 5

Claire Cain Miller, *For One Group of Teenagers, Social Media*
    *Seems a Clear Net Benefit,*
    N.Y. Times (May 24, 2023) ..................................................................................... 10

Dalai Lama (@DalaiLama), Twitter ................................................................................ 9

Douglas A. Blackmon et al., *Birth of a Movement,*
    Wall St. J. (Oct. 29, 2010) ......................................................................................... 4

Elizabeth Dias, *Facebook's Next Target: The Religious Experience,*
    N.Y. Times (Jul. 25, 2021) ......................................................................................... 9

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media:*
    *Key Findings From Pew Research Center Surveys,*
    Pew Rsch. Ctr. (Apr. 24, 2023) .................................................................................. 7

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the*
  *Reality of Being Sick,*
  Teen Vogue (Sept. 22, 2022) ................................................................ 10

Geyer Springs FBC, Facebook ............................................................... 9

Gov. Mike Dunleavy, Facebook (May 21, 2019) ................................... 7

*How Justin Bieber proved that YouTube can produce pop stars,*
  CBC Music (June 7, 2019) ..................................................................... 8

*How To Get A Driver's License In Arkansas As An Undocumented Immigrant,*
  USCIS Guide .......................................................................................... 16

Banksy (@Banksy) https://www.instagram.com/banksy/ ....................... 14

Islamic Center of Little Rock, Facebook ............................................... 9

Jem Aswad, *How Shawn Mendes Is Turning Vine Fame into a Music Career,*
  Billboard (Jul. 18, 2014) ........................................................................ 8

John Paul Brammer, *LGBTQ and Out on Social media – But Nowhere Else,*
  NBC News. (Oct. 11, 2017) .................................................................... 10

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online,*
   The Verge (July 27, 2021) ...................................................................... 18

Makeda Easter, *Rise of the Dancefluencer,*
  L.A. Times (Jan. 16, 2020) ..................................................................... 8

Matt Petronzio, *How Young Native Americans Built and*
  *Sustained the #NoDAPL Movement,*
  Mashable (Dec. 7, 2016) ......................................................................... 5

Matthew N. Berger, et al. *Social Media Use and Health and Well-being of Lesbian, Gay,*
  *Bisexual, Transgender, and Queer Youth: Systematic Review.*
  21 J. Medical Internet Rsch. e38449, (2022) ......................................... 13

Megan Russo, *Mismatched Gender Markers on State ID Cards,*
  The Regulatory Review (Mar. 10, 2021) ................................................ 16

Michelle Faverio et al., *Online Religious Services Appeal to Many Americans,*
  *But Going in Person Remains More Popular,*
  Pew Rsch. Ctr. (Jun. 2, 2023) ................................................................ 9

Monica Anderson & Skye Toor, *How Social Media Users Have Discussed Sexual
  Harassment Since #MeToo Went Viral,*
  Pew Rsch. Ctr. (Oct. 11, 2018) ............................................................................ 6

Paulasojoro, TikTok .................................................................................................. 10

Pope Francis (@franciscus), Instagram ...................................................................... 9

Rainier Harris, *How Young People Use Social Media to Engage Civically*,
  PBS (Nov. 5, 2020) ............................................................................................ 4, 18

Ramona Alaggia & Susan Wang, *"I never told anyone until the #metoo movement":*
  *What Can We Learn From Sexual Abuse and Sexual Assault Disclosures*
  *Made Through Social Media?,*
  Child Abuse & Neglect 103 (2020) 104312 .......................................................... 5, 6

Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their*
  *Followers Engaged,*
  Vox (Sept. 18, 2020) ............................................................................................ 9

Sam Bestvater et. al., *#BlackLivesMatter Turns 10,*
  Pew Rsch. Ctr. (Jun. 29, 2023) ............................................................................. 5

Sam Bestvater et. al., *Politics on Twitter: One-Third of Tweets from*
  *U.S. Adults Are Political,*
  Pew Rsch. Ctr. (Jun. 16, 2022) ............................................................................. 4

Sarah M. Parsloe & Avery E. Holton, *#Boycottautismspeaks: Communicating a*
  *Counternarrative Through Cyberactivism and Connective Action,*
  21 Info., Commc'n. & Soc'y, 2017 ........................................................................ 5

Shriya Bhattacharya, *How TikTok Became a 'Gold Mine' For Dancers Looking to Get*
  *Discovered and Changed the Way They Make Money,*
  Insider (Apr. 7, 2023) ........................................................................................... 8

Temple Shalom of Northwest Arkansas, Facebook ..................................................... 9

Tess Eyrich, *The Future of the Town Hall is Online*,
  UC Riverside News (Oct. 1, 2018) ........................................................................ 7

Victoria Rideout et al., *Common Sense census: Media Use by Tweens and Teens,*
  Common Sense (2022) ........................................................................................ 3,7

Wynne Davis, *It's Not Just The Park Service: 'Rogue' Federal Twitter Accounts Multiply,*
  NPR (Jan. 27, 2017) ............................................................................................ 14

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union (ACLU) is a nonprofit, nonpartisan membership organization devoted to protecting the civil rights and civil liberties of all Americans, including the First Amendment rights to free speech, anonymity, and access to information online. The ACLU of Arkansas is a state affiliate of the ACLU. The ACLU and ACLU of Arkansas have frequently appeared before courts to advocate for First Amendment rights online, *see, e.g., Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (amicus), and the free speech rights of young people, *see, e.g., Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038 (2021) (counsel); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (counsel); *Lowry v. Watson Chapel Sch. Dist.,* 540 F.3d 752 (8th Cir. 2008) *cert. denied* 555 U.S. 1212 (Mar. 2, 2009) (counsel); *Shipley, Inc. v. Long,* 454 F.Supp.2d 819 (E.D. Ark. 2004) (counsel). The ACLU and ACLU of Arkansas have also litigated many of the seminal cases striking down laws that prohibited the communication of certain materials online without age verification. *See e.g., Reno*, 521 U.S. 844; *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999).

Recognizing the internet's power as a tool of democratization, the Electronic Frontier Foundation (EFF) has, for nearly 30 years, worked, on behalf of its more than 39,000 dues-paying members, to protect the rights of users to transmit and receive information online. EFF represents clients in impact litigation at the intersection of civil liberties and technology and frequently files amicus briefs in cases raising those issues.

---

[1] Counsel for amici certify that no counsel for a party authored this brief in whole or in part, and that no person other than amici curiae, their members, or their counsel made a monetary contribution to its preparation or submission.

Amici submit this brief to highlight the breadth of expression that occurs on social media and the burdens S.B. 396 will place on social media users, including adults.

## INTRODUCTION

If allowed to go into effect, Act 689 of 2023 ("S.B. 396") will require every person—including every adult—to verify their age before they can access their existing social media accounts or create new ones. If a user fails to show that they are 18 or older, S.B. 396 will additionally require them to obtain explicit parental consent in order to engage on social media. These requirements violate users' First Amendment rights.

People rely on social media to keep up to date on the news, engage with elected officials, connect with friends, create art, and build movements. Websites like Facebook, Twitter, Instagram, and TikTok allow children and adults to discover different perspectives, discuss social and political issues, and develop a better understanding of others' beliefs and opinions. Social media provides access to a vast array of information and ideas, and fosters communication and association between people who might otherwise never speak to each other. Social media use is protected by the First Amendment.

Requiring individuals to verify their ages before using social media will impose significant burdens on the exercise of First Amendment rights online. S.B. 396 will rob people of anonymity, deter privacy- and security-minded users, and block some individuals from accessing the largest social media platforms at all. Additionally, imposing a parental consent requirement on access for young people will impermissibly burden their rights to access information and express themselves online, stigmatize the use of social media, and run counter to the parental authority of parents who do not object to their kids using social media.

Time and again, courts—including the Supreme Court and the Eighth Circuit—have held that such burdens on users' access to, and ability to engage with, protected speech are

2

unconstitutional. Laws prohibiting the communication of certain materials online without verifying the ages of recipients have been struck down repeatedly, as have laws requiring parental consent for minors to access violent video games and other content that government actors have found objectionable. The same result is warranted here.

## ARGUMENT

### I. Core First Amendment activity takes place on social media.

In 2017, the Supreme Court recognized that the "most important places . . . for the exchange of views" are "the 'vast democratic forums of the Internet' in general . . . and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (quoting *Reno v. ACLU*, 521 U.S. 844, 868 (1997)). Since then, social media platforms' "position as the modern public square has only become more entrenched," "as the public's usage of and dependence on the Platforms has continued to increase." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 475 (5th Cir. 2022). Roughly 70 percent of American adults,[2] 84 percent of teenagers, and 38 percent of children ages 8–12 use social media.[3] People rely on it to share news, opinions, and ideas; participate in social and political movements; interact with their government representatives; and express themselves creatively. "In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105 (quoting *Reno*, 521 U.S. at 852).

---

[2] Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Rsch. Ctr. (Apr. 7, 2021), https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-2021/.

[3] Victoria Rideout et al., *Common Sense census: Media Use by Tweens and Teens, 2021*, Common Sense, 33 (2022), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

### A.    People use social media to engage in political expression.

Much of today's core political speech occurs on social media. Thirty-three percent of American adults' tweets are political in nature.[4] Even those who are too young to vote use social media to educate themselves and share political opinions.[5]

Social media exposes people to a wide range of views and perspectives, and can challenge unquestioned assumptions and beliefs. Indeed, roughly 23 percent of adult social media users in the United States "say they have changed their views about a political or social issue because of something they saw on social media in the past year."[6]

In a 2020 Pew Research Center survey, roughly one-third of American adults said they have used social media websites "to post a picture to show their support for a cause, look up information about rallies or protests happening in their area . . . or encourage others to take action on issues they regard as important."[7] Social media has been central to organizing, joining, and participating in social and political movements from the Tea Party movement,[8] to Occupy

---

[4] Sam Bestvater et. al., *Politics on Twitter: One-Third of Tweets from U.S. Adults Are Political*, Pew Rsch. Ctr. (Jun. 16, 2022), https://www.pewresearch.org/politics/2022/06/16/politics-on-twitter-one-third-of-tweets-from-u-s-adults-are-political/.

[5] Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://www.pbs.org/newshour/classroom/2020/11/student-voice-how-young-people-use-social-media-to-engage-civically/.

[6] Andrew Perrin, *23% of Users in U.S. Say Social Media Led Them to Change Views on an Issue; Some Cite Black Lives Matter*, Pew Rsch. Ctr. (Oct. 15, 2020), https://www.pewresearch.org/short-reads/2020/10/15/23-of-users-in-us-say-social-media-led-them-to-change-views-on-issue-some-cite-black-lives-matter/.

[7] Brooke Auxier, *Activism on Social Media Varies by Race and Ethnicity, Age, Political Party*, Pew Rsch. Ctr. (Jul. 13, 2020), https://www.pewresearch.org/short-reads/2020/07/13/activism-on-social-media-varies-by-race-and-ethnicity-age-political-party/.

[8] Douglas A. Blackmon et al., *Birth of a Movement,* Wall St. J. (Oct. 29, 2010), http://on.wsj.com/2hZCWio.

Wall Street,[9] to indigenous organizing to protest the Dakota Access Pipeline,[10] to the boycott of Autism Speaks.[11]

It has also led to new forms of movement building and community organizing. Black Lives Matter, for example, "stands as a model of a new generation of social movements intrinsically linked to social media."[12] More than 44 million tweets have included "#BlackLivesMatter" in the past ten years, and 77 percent of social media users say they have seen content related to Black Lives Matter on social media,[13] with spikes corresponding to current events as people share news and reactions related to police brutality and organize protests.[14]

Similarly, while activist Tarana Burke founded the MeToo movement in 2006, it was not widely popularized until "#metoo" went viral on Twitter in 2017. Seeing others post on social media about their experiences with sexual assault prompted many to discuss their own for the first time.[15] For many #metoo posters, "[k]nowing that they are not alone . . . and that

---

[9] Chenda Ngak, *Occupy Wall Street Uses Social Media to Spread Nationwide,* CBS News (Oct. 13, 2011), http://cbsn.ws/2gM2C0L.

[10] Matt Petronzio, *How Young Native Americans Built and Sustained the #NoDAPL Movement,* Mashable (Dec. 7, 2016), https://mashable.com/article/standing-rock-nodapl-youth.

[11] Sarah M. Parsloe & Avery E. Holton, *#Boycottautismspeaks: Communicating a Counternarrative Through Cyberactivism and Connective Action*, 21 Info., Commc'n. & Soc'y, 2017, https://www.tandfonline.com/doi/full/10.1080/1369118X.2017.1301514.

[12] Sam Bestvater et. al., *#BlackLivesMatter Turns 10*, Pew Rsch. Ctr. (Jun. 29, 2023), https://www.pewresearch.org/internet/2023/06/29/blacklivesmatter-turns-10/.

[13] *Id.*

[14] Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://www.pewresearch.org/short-reads/2020/12/11/social-media-continue-to-be-important-political-outlets-for-black-americans/.

[15] Ramona Alaggia & Susan Wang, *"I never told anyone until the #metoo movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, Child Abuse & Neglect 103 (2020) 104312, at 4 (referring to social media posts like "I never

collectively they have a voice seemed to underly their motivations [for speaking out]."[16] And this social media movement reached government officials: in the months following the surge of #metoo posts, 44 percent of congresspeople mentioned sexual misconduct on their official Facebook accounts.[17]

Social media also allows individuals to engage with, and learn about, their elected representatives more broadly.[18] "From local county supervisors and state representatives to the President of the United States, elected officials across the country increasingly rely on social media both to promote their campaigns and, after election, to communicate with constituents and seek their input in carrying out their duties as public officials." *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1163 (9th Cir. 2022), *cert. granted,* 143 S. Ct. 1779 (2023). "Governors in all 50 States and almost every Member of Congress have set up accounts," allowing users to "engage with them in a direct manner." *Packingham*, 582 U.S. at 104–05. Public officials' posts contain anything from political opinions to information about finding temporary shelter after a tornado[19] to polls about contemporary issues.[20] And some have used social media to host virtual town

---

told anyone until the #metoo movement about one of my assaults" and "I've never told anyone except Twitter").

[16] *Id.* at 7.

[17] Monica Anderson & Skye Toor, *How Social Media Users Have Discussed Sexual Harassment Since #MeToo Went Viral*, Pew Rsch. Ctr. (Oct. 11, 2018), https://www.pewresearch.org/short-reads/2018/10/11/how-social-media-users-have-discussed-sexual-harassment-since-metoo-went-viral/.

[18] *See* Aaron Smith & Sono Shah, *Though Not Especially Productive in Passing Bills, the 116th Congress Set New Marks for Social Media Use*, Pew Rsch. Ctr. (Jan. 25, 2021), https://www.pewresearch.org/short-reads/2021/01/25/though-not-especially-productive-in-passing-bills-the-116th-congress-set-new-marks-for-social-media-use/.

[19] *See, e.g.*, @SarahHuckabee, Twitter (April 11, 2023, 6:41 PM), https://twitter.com/SarahHuckabee/status/1645965414919290890

[20] *See, e.g.*, @IamTravisNelson, Twitter (June 13, 2023, 10:02 PM), https://twitter.com/IamTravisNelson/status/1668846327177048064.

halls,[21] which attract younger and lower-income voters.[22] It is therefore no stretch to suggest that social media platforms "are the forum for political discussion and debate, and exclusion from [them] amounts to exclusion from the public discourse." *Paxton*, 49 F.4th at 475–76.

### B. People use social media for artistic expression.

Many users see social media as a space to create. In a Pew Research study, 71 percent of teens reported that what they see on social media makes them feel "[l]ike they have a place where they can show their creative side."[23] "In any given day, about one in 10 tweens and teens will use their digital devices to create some type of art or music."[24]

For those looking to expand their creative horizons, social media offers an endless source of free information and tutorials. "The Violin Channel" on Facebook offers "classical music news, beyond just the violin and strings, to include masterclasses, competitions, interviews, educational resources, events, and concert live streams."[25] Searching "#drawingtips" on Instagram brings up more than 166,000 posts that can help budding artists learn to draw and avoid common mistakes.[26] And TikTok has "introduc[ed] people to different dance styles, from

---

[21] *See, e.g.* Gov. Mike Dunleavy, Facebook (May 21, 2019), https://www.facebook.com/GovDunleavy/videos/live-town-hall-meeting-i-hope-you-can-join-me-today-friday-may-31st-at-noon-for-/614354619039103/.

[22] Tess Eyrich, *The Future of the Town Hall is Online*, UC Riverside News (Oct. 1, 2018), https://news.ucr.edu/articles/2018/10/01/future-town-hall-online.

[23] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys/.

[24] Victoria Rideout et al., *Common Sense census: Media Use by Tweens and Teens*, Common Sense, 41 (2022), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

[25] "The Violin Channel," Facebook, https://www.facebook.com/theviolinchannel/about_details.

[26] #drawingtips, Instagram, https://www.instagram.com/explore/tags/drawingtips/.

Afrobeats to salsa, and boost[ed] enrollment for various types of dance classes."[27] Children no longer need to enroll in expensive art classes or work with private tutors to practice artistic skills; they can create and share for free on social media.

Social media allows people of all ages, shapes, colors, and abilities to share their unique artistic talents. For example, Amanda LaCount, who "never saw her body type represented onstage," has used Instagram to share her dancing with hundreds of thousands of people—including aspiring dancers and high-profile choreographers.[28] Popular singer Shawn Mendes learned to play guitar by watching YouTube videos, and was discovered by a manager who saw his covers on Vine, a video-sharing social media platform.[29] Other popular musicians, including Justin Bieber, Alessia Cara, and Ed Sheeran, were also discovered on social media platforms.[30]

### C.   People use social media for religious worship and fellowship.

Many people take to social media to share religious beliefs, connect with others of the same faith, or explore their religious identity. Seventeen percent of U.S. adults say they post about religion on social media, and 42 percent say they have seen someone else's prayer request

---

[27] Shriya Bhattacharya, *How TikTok Became a 'Gold Mine' For Dancers Looking to Get Discovered and Changed the Way They Make Money*, Insider (Apr. 7, 2023), https://www.businessinsider.com/tiktok-changed-dance-industry-professional-dancers-choreography-artists-movement-trends-2023-4?op=1.

[28] Makeda Easter, *Rise of the Dancefluencer*, L.A. Times (Jan. 16, 2020), https://www.latimes.com/projects/la-social-media-dance-influencer/.

[29] Jem Aswad, *How Shawn Mendes Is Turning Vine Fame into a Music Career*, Billboard (Jul. 18, 2014), https://www.billboard.com/music/music-news/shawn-mendes-vine-magazine-story-6165603/.

[30] *How Justin Bieber proved that YouTube can produce pop stars*, CBC Music (June 7, 2019), https://www.cbc.ca/music/how-justin-bieber-proved-that-youtube-can-produce-pop-stars-1.5163197.

online.[31] More than 18 million Twitter users follow the Dalai Lama's account,[32] and more than 9 million Instagram users follow Pope Francis's account.[33] Places of worship use social media to share information about upcoming events, livestream services, and foster community.[34] During the COVID-19 pandemic, many religious institutions built out their social media presence to ensure their congregations could stay connected.[35] Today, social media remains a vital source of community and information for religious and spiritual people.[36]

### D.   People use social media to share minority views and experiences.

While mainstream media might promote majority viewpoints and portray minority communities in stereotypical ways, social media allows individuals to share their personal stories and perspectives, thereby making those perspectives more widely accessible to others. For example, Indigenous people around the world use TikTok to showcase traditional dancing, discuss the significance of braids, and bring attention to issues facing their communities today.[37]

---

[31] Michelle Faverio et al., *Online Religious Services Appeal to Many Americans, But Going in Person Remains More Popular*, Pew Rsch. Ctr. (Jun. 2, 2023), https://www.pewresearch.org/religion/2023/06/02/online-religious-services-appeal-to-many-americans-but-going-in-person-remains-more-popular/.

[32] Dalai Lama (@DalaiLama), Twitter, https://twitter.com/dalailama.

[33] Pope Francis (@franciscus), Instagram, https://www.instagram.com/franciscus/.

[34] *See, e.g.*, Geyer Springs FBC, Facebook, https://www.facebook.com/geyerspringschurch; Agape Church LR, Facebook, https://www.facebook.com/AgapeChurchLR; Bentonville Arkansas Temple, Facebook, https://www.facebook.com/BentonvilleTemple/; Islamic Center of Little Rock, Facebook, https://www.facebook.com/theiclr.org/; Temple Shalom of Northwest Arkansas, Facebook, https://www.facebook.com/TempleShalomOfNorthwestArkansas.

[35] Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020), https://www.vox.com/recode/2020/9/18/21443661/religion-logging-off-online-engagement-content-creators.

[36] *See* Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (Jul. 25, 2021), https://www.nytimes.com/2021/07/25/us/facebook-church.html.

[37] Carrie Back, *How Indigenous Creators Are Using TikTok To Share Their Cultures*, Travel and Leisure (Oct. 21, 2022), https://www.travelandleisure.com/culture-design/how-indigenous-

And many young LGBTQ people who face discrimination and judgment offline turn to social media for community, exploration, and support.[38]

People with disabilities have also used social media to build community and educate others. Paula Sojo was nineteen years old when she got her first ostomy bag, and felt isolated and embarrassed sitting in the hospital surrounded by other patients decades older than her.[39] She took to TikTok to share her experience with Crohn's disease, and now has 284.7 thousand followers who discuss their own chronic illnesses in comments and ask questions about Sojo's.[40] Sojo uses her TikTok in this way both "to create a community for other chronically ill people" and "to educate able-bodied people on what it's like to live with a chronic illness."[41]

\* \* \*

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. As the foregoing examples demonstrate, this is precisely what occurs on social media. Regardless of whether this Court believes social media "adds anything of value to society," it is "as much entitled to the protection of free speech as the best of literature."

---

creators-use-tiktok-to-share-their-cultures; *see also* #nativetiktok, TikTok, https://www.tiktok.com/tag/nativetiktok.

[38] *See, e.g.*, Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://www.nytimes.com/2023/05/24/upshot/social-media-lgbtq-benefits.html; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed*,' BBC (Nov. 29, 2020), https://www.bbc.com/news/av/uk-55079954; John Paul Brammer, *LGBTQ and Out on Social media – But Nowhere Else*, NBC News. (Oct. 11, 2017), https://www.nbcnews.com/feature/nbc-out/lgbtq-out-social-media-nowhere-else-n809796.

[39] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://www.teenvogue.com/story/chronic-illness-influencers-on-tiktok-are-showing-the-reality-of-being-sick.

[40] *Id.*; Paulasojoro, TikTok, https://www.tiktok.com/@paulasojoro.

[41] *Id.*

*Interactive Digital Software Ass'n v. St. Louis Cnty., Mo.*, 329 F.3d 954, 958 (8th Cir. 2003)

(quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)); *see also Brown v. Ent. Merchants*

*Ass'n*, 564 U.S. 786, 790 (2011) (noting that First Amendment principles apply to new forms of

communication regardless of their esthetic and moral value). Social media websites "can provide

perhaps the most powerful mechanisms available to a private citizen to make his or her voice

heard," and burdens on access to social media can have devastating consequences for First

Amendment activity. *Packingham*, 582 U.S. at 107.

## II.    Requiring age verification will impermissibly burden users, including adults.

If S.B. 396 is allowed to go into effect, social media users—including adults—will have

to "verify" their ages before they can access their existing social media accounts or create new

ones. § 4-88-1102(b)(1), (c)(1). Pursuant to the law, they will need to use "a state-approved

application" that connects to "the Office of Driver Services" to offer a "digitized identification

card," *id.* (c)(2)(A), § 4-88-1101 (4); other "[g]overnment-issued identification," § 4-88-

1102(c)(2)(B); or "[a]ny commercially reasonable age verification method" that the social media

company chooses. § 4-88-1102(c)(2)(C). This will burden users who do not have government

identification, who want to engage in anonymous speech or are otherwise concerned about

privacy and security, or whose age or identity "commercially reasonable . . . method[s]" will fail

to accurately gage. For these reasons, courts have consistently struck down attempts to impose

age verification schemes online in the name of protecting children.

### A.    Age verification will rob users of anonymity.

Age verification schemes "are not only an additional hassle," but "they also require that

website visitors forgo the anonymity otherwise available on the internet." *Am. Booksellers*

*Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003). They force users to "relinquish their anonymity

11

to access protected speech, and . . . create a potentially permanent electronic record" of the sites users choose to visit. *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008). That "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity." *State v. Weidne*r, 235 Wis. 2d 306, 320 (2000). And, not surprisingly, it "discourage[s] users from accessing [the regulated] sites." *Reno*, 521 U.S. at 856.

"As the Supreme Court has recognized, speakers ordinarily have the right to keep their identities private. In fact, the right to remain nameless is 'an aspect of the freedom of speech protected by the First Amendment' and a component of 'a respected tradition of anonymity in the advocacy of political causes.'" *Calzone v. Summers*, 942 F.3d 415, 425 (8th Cir. 2019) (quoting *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 341–43 (1995)). "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre*, 514 U.S. at 341–42. These concerns—and the right to speak anonymously— necessarily translate to the Internet, where "any person . . . can become a town crier" and the content "is as diverse as human thought." *Reno*, 521 U.S. at 870. "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

Courts have recognized the importance of protecting anonymous speech online when striking down age verification requirements similar to the one at issue here.  "[P]reserv[ing] anonymity" may be essential for users who seek to have "a distinct online identity," *Cyberspace, Commc'ns, Inc. v. Engler*, 55 F. Supp. 2d 737, 742 (E.D. Mich. 1999), *aff'd and remanded*, 238 F.3d 420 (6th Cir. 2000), who want to discuss "sensitive, personal, controversial, or stigmatized

content," *ACLU v. Gonzales,* 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007), *aff'd sub nom. Mukasey*,

534 F.3d 181, or who want to ask personal questions. *See, e.g., Cyberspace, Commc'ns, Inc*, 55

F. Supp. 2d at 749 (noting example of teenager relying on anonymity when "asking . . . about an

encounter with her boyfriend that she incorrectly reasoned was not sexual intercourse");

*Gonzales,* 478 F. Supp. 2d at 806 (recognizing "importan[ce]" of anonymity "for users with

embarrassing medical and sexual questions which they would not even discuss with their mates

or personal physicians"); *ACLU v. Johnson*, 4 F.Supp.2d 1029, 1032 (D.N.M.1998), *aff'd*, 194

F.3d 1149 (10th Cir. 1999) ("Requiring age verification before providing access to speech on the

Internet would bar many people from accessing important information—such as gynecological

information—anonymously.").

     This may be particularly important for users exploring their identities, including

transgender and queer youth. A recent meta-analysis of "moderate to high quality" studies of

"how LGBTQ youths and adolescents use social media for connection . . ., identity development,

and social support" found that "allow[ing] gender-diverse users to change their nicknames to suit

their identity . . . could aid in gradual identity disclosure," that "having multiple social media

accounts permitted LGBTQ youths to express and explore identities with specific audiences with

anonymity," and that giving young people the ability to "control the expression of their sexual

and gender identities [helped] prevent or reduce exposure to stigma and discrimination."[42]

---

[42] Matthew N. Berger, et al. *Social Media Use and Health and Well-being of Lesbian, Gay, Bisexual, Transgender, and Queer Youth: Systematic Review*. 21 J. Medical Internet Rsch.e38449, (2022).

Requiring age verification may also stifle the speech of whistleblowers, dissidents,[43] authors, and other artists.[44] "Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." *McIntyre*, 514 U.S. at 342 (quoting *Talley v. California*, 362 U.S. 60, 64 (1960)). And, "quite apart from any threat of persecution, an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity." *Id.*

In addition, without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINET, Inc. v. Chapman*, 362 F.3d 227, 236 (4th Cir. 2004). Equally, certain conversations simply may not happen, with significant practical effects. "Without open discussion" on sensitive topics, for example, "there would quite possibly be greater numbers of teenage pregnancy or sexually transmitted diseases. This would be contrary to the interests of the [government]." *Cyberspace, Commc'ns, Inc.*, 55 F. Supp. 2d. at 749.

## B.   Age verification will raise additional privacy and security concerns.

Age verification schemes also implicate other "privacy and security concerns." *Mukasey*, 534 F.3d at 197. Courts have repeatedly found that "[r]equiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and because Internet users are afraid of fraud and identity theft on the Internet." *Gonzales*, 478 F. Supp. 2d at 806; *see also PSINET, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001),

---

[43] *See, e.g.,* Wynne Davis, *It's Not Just The Park Service: 'Rogue' Federal Twitter Accounts Multiply*, NPR (Jan. 27, 2017), https://www.npr.org/sections/alltechconsidered/2017/01/27/512007632/its-not-just-the-park-service-rogue-federal-twitter-accounts-multiply

[44] *See, e.g.,* Banksy (@Banksy) https://www.instagram.com/banksy/

*aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access their [identifying information] . . . may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide.").

Though S.B. 396 would prohibit social media companies from "retain[ing] any identifying information . . . after access to the social media platform has been granted," § 4-88-1103(2), courts have not been impressed by similar requirements when considering other age verification schemes. Such requirements fail to "alleviate the deterrent effect of age verification on users, because users must still disclose the personal information to [a company] . . .  and then rely on [said company] . . . to comply with the confidentiality requirement." *Gonzales*, 478 F. Supp. 2d at 806. *Cf. Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 754 (1996) (holding provision that required subscribers to provide written notice to operators if they wanted access to certain TV channels unconstitutional in part because "the 'written notice' requirement will further restrict viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish the watch the 'patently offensive' channel"). Moreover, S.B. 396 fails to impose even an ostensibly privacy-protective requirement on any third parties that social media companies may rely on to verify users' ages.

C.    **Age verification will prevent some users from accessing social media at all.**

Finally, age verification requirements can "serve as a complete block to adults who wish to access [online] material but do not" have the necessary form of identification. *PSINET*, 362 F.3d at 237; *see also Am. Booksellers Found.*, 342 F.3d at 99 (striking down age verification requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites"). Under S.B. 396, that could include individuals who do not have a

15

driver's license or other government-issued form of identification, including undocumented immigrants who cannot obtain a State ID or driver's license.[45] And transgender and gender-nonconforming people might not have identification that matches their true identity—and that which they seek to portray on social media.[46]

### D. S.B. 396's age verification requirement will impermissibly burden adult speech.

Courts have consistently struck down laws prohibiting the communication of certain content to minors online, absent age verification, in part because of the burdens on users. A law that "'effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another . . . is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purposes that the statute was enacted to serve.'" *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (quoting *Reno*, 521 U.S. at 874). *See also PSINET, Inc.*, 362 F.3d at 235 (same); *Am. Booksellers Found. for Free Expression v. Sullivan*, 799 F. Supp. 2d 1078, 1082–83 (D. Alaska 2011) (same); *Am. Booksellers Found.*, 342 F.3d at 101 ("[R]estrictions aimed at minors may not limit non-obscene expression among adults."); *Shipley, Inc. v. Long*, 454 F. Supp. 2d 819, 831 (E.D. Ark. 2004) (holding unconstitutional a prohibition on the display of material harmful to minors because it would burden adults' and older minors' access to non-obscene materials).[47]

---

[45] *See How To Get A Driver's License In Arkansas As An Undocumented Immigrant*, USCIS Guide, https://www.uscisguide.com/state-issued-id/how-to-get-a-drivers-license-in-arkansas-as-an-undocumented-immigrant/.

[46] Megan Russo, *Mismatched Gender Markers on State ID Cards*, The Regulatory Review (Mar. 10, 2021), https://www.theregreview.org/2021/03/10/russo-mismatched-gender-markers-state-id-cards/.

[47] The State may argue that this is a requirement of strict scrutiny, which should not govern here because, in contrast to the cited cases, S.B. 396 is not limited to content that is "harmful to minors." However, Plaintiff has argued that S.B. 396 should be subject to strict scrutiny as a

Moreover, previous age verification cases have generally considered restrictions on the publication of information that the government argued is not protected vis-à-vis minor recipients. *See, e.g., Mukasey*, 534 F.3d at 187, 206. But S.B. 396 restricts speech that is protected for any person, including a minor, to receive; accordingly, the age verification requirement also impermissibly burdens minors' First Amendment rights.

Age verification requirements are more restrictive than policies enabling or encouraging users (or their parents) to control their own access to information, whether through user-installed devices and filters or affirmative requests to third party companies. "Filters impose selective restrictions on speech at the receiving end, not universal restrictions at the source." *Ashcroft*, 542 U.S. at 657. And "[u]nder a filtering regime, adults . . . may gain access to speech they have a right to see without having to identify themselves[.]" *Id.* Similarly, Congress could "act to encourage the use of filters . . .  by parents" to protect minors. *Id. Cf. United States v. Playboy Entertainment Group*, 529 U.S. 803, 809–10, 815 (2000) (finding that voluntary, "targeted blocking" of certain content by viewers "is less restrictive than banning" the same content). For this reason alone, S.B. 396 is unconstitutional.

---

speaker- and content-based law. Plaintiff's Br., ECF No. 18 at 23–29. In addition, many of the cases considering laws prohibiting the communication of certain information on the Internet without age verification have relied on the existence of less restrictive alternatives when striking the laws down as overbroad, not insufficiently tailored under strict scrutiny. *See Reno*, 521 U.S. at 864 (noting "the overbreadth of the CDA"); *id.* at 879 (describing the law's "facial overbreadth"); *Gonzales*, 478 F. Supp. 2d at 812 (noting that the Fourth Circuit in *PSINET* struck down such a law as "overly broad" (citing *PSINET*, 362 F.3d at 239)). Similarly, if the Court were to view S.B. 396 as regulation of an entire medium, the existence of less restrictive alternatives would be dispositive. *See, e.g., Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 585 n.7 (1983) (where the government "singles out" a particular medium—particularly one engaged in the publication of speech—for regulation, it "can survive only if the governmental interest outweighs the burden *and cannot be achieved by means that do not infringe First Amendment rights as significantly*" (emphasis added)).

17

**III.     Requiring parental consent for minors will impermissibly burden users.**

S.B. 396 additionally prohibits minors from having or opening a social media account without "the express consent of a parent or legal guardian." § 4-88-1102(a), (b)(2). This burdens the First Amendment rights of young people who use social media accounts, and of the adults who are interested in hearing what they have to say.

"Minors are entitled to a significant measure of First Amendment protection." *Brown*, 564 U.S. at 794 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–213 (1975)). This applies to the "public dissemination of protected materials to [minors]," which the government may bar "only in relatively narrow and well-defined circumstances." *Erznoznik*, 422 U.S. at 212–13. *See also Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 741 (1970) (Brennan, J., concurring) (a statute providing that "parents could prevent their children, even if they are 18 years old, from receiving political, religious, or other materials that the parents find offensive . . . [would] not [be] without constitutional difficulties"). This protection also applies to what young people—who are often at the forefront of movements, trends, and technologies[48]—can say. *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2044 (2021) (recognizing "significant . . . First Amendment protection" for what minors say online); *see also Brown*, 564 U.S. at 795, n.3 (discussing importance of protecting minors' right to attend rallies "in support of laws against corporal punishment of children, or laws in favor of greater rights for minors"). "Even where the protection of children is the object, the constitutional limits on governmental action apply." *Id.* at 804–05.

---

[48] *See e.g.,* Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, The Verge (July 27, 2021), https://www.theverge.com/22583848/disabled-teen-cripple-punk-media-representation; Rainier Harris, *How Young People Use Social Media To Engage Civically*, PBS (Nov. 5, 2020), https://www.pbs.org/newshour/classroom/2020/11/student-voice-how-young-people-use-social-media-to-engage-civically/.

Nearly every time a new communications technology emerges, some in society fear the effects it will have on children. "In the 1800's, dime novels depicting crime . . . were blamed in some quarters for juvenile delinquency. When motion pictures came along, they became the villains instead. . . . Radio dramas were next, and then came comic books. . . . And, of course, after comic books came television and music lyrics." *Id.* at 797–98. Video games followed. *Id.*[49] And yet the Supreme Court has, time and again, struck down legislation seeking to protect kids from purportedly dangerous new mediums. *See id.* (striking down law requiring parental consent before minors can access violent video games); *Reno*, 521 U.S. at 874 (invalidating statute prohibiting indecent communications available to minors online); *Erznoznik*, 422 U.S. at 212–13 (invalidating restriction on drive-in movies designed to protect children).

*Brown* is particularly instructive. In that case, the Supreme Court struck down a state law that prohibited the sale or rental of violent video games to minors—in effect, barring minors' access without parental consent—on First Amendment grounds. The state "claim[ed] that the Act is justified in aid of parental authority: By requiring that the purchase of violent video games can be made only by adults, the Act ensures that parents can decide what games are appropriate." *Brown*, 564 U.S. at 802. While recognizing that both this aim, and the legislature's goal of "addressing a serious social problem," were "legitimate," the Court held that, where First Amendment rights are involved, such aims "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive"—and that the statute failed to do. *Id* at 806.

---

[49] Often, as may be the case here, the concerns are motivated by perceptions that the medium at issue is uniquely "interactive"—but that too "is nothing new," for "all literature is interactive." *Id.* Indeed, "the better it is, the more interactive. Literature when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own." *Id.* (quoting *American Amusement Machine Ass'n. v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001)).

"As a means of protecting children from portrayals of violence, the legislation is seriously underinclusive, not only because it excludes portrayals other than video games, but also because it permits a parental . . . veto." *Id.* If the material is indeed "dangerous [and] mind-altering," the Court explained, it does not make sense to "leave [it] in the hands of children so long as one parent . . . says it's OK." *Id.* at 802.

Equally, "as a means of assisting concerned parents," the Court held that the regulation "is seriously overinclusive because it abridges the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime." *Id.* at 805. "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought to* want." *Id* at 804. *Cf. Reno*, 521 U.S. at 878 (holding that law prohibiting online distribution of certain materials to minors was overbroad in part because it would override the desires of parents who wanted their kids to "obtain information on the Internet that [they], in [their] parental judgment, deemed appropriate"). The Court thus rejected the idea "that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent,*" for "[s]uch laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795, n.3. "This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.* at 804.

The Court also expressed "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802. "Accepting that position would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik,* 422 U.S. at 212–213).

Each of those holdings governs here: To the extent that S.B. 396 is an attempt to protect minors from materials or interactions that harm them, it is "seriously underinclusive . . . because it permits a parental . . . veto." *Id.* at 805. To the extent that S.B. 396 is an attempt to "assist[ ] concerned parents," it is "seriously overinclusive because it abridges the First Amendment rights of young people whose parents . . . think [social media use is] a harmless pastime." *Id.* at 805. And it also raises First Amendment concerns because it seeks to punish third parties "*just in case* their parents disapprove." *Id.* at 802.

In a case that predates *Brown*, the Eighth Circuit reached the same conclusion with respect to a St. Louis ordinance that made it unlawful "to sell, rent, or make available graphically violent video games to minors . . . without a parent or guardian's consent." *Interactive Digital Software Ass'n*, 329 F.3d at 956. Without "denigrat[ing] the government's role in supporting parents, or the right of parents to control their children's exposure to graphically violent materials," the court held "that the government cannot silence protected speech by wrapping itself in the cloak of parental authority." *Id*. at 960.

As the Seventh Circuit explained when striking down a similar parental consent restriction on violent video games in *American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001)—relied on by both the Supreme Court in *Brown*, 564 U.S. at 798 and the Eighth Circuit in *Interactive Digital Software Ass'n*, 329 F.3d at 957–59—"it is obvious that [young people] must be allowed the freedom to form their political views on the basis of uncensored speech," in part because they "are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." 244 F.3d at 577. "To shield children right up to the age of 18 from exposure to violent descriptions and

images would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." *Id.* The same is true for social media.

The Western District of Arkansas similarly held that young people have the right to access information when striking down a policy that prohibited high school students from checking any *Harry Potter* books out of the school library without "a signed permission statement from their parent/legal guardian." The court concluded that "the stigmatizing effect of having to have parental permission to [exercise that right] constitutes a restriction on access." *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1001–02 (W.D. Ark. 2003). Equally, simply asking for their parents' consent, even if it would be granted, may discourage some young people from exercising their First Amendment rights on social media.

## CONCLUSION

To ensure that users' First Amendment rights are protected, amici respectfully request that the Court grant Plaintiff's Motion for a Preliminary Injunction.

Dated: July 14, 2023                    Respectfully submitted,

                                        **/s/ Holly Dickson**
                                        Holly Dickson, Ark. Bar No. 98137
                                        THE ARKANSAS CIVIL LIBERTIES
                                        UNION FOUNDATION, INC.
                                        904 West Second Street, Suite 1
                                        Little Rock, AR 72201
                                        (501) 374-2842
                                        holly@acluarkansas.org

                                        Vera Eidelman
                                        Laura Moraff
                                        Ben Wizner
                                        AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION
                                        125 Broad Street, 18th Fl.
                                        New York, NY 10004
                                        (212) 549-2500
                                        veidelman@aclu.org

David Greene
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org

*Counsel for Amici Curiae*