**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

NETCHOICE, LLC                                                                                    **Plaintiff**

**Case No. 5:23-cv-05105-TLB**

TIM GRIFFIN, in his official capacity
as Attorney General of Arkansas                                                   **Defendant**

**THE ATTORNEY GENERAL'S RESPONSE TO
NETCHOICE'S MOTION FOR A PRELIMINARY INJUNCTION**

Throughout our nation's history, governments have designated certain areas that are not appropriate for minors to occupy. From bars to casinos, state and local governments have regulated minors' access to such establishments, due to the potentially harmful nature of what lies inside. The Constitution has always allowed such regulations. The Social Media Safety Act of 2023[1] follows in those footsteps to address a new frontier, protecting minors from the harmful and predatory environments of social media. It does so by requiring all potential users to verify their age and by requiring minors to have parental permission to create an online profile.

Plaintiff NetChoice, LLC claims that Arkansas's protection of minors violates the free-speech rights of adults and minors in Arkansas, though NetChoice never asserts its members' own rights. Act 689, however, does not infringe on free speech because it regulates nonexpressive conduct by treating social media as places (like bars or casinos), and sets parameters for when minors can be present in those places. Moreover NetChoice does not have standing to bring First Amendment claims on behalf of third parties without first making any claims on behalf of itself. And even if NetChoice chins those bars, the Act is narrowly tailored to serve the compelling governmental

---

[1] The Social Media Safety Act was signed into law by Governor Sanders on April 11, 2023. See. 2023 Ark. Acts 689. The Act does not become effective until September 1, 2023. See 2023 Ark. Acts 689 §2.

interest of protecting minors. The Court should deny NetChoice's motion for a preliminary injunction.

## Facts

The term "social media" has become ubiquitous in today's society. Today about 70% of Americans use social media to connect with the world. *Social Media Fact Sheet*, Pew Rsch. Ctr. (Apr. 7, 2021).[2] In 2005, that number was 5%. *Id.* In the span of eighteen years, the method in which our citizenry communicates and interacts with each other, and with the world, has fundamentally changed. Now, an entire generation of minors have known nothing other than a world with social media. From birth, they have been constantly bombarded by a deluge of images, videos, and advertisements.

Despite the great power that social-media companies wield in our daily lives and the lives of our children, they have neglected their great responsibility. They have instead created platforms that are particularly addictive to minors to farm revenue. *Fact Sheet: Biden-Harris Administration Announces Actions to Protect Youth Mental Health, Safety, & Privacy Online*, Off. of the President (May 23, 2023) [hereinafter, "*Minors' Health, Safety, & Privacy Online*"].[3] They have "undeniabl[y]" contributed to the "unprecedented youth mental health crisis" that is raging through the United States. *Id.* They have "normalize[d] [self-harming] behaviors" by "show[ing] live depictions of self-harm acts like partial asphyxiation, leading to seizures, and cutting, leading to

---

[2] https://www.pewresearch.org/internet/fact-sheet/social-media.

[3] https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/23/fact-sheet-biden-harris-administration-announces-actions-to-protect-youth-mental-health-safety-privacy-online/.

significant bleeding." U.S. Surgeon General, *Social Media & Youth Mental Health* 8 (2023).[4] Considering that, it's no surprise that in the last ten years the number of our nation's teens reporting depression and anxiety has doubled, and nearly one-third of our nation's young girls report that they have seriously considered suicide. *See Minors' Health, Safety, & Privacy Online*. And social-media platforms are regularly used to sexually exploit minors. FBI Nat'l Press Off., *FBI and Partners Issue National Public Safety Alert on Financial Sextortion Schemes* (Dec. 19, 2022) [hereinafter, "*Financial Sextortion*"].[5]

There's no two ways around it: The mix of minors and social media is decidedly bad. The costs to the children of Arkansas and our nation are at a breaking point. That's why the Arkansas General Assembly decided to put a stop to these companies unilaterally profiting from the harm they are causing minors and passed the Social Media Safety Act, which was signed by Governor Sanders and is now Act 689 of 2023. The Act allows individuals under the age of eighteen to create social-media profiles, but only with parental authorization.

NetChoice and its member social-media companies decided that they didn't want to pay the minimal costs of age-verification to keep minors safe, so NetChoice filed this lawsuit. Now, NetChoice asks the Court for a preliminary injunction before the law goes into effect on September 1, 2023.

---

[4] https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf.

[5] https://www.fbi.gov/news/press-releases/fbi-and-partners-issue-national-public-safety-alert-on-financial-sextortion-schemes.

## Analysis

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). NetChoice bears the burden of proving it is entitled to such an extraordinary remedy. *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020). That burden is made even more difficult to bear when, as here, NetChoice seeks to preliminarily enjoin "a duly enacted state statute." *Planned Parenthood Minn., N.D, S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (en banc). It must make a "rigorous threshold showing" that it is "likely to prevail on the merits." *Id.*

Even if NetChoice makes that showing, "a preliminary injunction does not follow as a matter of course." *Benisek*, 138 S. Ct. at 1944. It must also establish three other factors: (1) a likelihood of irreparable harm without the injunction, (2) the balance of equities is in their favor, and (3) the public interest is on their side. *Dakotans for Health v. Noem*, 52 F.4th 381, 388 (8th Cir. 2022).

### 1. NetChoice does not have standing because it is exclusively asserting the rights of third parties.

Standing under Article III of the U.S. Constitution is a threshold jurisdictional issue that the Plaintiff has the burden of establishing. *Ojogwu v. Rodenburg L. Firm*, 26 F.4th 457, 461 (8th Cir. 2022). Under Article III, the Plaintiff must show: (1) "an injury in fact that is concrete, particularized, and actual or imminent," (2) "the injury was likely caused by the defendant"—i.e., traceable, and (3) "the injury would likely be redressed by judicial relief." *Id.* (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2022)). Failure to allege any one of these requirements

independently defeats the Court's jurisdiction, and plaintiffs "must demonstrate they have standing for each claim they bring." *Webb ex rel. K.S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019).

NetChoice alleges that Act 689 violates the First Amendment, but it never claims that *its members'* rights are being violated. Instead, NetChoice is clear that it is trying to vindicate the rights of *others* not before the Court. *See* Pl.'s Br. 14 (alleging that Act 689 "imposes onerous obligations on 'social media companies' that burden the First Amendment rights of adults and minors"); *see also, e.g.*, Compl. ¶¶ 3, 12, 24, 27, 50 (claiming Act 689 violates the rights of minors and adults); Pl.'s Br. 3–4, 12, 17, 21, 22, 26–27, 28, 31–32 (claiming that Act 689 violates the rights of social-media users). That is a fatal defect to demonstrating this Court has jurisdiction.

A plaintiff must first establish the "inescapable threshold" Article III requirements for itself before asserting the rights of others in an overbreadth claim. *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 799 (8th Cir. 2006). "Under no circumstances, . . . does overbreadth doctrine relieve a plaintiff of [that] burden . . . ." *Id.* Thus, NetChoice must first show that its "First Amendment right to free expression" is in peril. *Repub. Party of Minn. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004). NetChoice fails to establish that it will suffer a constitutional injury.

For an injury in fact to be sufficiently particularized to grant standing, it must "affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up). NetChoice fails to do so: It does not assert a single violation of its own constitutional rights. *See generally* Compl.; Pl.'s Br. While it is true that NetChoice alleges that the rights of a slew of natural people who are unrelated to it will be violated, that is a classic assertion of third-party rights that is insufficient to confer standing. *See Hughes v. City of Cedar Rapids*, 840 F.3d 987, 992–93 (8th Cir. 2016) (holding that a plaintiff asserting third-party standing on behalf of his wife failed to show an injury in fact).

NetChoice also argues that the costs it will incur implementing the requirements of Act 689 causes it an injury. But regulatory costs unrelated to speech do not establish an injury in fact; instead, a plaintiff must "establish that [it] would like to engage in arguably protected speech." *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011). NetChoice, however, has not alleged that its members wish to engage in any speech. *See generally* Compl.; Pl.'s Br. Thus, regulatory costs alone are not sufficient to establish a First Amendment injury.

In sum, NetChoice does not meet the requirements for Article III standing to challenge Act 689 under the First Amendment because it has not pled how the Act injures its constitutional rights in a personal or individual way. *See Spokeo*, 578 U.S. In fact, NetChoice's pleadings are void of any assertion that NetChoice's members are even speaking. Instead, NetChoice seeks to walk into court by simply waving the alleged rights of third parties. Article III does not allow it to do so.

## 2. Act 689 does not regulate speech, it regulates the places where minors can be.

Act 689 regulates only nonexpressive conduct, so NetChoice's challenge falls outside First Amendment analysis. *See Redlich v. City of St. Louis*, 51 F.4th 283, 287 (8th Cir. 2022) (explaining that only "inherently expressive" conduct is constitutionally protected (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006))). Conduct is protected if the actor had "[a]n intent to convey a particularized message . . . and the likelihood was great that the message would be understood by those who viewed it." *Id.* (first alteration in original) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).

The conduct regulated in Act 689 is how social-media companies may allow minors to create an account on the companies' platforms. § 1102(a).[6] NetChoice does not provide any analysis for why this conduct is protected expression, and the caselaw makes clear that it is not.

First, NetChoice has not provided any facts showing that its members are trying to convey a particularized message by how they allow minors to create accounts. *Redlich*, 51 F.4th at 287. In fact, NetChoice has not alleged its members are speaking at all. *See generally* Compl.; Pl.'s Br. And even if NetChoice has standing to assert the rights of its members' users, it has not explained how the users' action of signing up for an account is expressive.

Second, even if the creation of a social-media account was intended to convey a message, it is unlikely to be understood by those viewing the creation of the account. *Redlich*, 51 F.4th at 287. As the en banc Eighth Circuit recently held, when regulated conduct with an intended message is "invisible to observers unless explained," there is not a great likelihood that the intended message would be understood, and thus the conduct is "not inherently expressive," and the regulation does "not implicate the First Amendment." *Ark. Times LP v. Waldrip ex rel. Univ. of Ark. Bd. of Trs.*, 37 F.4th 1386, 1394 (8th Cir. 2022) (en banc).

In fact, many courts have held that limiting minors' (and even older people's) access to a place where speech—even political speech—may occur does not violate the First Amendment. In *Indigo Room, Inc. v. City of Fort Myers*, Fort Myers had passed an ordinance that barred anyone "under the age of 21 from entering or remaining in certain alcoholic beverage establishments while alcohol [was] being served or sold to the public." 710 F.3d 1294, 1297–98 (11th Cir. 2013). The

---

[6] For the ease of the reader, this brief will cite specific provisions of Act 689 using the section in the Arkansas Code Annotated in which the law is to be codified, omitting the title and chapter references. For example, a provision to be codified at Arkansas Code Annotated § 4-88-1102 will be cited as § 1102.

ordinance had several exceptions, including one for "persons accompanied by a parent." *Id.* at 1298. Nineteen-year-old Dylan Jones entered an establishment in violation of the ordinance to attend a "political event[]." *Id.* at 1297. Jones was then issued a citation. *Id.* at 1298.

Jones sued the City for violating his First Amendment rights. *Id.* at 1299. Raimond Aulen, another plaintiff, also sued the City. *Id.* Aulen, however, was "over 21 years old" and argued that the ordinance violated "his right to engage in political speech . . . around individuals under the age of 21." *Id.*

The Eleventh Circuit upheld the ordinance and explained that it regulated the conduct of "admitt[ing]" people under 21 years old and did "not regulate speech." *Id.* at 1300. This was so because the ordinance did not bar the plaintiffs from "observ[ing] or engag[ing] in [protected ex-pression]" in general but only in certain alcoholic-beverage establishments. *Id.* Thus, the ordinance did "not infringe on . . . speech in the first instance" of either the minor that wished to speak or the adult that wished to speak to minors. *Id.*

In the same way, Act 689 allows minors to engage in speech anywhere that they wish (even social media with parents' permission). The only limitation is on conduct—entering a social-media establishment alone. There is a long history of restrictions on minors entering establishments, even if speech may occur there. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 824 (2011) (Thomas, J., dissenting) (explaining that historically "it was unlawful for tavern keepers (or anyone else) to entertain children without their parents' consent"). That history continues to this day in laws throughout the United States. *See, e.g.*, Ind. Code § 7.1-5-7-10 (taverns, bars, and similar estab-lishments serving alcohol); La. Stat. Ann. § 26:90(A)(3) (same); 230 Ill. Comp. Stat. 10/11(10) (gambling establishments); La. Stat. Ann. § 14:90.5(B) (same); Ohio Rev. Code Ann. § 3772.99(D) (same).

NetChoice essentially asks the Court to throw that history in the garbage and give its members special treatment under the First Amendment. But courts do not give the Internet generally or social-media platforms specifically special First Amendment protection. *See Packingham v. North Carolina*, 582 U.S. 98 (2017) (applying standard First Amendment analysis to a bar on convicted sex offenders' access to social media). The Court should not entertain NetChoice's request.

Instead, Act 689 regulates minors' admission to social media, not what minors are able to say or hear. Thus, as a conduct regulation, the Act does "not implicate the First Amendment," and the Court should deny NetChoice's request for a preliminary injunction. *Waldrip*, 37 F.4th at 1394.

### 3. Even if Act 689 does regulate some speech, it promotes a substantial governmental interest and the means chosen add to its effectiveness.

Even if the Court were to disagree that Act 689 only regulates conduct, its effect on speech is only "incidental," so it is constitutional if it "promotes [a] substantial Government interest" and the "means chosen . . . add[s] to the effectiveness" of reaching that interest. *FAIR*, 547 U.S. at 67 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). As explained below, Arkansas has a substantial government interest in protecting minors from the harms of social media usage and Arkansas's approach adds to the effectiveness of its ability to reach that goal. So the Court should deny NetChoice's request for a preliminary injunction.

In response, NetChoice asserts that Act 689 discriminates on the basis of content, speaker, and viewpoint and is thus subject to strict scrutiny. It is not.

*Act 689 is not a content-based regulation.* Act 689 is only content based if "the content of the message" must be "examine[d] . . . to determine whether a violation has occurred." *Doe v. Bell*, 969 F.3d 883, 888 (8th Cir. 2020) (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)). This same test applies anytime the courts review for content-based regulation, even when a law

regulates based on function or purpose. *See, e.g.*, *Price v. City of Chicago*, 915 F.3d 1107, 1118 (7th Cir. 2019). That's so because such regulations can *sometimes* be a "proxy that achieves the same result" as content-based regulations, but "[t]hat does not mean that any classification that considers function or purpose is *always* content based." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022). Therefore, regulations based on function and purpose are not automatically content-based regulations.

NetChoice challenges the definitions of two terms in the Act. First, NetChoice takes aim at the definition of "social media company," which defines that term, in relevant part, as an "online forum" with "public profiles[s]" that are "for the primary purpose of interacting socially." § 1101(7)(A). It claims that this definition treats "expression that serves 'the primary purpose of interacting socially'" more favorably than "expression that serves other purposes." Pl.'s Br. 24 (citing § 1101(7)(A)). But that definition has nothing to do with *the message* that is being expressed. Instead, it is directed at *the place* where a message is expressed (i.e., an "online forum" with "public profiles[s]" that are "for the primary purpose of interacting socially"). § 1101(7)(A). Thus, this is not a content-based distinction because the expression itself does not need to be examined to determine whether the online forum is subject to the Act 689. *See Bell*, 969 F.3d at 888.

NetChoice runs into the same problem when it argues that the definition exempts companies that offer (1) "'educational devices' or 'enterprise collaboration tools for kindergarten through grade twelve (K-12) schools,'" Pl.'s Br. 24 (quoting § 1101(7)(B)(iv)); (2) "interacti[ve] gaming, virtual gaming, or an online service," *Id.* (second alteration in original) (citing § 1101(7)(B)(iii)); and (3) "career development opportunities," *Id.* at 25 (quoting § 1101(7)(B)(v)). These definitional exemptions do not restrict the type of expression that occurs on those companies' platforms, so the

expression itself does not need to be examined to determine whether a violation occurred. *See Bell*, 969 F.3d at 888.

Second, NetChoice challenges the definition of "social media platform." According to NetChoice, the market has created a murky "line between services that provide their own content and those that facilitate the sharing of user-generated content," which "forces" legislatures to use "imprecise and content-based definition[s]." Pl.'s Br. 25. In other words, under NetChoice's theory, States are faced with an impossible choice—(1) try to protect minors from the harms of social media while being confronted with the impossible task of passing constitutional legislation or (2) stand aside and allow minors to suffer. Heads NetChoice wins; tails the States and the people lose. That's not the law, and the specific examples NetChoice raises do not sustain their argument.

NetChoice takes aim at Act 689's exemption of certain platforms from the definition of "social media platform" based on "the predominant or exclusive function" of the platform. *Id.* (quoting § 1101(8)(B)). NetChoice, however, fails to recognize that expression unrelated to the predominant or exclusive function of the platform may occur still occur on the platform, and thus "the content of the message" need not be "examine[d] . . . to determine whether a violation has occurred," so the exemptions are not content based. *Bell*, 969 F.3d at 888 (quoting *McCullen*, 573 U.S. at 479).

*Act 689 is not a speaker-based regulation.* Next, NetChoice says that Act 689 distinguishes among speakers. But according to NetChoice, the alleged speaker discrimination is merely a "practical effect" of the alleged content discrimination and is thus a rebranding of the alleged content discrimination. As NetChoice's content-based allegations fail, so too do its speaker-based ones. Even so, "[i]t would be error to conclude . . . that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Turner*

*Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 660 (1994). For such heightened scrutiny to apply, the regulation must be "structured in a manner that raise[s] suspicions that their objective was, in fact, the suppression of certain ideas." *Id.*; *see also Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (explaining that speaker-based regulation may "simply [be] a means to control content").

According to NetChoice, Act 689 is speaker-based because it applies to social-media platforms whose annual gross revenue is $100 million or more but not to platforms with less than $100 million in annual gross revenue. § 1101(8)(C); *see also* Pl.'s Br. 27. But a revenue-based distinction has nothing to do with the content expressed on the platforms. The exact same content could appear on either a regulated platform or an unregulated one, so there is no reason to believe that the regulation is merely "a means of ensuring that particular [messages] will be [expressed], or not [expressed]." *Turner Broad.*, 512 U.S. at 649–50. Moreover, a company with a revenue less than $100 million dollars today might be over that threshold a year from now. As another federal district court has explained when confronted with a regulation distinguishing between for-profit and non-profit entities, if the law "make[s] no reference to the subject of the [expression]," then a "non-profit exemption is content-neutral," even though it is "distinguished by law and, by definition, pursue[s] differ[ent] objectives" than a for-profit entity. *Doohan v. CTB Invs., LLC*, 427 F. Supp. 3d 1034, 1064–65 (W.D. Mo. 2019). So too, here. The revenue distinction is not speaker based.

*Act 689 is not a viewpoint-based regulation.* Finally, NetChoice argues that Act 689 regulates based on viewpoint. Pl.'s Br. 28–29. It points to two provisions in the statute. First, the definition of "social media company" excludes certain companies if their primary purpose is "educational or informative." § 1011(7)(B)(ii). Second, the definition of "social media platform" excludes platforms that predominantly or exclusively provide "[n]ews, sports, entertainment, or other content that is preselected by the provider." *Id.* § 1101(8)(iv). Neither of these has anything to do with

viewpoint. The company could provide education or instruction about why it is best vote to for Democratic candidates or about why it is best to vote for Republican candidates. The platform could provide content supporting the St. Louis Cardinals or the Chicago Cubs. The Act regulates my subject matter, which is not a viewpoint. That is the very definition of non-viewpoint-based regulation.

### 4.  If strict scrutiny applies to Act 689, the Act survives it.

Even if Act 689 is subject to strict scrutiny, it survives. Here, the Act is "narrowly tailored to serve compelling state interests." *Willson v. City of Bel-Nor*, 924 F.3d 995, 1000 (8th Cir. 2019) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).[7] In short, some social media is designed in a way that harms minors' mental health, risks putting them in contact with sexual predators, and makes it easy for identity thieves to steal and misappropriate minors' personal information. Arkansas "has a compelling interest in protecting minor children," and Act 689 does just that. *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 897 (8th Cir. 2020). And the Act does so in a narrowly tailored way.

### 4.1.  The State of Arkansas has a compelling interest in protecting minors from the harm of social media.

Courts have routinely held that "[t]he government has a compelling interest in protecting minor children." *Mitchell*, 959 F.3d at 897. In fact, the Supreme Court has explained that the interest in "safeguarding the physical and psychological well-being of a minor" is so "evident" that

---

[7] Because Act 689 survives strict scrutiny, it necessarily survives any lower level of scrutiny the Court may apply. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226 (1995) (explaining that intermediate scrutiny is easier to satisfy than strict scrutiny)

.

it is "beyond the need for elaboration." *Maryland v. Craig*, 497 U.S. 836, 852–53 (1990) (quoting *Osborne v. Ohio*, 495 U.S. 103, 109 (1990)). It is sufficiently compelling to survive strict scrutiny when States have limited adults' rights to view pornography featuring minors, the press's and public's right to attend a criminal trial, and a defendant's right to face their accusers in court. *Id.* (first citing *Osborne v. Ohio*, 495 U.S. 103, 109 (1990); then citing *Globe Newspaper Co. v. Superior Ct. of Norfolk Cnty.*, 457 U.S. 596, 607 (1982)). And it even can overcome a parent's right "to make decisions concerning the care, custody, and control of their children." *Slaven v. Engstrom*, 710 F.3d 772, 779 (8th Cir. 2013). Arkansas has just such a compelling interest in protecting minors today.

*          *          *

NetChoice paints social media as an idyllic utopia, where users merely check the news, share recipes, chat with friends, showcase their creative talents, follow their dream college, and engage in the democratic process. But look closer and the darkest corners of the Internet lurk beneath.

Among a host of other problems, social-media usage causes grave harms to minors' mental health, leading to depression and potentially suicide; it gives sexual predators an avenue to communicate with minors and to misappropriate minors' images; and it makes it easy for identity thieves to steal and misappropriate minors' information. Whatever benefits social media has for minors, they cannot be evaluated in the vacuum NetChoice wishes. Instead, the overwhelming body of research evidences the persistent dangers of minors' social-media use, despite the modicum of policies that purport (but fail) to protect minors.

Social media comes with many dangers for minors. In fact, data NetChoice has cited agrees: The American Academy of Child & Adolescent Psychiatry recently explained the "risks

of social media," include "[e]xposure to dangerous people"; "[c]yber bullying," which is "a risk factor for depression and suicide"; and [p]rivacy concerns including the collection of data about teen users," "[i]dentity theft," and "[o]versharing of personal information." *Social Media and Teens*, American Academy of Child & Adolescent Psychiatry (updated Mar. 2018).[8]

And it's not just professional organizations. The federal government agrees that there are grave risks. In May, the White House issued a statement that the evidence is "undeniable" that social media is a reason "[t]he United States is experiencing an unprecedented youth mental health crisis." *See Minors' Health, Safety, & Privacy Online*. Anxiety and depression in children and adolescents has risen nearly 30%. *Id.* The number of teens and young adults with depression have more than doubled. *Id.* Almost 60% of girls and 70% of LGBQ+ students have persistent feelings of sadness. *Id.* And, startlingly, about 33% of high-school girls have "*seriously* considered suicide." *Id.* (emphasis added). The evidence goes on. The U.S. Surgeon General found that teens spend an average of 3.5 hours per day on social media, while 25% spend more than 5 hours per day. *Surgeon General's Advisory on Social Media and Youth Mental Health* 10.[9] And, from a study of 12–15 year olds, "adolescents who spen[d] more than 3 hours per day on social media face[] double the risk of experiencing poor mental health outcomes including symptoms of depression and anxiety." *Id.* at 6. These concerns are even more pronounced in adolescent girls. *Id.* at 7.

It should be no wonder that social media wrecks minors' mental health. After all, dozens of studies have found that platforms "normalize [self-harming] behaviors" by "show[ing] live depictions of self-harm acts like partial asphyxiation, leading to seizures, and cutting, leading to significant bleeding." *Id.* at 8. And, in turn, social-media platforms, including their "algorithmic

---

[8] https://archive.ph/LOY12.

[9] https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf.

designs," have caused children's deaths that are linked to "suicide- and self-harm-related content" available on the platforms. *Id.*

Social media also creates an environment conducive for crimes against children. In 2022 alone, the CyberTipline received more than 32 million reports of suspected online child sexual exploitation. *CyberTipline 2022 Report*, Nat'l Ctr. for Missing & Exploited Children.[10] "more than 31.8 million of . . . these reports were from Electronic Service Providers," like social-media companies, because they are legally required to do so. *2022 CyberTipline Reports by Electronic Service Providers (ESP)* 1, Nat'l Ctr. for Missing & Exploited Children (2023).[11] Social media companies, however, have "no legal requirements for proactive efforts to detect" "apparent child pornography." *Id.* The 2022 report data is, in part, as follows:

| Electronic Service Provider | Number of Reports |
|---|---|
| Facebook | 21,165,208 |
| Instagram | 5,007,902 |
| Snapchat | 551,086 |
| TikTok Inc. | 288,125 |
| Twitter, Inc. | 98,050 |
| Reddit, Inc. | 52,592 |
| Pinterest Inc. | 34,310 |
| Microsoft – Xbox | 1,185 |
| LinkedIn Corporation | 201 |
| NextDoor, Inc. | 1 |

*Id.*

In response, the FBI, the National Center for Missing and Exploited Children (the "Center"), and Homeland Security Investigations issued a joint public-safety alert, warning of the alarming increase in incidents of "financial sextortion," which is when children and teens are

---

[10] https://www.missingkids.org/cybertiplinedata (last visited July 27, 2023).

[11] https://www.missingkids.org/content/dam/missingkids/pdfs/2022-reports-by-esp.pdf.

coerced into sending explicit images online and are extorted for money. *See Financial Sextortion*. Adult predators often create fake accounts, posing as minors, and then take advantage of real minors' "comfort[]" "in online environments," coercing them into sending explicit images of themselves. *Id.* So far, "the FBI has interviewed victims as young as 10 years old." *Id.*

It's easy for these types of predators to gain access. In 90% of reports of online enticement[12] the predator directly communicated with children. *The Online Enticement of Children* 4. Most of these encounters "begin on social networking or chat sites." *Id.* at 11. Predators will then "[m]ove quickly and ask for nudes immediately after following or friending a child on a social media platform." *Sextortion*, Nat'l Ctr. for Missing & Exploited Children.[13]

Existing self-imposed age requirements offer almost no protection. Predators can (and often do) lie "when registering for their online account to circumvent the system and communicate with minors." *Online Enticement of Children* 9. NetChoice's own member Meta acknowledges the problem. Meta's platforms—both Facebook and Instagram—merely require a new user to input a birthday on the honor system, but people "often . . . get around [age requirements] by misrepresenting their age." *How Do We Know Someone Is Old Enough to Use Our Apps?*, Meta (July 27, 2021).[14]

---

[12] "Online enticement" is where the predator attempts "to share sexually explicit images, meet[] in person for sexual purposes, engag[e] the child in a sexual conversation or . . . sell or trade the child's sexual images to others." *The Online Enticement of Children: An In-Depth Analysis of CyberTipline Reports* 4, Nat'l Ctr. for Missing & Exploited Children (2017), https://www.missingkids.org/content/dam/missingkids/pdfs/ncmec-analysis/Online%20Enticement%20Pre-Travel1.pdf.

[13] https://www.missingkids.org/theissues/sextortion (last visited July 27, 2023).

[14] https://about.fb.com/news/2021/07/age-verification/.

The solution is the simple approach that Act 689 adopts—reasonable age verification. The burden to implement such verification "is minimal, and reducing as technology evolves ever further." Ex. 1, at ¶ 8 (Dec. of Tony Allen). Currently, the cost is about $0.12 per verification. *Id.* at ¶ 72. But the actual cost is likely to be much lower because a single verification result "may be shared among social media platforms" and thus "defrayed across" multiple social-media companies. *Id.* at ¶¶ 19, 91.

Despite this minimal cost and even after being "alerted" to these "undeniable" "abuses" of social media, these companies turn a blind (or not so blind) eye and engage in "excessive data collection, which they use to deliver harmful content and troves of paid advertising." *See Minors' Health, Safety, & Privacy Online.* Instead of cleaning up their act, they "often use manipulative design techniques embedded in their products to promote addictive and compulsive use by young people to generate more revenue." *Id.* Like the cannibalistic witch welcoming Hansel and Gretel into her gingerbread house, social-media companies invite minors onto their addictive platforms, fattening their purses at the expense of minors' health.

There can be no doubt: Arkansas has a compelling interest in protecting minors from the dangers of social media.

### 4.2.    Act 689 is narrowly tailored to protect minors from the harms of social media.

A law is narrowly tailored if it (1) "actually advances the state's interest," (2) does not sweep too broadly," (3) does not leave significant influences bearing on the interest unregulated," and (4) "could be replaced by no other regulation that could advance the interest as well with less infringement of speech." *Bell*, 969 F.3d at 892 (quoting *Republican Party of Minn. v. White*, 416 F.3d 738, 752 (8th Cir. 2005)).

First, Act 689 actually advances Arkansas's interest in protecting minors. It does so by requiring age verification in a material manner, which will keep predators from lying about their age and preying on children and it will give parents more control over what social-media platforms their children are using. It also protects the mental health of Arkansas's minors by requiring a minor to have parental authorization to make a profile on a social media site. Such a requirement means that many minors will be protected from the well-documented mental health harms present on social media because their parents will have to be involved in their profile creation. That means minors will be more aware of the negatives of social media, and parents will be more likely to be involved in their minor's online experience.

Second and third, the Act does not sweep too broadly or leave significant influences unregulated. The Act imposes a single requirement on regulated social-media companies and platforms—perform a reasonable age verification. And it does not "permit 'vast swaths' of speech that undermine the state's compelling interest." *Bell*, 969 F.3d at 893 (*Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448–49 (2015)). Instead, the Act targets the types of social media that are most likely to lead to predators contacting minors while leaving others unregulated. *See supra* at 15 (table of reports); *see also* § 1101(7)–(8). As revealed by the research, the exceptions to the Act concern social networking generated from two-way, private communications. Business to business services, educational platforms, and news sources are very clearly not the environment where dangers to children thrive. This extends to mental health protections for minors. It is the two way and group conversations and interactions that are present on social media that lead to much of the mental health harm towards minors. By focusing in on the social media companies that foster the largest environments for such interaction, the Act is zeroing in on the areas that provide the most harm to minor's mental health.

Fourth, no other regulation would advance the State's interest as well with infringement on less speech. Allowing minors to access social media without parental approval to any extent would undermine the goals of Act 689 and the State's interest in protecting minors. The burdens of Act 689 are "minimal." Ex. 1, at ¶ 8 (Dec. of Tony Allen).

Therefore, Act 689 is narrowly tailored to achieve a compelling government interest.

### 5. Act 689 is not unconstitutionally vague, because any person of ordinary intelligence can tell that it regulates Meta, Twitter and TikTok.

To analyze NetChoice's vagueness challenge, the Court must only consider "the particular facts at issue" in this case because "a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010). There is "no exception" to that rule "for . . . speech." *Id.* at 20. Instead, a law is not vague if "a person of ordinary intelligence" has "fair notice of what is prohibited" and so long as the law does not "authorize[] or encourage[] seriously discriminatory enforcement." *Id.* at 18. The law need not give "perfect clarity and precise guidance," even if it "restrict[s] expressive activity." *Id.* at 19. Moreover, it is important that courts do not merge a plaintiff's First Amendment claims with their vagueness claims, because two different standards apply. *Id.*

NetChoice's vagueness claim fails because some of its members' conduct is clearly proscribed in Act 689, and they cannot simply cite vagueness as it pertains to third parties.

NetChoice questions whether profiles on platforms, such as Spotify, Pandora, Pinterest, and Nextdoor, have the "primary purpose of interacting socially with other profiles." Pl.'s Br. 35–36. The first problem is that Spotify and Pandora are not NetChoice members. *About Us*,

NetChoice.[15] So NetChoice can't assert the statute is vague as to them. *See Holder*, 561 U.S. at 18.

The second problem for NetChoice is that a "primary purpose" is not vague. A statute is not vague because of "the possibility that it will sometimes be difficult to determine whether the . . . fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018) (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)). Such a primary-purpose requirement is a standard factual inquiry that courts, juries, and regulators address all the time. *See, e.g., Terwilliger v. St. Vincent Infirmary Med. Ctr.*, 804 S.W.2d 696, 699 (Ark. 1991) (affirming a finding that a hospital was not "operated primarily for religious purposes"). In other words, social interaction must be the primary "end to be attained" of a profile. *Purpose*, Merriam-Webster Online.[16]

NetChoice's vagueness claim fails. Its members are clearly regulated, and it cannot succeed on a claim challenging the statute's vagueness as to others. The Court should deny relief on this claim.

### 6. The remaining preliminary-injunction factors—irreparable harm, the balance of the equities, and the public interest—weigh in the State's favor.

To show irreparable harm, NetChoice "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 78 (8th Cir. 2012)). Although a loss of First Amendment rights establishes irreparable

---

[15] https://netchoice.org/about/ (last visited July 27, 2023).

[16] https://www.merriam-webster.com/dictionary/purpose (last visited July 26, 2023).

harm, when a plaintiff "is unlikely to succeed in showing his First Amendment rights have been violated"—like NetChoice here—there is no "threat of irreparable harm that warrants preliminary injunctive relief." *Id.*

When balancing the equities and public interest, courts consider the alleged "harm against the 'serious[] and irreparabl[e] harm' that an injunction would inflict on the State [and the public] by 'barring the State from'" implementing a validly enacted law. *Eggers v. Evnen*, 48 F.4th 561, 567 (8th Cir. 2022) (quoting *Abbot v. Perez*, 138 S. Ct. 2305, 2324 (2018)); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that balance-of-the-equities and public-interest "factors merge when the Government is the opposing party"). Although "[g]enerally" these factors follow the likelihood-of-success factor, this is not a usual situation. *Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 399 (8th Cir. 2020). The State has a "transcendent interest in protecting the welfare of children." *Upper Midwest Bookseller Ass'n v. City of Minneapolis*, 780 F.2d 1389, 1392 (8th Cir. 1985) (quoting *Ginsberg v. New York*, 390 U.S. 629, 640 (1968)). The interest in "safeguarding the physical and psychological well-being of a minor" is so "evident" that it is "beyond the need for elaboration." *Craig*, 497 U.S. at 852–53 (quoting *Osborne*, 495 U.S. at 109). Likewise, there is "a significant public interest in protecting . . . children." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003); *see also L.W. ex rel. Williams v. Skrmetti*, — F.4th —, 2023 WL 4410576, at *8 (6th Cir. 2023) (explaining the "the public interest . . . weigh[s] heavily in favor of the State" when "protect[ing] its children from health risks"). Therefore, enjoining Act 689 will harm the State's ability to protect and the public's weighty interest in protecting children. Thus, neither the equities nor public interest is in the Plaintiffs' favor.

## Conclusion

The Social Media Safety Act is a constitutional regulation narrowly designed to protect the children of Arkansas from the well-documented harms of social media. The Act regulates nonexpressive conduct, in keeping with our nation's long history of keeping children out of areas where they can be exploited by adults. NetChoice does not have standing because it is exclusively asserting the rights of third parties and is not asserting its own free-speech rights. Even if Act 689 constitutes speech, it is narrowly tailored to achieve Arkansas's compelling interest in protecting minors. Act 689 is not unconstitutionally vague, because any ordinary person can recognize whether the entities represented by NetChoice are regulated or not. Finally, all of the other factors in a preliminary injunction decision weigh in favor of the Defendant. NetChoice's motion for preliminary injunction should be denied.

Respectfully submitted,

TIM GRIFFIN
Attorney General


By:   John Payne
Ark. Bar No. 97097
Deputy Attorney General

Jordan Broyles
Ark. Bar No. 2015156
Senior Assistant Attorney General

Noah P. Watson
Ark. Bar No. 2020251
Senior Assistant Attorney General

Justin Brascher
Ark. Bar No. 2023029
Assistant Attorney General


Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 503-4335
(501) 682-2591 fax
john.payne@arkansasag.gov
jordan.broyles@arkansasag.gov
noah.watson@arkansasag.gov
justin.brascher@arkansas.gov

*Attorneys for Tim Griffin*