# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

| | |
|---|---|
| NETCHOICE, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>TIM GRIFFIN, in his official capacity as Attorney General of Arkansas,<br><br>*Defendant*. | Civil Action No. 5:23-cv-05105-TLB<br><br>**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION .................................................................................................................................. 1

I.       NetChoice Has Article III Standing. ................................................................................. 3

II.     NetChoice Is Likely To Succeed On Its First Amendment Claim. ................................... 5

          A.      S.B. 396 Triggers Strict Scrutiny Multiple Times Over. ...................................... 5

          B.      S.B. 396 Cannot Survive Any Level of Heightened Scrutiny. ............................ 10

III.    NetChoice Is Likely To Succeed On Its Vagueness Claim. ............................................ 14

IV.    The Other Preliminary Injunction Factors Overwhelmingly Support Relief. ................... 15

CONCLUSION .................................................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Ark. Writers' Project v. Ragland*,
  481 U.S. 221 (1987) .................................................................................................... 10

*Ark. Times LP v. Waldrip ex rel. Univ. of Ark. Bd. of Trustees*,
  37 F.4th 1386 (8th Cir. 2022) ......................................................................................... 8

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) .................................................................................... 11

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ....................................................................................................... 4

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011) ...................................................................................... 2, 6, 11, 14

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ....................................................................................................... 9

*City of Austin v. Reagan Nat'l Advert. of Austin*,
  142 S.Ct. 1464 (2022) .................................................................................................... 9

*Collins v. Yellen*,
  141 S.Ct. 1761 (2021) .................................................................................................... 3

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205, 213-14 (1975) ..................................................................................... 1, 7

*Fayetteville Pub. Lib. v. Crawford Cnty.*,
  2023 WL 4845636 (W.D. Ark. July 29, 2023) .................................................... 4, 6, 12

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ....................................................................................................... 4

*Indigo Room, Inc. v. City of Fort Myers*,
  710 F.3d 1294 (11th Cir. 2013) ..................................................................................... 7

*Interactive Digit. Software Ass'n v. St. Louis Cnty.*,
  329 F.3d 954 (8th Cir. 2003) ....................................................................................... 12

*Minneapolis Star & Tribune v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983) ..................................................................................................... 10

*NetChoice, LLC v. Attorney General*,
  34 F.4th 1196 (11th Cir. 2022) ....................................................................................... 4

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ................................................................................................ passim

*Redlich v. City of St. Louis*,
  51 F.4th 283 (8th Cir. 2022), ......................................................................................... 8

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ....................................................................................................... 9

*Rumsfeld v. FAIR, Inc.*,
   547 U.S. 47 (2006) .................................................................................................... 8

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ............................................................................................. 4, 6

*State v. Packingham*,
   777 S.E.2d 738 (N.C. 2015) ..................................................................................... 7

*TransUnion LLC v. Ramirez*,
   141 S.Ct. 2190 (2021) ............................................................................................... 3

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ................................................................................................ 10

*United States v. O'Brien*,
   391 U.S. 367 (1968) .................................................................................................. 7

*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000) ................................................................................................ 14

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................................................ 15

*Virginia v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988) ............................................................................................. 4, 5

**Statute**

Ark. Code Ann. §4-88-1101 ..................................................................... 7, 9, 10, 15

**Other Authorities**

Am. Academy of Child & Adolescent Psychiatry, Social Media and Teens (Mar. 2018),
   https://tinyurl.com/3e9bbmpr ................................................................................ 11

U.S. Surgeon General, Social Media and Youth Mental Health (May 23, 2023),
   https://tinyurl.com/397uewm8 ..................................................................... 2, 11, 12

iii

# INTRODUCTION

Arkansas' opposition confirms the profound First Amendment problems with S.B. 396 and the pressing need for a preliminary injunction. The state defends S.B. 396 as a restriction on where minors can go rather than what minors can see and tries to liken it to age restrictions on bars and casinos. But the state's own claimed interests turn on harms from what minors see and hear online. Restrictions on bookstores, libraries, and debating societies—all of which would plainly violate the First Amendment—are better analogies. Beyond that fundamental defect, S.B. 396 is riddled with content-, speaker-, and even viewpoint-discriminatory provisions and is hopelessly vague. And every equitable factor supports enjoining this law before it inflicts irreparable injury.

Unable to reconcile S.B. 396 with the bedrock principle that the First Amendment prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975), Arkansas simply proceeds as if that principle does not exist. Indeed, the state barely acknowledges the mountain of Supreme Court and Eighth Circuit cases invalidating government efforts to prevent minors from accessing supposedly harmful protected expression. Instead, it tries to avoid the First Amendment altogether, first by claiming that NetChoice lacks standing, and then by claiming that restricting access to "social media" does not implicate the First Amendment. Those arguments strain credulity. S.B. 396 directly regulates NetChoice members, saddling them with compliance costs and restricting them from disseminating speech. Those financial and First Amendment injuries suffice both to satisfy Article III and to permit NetChoice and its members to vindicate the First Amendment rights of the members and their users under a long line of cases that the state ignores. And the notion that S.B. 396 "regulates minors' admission to social media, not what minors are able to say or hear," Opp.9, blinks reality. People seek to be "admitted" to "social media" so they can access and participate in speech on those services—which is why the

1

Supreme Court has already held (in another case the state largely ignores) that government restrictions on accessing "social media" services "prevent the user from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017).

When the state finally turns to the First Amendment, its efforts to evade strict scrutiny fare no better. It insists that S.B. 396 is not content based because its various distinctions are purportedly "directed at *the place* where a message is expressed," not "*the message*" itself. Opp.10. But the state acknowledges elsewhere (as it must) that the Act distinguishes among "places" *based on the "subject matter" of the speech they supply*. Opp.13. The state argues that S.B. 396 is speaker-neutral, but it admits that the Act applies to some online services but not others. And while the state denies that the Act discriminates based on viewpoint, it has no answer to the fact that the Act explicitly distinguishes "educational or informative" takes from other viewpoints.

As for the state's effort to satisfy strict scrutiny, its brief is long on its professed interests (which turn on content) and short on narrow tailoring. Despite spilling significant ink on the supposed harmful effects of "social media," even its own primary source acknowledges that "social media" has many *benefits*; allows that "[m]ore research is needed to fully understand the impact of social media"; and admits that "[m]ost prior research to date has been correlational." U.S. Surgeon General, Social Media and Youth Mental Health 4, 11 (May 23, 2023), https://tinyurl.com/397uewm8. That is not nearly enough under Supreme Court precedent, which requires actual "proof" of a "direct causal link" connecting speech to harm before the First Amendment rights of minors may be curtailed. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799-800 (2011). Regardless, S.B. 396 is not remotely tailored. The law restricts minors from accessing wide swaths of innocuous speech on disfavored online services, *see* PI.Br.21-22, but it exempts services like Discord, Mastodon, Truth Social, YouTube, Parler, and Xbox Live, even

though minors may come across indistinguishable material on those services. It allows minors to access all the very same sites and content that purportedly expose them to all sorts of harms so long as one parent agrees to sign them up for an account. And the state barely even tries to explain why less restrictive alternatives like the multitude of filtering technologies and settings already available to parents are unworkable.

As to vagueness, the state barely defends the law's definition of "social media company" and "social media platform." It instead insists that NetChoice cannot raise a vagueness challenge because "*some* of its members' conduct is clearly proscribed." Opp.20 (emphasis added). But NetChoice explained in its opening brief that *other* members like Pinterest and Nextdoor have no way of knowing whether they qualify. The state ignores that inconvenient reality entirely.

The remaining equitable considerations are not close. While the state admits that abridgment of First Amendment rights is a quintessential irreparable injury, it nevertheless insists that the equities tip in its favor because of its interest in protecting children. But that assertion is considerably undermined both by the state's four-month delay in implementing the law and by the continuing ability of minors to access similar material on unregulated sites. The Court should enjoin the state from enforcing S.B. 396.

I.     **NetChoice Has Article III Standing.**

Arkansas begins by disputing NetChoice's standing. That is borderline frivolous. Standing requires: (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that is traceable to the challenged action of the defendant; and (3) that would likely be redressed by judicial relief. *See TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021). S.B. 396 directly regulates NetChoice members and imposes massive compliance costs on them. A "pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 141 S.Ct. 1761, 1779 (2021). That injury is directly traceable to S.B. 396. And a preliminary injunction prohibiting the state

from enforcing the law will redress that injury. Arkansas does not dispute that NetChoice meets the other requirements for associational standing.[1] Article III requires nothing more.

The state acknowledges that NetChoice members will incur compliance costs if the law takes effect. Opp.6. But it insists that a pocketbook injury is not enough here because the law purportedly implicates only the First Amendment rights of users, not the First Amendment rights of the services themselves. Opp.5-6. That is both wrong and beside the point. It is wrong because many cases make clear that online services like Facebook, TikTok, and Twitter have a First Amendment right to disseminate both their own and third-party speech. *See NetChoice, LLC v. Attorney General*, 34 F.4th 1196, 1210 (11th Cir. 2022). As the Supreme Court has explained, the "dissemination of information" is "speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). After all, "if the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). By restricting how online services can disseminate speech to their users, S.B. 396 interferes with their First Amendment rights.

But even setting that aside, longstanding precedent makes clear that a plaintiff needs an injury-in-fact, not a First-Amendment injury as such, to challenge a law on First Amendment grounds. Indeed, this Court just confirmed as much. *See Fayetteville Pub. Lib. v. Crawford Cnty.*, 2023 WL 4845636, *9 n.23 (W.D. Ark. July 29, 2023) (recognizing that it is "proper" for plaintiffs to "represent the interests of Arkansas citizens across the state"). *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988), illustrates the point. There, a group of booksellers brought

---

[1] NetChoice's mission is to "promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful." Compl. ¶6. This suit is plainly germane to that purpose, and there is no reason why it requires participation of NetChoice members as parties. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

4

a First Amendment challenge to a Virginia statute that made it unlawful to knowingly display sexually explicit material to minors. The state argued that the booksellers lacked standing because they "did not suffer sufficient harm, and what harm they did suffer was economic, not speech related." *Id.* at 392. The Court rejected that argument, explaining that the plaintiffs established injury-in-fact because "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Id.* And while the "usual rule is that a party may assert only a violation of its own rights," "in the First Amendment context 'litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Id.* at 392-93. The Court therefore had no problem allowing the booksellers to "alleg[e] an infringement of the First Amendment rights of bookbuyers." *Id.* at 393. That decision forecloses the state's exceedingly strained argument that the very parties directly regulated by S.B. 396 lack standing to challenge it.

**II.     NetChoice Is Likely To Succeed On Its First Amendment Claim.**

    **A.     S.B. 396 Triggers Strict Scrutiny Multiple Times Over.**

1. S.B. 396 restricts a massive amount of core First Amendment activity. It restricts minors of all ages from creating accounts and accessing content on services like Facebook and Twitter even if all they want to do is to attend church services, watch the launch of a presidential campaign, or simply communicate with friends or family. PI.Br.20-21; *see also* ACLU.Br.4-11. And by requiring all users to verify their age before creating an account, S.B. 396 burdens the right of *adults* to access those services too, PI.Br.22—a point the state does not contest. By restricting access to these services, Arkansas "prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. In fact, S.B. 396 imposes even greater

5

restrictions on protected speech than the Arkansas law that this Court recently enjoined. *See Fayetteville Pub. Lib.*, 2023 WL 4845636, at \*21. That law at least attempted to confine its restrictions to constitutionally unprotected obscenity. S.B. 396 makes no such effort; it instead restricts minors (and adults) from accessing online services even if all they want to do is share pictures of their latest sports exploits or tell friends about a recent vacation.

The state does not seriously deny that adults and minors use online services like Facebook, TikTok, and Twitter to engage in protected First Amendment activity. The state nevertheless tries to evade First Amendment scrutiny by arguing that S.B. 396 regulates conduct, not speech. By its telling, S.B. 396 does not implicate the First Amendment *at all* because it "regulates minors' admission to social media, not what minors are able to say or hear." Opp.9. That argument is hard to take seriously. Time and again, courts have held that the First Amendment may not be evaded by isolating some purportedly "non-speech" component of protected activity. A law that precludes the publishing of books, for instance, does not become any more tolerable if it accomplishes that end by banning "purchasing or using ink." *Sorrell*, 564 U.S. at 571; *see also, e.g.*, *Brown*, 564 U.S. at 792 n.1. So too with a law that precludes people from reading the New York Times by restricting access to nytimes.com. Just as with library cards, newspaper subscriptions, or any of the myriad other "conduct" necessary to access speech, people create the accounts S.B. 396 targets to gain access to online services "where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. Divorcing the act of signing up for an account from the act of using the service to engage in or access speech is thus akin to trying to distinguish the act of purchasing a book from the intended objective of reading it.

That is precisely why the Supreme Court has already held that, when the government "foreclose[s] access to social media altogether," it "prevent[s] the user from engaging in the

6

legitimate exercise of First Amendment rights." *Id.* at 108. The Court did so, moreover, while reversing a North Carolina Supreme Court decision holding that a state statute prohibiting sex offenders from "access[ing] certain carefully-defined Web sites" was "a regulation of conduct," not speech. *State v. Packingham*, 777 S.E.2d 738, 744 (N.C. 2015). If a statute restricting convicted sex offenders' access to "social media" services is a regulation of speech, then it is impossible to conclude that a statute restricting minors' access to those same services is not.

Rather than grapple with what the Supreme Court has squarely held about online services and state efforts to regulate them, the state persists in the fiction that its law regulates only access to "places," and tries to analogize it to laws that prohibit minors from entering casinos and bars. Opp.1, 7-8 (citing *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294 (11th Cir. 2013)). That comparison is more than a little ironic given the Act's carveout for services that provide gaming content. §1101(7)(B)(iii). But that aside, there is an obvious difference between laws restricting access to such establishments and laws that restrict access to services dedicated to disseminating speech. The government may well have reasons "unrelated to the suppression of free expression" to limit access to casinos and bars. *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Most obviously, such laws serve its interest in preventing minors from engaging in *non-speech* activities like drinking and gambling. *See, e.g.*, *Indigo Room*, 710 F.3d at 1300. But by the state's own telling, the harm with which S.B. 396 is concerned has nothing to do with the mere act of signing up for an account; restricting account creation is just the way the state seeks to prevent minors from accessing speech that it does not think they should see or hear. *See* Opp.14-16. That brings the Act squarely within the rule that the government may not protect minors from "ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213-14.

The remaining cases the state cites are even further off-point. Opp.6-9. *Redlich v. City of St. Louis*, 51 F.4th 283 (8th Cir. 2022), involved a law that required a permit to distribute "potentially dangerous food." *Id.* at 284-85. *Arkansas Times LP v. Waldrip ex rel. University of Arkansas Board of Trustees*, 37 F.4th 1386 (8th Cir. 2022) (en banc), involved a statute that prohibited state contractors from making "economic decisions that discriminate against Israel." *Id.* at 1394. And *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006), involved a statute that required law schools to allow military recruiters on campus. *Id.* at 64. In each case, the law at issue regulated conduct (*i.e.*, distributing dangerous food, engaging in commercial relations with Israel, law school recruiting), the impact on speech was incidental, and the law was justified by an interest wholly unrelated to the suppression of speech. *See Redlich*, 51 F.4th at 287; *Ark. Times*, 37 F.4th at 1393-94; *Rumsfeld*, 547 U.S. at 67. By contrast, S.B. 396 restricts access to services dedicated to speech, and the burdens it imposes on speech are anything but incidental. Indeed, as the state itself acknowledges, restricting what minors can see and hear is the entire point. Opp.13-18.

2. S.B. 396 not only restricts an unprecedented amount of First Amendment activity; it does so on the basis of content, speaker, and viewpoint. Repeating the same mantra, the state insists that the Act is content-neutral because its exceptions are purportedly "directed at *the place* where a message is expressed*,*" not "*the message*" itself. Opp.10. But that ignores that "places" (*i.e.*, disfavored online services like Facebook and Twitter) are subject to the statute's onerous requirements only because of the content of the speech they supply. Opp.12-13. A law that imposes a special tax on bookstores that primarily sell self-help books while exempting stores that primarily sell books about news or sports would not be content-neutral just because it is ostensibly directed at "*the place* where [the] message is expressed." The same is true here. By the law's plain terms, a company that "exclusively offers subscription content in which users follow or

8

subscribe unilaterally" is generally exempt. §1101(7)(B)(i). But a company that "allows a user to generate short video clips of dancing, voice overs, or other acts of entertainment" is not. §1101(7)(B)(ii). Similarly, a company that "exclusively offers interacting [sic] gaming" or "communication related to" gaming is exempt, but a company that offers other types of content (such as political content) is not. §1101(7)(B)(iii). That is about as content based as it gets. In fact, the law's content-based distinctions are so obvious that even the state ultimately cannot resist admitting that the "Act regulates [b]y subject matter." Opp.13. And it repeatedly emphasizes that the point of the law is to shield minors from *content* that the state thinks is harmful to them. *See, e.g.*, Opp.15-16 (identifying specific content on "social media" that supposedly "wrecks minors' mental health"). A law that "singles out specific subject matter for differential treatment" is the "paradigmatic example of content-based discrimination." *Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015); *see also City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S.Ct. 1464, 1471 (2022).

Making matters worse, S.B. 396 singles out a few specific online services for differential treatment, adding speaker discrimination to its list of infirmities. The state does not dispute that the practical effect of the law's exceptions and revenue requirements is to single out a few online services. Opp.20. The Act restricts minors from accessing Instagram and Twitter, but not smaller services like Parler, Gab, and Truth Social. It covers Facebook, but not LinkedIn or YouTube. Arkansas tries to sweep that problem under the rug by characterizing NetChoice's speaker-based argument as "a rebranding of the alleged content discrimination," and insists that speaker-based distinctions trigger strict scrutiny only if they are a proxy for content discrimination. Opp.11-12. The law's speaker discrimination is certainly a tell-tale sign of content discrimination. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010). But even apart from content discrimination, the Supreme Court has made clear that speaker distinctions present specific problems of their own,

9

particularly when they single out some but not all those in the business of disseminating speech. *See, e.g.*, *Ark. Writers' Project v. Ragland*, 481 U.S. 221, 228-31 (1987); *Minneapolis Star & Tribune v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983).  After all, laws that "discriminate among media, or among different speakers within a single medium," present very real "dangers of suppression and manipulation" of the medium (and signal a lack of tailoring to boot).  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659, 661 (1994).  Such distinctions are inherently dangerous, as they tend to skew public debate.  A law that singles out the New York Times and the Washington Post but not the Wall Street Journal or the New York Post may skew debate regardless of why that distinction was drawn.  So too of a law that burdens Twitter but not Mastodon.

The state also resists the conclusion that the law discriminates based on viewpoint, noting that a company may "provide education or instruction about why it is best vote to for [sic] Democratic candidates or about why it is best to vote for Republican candidates." Opp.13.  But the state has no answer to the fact that the Act explicitly distinguishes between "short video clips of dancing, voice overs, or other acts of entertainment" that express an "educational or informative" viewpoint and video clips, voice overs, or other acts of entertainment that express a different viewpoint.  §1101(7)(B)(ii).  S.B. 396 thus triggers strict scrutiny several times over.

      **B.**      **S.B. 396 Cannot Survive Any Level of Heightened Scrutiny.**

When the state finally turns to strict scrutiny, it abandons any argument that S.B. 396 is justified by an interest in assisting parental authority.  That decision is wise.  Both Supreme Court and Eighth Circuit precedent foreclose any such claim, *see* PI.Br.29, and the state identifies no evidence that the multitude of tools available to parents who wish to restrict their children's access to online services are not up to the task.  But once the state abandons the notion that it is trying to aid parents, its strict-scrutiny problems become all the more glaring.  It is even harder to justify

10

S.B. 396's many exemptions—not to mention that it leaves minors free use "social media" to their hearts' content so long as one parent approves—if the purported interest justifying the law is simply that the "mix of minors" and "social media" is "decidedly bad." Opp.3.  As the Supreme Court observed when rejecting a comparable state effort to restrict minors' access to speech, "[t]hat is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802.

The state's problems begin with its claim that S.B. 396 is narrowly tailored to serve its interest in "protecting minors from the harm of social media." Opp.13.  While the state no doubt has a strong interest in protecting children, "overly general statements of abstract principles do not satisfy the government's burden to articulate a compelling interest." *Awad v. Ziriax*, 670 F.3d 1111, 1129-30 (10th Cir. 2012).  Strict scrutiny demands that the state "specifically identify an 'actual problem' in need of solving." *Brown*, 564 U.S. at 799.  So if the state wants to restrict minors' access to online services, it must provide firm "proof"—not just "predictive judgment"— of a "direct causal link" between those services and "harm to minors." *Id.*  Studies that establish mere "correlation" will not do. *Id.* at 800.

The state's evidence falls far short of that high bar.  The state did not include any legislative findings in S.B. 396.  And the evidence it musters in its opposition is thin and at best shows that the impact of "social media" on minors remains hotly debated.  Its primary authority, a report from the U.S. Surgeon General, notes several potential "*benefits* of social media use among children and adolescents," such as providing "positive community and connection with others who share identities, abilities and interests," "access to important information," "a space for self-expression," and a place for teens to "form and maintain friendships online and develop social connections." U.S. Surgeon General, *supra*, at 6; *see also* Am. Academy of Child & Adolescent Psychiatry, Social Media and Teens (Mar. 2018), https://tinyurl.com/3e9bbmpr (noting potential benefits of

11

"social media"). The report notes that the "buffering effects against stress that online social support from peers may provide can be especially important for youth who are often marginalized, including racial, ethnic, and sexual and gender minorities." U.S. Surgeon General, *supra*, at 6. And while it acknowledges that "social media," like all technologies, have potential risks, it cautions that "robust independent safety analyses on the impact of social media on youth have not yet been conducted," *id.* at 4, that "[m]ore research is needed to fully understand the impact of social media," *id.*, and that "[m]ost prior research to date has been correlational," *id.* at 11. That is hardly the conclusive proof of a direct causal link between "social media" and harm to minors that the First Amendment demands. And if history is any indication, that demand for proof is wise. After all, many forms of new media have been accused of harming minors in the past, only to have the perceived threat ultimately prove unfounded. PI.Br.5-6; *see also Fayetteville Pub. Lib.*, 2023 WL 4845636, at *11 (citing attempts to ban James Joyce's *Ulysses*).

In all events, even if Arkansas could muster proof that the harms it purports to address "are real, not merely conjectural," *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 958 (8th Cir. 2003), the means it has chosen are wildly overinclusive and underinclusive. The state insists that the Act is not overinclusive because it "zero[s] in on the areas that provide the most harm to minor[s'] mental health." Opp.19. But it does not dispute that the law restricts minors from accessing wide swaths of entirely innocuous speech on many popular services. The Act prohibits, for example, minors from accessing Facebook to watch church services without parental approval. It restricts minors from watching and participating in a presidential candidate's launch announcement on Twitter without parental consent. And by requiring all users to verify their age, the law hinders adults' ability to access the same content. NetChoice highlighted these and other problems in its opening brief. PI.Br.31-32. The state has no response.

12

The state's argument that these sweeping restrictions are necessary to protect children from online predators also runs headlong into *Packingham*. There, North Carolina argued that barring convicted sex offenders from accessing services like Facebook and Twitter was necessary to protect minors from such predators. 582 U.S. at 106. The Court acknowledged the importance of that interest, but it nevertheless concluded that even a law targeting convicted sexual predators was not sufficiently tailored because it prohibited sex offenders from engaging in substantial protected First Amendment activity on those services. *Id.* at 107-08. The Court noted that the state had narrower way to protect minors: It could "prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." *Id.* at 107. "Specific laws of that type must be the State's first resort to ward off the serious harm that sexual crimes inflict." *Id.* If barring a limited group of convicted *sex offenders* from accessing "social media" is an insufficiently tailored means of protecting minors from online predators, it is impossible to see how restricting the entire universe of potential *victims* from accessing those services is remotely narrowly tailored.

The state likewise has little response to NetChoice's illustrations of why S.B. 396 is underinclusive when judged against the interests it identifies. It insists that the law "does not permit vast swaths of speech that undermine the state's compelling interest." Opp.19. In fact, that is precisely what its parade of exceptions does. PI.Br.32. The state tries to defend some (but not all) of those exceptions on the ground that "[b]usiness to business services, educational platforms, and news sources are very clearly not the environment where dangers to children thrive," and "[i]t is the two way and group conversations and interactions … on social media that lead to much of the mental health harm towards minors." Opp.19. But it does not dispute that the law exempts many services that allow "two way and group conversations and interactions" and contain virtually

13

identical content—such as Mastodon, YouTube, Truth Social, Amazon Twitch, and Xbox Live. And the state ignores the Supreme Court's teaching that an effort to protect minors from purportedly harmful content is "underinclusive" when the state is "perfectly willing" to allow minors to access the same content "so long as one parent" approves. *Brown*, 564 U.S. at 802.

On top of all that, the state has no answer to the fact that less restrictive alternatives are available to address its concerns. The Supreme Court has emphasized time and again that, when it comes to constitutionally protected material on the Internet, enabling people to voluntarily filter content at the receiving end is less restrictive than the state restricting content at the source. PI.Br. 33-34. Parents already have many tools to protect their children from the purportedly harmful effects of the Internet, including by refusing to give them smartphones, tablets, and laptops in the first place. PI.Br.33-34. To the extent the state is concerned that not enough parents know about these tools, the Supreme Court has already instructed that a campaign promoting them is a much less restrictive alternative. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 823 (2000). And to the extent the state's real complaint is that parents know about these tools but choose not to use them, *see* Allen Decl. ¶85, a law in "in support of what the State thinks parents *ought* to want" does not cut it under strict scrutiny. *Brown*, 564 U.S. at 804.

**III.     NetChoice Is Likely To Succeed On Its Vagueness Claim.**

Making matters worse, S.B. 396 fails to provide a person of ordinary intelligence with fair notice of what is prohibited because it is unclear to whom it applies. The state barely tries to argue otherwise. Instead, it spends the bulk of its discussion contending that NetChoice cannot assert its vagueness claim "because some of its members' conduct is clearly proscribed." Opp.20. But NetChoice pointed out in its opening brief that it is unclear whether the law applies to other NetChoice members. After all, some Pinterest users, for example, "interact[] socially with other profiles," but others never interact with anyone. Similarly, some Nextdoor users interact socially,

14

but some browse the site without ever interacting with another user. It is not clear how NetChoice members are supposed to figure out whether "the primary purpose" of its service is social interaction or something else, §1101(7)(A), and the state's opposition does not provide guidance. Moreover, several NetChoice members allow users to send direct messages to others. It is not at all clear whether they fall within the law's exception for services in which "the *predominant* or exclusive function" is "[d]irect messaging." §1101(8)(A)-(B). Arkansas insists that "primary-purpose requirement[s] [are] standard factual inquir[ies] that courts, juries, and regulators address all the time." Opp.21. But that exacerbates the problem. Both the First Amendment and due process abhor laws that are "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

## IV.    The Other Preliminary Injunction Factors Overwhelmingly Support Relief.

The other preliminary injunction factors overwhelmingly favor relief. The state agrees that the loss of First Amendment rights is a quintessential irreparable injury, and it does not dispute that the Act would force NetChoice members to incur compliance costs that they could not recoup. The state insists that the equities and the public interest cut in its favor because of its general interest in protecting children. But the state has no interest in enforcing an unconstitutional law, and its arguments are considerably undermined both by the four-month delay built into S.B. 396 and by the fact that the law leaves minors free to access all the same content on the many exempted services and with only a single parent's approval on the covered ones. PI.Br.38. Particularly given the many tools already available to parents who wish to restrict their children's access to online services, it is hard to see how maintaining the status quo could cause any material harm.

## CONCLUSION

For these reasons, the Court should grant the motion.

Date: August 3, 2023	Respectfully submitted,

Marshall S. Ney, Ark. Bar No. 91108
Katherine C. Campbell, Ark. Bar No. 2013241
Friday, Eldredge & Clark, LLP
3350 S. Pinnacle Hills Pkwy, Suite 301
Rogers, AR 72758
Telephone: (479) 695-6049
Facsimile: (501) 244-5389
mney@fridayfirm.com
kcampbell@fridayfirm.com

Paul D. Clement (admitted *pro hac vice*)
Erin E. Murphy (admitted *pro hac vice*)
James Y. Xi (admitted *pro hac vice*)
Joseph J. DeMott (admitted *pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com