UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| NETCHOICE, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>TIM GRIFFIN, in his official capacity as Attorney General of Arkansas,<br><br>*Defendant*. | Civil Action No. 5:23-cv-05105-TLB<br><br>**NETCHOICE'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

NetChoice has standing both to bring this case and to vindicate the First Amendment rights of third parties who are also impacted by S.B. 396. "NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet." Szabo Decl. ¶3. NetChoice has brought this case on behalf of its members, many of whom are or at least appear to be regulated by S.B. 396. An association has standing to proceed on behalf of its members so long as (1) at least one of its members has standing; (2) the interests at stake are germane to its purpose; and (3) neither the claim nor the relief requested requires participation of its members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The state does not and cannot deny that this suit is germane to NetChoice's mission to "protect free speech and free enterprise online," Szabo Decl. ¶11, and it has never suggested that anything about this suit necessitates the participation of NetChoice's members. Reply.Br.4 n.1.

The only question, then, is whether NetChoice's members have standing in their own right and to vindicate the First Amendment rights of those who would like to use their services. They plainly have both. Indeed, they have standing in their own right twice over, as S.B. 396 requires them to take costly compliance measures or face potential sanctions, and restricts their First Amendment right to disseminate information to others to boot. And longstanding Supreme Court precedent confirms that NetChoice may assert the First Amendment rights of adults and minors to speak and receive speech on their services. Those injuries are all directly traceable to S.B. 396, and an injunction prohibiting the Attorney General from enforcing S.B. 396 would redress those injuries. Accordingly, there are no standing concerns here.

1. At the outset, NetChoice's members have standing for the exact same reason that the booksellers had standing in *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988), and *Fayetteville Public Library v. Crawford County*, 2023 WL 4845636 (W.D. Ark. July

1

29, 2023):  The law they have challenged, S.B. 396, is "directly aimed" at them and requires them to "take significant and costly compliance measures" or risk potential sanctions.  *Am. Booksellers*, 484 U.S. at 393; *see also Fayetteville*, 2023 WL 4845636, at *9.  Complying with the Act will require NetChoice members to "[i]mplement[] the age-verification and parental-consent requirements," which will impose "substantial, unrecoverable costs" on them, Szabo Decl. ¶¶12-13, and "require substantial and burdensome changes to the design and operation" of their services, Davis Decl. ¶¶50-52; *see also* Boyle Decl. ¶¶8-10; Harriman Decl. ¶¶31-34.  And the threat of enforcement is real, "not imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979).  The state argues in its opposition (at 20) that the Act applies to several NetChoice members, and it "has not disavowed any intention" of enforcing the statute.  *Id.*  As countless cases confirm, a party has standing to bring a pre-enforcement challenge to a law that requires it to take costly compliance measures under a non-speculative threat of sanctions.  *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014) (collecting cases); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602-04 (8th Cir. 2022).

  2.  On top of that, NetChoice's members have standing because S.B. 396 restricts their First Amendment rights to disseminate both their own content and third-party content to those who would like to use their services.  As the Supreme Court has long explained, the "dissemination of information" is "speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).  Just as the First Amendment protects a newspaper's right to publish articles, op-eds, and reader comments to readers, *see, e.g.*, *N.Y. Times v. Sullivan*, 376 U.S. 254 (1964), a broadcaster's right to broadcast programming of its creation or choosing to viewers, *see, e.g.*, *Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994), and a pharmaceutical company's right to disseminate prescriber-identifying information for marketing purposes, *see Sorrell*, 564 U.S. at

2

570, the First Amendment protects the right of online services like Facebook and Twitter to deliver both their own speech and "curated compilations of speech created, in the first instance, by others," to their users.  *NetChoice, LLC v. Attorney General, Florida*, 34 F.4th 1196, 1213 (11th Cir. 2022); *see also NetChoice, LLC v. Paxton*, 142 S.Ct. 1715, 1715-16 (2022) (vacating Fifth Circuit's stay order positing otherwise); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (explaining that "compilation of the speech of third parties" is itself a "communicative act[]" protected by the First Amendment).  By restricting how NetChoice's members can disseminate speech, the Act interferes with their First Amendment rights.

3.  Because NetChoice itself has standing on behalf of its members, NetChoice and its members also have "third-party standing" to assert the First Amendment rights of individuals who use the online services its members offer (*e.g.*, Facebook, Twitter, and TikTok).  Indeed, NetChoice has standing to assert those third-party interests twice-over, as longstanding precedent makes clear that so long as a plaintiff has *any* injury-in-fact, whether it be a pocketbook injury or a First Amendment injury, it may challenge a law on First Amendment grounds.

Once again, *American Booksellers* is squarely on point.  There, the plaintiffs, "a number of organizations with memberships consisting of national and Virginia booksellers, two Virginia bookstores, and a Virginia adult and her juvenile child" brought a pre-enforcement facial challenge under the First Amendment to a Virginia statute that made it unlawful to knowingly display sexually explicit material to minors.  484 U.S. at 388 & n.3.  The district court "dismissed the parent and child for failure to allege potential prosecution," so the organizations representing booksellers and the two bookstores were the only "remaining plaintiffs" by the time the case got to the Supreme Court.  *Id.*  Virginia argued that those remaining plaintiffs lacked standing to bring

a First Amendment challenge because they asserted only "economic" injuries and "the First Amendment rights of bookbuyers"—not any "speech related" injuries of their own. *Id.* at 392-93.

The Court rejected that argument. It acknowledged that the booksellers no longer pressed "a violation of [their] own First Amendment right to display the restricted works." *Id.* at 393 n.6. But it nevertheless held that they had standing to bring a First Amendment challenge. As the Court explained, the booksellers met the injury-in-fact requirement because "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Id.* at 392. And while the "usual rule is that a party may assert only a violation of its own rights," "in the First Amendment context 'litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Id.* at 392-93; *see also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 954-59 (1984) (similar). The Court therefore had no problem with the booksellers "alleg[ing] an infringement of the First Amendment rights of bookbuyers," even though no bookbuyers remained in the case, and even though the booksellers no longer pressed any First Amendment rights of their own. *Id.* at 393 &n.6. In fact, this case is even easier than *American Booksellers* because, unlike the booksellers in that case, NetChoice asserts its members' own First Amendment rights.

*American Booksellers* hardly stands alone. The plaintiffs in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), were organizations that represented the video game and software industries, not minors asserting a First Amendment right to purchase violent video games without their parents' consent. *Id.* at 789. Although the Court did not specifically address standing, it saw no problem with allowing the industry plaintiffs to assert the First Amendment

4

rights of minors, repeatedly emphasizing minors' rights in striking down the California law even though none of the plaintiffs before it was a minor. *Id.* at 795 n.3; *id.* at 805; *see also Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 252-53 (2002) (emphasizing "the rights of adults" to receive speech even though the plaintiffs were publishers of adult-oriented materials, not consumers); *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 811 (2000) (similar). And just a few weeks ago, this Court held that it "is proper" for bookseller and librarian plaintiffs to "represent the interests of Arkansas citizens across the state who will suffer the same injuries" in a First Amendment challenge. *Fayetteville*, 2023 WL 4845636, at *9 n.23.

In other contexts as well, courts have emphasized that the limitations on third-party standing do not bar commercial actors from asserting the constitutional rights of prospective users of their products or services when challenging restrictions on their own operations. *See Craig v. Boren*, 429 U.S. 190, 192, 194-95 (1976). The Supreme Court has held, for example, that convenience store owners may raise their prospective customers' right to be free from sex discrimination, *id.* at 192; and distributors of contraceptives may raise prospective customers' right to privacy, *Carey v. Population Services Int'l*, 431 U.S. 678, 683-84 (1977). The Eighth Circuit has likewise held that a white business owner may "assert a claim bottomed on alleged racial discrimination suffered by his black clientele," *Wilson v. City of N. Little Rock*, 801 F.2d 316, 322 n.2 (8th Cir. 1986); and an adult bookstore may "assert the [constitutional] rights of its present and potential customers," *Postscript Enters., Inc. v. Whaley*, 658 F.2d 1249, 1252 (8th Cir. 1981); *Postscript Enters., Inc. v. Westfall*, 771 F.2d 1132, 1136 (8th Cir. 1985); *see also Teixeira v. Cty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (en banc). In short, a long line of precedent forecloses any claim that NetChoice lacks standing to vindicate both its members' interests and the interests of the minors and adults whose First Amendment rights S.B. 396 curtails.

Date: August 9, 2023                                   Respectfully submitted,

                                                Marshall S. Ney, Ark. Bar No. 91108
Katherine C. Campbell, Ark. Bar No. 2013241
Friday, Eldredge & Clark, LLP
3350 S. Pinnacle Hills Pkwy, Suite 301
Rogers, AR 72758
Telephone: (479) 695-6049
Facsimile: (501) 244-5389
mney@fridayfirm.com
kcampbell@fridayfirm.com

Paul D. Clement (admitted *pro hac vice*)
Erin E. Murphy (admitted *pro hac vice*)
James Y. Xi (admitted *pro hac vice*)
Joseph J. DeMott (admitted *pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com