**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

NETCHOICE, LLC,

        *Plaintiff*,

        v.

TIM GRIFFIN, in his official capacity as
Attorney General of Arkansas,

        *Defendant*.

Civil Action No. 5:23-cv-05105-TLB

**BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ......................................................................................... 3

    A.    Adults And Minors Alike Engage in First Amendment Activity on Online
        Services Covered by the Act. ................................................................... 3

    B.    Parents Have Many Ways to Control What Their Children See on the
        Internet. ................................................................................................. 6

PROCEDURAL HISTORY ........................................................................................ 10

    A.    Arkansas Promulgates Act 689 of 2023 ................................................. 10

    B.    The Court Preliminarily Enjoins Enforcement of Act 689. ..................... 13

LEGAL STANDARD ................................................................................................. 15

ARGUMENT ............................................................................................................. 17

I.    Act 689 Violates The First Amendment. ......................................................... 18

    A.    Act 689 Triggers Heightened Scrutiny Several Times Over. ................... 18

        1.    Act 689 restricts a breathtaking amount of core First Amendment
            activity. ...................................................................................... 18

        2.    Act 689 restricts speech based on content, speaker, and viewpoint. ........ 24

    B.    Act 689 Cannot Survive Any Level of Heightened Scrutiny, Let Alone
        Strict Scrutiny. ....................................................................................... 30

II.    Act 689 Is Unconstitutionally Vague. .............................................................. 36

III.    NetChoice Meets All Other Requirements For Issuance Of A Permanent
    Injunction. ....................................................................................................... 39

CONCLUSION .......................................................................................................... 40

i

## TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
  141 S.Ct. 2373 (2021) ........................................................................................... 31

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .............................................................................................. 15

*Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*,
  793 F.3d 822 (8th Cir. 2015) ................................................................................ 15

*Ark. Writers' Project, Inc. v. Ragland*,
  481 U.S. 221 (1987) .............................................................................................. 27

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ................................................................................. 23, 32, 35

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) ............................................................................ 31

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) .............................................................................................. 36

*Bank One, Utah v. Guttau*,
  190 F.3d 844 (8th Cir. 1999) ................................................................................ 39

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  140 S.Ct. 2335 (2020) ..................................................................................... 25, 26

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus*,
  482 U.S. 569 (1987) .............................................................................................. 22

*Brandt v. Rutledge*,
  551 F.Supp.3d 882 (E.D. Ark. 2021) ................................................................... 39

*Brown v. Entm't Merchants Ass'n*,
  564 U.S. 786 (2011) ....................................................................................... passim

*Burt v. Rumsfeld*,
  354 F.Supp.2d 156 (D. Conn. 2005) .................................................................... 16

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ......................................................................................... 27, 28

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  142 S.Ct. 1464 (2022) ........................................................................................... 25

*City of Boerne v. Flores,*
   521 U.S. 507 (1997) ........................................................................ 30

*Crawford v. Marion Cnty. Election Bd.,*
   553 U.S. 181 (2008) ........................................................................ 23

*Dorsey v. Nat'l Enquirer, Inc.,*
   973 F.2d 1431 (9th Cir. 1992) ........................................................ 17

*Erznoznik v. City of Jacksonville,*
   422 U.S. 205 (1975) .......................................................... 1, 20, 21, 22

*FCC v. Fox TV Stations, Inc.,*
   567 U.S. 239 (2012) ........................................................................ 36

*Fulton v. City of Philadelphia,*
   141 S.Ct. 1868 (2021) ..................................................................... 16

*Hess v. Citibank, N.A.,*
   459 F.3d 837 (8th Cir. 2006) .......................................................... 15

*Hispanic Int. Coal. of Ala. v. Governor of Ala.,*
   691 F.3d 1236 (11th Cir. 2012) ...................................................... 39

*Iancu v. Brunetti,*
   139 S.Ct. 2294 (2019) ..................................................................... 30

*IDK, Inc. v. Clark Cnty.,*
   836 F.2d 1185 (9th Cir. 1988) ........................................................ 16

*Ingebretsen v. Jackson Pub. Sch. Dist.,*
   88 F.3d 274 (5th Cir. 1996) ............................................................ 39

*Interactive Digital Software Ass'n v. St. Louis Cnty.,*
   329 F.3d 954 (8th Cir. 2003) .............................................. 21, 22, 35

*Interstate Circuit, Inc. v. City of Dallas,*
   390 U.S. 676 (1968) .............................................................. 21, 36

*Joseph Burstyn, Inc. v. Wilson,*
   343 U.S. 495 (1952) .............................................................. 21, 36

*Ladd v. Law & Tech. Press,*
   762 F.2d 809 (9th Cir. 1985) .......................................................... 15

*Little Rock Fam. Plan. Servs. v. Rutledge,*
   397 F.Supp.3d 1213 (E.D. Ark. 2019) ........................................... 39

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ................................................................................. 18, 31

*NAACP v. Button*,
   371 U.S. 415 (1963) ........................................................................................ 36

*Nat'l Bank of Comm. of El Dorado v. Dow Chem. Co.*,
   165 F.3d 602 (8th Cir. 1999) .......................................................................... 15

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
   138 S.Ct. 2361 (2018) ............................................................................. 16, 27

*Nunes v. Lizza*,
   2020 WL 6938825 (N.D. Iowa July 23, 2020) ............................................. 17

*Packingham v. North Carolina*,
   582 U.S. 98 (2017) ................................................................................. *passim*

*Postscript Enters. v. City of Bridgeton*,
   905 F.2d 223 (8th Cir. 1990) .......................................................................... 15

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ................................................................................. 24, 25

*Reno v. ACLU*,
   521 U.S. 844 (1997) ................................................................................ *passim*

*Sable Commc'ns of Cal., Inc. v. FCC*,
   492 U.S. 115 (1989) ................................................................................. 16, 23

*Shipley, Inc. v. Long*,
   454 F.Supp.2d 819 (E.D. Ark. 2004) ............................................................. 21

*Solantic, LLC v. City of Neptune Beach*,
   410 F.3d 1250 (11th Cir. 2005) ...................................................................... 16

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ................................................................................. 27, 30

*St. Croix Waterway Ass'n v. Meyer*,
   178 F.3d 515 (8th Cir. 1999) .......................................................................... 16

*Superior Films, Inc. v. Dep't of Educ. of Ohio*,
   346 U.S. 587 (1954) ........................................................................................ 36

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ........................................................................................ 20

*Toben v. Bridgestone Retail Operations, LLC*,
   751 F.3d 888 (8th Cir. 2014) ................................................................. 15

*Turner Broad. Sys. v. FCC*,
   512 U.S. 622 (1994) ............................................................................. 27

*United States ex rel. SBA v. Light*,
   766 F.2d 394 (8th Cir. 1985) ................................................................. 15

*United States v. Doe*,
   968 F.2d 86 (D.C. Cir. 1992) ................................................................. 17

*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000) ....................................................................... *passim*

*United States v. Williams*,
   553 U.S. 285 (2008) ......................................................................... 17, 36

*Video Software Dealers Ass'n v. Webster*,
   968 F.2d 684 (8th Cir. 1992) ................................................................. 21

*Video Software Dealers Ass'n. v. Schwarzenegger*,
   2007 WL 2261546 (N.D. Cal. Aug. 6, 2007) ........................................ 16

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ............................................................................. 20

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
   536 U.S. 150 (2002) ............................................................................. 16

*Winters v. New York*,
   333 U.S. 507 (1948) ............................................................................. 36

**Statutes**

28 U.S.C. §1292(a)(1) ................................................................................ 14

Ark. Code Ann. §4-88-103 ......................................................................... 13

Ark. Code Ann. §4-88-1401(1) ................................................................... 13

Ark. Code Ann. §4-88-1401(7)(A) ........................................................ *passim*

Ark. Code Ann. §4-88-1401(7)(B) ......................................................... *passim*

Ark. Code Ann. §4-88-1401(8)(A) ................................................. 12, 25, 38

Ark. Code Ann. §4-88-1401(8)(B) ......................................................... *passim*

Ark. Code Ann. §4-88-1401(8)(C) ................................................................... 28

Ark. Code Ann. §4-88-1402(a) ....................................................................... 13

Ark. Code Ann. §4-88-1402(b)(1) ................................................................. 13

Ark. Code Ann. §4-88-1402(b)(2) ................................................................. 13

Ark. Code Ann. §4-88-1402(c)(1) ................................................................. 13

Ark. Code Ann. §4-88-1402(c)(2) ............................................................ 13, 23

Ark. Code Ann. §4-88-1403(b)(2) ................................................................. 13

Ark. Code Ann. §4-88-1403(c)(1) ................................................................. 13

Ark. Code Ann. §4-88-1403(d) ................................................................. 27, 28

## Rules

Fed. R. App. P. 4(a)(1) .................................................................................. 14

Fed. R. Civ. P. 56(a) ...................................................................................... 15

## Other Authorities

Alexa Corse, *Ron DeSantis to Launch 2024 Presidential Run in Twitter Talk with Elon Musk*,
    Wall St. J. (May 23, 2023), https://tinyurl.com/484z3kfc ...................................... 19

Cincinnati Bengals, Year 4 Awaits, Instagram (June 20, 2023), https://tinyurl.com/4f2np3dj .... 30

Cincinnati Bengals, Year 4 Awaits, TikTok (June 20, 2023), https://tinyurl.com/44m7rkr4 ...... 30

Cincinnati Bengals, Year 4 Awaits, YouTube (June 20, 2023), https://tinyurl.com/y969z2pd ... 30

Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times
    (July 25, 2021), https://tinyurl.com/2p8jfyfy .......................................................... 19

Emily Dreibelbis, *Arkansas Limits Social Media Access for Kids Under 18, With One
    Major Exception*, PCMag (Apr. 13, 2023) .............................................................. 29

Daniel Howley, *Alphabet Misses on Earnings Expectations as Ad Revenue Falls*, Yahoo!
    (Feb. 2, 2023) .......................................................................................................... 29

John Inazu, *Virtual Assembly*,
    98 Cornell L. Rev. 1093 (2013) .............................................................................. 19

Jin Kim, *The Institutionalization of YouTube: From User-Generated Content to
    Professionally Generated Content*, 34 Media, Culture & Society (2012) ................ 28

Order, *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, No. 4:00-cv-2030
  (E.D. Mo. June 14, 2002) ................................................................................ 16

*Social Media and Teens*, Am. Acad. of Child & Adolescent Psychiatry
  (updated Mar. 2018), https://archive.ph/LOY12 ......................................................... 6

Jess Weatherbed, *New Arkansas Bill to Keep Minors Off Social Media Exempts Most
  Social Media Platforms*, The Verge (Apr. 13, 2023), https://archive.ph/KMmKe ................. 29

*World of Warcraft Forums*, Blizzard Entertainment, https://archive.ph/wip/mCc1a
  (last visited June 19, 2023) ............................................................................ 28

## INTRODUCTION

Arkansas Act 689 of 2023 is the latest attempt in a long line of government efforts to restrict new forms of expression based on concerns that they harm minors.  Books, movies, television, rock music, video games, and the Internet have all been accused in the past of exposing youth to content that has deleterious effects.  But the Supreme Court has repeatedly held that, while the government undoubtedly possesses "legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 794-95 (2011).  "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975).  Accordingly, government efforts to restrict minors from accessing such materials, including by requiring parental consent to do so, have repeatedly been struck down, especially when (as is often the case) they impede the First Amendment rights of adults and corporate speakers, too.

Act 689 should meet the same fate.  The Act purports to protect minors from the harmful effects of "social media" by requiring some of the companies that operate these services to verify that every person seeking to create an account is at least 18 years old or has obtained parental consent.  These requirements burden a mind-boggling amount of First Amendment-protected activity, including that of (1) minors, who must now provide evidence of parental consent before they may sign up to use online services such as Facebook and X (formerly known as Twitter), among others; (2) adults, who must now prove their age before speaking or receiving speech on these online services; and (3) the "social media companies" the law targets, which both disseminate others' expressive content and act as speakers in their own right.  Even worse, Act 689 draws a slew of content-, speaker-, and viewpoint-based distinctions.  For example, it restricts

access to a website that permits users to share videos of their newest dance moves or other acts of entertainment, but not to a website that permits users to share video gaming content.  Minors may readily access websites that provide news, sports, entertainment, and online shopping, but not those that allow them to upload their favorite recipes or pictures of their latest travels or athletic exploits.

And on top of all that, the Act does not even restrict access to supposedly harmful content in a sensible, let alone tailored, way:  The state asserts that the law regulates Facebook, X, Instagram, and Nextdoor, *see* Dkt.34 at 20; Prelim. Inj. Hr'g Tr. ("Tr.") at 142:16-143:02, but it does not cover YouTube, Mastodon, Discord, BeReel, Gab, Truth Social, Imgur, Brainly, DeviantArt, or Twitch.  It thus restricts access to political expression on X and photography on Instagram but places no restrictions on the exact same expression on Truth Social or DeviantArt. And the law allows minors to access *all* of the services and content that the state contends are too harmful for them, with no ongoing parental or other oversight whatsoever, so long as a parent agrees they can sign up for an account.

As this Court explained in granting NetChoice a preliminary injunction, Act 689 violates the Constitution in at least two distinct ways.  *See* Dkt.44 ("PI Opinion") at 30-48.  First, the Act violates the First Amendment because it is not narrowly tailored to serve the state's asserted interest in protecting minors.  *Id.* at 41-48.  Quite the contrary:  The Act does not "target content harmful to minors," but "simply impedes access to content writ large," unjustifiably burdening all manner of expression that enjoys full First Amendment protection.  *Id.* at 47-48.  Second, the Act "is unconstitutionally vague because it fails to adequately define which entities are subject to its requirements."  *Id.* at 32.  For example, an online service need not comply with the Act if its "predominant … function" is "[d]irect messaging consisting of messages, photos, or videos."  Ark.

Code Ann. §4-88-1401(8)(B).[1]  But many services offer direct messaging alongside other features, such as "allow[ing] users to create content that anyone can view," yet the Act "does not explain how [potentially regulated companies] are to determine which function is 'predominant,' leaving [them] to guess whether they are regulated."  PI Opinion at 34.

Because the problems with Act 689 are so glaring, no further factual development is needed to confirm that the Act is facially unconstitutional.  There can be no genuine dispute that the Act burdens protected speech, and its abject lack of tailoring is evident on its face.  Likewise, there can be no genuine dispute that several NetChoice members operate "an online forum" in which account holders may "interact[] socially with other profiles and accounts," Act 689 at §1401(7)(A)(i), yet one need only read the Act to confirm that its vague, exception-riddled definitions of "social media company" and "social media platform" fail to provide clear notice of what they do and do not cover.  Under these circumstances, discovery is wholly unnecessary and would accomplish nothing more than to further chill the First Amendment rights of NetChoice and its members.  This Court should accordingly grant this motion, enter a declaratory judgment that Act 689 is facially unconstitutional, and convert its preliminary injunction into a permanent injunction.

## FACTUAL BACKGROUND

### A.    Adults And Minors Alike Engage in First Amendment Activity on Online Services Covered by the Act.

NetChoice is an Internet trade association whose members operate a variety of online services, including Facebook, Instagram, Nextdoor, Pinterest, Snapchat, Tiktok, and X.  Ex. A, Decl. of Carl Szabo ¶4 ("Szabo Decl.") (citing Home, NetChoice, https://netchoice.org).  These

---

[1] All citations to Act 689 in this brief refer to particular subsections of Title 4, Chapter 88, Subchapter 14 of the Arkansas Code.  For simplicity's sake, the brief will cite only to the subsection, e.g., "Act 689 at §1401(8)(B)."

online services allow users to sign up for an account, create and share content, and view others'
content.  Ex. B, Decl. of Antigone Davis ¶¶7-8, 19 ("Davis Decl."); Dkt.17-3, Decl. of David
Boyle ¶¶3-5 ("Boyle Decl."); Ex. C, Decl. of Justyn Harriman ¶¶3, 7 ("Harriman Decl."); Ex. 14
at 1-2.[2]  Adults and minors use these online services to engage in a broad array of expressive
activity, protected by the First Amendment, on a wide range of topics.  PI Opinion at 13 (citing
Joint Stipulations ¶7 (Aug. 11, 2023)).

   *Facebook and Instagram.*  Facebook and Instagram are owned by Meta Platforms, Inc.
("Meta").  Davis Decl. ¶2.  Both services are used by private individuals (including teens and
adults), public figures, businesses, and other organizations.  *Id.* ¶¶7-8, 11.  Facebook displays
content in Feed, a feature that shows users content that they are most likely to be interested in—
for example, status updates from friends, photos and videos from family gatherings, articles from
local or national news outlets, and much more.  *Id.* ¶9.  Instagram similarly displays content in
Instagram Feed, a feature it launched in 2010.  *Id.* ¶10.  Over 3 billion people use Meta's services,
sharing over 100 billion messages per day.  *Id.* ¶5.

   *Snapchat.*  Snapchat, the flagship application of Snap Inc. ("Snap"), is a camera and
communications service that allows users (including teens and adults) to communicate using text,
audio and video calls, photos, and short videos.  Boyle Decl. ¶¶3, 6.  Snapchat is used for direct,
private communications, often between small groups of people who already know each other in
real life.  *Id.*  By default, the app requires a user to first accept another user as a friend in order to
send communications.  *Id.*

   Snapchat opens to the user's camera and allows the user to send communications that by
default delete after being opened.  *Id.* ¶4.  It also offers users a variety of tools to add effects to

---

[2] All numbered exhibits are attached to Exhibit D, Declaration of Katherine C. Campbell.

photos, such as adding puppy dog ears to a face or augmented reality effects on a landmark (e.g., rainbows coming out of the Eiffel tower). *Id.* In addition to sending direct messages, Snapchat enables users to compile photos and videos into "Stories," which are generally available for 24 hours and which, by default, are viewable only by a user's friends. *Id.* Snapchat also offers a "Discover" feature, which gives access to vetted content from trusted partners (e.g., NBC News), as well as a "Spotlight" feature, which features certain approved user-generated content that anyone can view. *Id.* Snapchat has over 380 million users. *Id.*

***Nextdoor.*** Nextdoor is an application aimed at facilitating constructive neighborhood connections and conversations. Harriman Decl. ¶7. Individuals who sign up for Nextdoor are placed in a neighborhood based on their address and automatically receive updates from nearby neighbors, businesses, and public services. *Id.* ¶¶4-5. Nextdoor is used overwhelmingly by adults looking to connect with other nearby residents—to learn about events in their community, give and receive help, and build real-world connections. *Id.* ¶¶3, 14-15. A tiny fraction (approximately 1%) of Nextdoor's users are between the ages of 13 and 17. *Id.* ¶14. Teens use Nextdoor to find employment—e.g., dog walking or cat sitting, selling crafts, gardening, snow shoveling, tutoring, babysitting, and offering technical computer assistance to neighbors. *Id.* ¶15. Nextdoor has about 80 million verified users and is used by roughly one quarter of households in Arkansas. *Id.* ¶3.

***Pinterest.*** Pinterest is a visual discovery engine for finding ideas like recipes, home and style inspiration, and more. Ex. 14 at 1. Individuals who sign up for Pinterest can create and share Pins displaying images, videos, or products. *Id.* at 2-3. Each user sees a "home feed" that displays content (Pins, people, and businesses) curated based on the user's recent activity. *Id.* at 1. Users can also search for Pins on a given topic by typing keywords into a search bar. *Id.* at 1-2. For example, a search for "birthday party" would return Pins showing ideas for birthday party décor,

party food recipes, birthday gift ideas, and the like.  *Id.* at 1.  Pinterest users can organize and save their Pins on Boards; collaborate with other users on Group Boards; and follow profiles and Boards that others choose to make public.  *Id.* at 3-4.  Pinterest has approximately 482 million monthly active users.  Ex. 16 at 2.

As these examples illustrate, the online services operated by NetChoice members "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind."  *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).  Adults and minors alike use these online services to read the news, connect with friends, explore new interests, and follow their favorite sports teams and their dream colleges.  Szabo Decl. ¶6.  Some use online services to showcase their creative talents to others, including artwork, photography, writing, and other forms of creative expression.  *Id.*  Others use online services to raise awareness about social causes and to participate in public discussion on the hottest topics of the day.  *Id.*  Still others use online services to build communities and connect with others who share similar interests or experiences.  *Id.*  These services are ubiquitous: Ninety percent of teens have used social media, seventy-five percent report having at least one active profile, and more than half report visiting a social media site at least once a day.  *See Social Media and Teens*, Am. Acad. of Child & Adolescent Psychiatry (updated Mar. 2018), https://archive.ph/LOY12.

**B.     Parents Have Many Ways to Control What Their Children See on the Internet.**

Parents who wish to limit their children's access to online services such as Facebook, YouTube, and TikTok have numerous options at their disposal.  Like the movie, music, and video game industries, which have developed sophisticated ratings systems to assist parents, the tech industry has developed sophisticated filtering tools and technologies, often in response to consumer demand, that enable parents to restrict which services their children use, how much time they spend on them, and what content they can view.

*Network-level restrictions.*  Cell carriers and broadband providers provide parents with tools to block certain apps and sites from their kids' devices, ensure that they are texting and chatting with trusted contacts, and restrict screen time during certain hours of the day.  *See, e.g.*, Ex. 2 (AT&T parental controls); Ex. 3 (Comcast parental controls); Ex. 12 (T-Mobile Family Controls); Ex. 13 (Verizon Smart Family controls).  Most wireless routers (the devices that provide wireless Internet throughout a home) contain parental control settings as well.  *See* Ex. 11.  Parents can use those settings to block specific websites and applications (including Facebook, X, TikTok, etc.) if they find them inappropriate for their children.  *See* Ex. 10 (Netgear Circle® Smart Parental Controls).  In addition, these settings empower parents to limit the time that their children spend on the Internet by turning off their home Internet at specific times during the day, pausing Internet access for a particular device or user, or limiting how long a child can spend on a particular website or online service.  *Id.*  Parents can also set individualized content filters for their children and monitor the websites they visit and the services they use.  *Id*.

*Device-level restrictions.*  Additional parental controls are available at the device level. Parents can decide whether to let their children use computers, tablets, and smartphones in the first place.  And those who choose to let their kids use such devices have many ways to control what they see and do.  Apple, for example, provides parents with tools to limit how long their children can spend on their iPhones, iPads, and MacBooks.  *See* Ex. 1 (Parental controls for iPhone, iPad, and iPod Touch).  It also provides them with tools to control what applications (*e.g.*, Facebook, X, and TikTok) their children can use, set age-related restrictions for those applications, filter online content, and control privacy settings.  *Id.*  Google and Microsoft offer similar parental controls for their devices.  *See* Ex. 4; Ex. 6.  In addition, many third-party applications allow parents to control and monitor their children's use of Internet-connected devices and online services.  *See* Ex. 8.

*Browser-level restrictions.*  Parental controls on Internet browsers offer another layer of protection.  Google Chrome, Microsoft Edge, and Mozilla Firefox all offer parents tools to control which websites their children can access.  *See, e.g.*, Ex. 9 (describing controls on Mozilla Firefox). Microsoft offers "Kids Mode," which allows children to access only a pre-approved list of websites.  *See* Ex. 7.  Google has a similar feature.  *See* Ex. 5.  It also provides parents with "activity reports," allowing them to see what apps and websites their children are accessing the most.  *Id.*.

*Application-level restrictions.*  NetChoice members themselves have expended significant resources to ensure that their services are appropriate for adults and teens alike.  For starters, many services operated by NetChoice members, including Facebook, Instagram, Snapchat, Nextdoor, and Pinterest, require users in the United States to be at least 13 years old before they can create an account.  *See* Davis Decl. ¶27; Boyle Decl. ¶5; Harriman Decl. ¶13; Ex. 14 at 1.  Meta also trains its content reviewers to flag Facebook and Instagram accounts that appear to be used by people who are under 13, and it removes those accounts unless the user can prove that they meet the minimum age requirement.  Davis Decl. ¶27; *see also* Boyle Decl. ¶5 (Snap similarly takes action to terminate accounts of individuals under 13).  NetChoice members also encourage teenagers who are old enough to create an account to use private settings.  Snapchat, for example, defaults all minor users to private settings.  Boyle Decl. ¶6.  Facebook, Instagram, and Pinterest likewise default teenagers under age 16 to private settings when they join and encourage them to choose more private settings through prompts and suggestions.  *See* Davis Decl. ¶31; Ex. 17 at 2.

NetChoice members expend significant resources curating the publication of content that users share.  *See, e.g.*, Davis Decl. ¶¶33-40; Harriman Decl. ¶9.  Members restrict violent and sexual content, bullying, and harassment.  *See* Szabo Decl. ¶7; Davis Decl. ¶¶33-35; Boyle Decl. ¶6.  Several use "age gating" to keep minors from seeing certain content visible to adults, or

younger teens from seeing content visible to older teens. Szabo Decl. ¶7; Davis Decl. ¶32. NetChoice members implement their policies through algorithms, automated editing tools, and human review. *See* Davis Decl. ¶¶27, 36. If a member decides that a piece of content violates its policies, it can remove the content, restrict it, or add a warning label or a disclaimer to accompany it. *See* Harriman Decl. ¶10. Members may (and do) suspend or ban accounts that violate their policies. *See* Davis Decl. ¶27.

NetChoice members also provide users with tools to curate the content they wish to see. *See* Szabo Decl. ¶7. Users can generally choose who they follow and who can follow them. *See* Davis Decl. ¶¶7-8; Ex. 14 at 3-4. Some members provide users with tools to identify content they wish to avoid. Facebook users, for example, can control the content that Facebook recommends to them by hiding a post or opting to see fewer posts from a specific person or group. Davis Decl. ¶41. Instagram users can use a "not interested" button or keyword filters (for example, "fitness" or "recipes" or "fashion") to filter out content they do not wish to see. *Id.*

NetChoice members also empower parents to monitor their teens' online activities. *See* Szabo Decl. ¶7. Parents can use Facebook and Instagram's "supervision tools" to see how much time their teens spend on these services, set time limits or scheduled breaks, and view which accounts their teens follow or "friend" and which accounts follow or "friend" their teens. Davis Decl. ¶28. TikTok has a "family pairing" feature that allows parents to, among other things, set a screen time limit, restrict exposure to certain content, decide whether their teen's account is private or public, turn off direct messaging, and decide who can comment on their teen's videos. Szabo Decl. ¶7. Through Snapchat's "family center," parents can keep track of who their teens are friends with and who they communicate with. Boyle Decl. ¶7.

NetChoice members—including Meta, TikTok, and Pinterest—take numerous steps to keep teens safe on their services, including by implementing policies to combat child sex exploitation.  For example, members devote their resources to identifying illegal images and videos of child sexual abuse and reporting them to the relevant authorities.  *See, e.g.*, Boyle Dec. ¶6 (Snap); Ex. 15 (Pinterest).  In addition, Snapchat permits messages only between people who are already friends on the platform or who are already contacts in each other's phones and does not recommend minors as friend connections for others unless the person is already in their phone contacts or they share multiple mutual friends.  Boyle Decl. ¶6.  Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected.  Davis Decl. ¶30.  Instagram also informs young people when an adult who has been exhibiting potentially suspicious behavior tries to interact with them.  *Id.*  If an adult is sending a large number of friend or message requests to people under age 18, for example, or if the adult has recently been blocked by people under age 18, Instagram alerts the recipients and gives them an option to end the conversation and block, report, or restrict the adult.  *Id.*

## PROCEDURAL HISTORY

### A.    Arkansas Promulgates Act 689 of 2023.

Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech is appropriate for minors, *see* Dkt.18 at 6-7 & n.1, and the wealth of tools available to help parents restrict their children's Internet access should they choose to do so, Arkansas recently took it upon itself to decree what is appropriate for minors on the Internet. In April 2023, the state enacted Act 689, a law that dramatically hinders minors from accessing "social media platforms," significantly curtailing their ability to engage in core First Amendment activities on some of the most popular online services.  In particular, Act 689 requires "social media companies" to verify the age of everyone who attempts to create an account and access their

services, and prohibits minors from creating new accounts on "social media platforms" without first obtaining parental consent.  That said, Act 689 conspicuously does not apply to *all* online services, or even all services that many think of as "social media platforms."  The law instead draws a host of vague and nonsensical distinctions based on content, speaker, and viewpoint, imposing its onerous requirements on a handful of online services that Arkansas views as associated with speech that it disfavors while exempting many other services.

**Definition of "social media company."**  Act 689 defines "social media company" as a company that offers "an online forum" in which individuals may "establish an account … for the primary purpose of interacting socially with other[s]"; "create posts or content"; "[v]iew [others'] posts or content"; and "establish[] mutual connections through request and acceptance."  Act 689 at §1401(7)(A).  But the Act includes multiple exceptions to the definition of "social media company" that are arbitrary; content-, speaker-, and viewpoint-based; and do not map onto any sensible concerns.  In particular, the Act exempts from its definition of "social media company" (i) a "[m]edia company that exclusively offers subscription content in which users follow or subscribe unilaterally and whose platforms' primary purpose is not social interaction"; (ii) a "[m]edia company that exclusively offers interacting gaming, virtual gaming, or an online service, that allows the creation and uploading of content for the purpose of interacting gaming, entertainment, or associated entertainment, and the communication related to that content"; (iii) a company that offers an enumerated service, such as "cloud storage" or "enterprise collaboration tools for kindergarten through grade twelve (K-12) schools," and derives less than 25% of its revenue "from operating a social media platform, including games and advertising"; and (iv) a "[c]ompany that provides career development opportunities, including professional networking, job skills, learning certifications, and job posting and application services."  *Id.* §1401(7)(B)(i),

11

(iii)-(v).   The Act then creates an exception-to-an-exception, stating that a "[s]ocial media company that allows a user to generate short video clips of dancing, voice overs, or other acts of entertainment in which the primary purpose is not educational or informative, does not meet the [first] exclusion."  *Id.* §1401(7)(B)(ii).

*Definition of "social media platform."*  Act 689's definition of "social media platform" is similarly riddled with arbitrary exceptions based on content, speaker, and viewpoint.  The Act defines "[s]ocial media platform" as "a public or semipublic internet-based service or application," a "substantial function" of which "is to connect users in order to allow users to interact socially with each other within the service or application."  *Id.* §1401(8)(A).  But the term excludes any "online service," "website," or "application if [its] predominant or exclusive function" is (i) email; (ii) private, direct messaging; (iii) streaming of media content licensed by someone other than "a user or account holder"; (iv) "[n]ews, sports, entertainment, or other content that is preselected by the provider and not user generated"; (v) "[o]nline shopping or e-commerce"; (vi) "[b]usiness-to-business software that is not accessible to the general public"; (vii) "[c]loud storage"; (viii) "[s]hared document collaboration"; (ix) "[p]roviding access to or interacting with data visualization platforms, libraries, or hubs"; (x) "[t]o permit comments on a digital news website, if the news content is posted only by the provider of the … website"; (xi) "obtaining technical support for [a] social media company's social media platform, products, or services"; (xii) "[a]cademic or scholarly research"; and (xiii) certain other types of research. *Id.* §1401(8)(B).

*The Act's burdensome requirements.*  Act 689 imposes onerous obligations on certain disfavored "social media companies," thus burdening the First Amendment rights of adults, minors, and companies to speak, listen, and associate without government interference.  The Act specifies that "a social media company shall not permit an Arkansas user who is a minor to be an

account holder"—i.e., an "individual who creates an account or a profile" "on the social media company's social media platform"—"unless the minor has the express consent of a parent or legal guardian." *Id.* §§1401(1), 1402(a). "A social media company shall verify the age of an account holder," and "[i]f the account holder is a minor, the social media company shall confirm that a minor has [parental] consent … to become a new account holder, at the time an Arkansas user opens the account." *Id.* §1402(b)(1)-(2). In addition, "[a] social media company shall use a third party vendor to perform reasonable age verification before allowing access to the social media company's social media platform." *Id.* §1402(c)(1). The Act specifies that "[r]easonable age verification methods" include providing a "digitized identification card," "[g]overnment-issued identification," or "[a]ny commercially reasonable age verification method." *Id.* §1402(c)(2).

A "social media company" that violates those restrictions faces civil and criminal liability. The Act authorizes the Arkansas Attorney General to bring civil enforcement actions and makes a willful and knowing violation of the Act as a Class A criminal misdemeanor. *Id.* §1403(b)(2) (citing Ark. Code Ann. §4-88-103). In addition, an individual may sue to recover "[d]amages resulting from a minor accessing a social media platform without his or her parent's or custodian's consent," or "[a] penalty of [$2,500] per violation," as well as court costs and attorney's fees. *Id.* §1403(c)(1).

### B.    The Court Preliminarily Enjoins Enforcement of Act 689.

Shortly after Act 689 was enacted, NetChoice filed this lawsuit challenging the Act's constitutionality on behalf of its members and moved for a preliminary injunction. Dkt.2, 17. After full briefing, this Court held an evidentiary hearing at which it received documentary evidence from both sides, as well as testimony from the state's expert witness, Tony Allen, and heard argument on NetChoice's motion. In a 50-page opinion, the Court held that (1) NetChoice has standing to challenge Act 689; (2) there is no prudential bar to NetChoice invoking the First

Amendment rights of Arkansans; (3) "Act 689 is unconstitutionally vague because it fails to adequately define which entities are subject to its requirements"; (4) Act 689 likely violates the First Amendment because it "is not narrowly tailored" to achieve the state's asserted interest in protecting minors; (5) "NetChoice members are likely to suffer irreparable harm if the Act goes into effect"; and (6) "[t]he balance of the equities and public interest decidedly favor NetChoice." PI Opinion at 25, 32, 48-49.  Accordingly, the Court preliminarily enjoined enforcement of Act 689 pending final disposition of the case.  *Id.* at 50.

The state had 30 days to appeal this Court's grant of a preliminary injunction, *see* Fed. R. App. P. 4(a)(1); 28 U.S.C. §1292(a)(1), but chose not to do so.  On October 11, the Court entered a scheduling order for further proceedings.  *See* Dkt.46.  Pursuant to that order, the parties filed a joint Rule 26(f) report on October 24.  *See* Dkt.47.  In that report, NetChoice explained that discovery is unnecessary because—for the reasons explained in the Court's preliminary-injunction opinion—Act 689 is facially unconstitutional for (at least) two independent reasons.  *Id.* ¶¶1, 3. The state disagreed, indicating its intent to seek discovery from NetChoice's members and inquire into "the veracity of the affidavits" that NetChoice and three of its members submitted in support of the motion for a preliminary injunction.  *Id.* ¶3.  The state has not identified what exactly in any of those short affidavits it has some reason to doubt is true.  On October 27, 2023, NetChoice moved (over the state's objection) to vacate the deadline for initial disclosures and to stay discovery pending resolution of its forthcoming motion for summary judgment.  *See* Dkt. 48; Dkt. 49.  NetChoice now moves for summary judgment on Counts 1 and 2 of its complaint, to which it is entitled for the reasons set forth in this brief.[3]

---

[3] Because success on Counts 1 and 2 would afford NetChoice complete relief, NetChoice will consent to dismissal of Counts 3 and 4 if the Court grants this motion.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *Nat'l Bank of Comm. of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Nat'l Bank of Comm.*, 165 F.3d at 607 (non-movant "must show there is sufficient evidence to support a jury verdict in their favor").  Summary judgment is "not … a disfavored procedural shortcut, but rather … an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  *Postscript Enters. v. City of Bridgeton*, 905 F.2d 223, 225 (8th Cir. 1990).

Although summary-judgment motions typically follow discovery, the Eighth Circuit has made clear that district courts are not "require[d]… to allow parties to conduct discovery before entering summary judgment."  *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 836 (8th Cir. 2015) (quoting *United States ex rel. SBA v. Light*, 766 F.2d 394, 397 (8th Cir. 1985)).  Discovery "is not necessary in every situation"; some cases turn on "legal questions, suitable for resolution without discovery."  *Hess v. Citibank, N.A.*, 459 F.3d 837, 846 (8th Cir. 2006); *see also, e.g.*, *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 896-98 (8th Cir. 2014) (affirming award of summary judgment without any merits discovery); *Ladd v. Law & Tech. Press*, 762 F.2d 809, 810 (9th Cir. 1985) (same).

"[F]acial constitutional challenge[s]," including First Amendment and void-for-vagueness claims, are often susceptible to resolution without discovery because they present "questions of law" for which "specific facts [a]re not relevant." *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 519-20 (8th Cir. 1999); *see IDK, Inc. v. Clark Cnty.*, 836 F.2d 1185, 1189 (9th Cir. 1988). Indeed, the Supreme Court has repeatedly held that a statute fails the "narrow tailoring" requirement of First Amendment analysis—which effectively resolves the merits—before any discovery has taken place. *See, e.g., Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1881-82 (2021); *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S.Ct. 2361, 2370, 2375-76 (2018); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 168 (2002); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 131 (1989). District courts likewise have frequently held that pure questions of First Amendment law are suitable for resolution at summary judgment without discovery. *See, e.g., Video Software Dealers Ass'n. v. Schwarzenegger*, 2007 WL 2261546, at *3 (N.D. Cal. Aug. 6, 2007) (granting plaintiffs' motion for summary judgment without discovery in challenge to California law requiring parental consent for minors' purchase or rental of violent video games), *aff'd*, 556 F.3d 950 (9th Cir. 2009), *aff'd sub nom. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011).[4] Moreover, courts have recognized that "speedy resolution of cases involving free speech is desirable" because time-consuming and costly discovery can

---

[4] *See also, e.g., Burt v. Rumsfeld*, 354 F.Supp.2d 156, 161-65 (D. Conn. 2005) (holding that First Amendment question was suitable for resolution at summary judgment without discovery and denying government's motion for discovery), *rev'd on other grounds sub nom. Burt v. Gates*, 502 F.3d 183 (2d Cir. 2007); Order, ECF No. 39, *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, No. 4:00-cv-2030 (E.D. Mo. June 14, 2002) (denying request for discovery in challenge to county's parental-consent requirement for minors' purchase or rental of violent video games because case turned purely on legal issues); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1274 (11th Cir. 2005) (invalidating content-based sign regulation without discovery because it raised "First Amendment questions" of a "purely legal" nature).

itself chill First Amendment rights. *Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1435 (9th Cir. 1992); *see Nunes v. Lizza*, 2020 WL 6938825, at *2 (N.D. Iowa July 23, 2020).

## ARGUMENT

No factual development is needed to confirm that Act 689 is facially unconstitutional. There can be no genuine dispute that the Act restricts access to "a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105 (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)); *see also* PI Opinion at 13 ("The parties jointly stipulate that adults and minors use NetChoice members' online services to engage in an array of expressive activity that is protected by the First Amendment." (footnote omitted)).  Accordingly, the Act can survive First Amendment scrutiny only if it is "narrowly tailored" to serve the state's asserted interest. *Packingham*, 582 U.S. at 105.  As a matter of law, it is not. *See* PI Opinion at 41-48; *infra* Part I.B; *see also United States v. Doe*, 968 F.2d 86, 88 (D.C. Cir. 1992) ("Whether [a] regulation meets the 'narrowly tailored' requirement is of course a question of law.").  Similarly, there can be no genuine dispute that several NetChoice members operate "an online forum" in which account holders may "interact[] socially with other profiles and accounts."  Act 689 at §1401(7)(A)(i); *see* Szabo Decl. ¶¶3-4 (describing NetChoice's membership); *id.* ¶9 (X); Davis Decl. ¶¶5-11 (Facebook and Instagram); Boyle Decl. ¶4 (Snapchat); Harriman Decl. ¶¶3-5 (Nextdoor); Ex. 14 (Pinterest).  And it is clear on the face of the law's vague, exception-riddled definitions of "social media company" and "social media platform" that Act 689 threatens to impose civil and criminal liability on these companies without providing "fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see* PI Opinion at 30-35; *infra* Part II.  The Act is thus blatantly unconstitutional on its face.  Discovery is not needed to confirm that legal conclusion and could not possibly alter it.

17

## I.     Act 689 Violates The First Amendment.

A law that restricts speech protected by the First Amendment is subject to at least intermediate judicial scrutiny, meaning that it cannot be upheld unless it is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06. And if the law restricts speech based on content or viewpoint, it is subject to strict scrutiny: it must be "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Act 689 fails both tests because it is not remotely tailored to achieve the state's asserted interest in combating child sex exploitation. The Act is vastly overinclusive because "[i]t simply impedes access to content writ large," restricting minors' access to all sorts of innocuous speech on some of the most popular, widely used online services. PI Opinion at 47. The Act is also grossly underinclusive because it exempts many other online services, including some "that adult sexual predators commonly use to communicate with children." *Id.* at 44. Accordingly, the Act is plainly unconstitutional.

### A.     Act 689 Triggers Heightened Scrutiny Several Times Over.

#### 1.     Act 689 restricts a breathtaking amount of core First Amendment activity.

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more" without government interference. *Packingham*, 582 U.S. at 104. That includes the Internet generally and online services like those provided by NetChoice members specifically. Online services like Facebook, X, Snapchat, and TikTok offer "relatively unlimited, low-cost capacity for communication of all kinds." *Id.* (quoting *Reno*, 521 U.S. at 870). And "users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought,'" including everything from "debat[ing] religion and politics with their friends

18

and neighbors" on Facebook to "petition[ing] their elected representatives" on X.  *Id.* at 104-05. Users can watch church services, *see* Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (July 25, 2021), https://tinyurl.com/2p8jfyfy, associate and assemble with like-minded individuals, *see* John Inazu, *Virtual Assembly*, 98 Cornell L. Rev. 1093 (2013), watch presidential candidates launch their campaigns, *see* Alexa Corse, *Ron DeSantis to Launch 2024 Presidential Run in Twitter Talk with Elon Musk*, Wall St. J. (May 23, 2023), https://tinyurl.com/484z3kfc, debate those with whom they disagree, *Packingham*, 582 U.S. at 104, and more.

It is thus no surprise that the Supreme Court has held that the First Amendment limits the government's ability to restrict people's access to online services, even when its aim is to protect minors.  In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment. The state tried to justify the law on the ground that it served the state's interest in keeping sex offenders away from vulnerable minors.  582 U.S. at 106.  While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment. *Id.* at 107-08.  By barring sex offenders from accessing "social networking" websites altogether, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens."  *Id.* at 107.  Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge."  *Id.* at 107.  For the government to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."  *Id.* at 108.

19

Just as the First Amendment constrains the government's authority to restrict adults' access to online services like Facebook, Pinterest, and Nextdoor, it constrains the government's authority to restrict minors' access to those services as well. *See* PI Opinion at 40-41.  The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13, and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).  In fact, when the Supreme Court stated that "if there is any fixed star in our constitutional constellation it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," it did so in service of enforcing the right of *minors* not to salute the American flag. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Accordingly, as a general rule, "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik*, 422 U.S. at 214.  To be sure, the government may have some leeway to "adjust the boundaries of an existing category of *unprotected* speech" (like obscenity) "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794 (emphasis added).  But just as "the First Amendment strictly limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others," *Erznoznik*, 422 U.S. at 209, the First Amendment also prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable to them," *id.* at 213-14.  While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95.  When it comes to both adults and minors, the

20

"Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik*, 422 U.S. at 210.

Applying those principles, courts have routinely struck down government efforts to protect minors from the purportedly harmful effects of new forms of media. In *Brown*, for example, the Supreme Court held that a California law that prohibited the sale of violent video games to minors without parental consent violated the First Amendment. 564 U.S. at 804-05. The Court recognized that parents "have … the power to control what their children hear and say," but explained that the law did not "enforce *parental* authority"; instead, it "impose[d] *governmental* authority, subject only to a parental veto." *Id.* at 795 n.3. Similarly, in *Erznoznik*, the Court held that a local ordinance barring the display of movies containing nudity at drive-in theaters could not be upheld as a means of "prohibiting youths from viewing [such] films." 422 U.S. at 217-18; *accord Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 689-91 (1968) (invalidating ordinance restricting dissemination of films that are "not suitable for young persons"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952) (invalidating law authorizing denial of license to show films deemed "sacrilegious"). The Eighth Circuit likewise has struck down government efforts to restrict minors' access to constitutionally protected speech. *See Interactive Digital Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 956 (8th Cir. 2003) (invalidating ordinance prohibiting the sale of violent video games to minors without parental consent); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 687 (8th Cir. 1992) (invalidating law prohibiting sale to minors of videos depicting violence); *see also Shipley, Inc. v. Long*, 454 F.Supp.2d 819, 831 (E.D. Ark. 2004) (invalidating law restricting materials deemed "harmful to minors").

Just like the laws struck down in *Brown*, *Erznoznik*, *Interactive Digital*, and *Webster*, Act 689 plainly restricts vast quantities of expression that enjoys First Amendment protection. By restricting *all* access to *any* use of online services like Facebook, Snapchat, and Nextdoor, Arkansas has "prevent[ed] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. In fact, Act 689 is even more obviously unconstitutional than the laws invalidated in *Brown*, *Erznoznik*, *Interactive Digital*, and *Webster*. At least in those cases the government argued (albeit unsuccessfully) that the speech it had restricted was not constitutionally protected as to minors. *See Brown*, 564 U.S. at 792-93; *Erznoznik*, 422 U.S. at 212-13; *Interactive Digital*, 329 F.3d at 958; *Webster*, 968 F.2d at 688. But Act 689 does not even endeavor to confine its restrictions to speech that even arguably approaches any constitutional line. It instead restricts the ability of minors to create accounts and access *any* content on websites like Facebook and X even if all they want to do is to attend church services, watch the launch of a presidential campaign, or communicate with friends or family. Arkansas has thus restricted wide swathes of protected First Amendment activity based on a concern that minors *may* encounter harmful material on those services. If California had restricted access to *all* video games based on a concern that *some* video games may be addictive or violent, that would have made the First Amendment violation even more glaring. *See Packingham*, 582 U.S. at 108-09; *cf. Bd. of Airport Comm'rs of L.A. v. Jews for Jesus*, 482 U.S. 569 (1987) (invalidating ban on all "First Amendment activities" in airport's main terminal).

Making matters worse, by requiring *all* users to verify their age before creating an account, Act 689 burdens the right of *adults* to access those websites too. *See* PI Opinion at 39-40. The Supreme Court has repeatedly struck down even laws that restrict access to speech that is *not* constitutionally protected as to minors, on the ground that those efforts were insufficiently tailored

22

to avoid unduly restricting the First Amendment rights of adults.  For example, in *Ashcroft v. ACLU*, 542 U.S. 656 (2004), the Court concluded that a statute requiring Internet users to "identify themselves or provide their credit card information" before accessing certain sexually explicit websites impermissibly burdened the right of adults to "gain access to speech they have a right to see."  *Id*. at 667.  Likewise, in *Reno*, the Court held that a federal statute that required age verification via credit card to access "indecent" or "patently offensive" material on the Internet violated the First Amendment even assuming such content was unprotected as to minors because it "would completely bar adults who do not have a credit card and lack the resources to obtain one" from accessing protected speech.  521 U.S. at 849.  And in *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000), the Court held that a federal statute restricting sexual programming on cable television violated the First Amendment because alternatives like voluntary blocking would impose less of burden on the rights of adults.  *Id.* at 807; *see also, e.g.*, *Sable*, 492 U.S. at 131 (striking down a ban on prerecorded "dial-a-porn" messages, in an effort to prevent minors from accessing them, as too restrictive of adults' First Amendment rights).  Here too, Act 689 burdens adult speech by requiring all Arkansas users to verify their age via digitized identification before creating an account.  Act 689 at §1402(c)(2).  As the Supreme Court has recognized, such identification requirements "discourage users from accessing" online services, and they "completely bar" adults who do not possess identification.  *Reno*, 521 U.S. at 856; *cf. Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198-99 (2008) (requiring voters to present identification before voting imposes burdens, particularly where "economic or other personal limitations" may prevent potential voters from obtaining identification); *see also* Harriman Decl. ¶¶16-29.

The unique aspects of the online services regulated by Act 689 only heighten the First Amendment values at stake.  While government restrictions on books, magazines, movies, and

video games prohibit people from *receiving* speech, restrictions on accessing online services have the additional effect of restricting people from engaging in their own speech and associating with like-minded individuals.   The Internet and "social media" have become some of the "most important places … for the exchange of views." *Packingham*, 582 U.S. at 104 (quoting *Reno*, 521 U.S. at 868).  "Social media allows users to gain access to information and communicate with one another about it on any subject that might come to mind."  *Id.* at 107.  Government restrictions on "the exercise of First Amendment rights on websites integral to the fabric of our modern society and culture" thus unquestionably trigger heightened scrutiny, *id.* at 109.

### 2.    Act 689 restricts speech based on content, speaker, and viewpoint.

Act 689 not only restricts an unprecedented amount of First Amendment activity, but does so on the basis of content, speaker and viewpoint, triggering *strict* scrutiny multiple times over. *See* PI Opinion at 38 ("[T]he Court tends to agree with NetChoice that the restrictions in Act 689 are subject to strict scrutiny.").  It is the "most basic principle" of First Amendment law that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Brown*, 564 U.S. at 790-91.  Under the First Amendment, "esthetic and moral judgments about art and literature" and other forms of speech and expression "are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority."  *Playboy,* 529 U. S. at 818.  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve [a] compelling interest[]."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

***Content-based restrictions.***  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Id*. In assessing whether a regulation is content based, courts consider "whether a regulation of speech

'on its face' draws distinctions based on the message a speaker conveys." *Id.* "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter." *Id.* Others "are more subtle" but "achieve[] the same result" through distinctions based on "function or purpose." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1474 (2022). In *Reed*, for example, the Supreme Court held that distinctions between signs serving certain "noncommercial purposes," those "designed to influence the outcome of an election," and "temporary directional signs relating to a qualifying event" were content based. 576 U.S. at 159-60 (capitalization altered). Similarly, in *Barr v. American Association of Political Consultants, Inc.*, 140 S.Ct. 2335 (2020), the Court held that a federal statutory prohibition on robocalls with an exception for calls "made solely to collect a debt owed to or guaranteed by the United States" was content based because it "favor[ed] speech made for collecting government debt over political and other speech." *Id.* at 2346.

Act 689 is a content-based restriction on speech because it "singles out specific subject matter for differential treatment," including by using the "function or purpose" of speech as a proxy for its content. *Reed*, 576 U.S. at 169; *see also City of Austin*, 142 S.Ct. at 1472-73. For example, the Act's definition of "social media company" targets companies that provide services with "the primary purpose of interacting socially," Act 689 at §1401(7)(A), while generally excluding a company that "exclusively offers subscription content in which users follow or subscribe unilaterally and whose platforms' primary purpose is not social interaction," *id.* §1401(7)(B)(i). The law thus treats expression for purposes of "social interaction" less favorably than expression that serves other purposes. *See also id.* §§1401(7)(B)(i), (8)(A)(ii)(a), (8)(B)(v)(c), (xiii)(2). In addition, a company offering a service that "allows a user to generate short video clips of dancing, voice overs, or other acts of entertainment" is exempt from Act 689

25

only if "the primary purpose" of that protected speech is "educational or informative." *Id.* §1401(7)(B)(ii).

The Act also exempts a company that "exclusively offers interacti[ve] gaming, virtual gaming, or an online service, that allows the creation and uploading of content for the purpose of interacti[ve] gaming, entertainment, or associated entertainment, and the communication related to that content," *id.* §1401(7)(B)(iii), certain companies that offer "educational devices" or "enterprise collaboration tools for kindergarten through grade twelve (K-12) schools," *id.* §1401(7)(B)(iv), and companies that offer "career development opportunities, including professional networking, learning certifications, and job posting and application services," *id.* §1401(7)(B)(v). But it contains no comparable exceptions for companies that focus on other types of content, like political content. Thus, under Act 689, a company that permits users to share content for the purpose of gaming (like Activision Blizzard) is exempt, but a company that permits users to share content for the purpose of persuading others to vote for their preferred candidate (like X) is not. Likewise, a service that permits users to share job postings and engage in professional networking (like LinkedIn) is exempt, but one that permits users to share dance videos or engage in social networking (like Facebook, Instagram, or TikTok) is not. "That is about as content-based as it gets." *Barr*, 140 S.Ct. at 2346.

Act 689's definition of "social media platform" is also riddled with arbitrary content-based distinctions. The Act excludes a service "if the predominant or exclusive function is," among other things, disseminating content about "[n]ews, sports, [and] entertainment," "[a]cademic or scholarly research," and some "[o]ther research." Act 689 at §1401(8)(B)(iv), (xii), (xiii). The Act favors speech "focused on online shopping or e-commerce"—including "collections of goods for sale or wish lists," product "reviews," and related comments—as well as communications

"[f]or the purpose of providing or obtaining technical support." *Id.* §1401(8)(B)(v), (xi); *see also id.* §1401(8)(B)(xiii)(b) (carve-out for "classified advertising service[s]"). It also exempts "a news or public interest broadcast, website video, report, or event," and a "news-gathering organization." *Id.* §1403(d)(1)-(2). Users can therefore leave product reviews on Amazon, post comments on law review articles published on SSRN, and engage in competitive banter while playing fantasy football on ESPN. But they cannot reply to a friend's X missives or comment on Instagram posts without first verifying their age or obtaining parental consent. Act 689 thus singles out some speech for favorable government treatment based on subject matter, while subjecting other speech to unfavorable treatment based on subject matter.

***Speaker-based restrictions.*** Making matters worse, the law arbitrarily favors speech depending on who the speaker is. Courts are deeply skeptical of laws that "distinguish[] among different speakers," as "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). "Speaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own.'" *Nat'l Inst. of Family & Life Advocs.*, 138 S.Ct. at 2378 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)). When a law "discriminate[s] among media, or among different speakers within a single medium," the First Amendment problem is even worse. Such laws present very real "dangers of suppression and manipulation" of the medium and risk "distort[ing] the market [of] ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60, 661 (1994). And when "the basis on which [the government] differentiates between" media is "its content," the law is "particularly repugnant to First Amendment principles." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987).

27

Act 689 facially "distinguish[es] among different speakers," *Citizens United*, 558 U.S. at 340, in multiple respects. At the outset, the Act explicitly favors the speech of whoever provides the online service, *e.g.*, "[n]ews, sports, entertainment, or other content that is *preselected by the provider*," Act 689 §1401(8)(B)(iv) (emphasis added), over speech generated by users. *Compare id.* §1401(7)(A), (B)(ii), (8)(B)(ii)(c), (iii) (disfavoring public posting by individuals and other "user generated" content), *with id.* §1401(8)(B)(x) (favoring content "posted only by the provider of [a] digital news website"), (8)(B)(xiii)(a) (similar), *and id.* §1403(d) (carveout for "news-gathering organization[s]"). That is not even a workable distinction in practice, as the marketplace does not feature a clear dividing line between services that provide their own content and those that facilitate the sharing of user-generated content. Services that started off as content creators subsequently facilitate discussion of that content or discussions among users with a shared interest in the topic. *See, e.g.*, *World of Warcraft Forums*, Blizzard Entertainment, https://archive.ph/wip/mCc1a (last visited June 19, 2023). Similarly, services that initially focus on allowing users to share their own content may shift over time toward providing professionally generated content. *See, e.g.*, Jin Kim, *The Institutionalization of YouTube: From User-Generated Content to Professionally Generated Content*, 34 Media, Culture & Society 53-67 (2012). Implicitly recognizing that dynamic, Act 689 arbitrarily exempts services that offer their own content on favored topics like "news," "sports," or "entertainment" even if they also offer "chat, comment, or interactive functionality" that leads to the same kind of social interaction found on disfavored sites. Act 689 §1401(8)(B)(iv).

More troubling still, the Act imposes arbitrary size and revenue requirements that have the practical effect of singling out just a handful of companies for disfavored treatment. The Act does not apply to any "social media platform that is controlled by a business entity that has generated

less than one hundred million dollars … in annual gross revenue." Act 689 at §1401(8)(C).  Thus, the Act restricts protected expression by large entities such as Meta Platforms Inc. and X Corp. but not by smaller entities.  For example, the same user-generated speech that Arkansas restricts on Facebook or X is unrestricted if it appears on "smaller platforms such as Parler, Gab, and Truth Social."  *See* Jess Weatherbed, *New Arkansas Bill to Keep Minors Off Social Media Exempts Most Social Media Platforms*, The Verge (Apr. 13, 2023), https://archive.ph/KMmKe (noting that the latter three platforms "don't meet the annual gross revenue requirement of $100 million").  And a service generating $90 million in revenue could be regulated by the Act if owned by a somewhat larger enterprise, but entirely unregulated if spun off, even though the user-generated content available to minors on the service remained entirely unaltered.  It could also escape regulation if it were purchased by a much larger enterprise with more than $270 million in unrelated revenue, as the Act carves out companies with over $100 million in revenue if they derive "less than twenty-five percent … of [their] revenue from operating a social media platform" and also offer "cloud storage services, enterprise cybersecurity services, educational devices, or enterprise collaboration tools for [K-12] schools."  Act 689 at §1401(7)(iv).

Those distinctions make no sense in theory or in practice.  For example, a "short video clip[] of dancing" or "other acts of entertainment" is restricted if it appears on Instagram or X, *see id.* §1401(7)(B)(ii), but not if it appears on YouTube, which generates less than 25% of Google's total revenue.  *See* Emily Dreibelbis, *Arkansas Limits Social Media Access for Kids Under 18, With One Major Exception*, PCMag (Apr. 13, 2023) (citing statement by co-sponsor of Act 689 that the Act does not apply to Google), https://archive.ph/dEowc; Daniel Howley, *Alphabet Misses on Earnings Expectations as Ad Revenue Falls*, Yahoo! (Feb. 2, 2023) (noting that YouTube ad revenue makes up only about 13% of Google's total ad revenue).  This is so even though those

services are among the most popular with teens.  The Act places no restrictions on professional networking on LinkedIn, but requires adults to verify their age before engaging in professional networking on X or Facebook.  Users can share gaming content on Xbox Live, but cannot share the same content on Facebook or X.  That makes especially little sense because people often "cross-post"—i.e., post the same content on multiple online services.  *See, e.g.*, Cincinnati Bengals, Year 4 Awaits, Instagram (June 20, 2023), https://tinyurl.com/4f2np3dj; Cincinnati Bengals, Year 4 Awaits, TikTok (June 20, 2023), https://tinyurl.com/44m7rkr4; Cincinnati Bengals, Year 4 Awaits, YouTube (June 20, 2023), https://tinyurl.com/y969z2pd.  Simply put, Act 689 repeatedly draws arbitrary lines in an area that requires careful tailoring.

  ***Viewpoint-based restrictions.***  On top of all that, some of the Act's distinctions discriminate among viewpoints, suppressing speech "based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S.Ct. 2294, 2299 (2019); *see, e.g.*, *Sorrell*, 564 U.S. at 565 (restrictions on speech "promot[ing] brand-name drugs" were impermissibly "aimed at a particular viewpoint"). For example, the Act treats "video clips of dancing, voice overs, or other acts of entertainment" more favorably if their "primary purpose" is "educational or informative" than if it is not.  Act 689 at §1401(8)(B)(ii); *see also id.* §1401(8)(B)(xiii)(c) (favoring speech "used by and under the direction of an educational entity").  The First Amendment does not permit Arkansas to regulate private speech based on its perception of the value of the views expressed.

### B. Act 689 Cannot Survive Any Level of Heightened Scrutiny, Let Alone Strict Scrutiny.

  Because the government cannot suppress constitutionally protected speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them," *Brown*, 564 U.S. at 795, states bold enough to attempt such regulation must overcome strict scrutiny, which is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534

(1997).  To satisfy strict scrutiny, Arkansas must demonstrate that Act 689 is "the least restrictive means of achieving a compelling state interest."  *McCullen*, 573 U.S. at 478; *see also Playboy*, 529 U.S. at 827.  Even intermediate scrutiny would require Arkansas to demonstrate that Act 689 is "narrowly tailored to serve a significant governmental interest."  *Packingham*, 582 U.S. at 103; *see also Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2383-84 (2021) (reaffirming that intermediate scrutiny requires narrow tailoring).  As this Court already recognized, Act 689 cannot survive any level of heightened scrutiny, let alone strict scrutiny.  *See* PI Opinion at 41-48.

The state asserts that Act 689 furthers an important interest in "protecting minors."  Dkt.34 at 1-2, 13, 18-19, 21.  While the state no doubt has a strong interest in protecting minors, "overly general statements of abstract principles do not satisfy the government's burden to articulate a compelling interest."  *Awad v. Ziriax*, 670 F.3d 1111, 1129-30 (10th Cir. 2012).  Strict scrutiny demands that the state "specifically identify an 'actual problem' in need of solving."  *Brown*, 564 U.S. at 799.  And it of course demands that a law actually endeavor to solve the proffered problem.  To the extent the state attempts to justify Act 689 based on vague concerns about how much time teens spend on "social media," it flunks even that basic test.  As this Court has already explained, "Act 689 does not address time spent on social media; it only deals with account creation."  PI Opinion at 45.  "In other words, once a minor receives parental consent to have an account, Act 689 has no bearing on how much time the minor spends online."  *Id.*

Perhaps recognizing these problems, the state narrowed its focus at the preliminary injunction hearing, asserting that Act 689 furthers its interest in preventing child sexual exploitation as opposed to other "more general harms."  Tr.130:10-24; *see* Tr.121:25-122:11.  But as this Court recognized, Act 689 is seriously over- and under-inclusive when judged against that interest.  *See* PI Opinion at 43-48.  The law is overinclusive because it "simply impedes access to

content writ large" on covered services—even if the content is entirely innocuous. *Id.* at 47. The state does not (and cannot) dispute that teens use online services like Facebook, Pinterest, and Nextdoor for many legitimate and productive purposes that lie at the First Amendment's core. *See id.* at 13 (citing the parties' joint stipulation "that adults and minors use NetChoice members' online services to engage in an array of expressive activity that is protected by the First Amendment" (footnote omitted)); *id.* at 13-14 ("[U]sers employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." (quoting *Packingham*, 582 U.S. at 105)). Act 698 dramatically impinges upon those activities by restricting minors from accessing *any* content on covered services unless they obtain parental consent to create an account. *See id.* at 40-41 ("Act 689 obviously burdens minors' First Amendment Rights.").

The Act restricts, for example, minors from joining a Facebook group devoted to "support of laws against corporal punishment of children, or laws in favor of greater rights for minors," without parental consent. *Brown*, 564 U.S. at 795 n.3. It restricts minors from using Nextdoor to obtain a dog-walking job, even though the state's own evidence indicates that Nextdoor had only one report of suspected child sexual exploitation all last year. *See* PI Opinion at 44-45 (citing data from the National Center for Missing & Exploited Children ("NCMEC"), State's Hr'g Ex. 9); *accord* Harriman Decl. ¶12(b). It even restricts minors from watching and participating in a presidential candidate's launch announcement on X without parental consent. And on top of that, the Act has the practical effect of hindering adults from accessing the same online services, even though the state has no legitimate reason to do so. *See supra* pp.22-23; *Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57. Act 698 thus hinders access not just to potentially harmful content, but to online services that are, "for many … the principal sources for knowing current events, checking

ads for employment," and "otherwise exploring the vast realms of human thought and knowledge." PI Opinion at 39 (quoting *Packingham*, 582 U.S. at 107). That is breathtakingly overbroad measured against *any* interest the state might assert.[5]

Conversely, Act 698 is "wildly underinclusive when judged against" the state's interest in preventing child sexual exploitation. *Brown*, 564 U.S. at 802; *see* PI Opinion 47. The law regulates only a few social media services while excluding countless others, including YouTube, Google Hangouts, Discord, BeReel, Mastodon, Gab, Truth Social, Imgur, Brainly, DeviantArt, and Twitch—even though minors regularly use those services and may come across virtually indistinguishable material (as well as bad actors who seek to exploit children) on them. Indeed, the state's own evidence indicates that some of the services expressly exempted from Act 698's coverage—including sites like "Kik and Kik Messenger," along with other "video chat applications" and "gaming sites"—are "ones that adult sexual predators commonly use to communicate with children." PI Opinion at 43-44 (citing State's Hr'g Ex. 6 (FBI press release); Tr. 67:16-23 (testimony of state's expert witness)). What is more, the Act *exempts* "the sites with the third-, fourth-, fifth-, and sixth-highest numbers of reports" of suspected child sexual exploitation in 2022, per the NCMEC data on which the state relies. PI Opinion at 44-45 (discussing State's Hr'g Ex. 9). And the state is "perfectly willing" to allow minors to access any and all content on the sites it does restrict "so long as one parent … says it's OK." *Brown*, 564 U.S. at 802. "That is not how one addresses a serious social problem." *Id.*; *accord* PI Opinion at 48 ("If the legislature's goal in passing Act 689 was to protect minors from materials or interactions

---

[5] In addition, it is not even clear how online services can even implement some aspects of the law. The state's own expert witness testified at the preliminary injunction hearing that he had not "yet really seen any fully effective means" for websites to verify that the person granting permission is a parent or legal guardian of the minor, and "actually establishing that that is a parent or a legal guardian" is a "challenge with these processes." Tr. 55:17-56:3; Tr. 56:15-23; Tr.57:11-19.

that could harm them online, there is no compelling evidence that the Act will be effective in achieving those goals.").

The state's attempt to justify Act 689 as a means of protecting minors from online predators also runs headlong into *Packingham*. There, North Carolina argued that barring convicted sex offenders from accessing services like Facebook and Twitter was necessary to protect minors from such predators. 582 U.S. at 106. The Court acknowledged the importance of that interest, but it nevertheless concluded that even a law singling out convicted sexual predators was not sufficiently tailored because it prohibited sex offenders from engaging in substantial protected First Amendment activity on those services. *Id.* at 107-08. The Court noted that the state had a narrower way to protect minors: It could "prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." *Id.* at 107. "Specific laws of that type must be the State's first resort to ward off the serious harm that sexual crimes inflict." *Id.* If barring a limited group of *convicted sex offenders* from accessing "social media" is an insufficiently tailored means of protecting minors from online predators, it is impossible to see how restricting the entire universe of potential *victims* from accessing those services is remotely narrowly tailored. *Accord* PI Opinion at 47.

Those problems are more than enough to render the law unconstitutional. But on top of that, Act 689 is also patently not the "least restrictive means" to achieve the state's asserted goal of keeping minors safe online. *Cf. Playboy*, 529 U.S. at 827. As this Court observed, the law's "[a]ge-verification requirements are more restrictive than policies enabling or encouraging users (or their parents) to control their own access to information, whether through user-installed devices and filters or affirmative requests to third-party companies." PI Opinion at 47-48. "Filters impose selective restrictions on speech at the receiving end, not universal restrictions at the source." *Id.*

34

at 48 (quoting *Ashcroft*, 542 U.S. at 657).  And "[u]nder a filtering regime, adults ... may gain access to speech they have a right to see without having to identify themselves[.]"  *Id.* (quoting *Ashcroft*, 542 U.S. at 657).  Arkansas has provided no evidence that blocking and filtering technologies cannot achieve their goal of helping parents protect their children from the supposedly harmful effects of social media.  Parents can refuse to give their children smartphones, tablets, or laptops in the first place.  They can also restrict access to content on the Internet at the network level (parental controls through their service provider or on the router), the device level (parental controls on smartphones, tablets, and computers), and the application level (parental controls on web browsers like Chrome and Safari and apps like Instagram and TikTok).

To the extent Arkansas thinks those tools are insufficient because some children might skirt them or some parents might not utilize them, the Supreme Court has squarely held that "[i]t is no response that voluntary blocking requires a consumer to take action, or may be inconvenient, or may not go perfectly every time."  *Playboy*, 529 U.S. at 824.  The far less speech-restrictive path is to "publicize" the existence of those tools and to teach parents how to prevent their kids from circumventing them.  *Id.* at 825.  "A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."  *Id.* at 824.  And to the extent the state's real concern is that parents may make an informed decision *not* to restrict their children's use of covered services, it is not for the state to restrict minors' access to protected speech in service of "what the State thinks parents *ought* to want."  *Brown*, 564 U.S. at 804.  The "government cannot silence protected speech by wrapping itself in the cloak of parental authority."  *Interactive Digital*, 329 F.3d at 960.

In short, Act 689 burdens far too much and furthers far too little.  It flunks any level of heightened scrutiny.

**II.     Act 689 Is Unconstitutionally Vague.**

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54.  After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

 That is equally true when it comes to government speech restrictions aimed at protecting minors, which the Supreme Court has repeatedly struck down on vagueness grounds.  After all, "[i]t is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Circuit*, 390 U.S. at 689; *see also Joseph Burstyn*, 343 U.S. at 497; *Winters v. New York*, 333 U.S. 507, 518-19 (1948); *Gelling v. Texas*, 343 U.S. 960 (1952) (per curiam); *Superior Films, Inc. v. Dep't of Educ. of Ohio*, 346 U.S. 587 (1954).

"Here, Act 689 is unconstitutionally vague because it fails to adequately define which entities are subject to its requirements."  PI Opinion at 32.  The Act defines "social media company" as "an online forum that a company makes available for an account holder" to "[c]reate

a public profile, establish an account, or register as a user *for the primary purpose* of interacting socially with other profiles and accounts," "[u]pload or create posts or content," "[v]iew posts or content of other account holders," and "[i]nteract with other account holders or users, including without limitation establishing mutual connections through request and acceptance." Act 689 at §1401(7)(A) (emphasis added). That definition is hopelessly vague. As this Court has explained, "the statute neither defines 'primary purpose'—a term critical to determining which entities fall within Act 689's scope—nor provides any guidelines about how to determine a forum's 'primary purpose.'" PI Opinion at 32.

This "leav[es] companies to choose between risking unpredictable and arbitrary enforcement (backed by civil penalties, attorneys' fees, and potential criminal sanctions) and trying to implement the Act's costly age-verification requirements." *Id.* For example, it is unclear whether the Act applies to Pinterest, which allows users to "interact[] socially with other profiles" or just to browse content without such interactions. *See generally* Ex. 14. It is similarly unclear whether the Act applies to Nextdoor, as some people create Nextdoor accounts to "interact[] socially" with other users, while others create accounts to stay abreast of the happenings in their neighborhood without interacting with other users. *See generally* Harriman Decl. Indeed, while the state conceded at the preliminary injunction hearing that the Act does not apply to Snapchat, the state's own expert witness opined that he thought it would apply. PI Opinion at 33-34. "Such ambiguity renders a law unconstitutional." *Id.* at 32.

"Other provisions of Act 689 are similarly vague." *Id.* The law exempts a "[m]edia company that exclusively offers subscription content in which users follow or subscribe unilaterally and whose platforms' *primary purpose* is not social interaction," but a "[s]ocial media company that allows a user to generate short video clips of dancing, voiceovers, or other acts of

37

entertainment in which *the primary purpose* is not educational or informative does not meet" that exclusion. Act 689 at §1401(7)(B)(i)-(ii) (emphasis added). Here, too, the statute does not define the phrase "primary purpose," leaving companies to guess what it means. After all, "video clips of dancing" can be both "educational" and entertaining in a way that encourages "social interaction." It is unclear how a company is supposed to know whether the primary purpose of user-generated content is educational or something else.

Likewise, the statute defines the phrase "social media platform" to mean an "internet-based service or application … [o]n which a *substantial function* of the service or application is to connect users in order to allow users to interact socially with each other within the service or application," and it excludes from that definition services in which "the *predominant* or exclusive function is" "[d]irect messaging consisting of messages, photos, or videos" that are "[o]nly visible to the sender and the recipient or recipients" and "[a]re not posted publicly." *Id.* §1401(8)(A)-(B) (emphasis added). Again, the statute does not define "substantial function" or "predominant … function," leaving companies to guess whether their online services are covered by the law's demands. For example, many services—including Facebook and Instagram—allow users to send direct, private messages consisting of text, photos, or videos, but also offer other features that allow users to make content that anyone can view. *See* Davis Decl. ¶¶5, 8, 29-30; Boyle Decl. ¶¶3-4. "Act 689 does not explain how platforms are to determine which function is 'predominant,' leaving those services to guess whether they are regulated." PI Opinion at 34. This is not the narrow specificity that the Constitution requires of government regulations that "impose[] possible criminal and civil penalties on companies" and "interfere[] with … constitutionally protected speech." *Id.* at 30-31.

**III.     NetChoice Meets All Other Requirements For Issuance Of A Permanent Injunction.**

"The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits." *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999).  This Court has already held that NetChoice's members "are likely to suffer irreparable harm if the Act goes into effect."  PI Opinion at 48.  For one thing, the Act violates the First Amendment, and a "[l]oss of First Amendment freedoms, even for minimal periods of time, constitute[s] irreparable injury." *Id.* at 49 (second alteration in original) (quoting *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996)).  In addition, if this vague statute went into effect, NetChoice members would face a perilous choice between exposing themselves to massive liability for disseminating protected speech to minors or taking costly and burdensome steps that will drastically curtail access to their online services.  PI Opinion at 48.  These irreparable harms amply justify converting the Court's preliminary injunction into a permanent injunction.

In granting a preliminary injunction, this Court concluded that "[t]he balance of the equities and public interest decidedly favor NetChoice," given the First Amendment interests at stake.  *Id.* at 49.  The same is true of a permanent injunction.  Arkansas "has no interest in enforcing laws that are unconstitutional ... [and] an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the State."  *Little Rock Fam. Plan. Servs. v. Rutledge*, 397 F.Supp.3d 1213, 1322 (E.D. Ark. 2019) (citing *Hispanic Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012)); *Brandt v. Rutledge*, 551 F.Supp.3d 882, 892 (E.D. Ark. 2021), *aff'd sub. nom.*, *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022).  Moreover, allowing the statute to take effect would not serve the public interest, given the dearth of evidence that its age-verification and parental-consent requirements would "be an effective approach" to

"the harms [the state] has identified."  PI Opinion at 49.  All factors thus favor entry of a permanent injunction.

## CONCLUSION

The Court should grant NetChoice's motion for summary judgment.

Date: November 28, 2023                    Respectfully submitted,

Marshall S. Ney, Ark. Bar No. 91108
Katherine C. Campbell, Ark. Bar No. 2013241
Friday, Eldredge & Clark, LLP
3350 S. Pinnacle Hills Pkwy, Suite 301
Rogers, AR 72758
Telephone: (479) 695-6049
Facsimile: (501) 244-5389
mney@fridayfirm.com
kcampbell@fridayfirm.com

Paul D. Clement (admitted *pro hac vice*)
Erin E. Murphy (admitted *pro hac vice*)
James Y. Xi (admitted *pro hac vice*)
Joseph J. DeMott (admitted *pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com

*Counsel for Plaintiff NetChoice, LLC*