IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**NETCHOICE, LLC**                                                                                               **Plaintiff**

v.                                     Case No. 5:23-cv-05105-TLB

**TIM GRIFFIN**, in his official capacity
as Attorney General of Arkansas                                                                          **Defendant**

### THE ATTORNEY GENERAL'S SUPPLEMENTAL BRIEFING

Following a Case Management Hearing in this matter on November 30, 2023, the Court issued the following request for supplemental briefing: "Defendant is instructed to address with more specificity: (1) which facts they dispute within paragraphs 41-53 of [56] Plaintiff's Statement of Undisputed Facts, and (2) why those facts are material to Plaintiff's facial challenges to Act 689." Dkt. 60. In a nutshell, the State believes that discovery will show that the methods NetChoice claims its members use to protect children are ineffective, that NetChoice's members know their policies are ineffective, and that the only effective way to combat child exploitation is to require that platforms presenting the greatest risk age verify. Once the State can demonstrate through discovery that Act 689's age verification regime is the only effective way to combat child exploitation, the State can demonstrate that Act 689 is narrowly tailored.

### STANDARD

Under Rule 56(d), "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may" defer consideration of or deny the motion, grant more time for discovery, or provide other relief. Fed. R. Civ. P. 56(d). This rule "should be applied with a spirit of liberality" to "safeguard against an improvident or premature grant of summary judgment." *U.S. ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 426 (8th Cir. 2002). "As a general rule, summary judgment is proper only after the

nonmovant has had adequate time for discovery." *Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, L.L.P.,* 687 F.3d 1045, 1049–50 (8th Cir. 2012). "Nonmovants may request a continuance under Rule 56(d) until adequate discovery has been completed if they otherwise cannot present facts sufficient to justify their opposition. This option exists to prevent a party from being unfairly thrown out of court by a premature motion for summary judgment." *Id*. at 1050. Under Rule 56(d), the nonmovant must present an affidavit showing what further discovery might uncover or what information that discovery may reveal. *Id*. The Court has requested supplemental briefing on the issue of what specific facts are in dispute and therefore discovery is needed to resolve, as well as why those facts impact the Court's decision on the constitutionality of Act 689.

## ANALYSIS

In its Order granting NetChoice's request for a Preliminary Injunction, this Court relied in part on NetChoice's assertions that it its members took steps on their own platforms to protect minors through parental tools and filters. The Court held that the presence of such tools and filters meant that Act 689 was overly broad and not narrowly tailored to meet the government's interest in protecting minors. NetChoice makes many of these factual assertions in its SUF that it then uses to make its case as to why Act 689 is unconstitutional, specifically why it is not narrowly tailored. The State contests many of these factual assertions and requires discovery in order to properly respond to them. The State has specific issues with the factual statements made in ¶¶ 46-53 of NetChoice's SUF, and the declarations that are cited within. The State has cited numerous outside sources throughout this case, both through experts and the public domain, that NetChoice's assertions are not true. Therefore, the State needs the discovery process to probe these disputed factual assertions by NetChoice, demonstrating that Act 689 is narrowly tailored. Specifically, discovery will answer why Facebook was properly included in the Act, while

Snapchat was excluded. It will answer why the Act targets the types of platforms that it does, because those are the platforms that cause the most harm.

In ¶ 46-53 of its SUF, NetChoice references the internal content moderation and child protection capabilities of three of its members, Meta, Snap Inc, and Nextdoor, Inc. The State disputes each of these factual assertions.

*Meta.* NetChoice touts that its member Meta restricts the publication of "violent and sexually explicit content" as well as harmful bullying and harassing on its platforms. Dkt. 56, at ¶ 46. It also states that Meta removes such content from its platform. *Id.* at ¶ 47. NetChoice then uses ¶¶ 48 and 49 to further the illusion that its members are interested in helping parents monitor their children, referencing the "supervision tools" that allow parents to monitor the time their children spend on Meta's platforms, who they are friends with, who they are interacting with, and what their privacy settings are, among other things. *Id.* at ¶¶ 48-49. Antigone Davis, the Vice President, Global Head of Safety at Meta, submitted a declaration in support. Paragraphs 33-40 of Davis's declaration, which are titled in bold as *Content Moderation*, are specifically cited in ¶ 46 of the SUF as the basis for NetChoice's assertions. In those paragraphs, Davis touts the "Terms of Service" and "Community Standards" on Facebook and Instagram, which are both platforms owned and operated by Meta. Dkt. 54-2, at ¶ 33. Davis emphasizes that the Terms of Service and Community Standards prevent users from posting anything that is unlawful, misleading, fraudulent, for an illegal purpose, or would violate someone else's rights. *Id.* at ¶ 34. Davis specifically mentions that Instagram's Community Guidelines prohibit "nudity" and "hate speech." *Id.* at ¶ 35. Davis then goes into great detail in ¶¶ 36-40 about the lengths Meta goes to when it comes to content moderation. Davis details how Meta uses "artificial intelligence systems" to identify and remove graphic content. *Id.* at ¶ 36. "Thousands of people" at Meta

3

supposedly "work together to remove millions of pieces of content containing adult nudity, sexual activity… child nudity and sexual exploitation." *Id.* at ¶ 37. Allegedly, Meta has a "robust system in place" to prevent minors viewing graphic content. *Id.* at ¶ 39. When users violate Meta's policies, Davis states there is a system of "strikes" in place that may eventually lead to a user's account being disabled. *Id.* at ¶ 40.

Paragraphs 47-48 of the SUF cite Davis's declaration at ¶¶ 42-44. In a separate section titled in bold *Safety-Related Information, Resources, and Partnerships*, Davis says Meta has a Parent Portal, Youth Portal, and Child Safety Hub as part of its "Safety Center." *Id.* at ¶ 43. One of the purposes of this Center is "child protection." *Id.* Paragraph 43 mentions Meta's partnership with the National Center for Missing and Exploited Children (NCMEC) in "Take It Down" to help protect young people from sexual predators online. *Id.* at ¶ 43. Davis says Meta has "more than 30 tools" that "protect teens against unwanted interactions" and assist in "digital age verification." *Id.*

The State disputes many of the broad, sweeping generalities and alleged facts NetChoice and its declarants assert: Meta does not succeed in removing harmful content from its platform. It's "community standards" and "terms of service" are not enforced in the way that Meta's declaration says they are. Even the bolded titles of sections of Davis's declaration, like *Content Moderation,* imply that Meta is successful in moderating the content on its platforms. Instagram is not successful in eliminating "nudity" and "hate speech" on its platform. Meta does not have a "robust system in place" when it comes to preventing minors from viewing graphic content. Whether or not Meta actually removes "millions of pieces of content," it does not succeed in protecting children on its platform as it claims. Meta also does not disable user accounts that violate

its guidelines as it claims it does. Because these claims from Meta are not true, Act 689 is narrowly tailored to meet the government's interest in protecting children.

The State has cited evidence to the contrary throughout this litigation. The State has provided expert testimony as to the harmful effects of Meta's platforms. Dr. Karen Farst provided evidence that many children, including those in Arkansas, are being harmed by sexual predators through the use of NetChoice's members' platforms, contrary to the testimony of NetChoice's declarations. Declaration of Karen Farst, at 3-4. Dr. Farst testified that social media "is a significant contributor to sexual exploitation, abuse, and trafficking." Id at ¶ 14.

Several different respectable outside sources, ranging from the Wall Street Journal to Congress, have all provided evidence to the contrary. Reporting from the Wall Street Journal unveiled that sexual predators abound on Facebook and Instagram, despite Meta's protestations to the contrary[1]. Currently, Meta's "own systems" are "enabling and even promoting a vast network of pedophile accounts." *Id.* at 1. For example, Instagram's systems often "recommend" hashtags related to pedophilia. *Id.* Instagram's own recommendation system connect pedophiles to one another, and guide them to content sellers. *Id.* at 3. The Stanford Internet Observatory, which looks at how internet platforms like Facebook and Instagram handle child-sex content, says that the pedophile ecosystem on Instagram "remains active" and Instagram still has "significant room for improvement" when it comes to stopping child sex predators on their platform. *Id.* at 2. Meta has also been alerted to the existence of "problem accounts" that promote pedophilia, but their response has been "spotty" in removing them. *Id.* at 1. Facebook Groups, another large Meta platform, includes large groups explicitly centered on sexualizing children. *Id.* Despite

---

[1] See Jeff Horowitz and Katherine Blunt, *Meta is Struggling to Boot Pedophiles Off Facebook and Instagram,* Wall Street Journal, (December 1, 2023), https://www.wsj.com/tech/meta-facebook-instagram-pedophiles-enforcement-struggles-dceb3548. Attached as Exhibit 1.

such room for improvement, Meta has recently laid off hundreds of staffers who focused on "high severity" content problems, such as child safety. *Id.* at 3.

Meta has also made it clear they won't take every step necessary to limit what predators can do on their platforms, stating that restricting features that also connect people to acceptable content is "not a reasonable approach" to keeping their platforms safe. *Id.* Recently, priority at Meta was given to objectives such as "reducing advertiser friction" and avoiding the inadvertent limit of the "well intended use of [their] products" instead of traditional safety work focused on child exploitation. *Id.* This is probably why test accounts found that when they followed exclusively young girls, this "triggered Instagram to begin serving videos that promoted adult sex content."[2] When reporters alerted Meta to a large Facebook group titled "Incest," Meta determined that the group "doesn't go against [their] community standards" and refused to take the group down. Ex. 1 at 4. Such behavior flies directly in the face of Meta's statements in this case that they take down harmful content and harmful profiles.

In fact, Meta recently announced they will be introducing "end-to-end encryption" as a default in their Facebook messenger app, despite pleas from law enforcement and child protection groups.[3] This form of encryption prevents Meta, as well as law enforcement groups, from accessing the contents of what users are sending and receiving, including communications and material from sexual predators towards children. *Id.* at 2.

---

[2] Jeff Horwitz and Katherine Blunt, *Instagram's Algorithm Delvers Toxic Video Mix To Adults Who Follow Children*, Wall Street Journal (November 27, 2023). https://www.wsj.com/tech/meta-instagram-video-algorithm-children-adult-sexual-content72874155. Attached as Exhibit 2

[3] See Josh Taylor, *Meta begins rolling out end-to-end encryption across Messenger and Facebook,* The Guardian, (December 6, 2023), https://www.theguardian.com/technology/2023/dec/07/meta-facebook-messenger-end-to-end-encryption. Attached as Exhibit 3.

NetChoice's members have even asked Congress to require digital age verification; they just don't care enough to do it on their own dime.[4] Antigone Davis, the same person who submitted a declaration in this case, recently pushed a proposal that app stores "notify parents" when their teen attempts to download an app such as Facebook, and then allow the parent to approve the download. *Id.* at 1. That sounds awfully similar to Act 689, except the cost is shifted to someone else. That means that a genuine factual dispute exists on which discovery is required.

The "Safety Center" and other such tools that Davis frequently touts in his declaration also don't work. A former executive at Meta, Arturo Bejar, recently testified before Congress, and revealed that senior management at Meta was "grossly understating the frequency of harm" experienced by minors on their platforms.[5] At one time in 2021, 13% of 13-15 year olds on Meta's platforms reported receiving unwanted advances on a weekly basis on a Meta platform. *Id.* at 3. This is in sharp contrast to the rosy scenario painted by Davis' declaration.

*Snap Inc.* Paragraphs 50-51 of the SUF make blanket statements about how Snap Inc. protects the teens who use Snapchat. It says Snap Inc. "identifies illegal images and videos of child sexual abuse materials," reports those materials to authorities, and offers a Family Center that allows parents to see "who their teens are friends with and who they communicate with." Dkt. 56, at ¶¶ 50-51. To support these statements, it cites a declaration from David Boyle, the Senior Director, Product at Snap Inc. *See* Dkt. 17-3. Like Davis's declaration for Meta, Boyle's declaration details the services that Snap offers children and parents to protect minors on its platform. *Id.* at ¶¶ 6-7. Paragraphs 6 and 7 from Boyle's declaration are cited in the SUF, and in

---

[4] Cristiano Lima and Naomi Nix, *Meta says vetting teens' ages should fall on app stores, parents*, Washington Post, (November 15, 2023), https://www.washingtonpost.com/technology/2023/11/15/meta-law-parental-controls-apple-google-apps/. Attached as Exhibit 4.
[5] *Written Testimony of Arturo Bejar before the Subcommittee on Privacy, Technology, and the Law* (Nov. 7, 2023), https://www.judiciary.senate.gov/imo/media/doc/2023-11-07_-_testimony_-_bejar.pdf. Attached as Exhibit 5.

them Boyle details the "numerous protections" minors receive on Snapchat. *Id.* at ¶ 6. He mentions that profiles for users under 18 are "private" and those under 18 can only receive messages from users whom they are already friends with or who are already in their phone's contacts. *Id.* Snap also offers parents a "Family center" which allows parents to link their Snapchat to their child's account so they can see who their child is communicating with, but it does not show the substance of the communications. *Id.* at ¶ 7.

The State needs to be able to conduct discovery in these areas. Act 689's purpose is to prevent children from harmful sexual predators. This Court ruled in its Order putting a preliminary injunction in place that Act 689 was most likely not narrowly tailored to meet that purpose. The Court cited as part of its reasoning the fact that many messaging apps, including Snapchat, were exempted from the statute, while apps like Facebook, Instagram, and Nextdoor were not. Discovery is necessary to allow the State to demonstrate why messaging apps such as Snapchat are exempt, and apps like Facebook are not. This requires a robust discovery process involving both Meta and Snap Inc.

*Nextdoor, Inc.* Paragraphs 52-53 of the SUF pertain to NetChoice member Nextdoor, Inc. It mentions that Nextdoor "takes steps" to discourage harmful content on its platform and had only one report of child sexual exploitation in 2022. Dkt. 56, at ¶¶ 52-53. It cites Nextdoor's Senior Engineering Manager for Trust & Safety and Verification, Justyn Harriman. *See* Dkt. 54-3. Harriman's declaration says that Nextdoor has "tools to automatically detect and report harmful content" and users themselves can "report guideline-violating content." *Id.* at ¶ 10. He emphasized that Nextdoor relies on a team of over 200,000 "volunteer community moderators" to review much of the reported content to see if it complies with community guidelines. *Id.* at ¶ 12.

8

Also, this Court specifically pointed out that it did not believe Nextdoor was an app that presented much of a harm to minors, making the Act not narrowly tailored. Discovery is necessary for the Court to fully analyze whether the Act is narrowly tailored. Discovery will answer whether Facebook was properly included in the Act, while Snapchat was excluded. It will answer whether the Act was targeted at the types of platforms that cause the most harm.

The Court also concluded that Act 689 was not narrowly tailored because it targeted content "writ large" instead of only content harmful to minors. The discovery process is necessary for the State to demonstrate why Act 689 requires all individuals to age verify. NetChoice repeatedly mentions how its members provide parents with multiple tools and methods to monitor and filter the content a minor could potentially see. The Court's order says largely the same thing, referencing multiple cases that talk about the use of filters to protect minors from online content. *See* Dkt. 44, at 47-48.

The State strongly contests NetChoice's assertion that its members' filters are effective. Dkt. 56 at ¶¶ 47-49. Because these filters are demonstrably not effective, any method short of restricting minors' access to the entire platform would not be effective in accomplishing the purpose of Act 689, which is to protect minors from the harms of social media. While NetChoice says that its members have numerous features within their platforms that allow parents to protect minors in a more targeted way than simply not allowing minors on the platform, those methods are routinely ineffective, and the State has produced evidence disputing this fact. The State deserves the opportunity to conduct discovery into the effectiveness of NetChoice's members' filters and methods of protecting minors using their platforms, in order to push back against the notion that the method of protection employed by Act 689 is too broad.

As of today, the evidence on these facts is one sided. Thus, the State seeks discovery to counter the factual assertions made by NetChoice that this Court used in its finding that Act 689 is not narrowly tailored.

## CONCLUSION

NetChoice's Motion for Summary Judgment is premature. Discovery has not even commenced in this case. The State has highlighted the many specific factual assertions that Choice has made that it contests. The State also has articulated why these disputed facts do materially impact the Court's decision regarding Act 689's constitutionality. For these reasons, the State requests this Court to deny NetChoice's motion or defer its decision on the motion until discovery is complete, staying the State's response deadline.

Respectfully submitted,

TIM GRIFFIN
Attorney General

By:   John Payne
Ark. Bar No. 97097
Deputy Attorney General

Jordan Broyles
Ark. Bar No. 2015156
Senior Assistant Attorney General

Noah P. Watson
Ark. Bar No. 2020251
Senior Assistant Attorney General

Justin Brascher
Ark. Bar No. 2023029
Assistant Attorney General

                    Arkansas Attorney General's Office
                    323 Center Street, Suite 200
                    Little Rock, Arkansas 72201
                    (501) 682-1019
                    (501) 682-2591 fax
                    john.payne@arkansasag.gov
                    jordan.broyles@arkansasag.gov
                    noah.watson@arkansasag.gov
                    justin.brascher@arkansasag.gov

                    *Attorneys for the Defendant*