**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

NETCHOICE, LLC                                                    PLAINTIFF

V.                              CASE NO. 5:23-CV-5105

TIM GRIFFIN, in his Official Capacity
as Attorney General of Arkansas                                   DEFENDANT


**MEMORANDUM OPINION AND ORDER**

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................... 3

II.     BACKGROUND ................................................................................................ 3

        A.    The Social Media Safety Act: Objectives and Requirements ........................ 3

        B.    Social Media Use Among Minors ................................................................ 6

        C.    Types of Speech Available on NetChoice Members' Platforms .................... 7

        D.    Existing Parental Controls .......................................................................... 9

        E.    Existing Social Media Protections for Minors ............................................ 12

III.    LEGAL STANDARD ....................................................................................... 14

IV.     DISCUSSION ................................................................................................. 16

        A.    Standing .................................................................................................. 16

        B.    Need for Further Discovery ....................................................................... 16

        C.    Merits Claims ........................................................................................... 19

              1.    Burdens on First Amendment Rights: Platform Users' Rights ............ 19

                    a. Level of Scrutiny ........................................................................ 19

                    b. Act 689 Is Not Narrowly Tailored to Serve a Compelling State
                       Interest ................................................................................... 24

              2.    Void for Vagueness:  NetChoice Members' Claim ............................ 34

        D.    Irreparable Harm ...................................................................................... 40

        E.    Balance of the Equities and the Public Interest .......................................... 40

V.      CONCLUSION ................................................................................................ 41

# I.    INTRODUCTION

This case presents a constitutional challenge to Arkansas Act 689 of 2023, the "Social Media Safety Act" ("Act 689"). Act 689 requires certain social media platforms to verify the age of all account holders who reside in Arkansas in order to prevent minors from opening accounts without parental consent. This age verification must be performed by a third-party vendor using the account-seeker's government identification or biometric information. Act 689 was set to go into effect September 1, 2023, but was preliminarily enjoined by this Court (Doc. 44). Plaintiff NetChoice, LLC, an Internet trade association, now moves for summary judgment on its First Amendment and vagueness claims. For the reasons that follow, NetChoice's Amended Motion for Summary Judgment (Doc. 66) is **GRANTED**.

# II.    BACKGROUND

## A.    The Social Media Safety Act: Objectives and Requirements

As described by the State, "Arkansas passed the Social Media Safety Act (Act 689) to protect children from the widespread dangers of social media" and "prevent[ ] online sexual predators from exploiting children in online spaces" by requiring "reasonable age verification." (Doc. 72, p. 1).

Act 689 is described in detail in the Court's preliminary injunction order (Doc. 44).[1] The broad strokes are as follows. Under Act 689, "[a] social media company shall not

---

[1] Act 689 has since been recodified at subchapter 14, rather than subchapter 11, of Chapter 88 of the Arkansas Code. In the Court's preliminary injunction order when reading a cite to, e.g., § 1102, the reader should now look to § 1402.

permit an Arkansas user who is a minor to be an account holder on the social media company's social media platform unless the minor has the express consent of a parent or legal guardian." Ark. Code Ann. § 4-88-1402(a). To enforce this prohibition, social media companies "shall use a third-party vendor to perform reasonable age verification before allowing access to the social media company's social media platform." *Id.* § 1402(c)(1). "Reasonable age verification methods" include providing the account holder's digital ID or other government-issued ID to the third-party vendor, or "[a]ny commercially reasonable age verification method" a third-party vendor might use. *Id.* § 1402(c)(2). Other age verification methods currently on the market utilize biometric data to perform face or voice analysis. (Doc. 45, pp. 17:12–20). Once their age is verified, an adult can access a social media platform. A minor, however, cannot access a social media platform unless and until the social media company confirms that the minor has express parental consent. *Id.* § 1402(b)(2). Act 689 does not say how a social media company should identify an account-seeking minor's parents or verify a parent's consent.

Act 689 defines both "social media company" and "social media platform," and neither definition follows common parlance. Under Act 689, a "social media company" is defined in terms of what *account holders* may do on the company's platform. A "social media company" is one that permits its account holders to: (1) create a public profile "for the ***primary purpose*** of interacting socially with other profiles and accounts"; (2) upload or post content; (3) view content of other account holders; and (4) interact with other account holders "through request and acceptance." *Id.* at § 1401(7)(A) (emphasis added). The definition of "social media company" has multiple exclusions: companies that offer

"career development opportunities"; exclusively gaming-related content; or exclusively "subscription content in which users follow or subscribe unilaterally." *Id.* at § 1401(7)(B). That last exclusion comes with an exception: "A social media company that allows a user to generate short video clips of dancing, voice-overs, or other acts of entertainment in which the primary purpose is not educational or informative does not meet the exclusion . . . ." *Id.* § 1401(7)(B)(i)(b). And finally, companies that offer "cloud storage services, enterprise cybersecurity services, educational devices, or enterprise collaboration tools for kindergarten through grade twelve (K-12) schools" and derive "less than twenty-five percent (25%)" of their revenue "from operating a social media platform" are excluded. *Id.* § 1401(7)(B)(iii). This exemption shields Google (a subsidiary of Alphabet, Inc.) from compliance, so neither Google Hangouts nor Google's video-sharing platform, YouTube, are required to verify the ages of their account holders under the Act.

Act 689 defines "social media platform" as a "public or semipublic internet-based service or application" of which the "***substantial function*** . . . is to allow users to interact socially with each other within the service or application." *Id.* § 1401(8)(A)(ii)(a) (emphasis added). The "social media platform" definition also comes with multiple exclusions: platforms for which "the predominant or exclusive function is" email or direct messaging; e-commerce including classified ads for the sale of goods (but not personal services); business-to-business interaction; shared document collaboration; data visualization; tech support; "[a]cademic or scholarly research"; use by educational entities; or hosting content that is created, posted, or selected by the provider rather than the user or account holder. *Id.* § 1401(8)(B). Act 689 also exempts platforms controlled by businesses that

generate less than $100 million annually. *Id.* § 1401(8)(C). As a result, platforms like Parler, Gab, and Truth Social are not required to verify the ages of their account holders.

### B.    Social Media Use Among Minors

Social media is used broadly by adults and near-universally by teens. In 2021, about 70% of Americans reported that they have used social media. *Social Media Use in 2021*, Pew Rsch. Ctr. (Apr. 7, 2021).[2] And as of 2023, up to 95% of people aged 13–17 reported using any social media platform. U.S. Surgeon General, Social Media and Youth Mental Health 4 (2023).[3] "There is broad agreement among the scientific community that social media has the potential to both benefit and harm children and adolescents." *Id.* at 5.

"[A]dolescents who spent more than 3 hours per day on social media faced double the risk of experiencing poor mental health outcomes including symptoms of depression and anxiety." *Id.* at 6. And "[a]s of 2021, 8th and 10th graders spen[t] an average of 3.5 hours per day on social media." *Id.* at 7. Social media users may encounter disturbing suicide- and self-harm-related content online. *Id.* at 8. "Social comparison driven by social media is [also] associated with body dissatisfaction, disordered eating, and depressive symptoms." *Id.* And social media users can become victims of cyberbullying, which has "a consistent relationship [with] depression among children and adolescents." *Id.* at 9.

---

[2] https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-2021/ [https://perma.cc/76X7-VFFQ].

[3] https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf [https://perma.cc/3HU9-S6ZA].

In addition to the risks posed by other minors on social media, these platforms can also be used by adults to sexually exploit minors. The State relies on an FBI report that found:

> Financial sextortion schemes occur in online environments where young people feel most comfortable—using common social media sites, gaming sites, or video chat applications that feel familiar and safe. On these platforms, online predators often use fake female accounts and target minor males between 14 to 17 years old, but the FBI has interviewed victims as young as 10 years old.

FBI Nat'l Press Off., *FBI and Partners Issue National Public Safety Alert on Financial Sextortion Schemes* (Dec. 19, 2022) [hereinafter *Financial Sextortion*].[4]

### C.    Types of Speech Available on NetChoice Members' Platforms

It is undisputed that adults and minors use NetChoice members' online services to engage in constitutionally protected speech. (Doc. 68, ¶¶ 4, 6, 14, 21, 30, 34, 37; Doc. 73, ¶¶ 2, 4, 6, 11, 12, 14, 15). Social media companies and platforms "allow[ ] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). "[U]sers employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997)). "On [NetChoice member Meta's platform,] Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104.  On NetChoice member X, "users can

---

[4] https://www.fbi.gov/news/press-releases/fbi-and-partners-issue-national-public-safety-alert-on-financial-sextortion-schemes [https://perma.cc/K5MN-W7SU].

7

petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104–05.

With all that said, the State reminds the Court that social media users "also engage in non-expressive activity not protected by the First Amendment, including criminal conduct and that which is harmful to minors." (Doc. 73, ¶¶ 2, 4, 11, 14). The Court would note that "harmful to minors" is not a category of unprotected speech. *See United States v. Stevens*, 559 U.S. 460, 468 (2010) ("'From 1791 to the present,' . . . the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,' and has never 'include[d] a freedom to disregard these traditional limitations.'" (second alteration in original) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992))). It is, however, true that despite these entities' efforts to self-regulate, social media users of any age may still encounter some speech online that is not entitled to constitutional protection, including real threats, child pornography, obscenity, defamation, fighting words, or speech integral to criminal conduct. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012). In addition, minors may encounter speech online that is constitutionally protected as to adults, but not as to minors, and some of that speech may be harmful to them.

## D.     Existing Parental Controls

Of course, parents may rightly decide to regulate their child's use of social media—including restricting the amount of time they spend on it, the content they may access, or even those they chat with. And many tools exist to help parents with this endeavor.

The first step to acquiring a social media account is an internet-capable device. Parents decide what, if any, internet-capable devices to give their child. Most manufacturers offer device-level parental controls for parents who chose to give their child internet-capable devices. For example, iPhones and iPads empower parents to limit the amount of time their children can spend on the device, choose which applications (e.g., YouTube, Facebook, Snapchat, or Instagram) their children can use, set age-related content restrictions for those applications, filter online content, and control privacy settings. *See* Apple, *Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch* (Doc. 66, pp. 52–59).[5] Google and Microsoft also offer parental controls for their devices. *See* Google, Safety Center, Parental Controls (Doc. 66, pp. 80–85);[6] Microsoft, *Getting Started with Microsoft Family Safety* (Doc. 66, pp. 86–90).[7] In addition, numerous third-party applications allow parents to control and monitor their children's use of Internet-

---

[5] https://support.apple.com/en-us/HT201304 [https://perma.cc/9PLJ-7CR4].

[6] https://safety.google/families/parental-supervision/ [https://perma.cc/WGU8-KKVS].

[7] https://support.microsoft.com/en-us/account-billing/getting-Started-with-microsoft-family-safety-b6280c9d-38d7-82ff-0e4f-a6cb7e659344 [https://perma.cc/F47N-PTSL].

connected devices and online services. *See* Ben Moore & Kim Key, *The Best Parental Control Apps for Your Phone*, PCMag (Mar. 29, 2022) (Doc. 66, pp. 99–115).[8]

The next step is connecting that internet-capable device to the internet. Devices may access the internet through a wireless plan on a particular device, i.e., cell-phone data, or by connecting to a wireless or wired network, e.g., home WiFi. At both these connection points, parental controls are available. Cell carriers and broadband providers have tools that allow parents to block certain applications and websites from their children's devices, ensure that their children are texting and chatting with trusted contacts only, and restrict their children's access to screen time during certain hours of the day. *See, e.g.*, AT&T, *Learn About the AT&T Secure Family App* (Doc. 66, pp. 60–64);[9] T-Mobile, *Family Controls and Privacy* (Doc. 66, pp. 135–43);[10] Comcast Xfinity, *Set Up Parental Controls for the Internet*, (Doc. 66, pp. 65–70).[11]

Wireless routers themselves offer parental controls, too. *See* Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 11,

---

[8] https://www.pcmag.com/picks/the-best-parental-control-apps-for-your-phone [https://perma.cc/ZK7Z-N5AQ].

[9] https://www.att.com/support/article/wireless/KM1271913 [https://perma.cc/2NBP-PNDG].

[10] https://www.t-mobile.com/privacy-center/education/family-controls [https://perma.cc/DJJ3-Q9S5].

[11] https://www.xfinity.com/support/articles/set-up-parental-controls-with-comcast-networking [https://perma.cc/7V5R-BLHC].

2021) (Doc. 66, pp. 126–34).[12] Parents can use these controls to block certain websites or online services that they deem inappropriate, set individualized content filters for their children, and monitor the websites their children visit and the services they use. *Id.* Parents can also use router settings to turn off their home internet at particular times of day or pause internet access for a particular device or user. *Id.*

Finally, there are the internet browsers and the websites or mobile applications through which children create social media accounts and access social media content. Many browsers offer parents tools to control which websites their children can access. *See, e.g.*, Mozilla, *Block and Unblock Websites with Parental Controls on Firefox* (Doc. 66, pp. 116–18).[13] Microsoft offers "Kids Mode," which allows children to access only a pre-approved list of websites. *See* Microsoft, *Learn More About Kids Mode in Microsoft Edge* (Doc. 66, pp. 91–98).[14] Google has a similar feature. It provides parents with "activity reports," allowing them to see what apps and websites their children access most frequently. *See* Google, Safety Center, Parental Controls (Doc. 66, pp. 80–85).[15]

Some social media platforms also offer parental controls within the platform itself. For example, Facebook and Instagram have "supervision tools" through which parents

---

[12] https://archive.ph/wip/uGaN2.

[13] https://support.mozilla.org/en-US/kb/block-and-unblock-websites-parental-controls-firef [https://perma.cc/2Q6Z-B4P6].

[14] https://support.microsoft.com/en-us/microsoft-edge/learn-more-about-kids-mode-in-microsoft-edge-4bf0273c-1cbd-47a9-a8f3-895bc1f95bdd [https://perma.cc/96PS-SP65].

[15] https://safety.google/families/parental-supervision/ [https://perma.cc/96ZQ-Y4TJ].

can set time limits, view privacy and content settings, and monitor what accounts their child is connected with. *See* Declaration of Antigone Davis ¶ 28, (Doc. 66, pp. 11–32) [hereinafter Davis Decl.]. Snapchat also offers a "family center" through which parents can see who their child is communicating with in the app. *See* Declaration of David Boyle, ¶ 7, (Doc. 17-3) [hereinafter Boyle Decl.].[16]

To be sure, parents may or may not use these tools. The State's expert explains that even though these filtering controls can be "applied in the home, on the router or on laptops, tablets, and smartphones through family cellular plans," research indicates "that many parents are unaware of this technology" or "do not know how to use it, or discover their children also know how to use it or have circumvented it some other way." (Doc. 34-1, ¶ 85). Furthermore, he attests, "Children can be very persuasive, and parents might release the controls to allow them to play a game designed for 18+ within a social media platform, unaware the game or platform may be a portal to pornographic or other unsuitable content and dangerous functionality." *Id.*

### E.    Existing Social Media Protections for Minors

Some NetChoice members have also developed policies and practices designed to protect minor users that operate on their platforms even without parental intervention. Facebook, Instagram, Pinterest, and Snapchat require users in the United States to be at

---

[16] NetChoice repeatedly cites "Boyle Declaration" which supposedly appears in the record as Exhibit C to NetChoice's summary judgment motion. First, NetChoice filed its motion and all exhibits as a single nearly 200-page document. Second, while NetChoice initially cites to the Boyle Declaration as "Exhibit C," the "Exhibit C" contained in the single 200-page summary judgment motion is, in fact, the Declaration of Justyn Harriman. The Declaration of David Boyle does, however, appear in the record at Doc. 17-3.

least 13 years old before they can create an account—though account holders are asked only to self-report their ages. *See* Davis Decl. ¶ 17; Pinterest, *All About Pinterest* (Doc. 66, pp. 152–56);[17] Boyle Decl. ¶ 5. While none of Plaintiff's members currently use the age verification methods required by Act 689, Meta employs human content reviewers who are trained to flag, among other things, Facebook and Instagram users who appear to be under 13; if a flagged user cannot prove they meet minimum age requirements, their account is taken down. *See* Davis Decl. ¶ 27. Members also use different default settings based on age: Snapchat defaults all minors to private settings, while Facebook, Instagram, and Pinterest do so for minors under 16. *See* Boyle Decl. ¶ 6; Davis Decl. ¶ 17; Pinterest, *Teen Safety Options* (Doc. 66, pp. 167–72).[18]

NetChoice members also attempt to curate the content that users post and see on their platforms. *See, e.g.*, Declaration of Justyn Harriman ¶ 9 (Doc. 66, pp. 33–46) [hereinafter Harriman Decl.]. Members attempt to restrict the uploading of violent and sexual content, bullying, and harassment. *See* Declaration of Carl Szabo ¶ 7 (Doc. 66, pp.4–10) [hereinafter Szabo Decl.]; Davis Decl. ¶¶ 36–37, 39; Boyle Decl. ¶ 6. Some NetChoice members, like Meta, also use age-verification technology to try to keep minors from seeing certain content visible to adults, or to keep younger teens from seeing content visible to older teens. *See* Szabo Decl. ¶ 7; Davis Decl. ¶ 32. NetChoice members implement these policies through algorithms, automated editing tools, and human review.

---

[17] https://help.pinterest.com/en/guide/all-about-pinterest [https://perma.cc/S6YD-HY6R].

[18] https://help.pinterest.com/en/article/teen-safety-options [https://perma.cc/NJL4-S9Y4].

*See* Davis Decl. ¶¶ 36, 27, 39–40. If a platform decides that certain content violates its policies, it may remove the content, restrict it, or add a warning label or disclaimer. *See* Davis Decl. ¶ 39. Nextdoor even gives "Kindness Reminders" before a user publishes a post containing potentially offensive language. *See* Harriman Decl. ¶ 7.b. Repeat violators of a platform's policies may find themselves suspended or banned from the platform. *See* Davis Decl. ¶ 40.

NetChoice members also utilize tools directed at the particular issue of child sexual exploitation. Meta and Nextdoor use both automated and human review to take down harmful content, including child sexual abuse material. *See* Davis Decl. ¶¶ 36–37; Doc. 72-2, p. 21:1–17 (Knapp Depo.). Snapchat purports to protect its minor users by only recommending minors as friend connections to people already in their contacts or with whom they have mutual friends. *See* Boyle Decl. ¶ 6. Instagram warns minor users when a "suspicious" adult tries to interact with them and gives them an option to end the conversation and block, report, and/or restrict the adult; adults are flagged as suspicious if they are sending a large number of friend or message requests to people under age 18 or if they have recently been blocked by people under age 18. *See* Davis Decl. ¶ 30. Snapchat similarly provides "in-conversation warnings" if minors connect with someone with whom they do not share mutual friends. *See* Doc. 72-3, pp. 35:20–36:13 (Boyle Depo.).

### III.    LEGAL STANDARD

A party moving for summary judgment must establish the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law. *See* Fed. R.

Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999). "As a general rule, summary judgment is proper 'only after the nonmovant has had adequate time for discovery.'" *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 894 (8th Cir. 2014) (citations omitted). Federal Rule of Civil Procedure 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). "The party seeking additional discovery must show: '(1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are essential to resist the summary judgment motion.'" *Marlow v. City of Clarendon*, 78 F.4th 410, 416 (8th Cir. 2023) (quoting *Toben*, 751 F.3d at 895).

To secure a permanent injunction, a party's claim must actually succeed on the merits. Once a successful merits claim is established, the Court "then considers the following factors in deciding whether to grant a permanent injunction: (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest." *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008). "The decision to grant or deny permanent

15

injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## IV.    DISCUSSION

### A.    Standing

Arkansas asserts that "NetChoice does not have standing to bring First Amendment claims on behalf of third parties without first making any claims on behalf of itself." (Doc. 72, p. 2). The State does not otherwise address NetChoice's standing or attempt to rebut the Court's prior standing determination. The factual and legal bases for NetChoice's suit have not changed. Therefore, for the reasons explained in the Court's preliminary injunction order, the Court finds that NetChoice has associational standing to assert claims based on the harms to be suffered by its member and third-party standing to assert the rights of its members' users.

### B.    Need for Further Discovery

The State argues that, under the Supreme Court's recent decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), the Court should find that more discovery is needed to resolve a facial challenge so summary judgment is not appropriate at this juncture. The State does not specify what additional factual information it seeks.

In *Moody*, the Supreme Court addressed a facial First Amendment challenge to two state laws that "limit[ed] [social media] platforms' capacity to engage in content moderation," thereby infringing, on the plaintiff's account, the platforms' protected editorial discretion. *Id.* at 717. The Court vacated the lower courts' rulings because "neither Court of Appeals properly considered the facial nature of NetChoice's challenge." *Id.* at 718. In

16

ruling on a facial challenge under the First Amendment, the Supreme Court said, a court must decide "whether a law's unconstitutional applications are substantial compared to its constitutional ones. To make that judgment, a court must determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." *Id.* at 718. Because "[t]he parties ha[d] not briefed the critical issues" and the record was "underdeveloped," the court vacated and remanded for the lower courts "to consider the scope of the laws' applications, and weigh the unconstitutional as against the constitutional ones." *Id.* at 726.

Here, NetChoice's challenge is based on the First Amendment rights of users, not platforms. It is unclear how additional factual development would help illuminate the scope of users' First Amendment interest in accessing regulated platforms. The laws' scope is largely not in dispute. While the parties disagree about some of the platforms that are subject to the Act's requirement, there is no dispute that users engage in protected speech on all the platforms that are arguably within the Act's proscription. Moreover, as the Court determines below, the Act imposes a platform-wide burden on users' right to engage in that speech, and the Court struggles to see how this would differ between the platforms regulated.

Notably, *Moody* went to the Supreme Court in a preliminary injunction posture. This case comes before the Court, now, at summary judgment. The State relies entirely on *Moody* and does not attempt to address the requirements for a court to postpone ruling

on a motion for summary judgment under Federal Rule of Civil Procedure 56(d).[19] Turning to those requirements, the State has not "set forth in affidavit form the specific facts they hope to elicit from further discovery," "that the facts sought exist," or "that these sought-after facts are essential to resist the summary judgment motion." *Marlow*, 78 F.4th at 416. "If a party fails to carry its burden, 'postponement of a ruling on a motion for summary judgment is unjustified.'" *Id.* (quoting *Stanback v. Best Diversified Prods., Inc.*, 180 F.3d 903, 911 (8th Cir. 1999)).

NetChoice bears the burden of showing that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law, and the State can argue that NetChoice has not met that burden on the existing record, as it has in its Response. But the Court cannot "simply refrain" from ruling on Plaintiff's motion and "instead allow this to proceed to full discovery" when the State has not made out the required showing under Rule 56(d).

---

[19]  In fact, the need for more time to conduct discovery has already been litigated here. The parties were originally permitted to commence discovery as of October 11, 2023. (Doc. 46, ¶ 6).  On October 23, 2023, Arkansas requested six months of discovery. (Doc. 47, ¶ 6(a)).   On November 30, 2023, Arkansas moved under Rule 56(d) to delay consideration of NetChoice's Motion for Summary Judgment.  (Doc. 58).  After fulsome briefing, the Court defined the boundries of continued limited discovery and granted Arkansas an extension of the discovery deadline to June 7, 2024. (Doc. 64).  Even though *Moody* potentially changes the posture of the analysis, Arkansas makes no effort to explain why or how it remains prejudiced, despite its discovery opportunities to date.

### C.    Merits Claims

### 1.    *Burdens on First Amendment Rights: Platform Users' Rights*

#### a.  Level of Scrutiny

NetChoice contends that Act 689's age-verification requirement targets speech based on content, speaker, and viewpoint and is therefore subject to strict scrutiny. The State disagrees and argues that Act 689's age-verification requirement "only regulates non-expressive conduct," namely, minors "entering a social media establishment alone," and so is not subject to First Amendment scrutiny at all. (Doc. 72, pp. 65–67). The State further argues that even if the Act regulates some speech, the effect is merely incidental.

Laws regulating speech or conduct unprotected by the First Amendment are subject to rational basis review. *Ginsberg v. New York*, 390 U.S. 629, 641 (1968). On the other hand, laws that restrict protected speech or expression are subject to heightened scrutiny. Courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. . . . In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).

The State focuses on the direct effect of the regulation on the social media platforms—ignoring NetChoice's assertion of users' rights—to argue that a platform's decision to allow minors on its platform is not "expressive." The Court need not decide whether a social media platform's decision to distribute speech to minors and by minors is itself expressive because the Act ultimately impacts users' speech by "deputiz[ing]

19

covered businesses into serving as censors for the State." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118 (9th Cir. 2024).

The First Amendment protects both the right to speak and the "right to receive information and ideas, regardless of their social worth." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The protections of the First Amendment extended to social media: "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). And the State concedes that social media users use these platforms "to engage in a broad array of expressive activity, protected by the First Amendment, on a wide range of topics." (Doc. 68, ¶ 4; Doc. 73, ¶ 2).

Act 689 forecloses access to social media for those minors whose parents do not consent to the minor's use of social media. It also burdens social media access for all Arkansans—both adults and minors whose parents would allow them to use social media. Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and "discourage[s] users from accessing [the regulated] sites." *Reno*, 521 U.S. at 856. Age-verification schemes like those contemplated by Act 689 "are not only an additional hassle," but "they also require that website visitors forgo the anonymity otherwise available on the internet." *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003); *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (finding age-verification requirements force users to "relinquish their anonymity to access protected speech").

20

Other courts examining similar regulations have found that "[r]equiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site[ ] because Internet users are concerned about security on the Internet and because Internet users are afraid of fraud and identity theft on the Internet." *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also PSINET, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access their [identifying information] . . . may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide."). Record evidence also reflects this concern. *See* Harriman Decl. ¶¶ 28–29. The State has made no attempt to address this concern and, as in its preliminary injunction order, the Court agrees that the age-verification requirement will deter adults from speaking or receiving protected speech on social media.

Because the Act burdens users' speech, the Act is subject to intermediate scrutiny at a minimum. However, NetChoice also argues that the Act discriminates based on content, speaker, and viewpoint. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others

are more subtle, defining regulated speech by its function or purpose." *Id.*

NetChoice argues that the law is content based because whether a particular "social media company" or "social media platform" is subject to the Act turns on content that users post on that platform. Under Act 689, a "social media company" is regulated if users use its online forum "for the primary purpose of interacting socially with other profiles." Ark. Code. Ann. § 4-88-1401(7)(A). Companies that "exclusively offer" "content for the purpose of interacting [sic] gaming, entertainment, or associated entertainment," "provide[ ] career development opportunities," or subscription content so long as that content is not "short video clips of dancing, voice-overs, or other acts of entertainment in which the primary purpose is not educational or informative," are, however, exempt. *Id.* § 1401(7)(B). Similarly, a "social media platform" is regulated if "a substantial function" of the platform is "to allow users to interact socially." *Id.* § 1401(8)(A). Here, too, platforms may be exempt from regulation if they predominantly feature certain types of content including "news, sports, entertainment," "academic or scholarly research," and "educational" programming. *Id.* § 1401(8)(B).

The State argues that Act 689 is not content based because it is not directed at "the message that is being expressed," but instead at "the place where a message is expressed." (Doc. 72, p. 9 (emphasis omitted)). This is a distinction without a difference. Under the Act, "whether any particular [company or platform] falls within the ban is determined by the content of the [posts] resting inside that [company or platform]. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'" *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993). A website operating in

22

Arkansas, an enforcement official, a court, or a jury applying the Act, cannot determine whether the website is regulated without looking to the content posted on that website. And the State itself cannot seem to resist this conclusion either. In its Response, it says: "The Act regulates my [sic] subject matter, which is not a viewpoint." (Doc. 72, p. 12).

"[I]t is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" *Reed*, 576 U.S. at 169 (quoting *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N. Y.,* 447 U.S. 530, 537 (1980)). "Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.*

NetChoice also argues that the Act is a speaker-based restriction. "Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000). Courts are "deeply skeptical of laws that 'distinguis[h] among different speakers, allowing speech by some but not others.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777–78 (2018) (citations omitted) (alteration in original) (quoting *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 340 (2010)). This is because "[s]peaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Id.* (quoting *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 580 (2011)).

Act 689 exempts platforms that distribute "licensed media" that is not licensed from users, "news, sports, entertainment or other content that is preselected by the provider

and not user generated," and digital news websites with social features "if the news content is posted only by the provider of the digital news website." Ark. Code. Ann. § 4-88-1401(8)(B). NetChoice argues that "the Act explicitly favors the speech of whoever provides the online service" over the speech of users of online services. (Doc. 67, p. 21). The Court agrees. This privileges institutional content creators—movie and TV studios, mainstream media outlets, and traditional journalists—over the Soundcloud artist, the TikTok chef, and the citizen journalist.

Because the Act draws both content-based and speaker-based distinctions, the State bears the burden of demonstrating that it survives strict scrutiny. And Arkansas has not done so.

### b. Act 689 Is Not Narrowly Tailored to Serve a Compelling State Interest

As described above, Act 689 is a content-based restriction on both adults' and minors' access to constitutionally protected speech. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Playboy Ent. Grp.*, 529 U.S. at 812.

As in the Court's preliminary injunction order, *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011), remains instructive. There, a California law prohibited the sale or rental of violent video games to minors. *Id.* at 802. The law "straddle[d] the fence

24

between (1) addressing a serious social problem and (2) helping concerned parents control their children." *Id.* at 805. The *Brown* Court recognized these goals as legitimate; however, because the law affected Californians' First Amendment rights, the Court cautioned that the state's objectives "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." *Id.* "As a means of protecting children from portrayals of violence, the legislation [was] seriously underinclusive, not only because it exclude[d] portrayals other than video games, but also because it permit[ted] a parental . . . veto." *Id.* If the material was indeed "dangerous [and] mindaltering," the Court explained, it did not make sense to "leave [it] in the hands of children so long as one parent . . . says it's OK." *Id.* at 802. And "as a means of assisting concerned parents," the Court held that the regulation was "seriously overinclusive because it abridge[d] the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime." *Id.* at 805. Put simply, the legislation was not narrowly tailored.

In the end, the *Brown* Court rejected the argument "that the state has the power to prevent children from hearing or saying anything without their parents' prior consent," for "[s]uch laws do not enforce parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto." *Id.* at 795 n.3. "This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.* at 804. The Court also expressed "doubts that punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802. "Accepting that position would largely vitiate the rule that 'only in relatively narrow and

well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975)).

The Court does not doubt the reality, well supported by the record, that unfettered social media access can and does harm minors. And the State "has a compelling interest in protecting minor children." *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 897 (8th Cir. 2020). The State does not, however, have "a free-floating power to restrict the ideas to which children may be exposed. 'Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'" *Brown*, 564 U.S. at 794–95 (quoting *Erznoznik*, 422 U.S. at 213–14).

The State regulation here, like the one in *Brown*, is not narrowly tailored to address the harms that the State has a compelling interest in preventing. The State maintains that Act 689 is not underinclusive because it "targets the types of social media that are most likely to lead to predators contacting minors while leaving others unregulated." (Doc. 72, p. 20). The State's evidence undermines this contention.

With respect to incidence of online exploitation, the State cites the National Center for Missing and Exploited Children's (NCMEC) 2022 CyberTipline Report. *See* Doc. 72, p. 15 (citing *2022 CyberTipline Reports by Electronic Service Providers (ESP)* 1, National Center for Missing & Exploited Children (2023)[20]). This report lists dozens of electronic

---

[20] https://www.missingkids.org/content/dam/missingkids/pdfs/2022-reports-by-esp.pdf [https://perma.cc/E9UH-ALR9].

26

service providers, including all of the platforms regulated by the Act, and notes the number of suspected incidents of child sexual exploitation that each platform self-reported over the past year. *Id.* As the Court noted in its preliminary injunction order, *see* Doc. 44, pp. 44–45, Act 689 regulates Facebook and Instagram, the platforms with the two highest numbers of reports.[21] But, the Act *exempts* Google, WhatsApp, Omegle, and Snapchat—the sites with the third, fourth, fifth, and sixth highest numbers of reports. Nextdoor is at the very bottom of NCMEC's list, with only one report of suspected child sexual exploitation in 2022, yet the State continues to justify Nextdoor's inclusion based on the purported risk to minors. *See* Doc. 72, p. 21.

The State likewise continues to cite the FBI's public safety alert on financial sextortion. *See* Doc. 72, p. 16 (citing *Financial Sextortion*). The alert notes "gaming sites or video chat applications that feel familiar and safe [to minors]" are common places where adult predators engage in financial "sextortion" of minors. *Id.* Act 689 also exempts these platforms from age verification.

The State acknowledges that "private conversations and interactions . . . lead to much of the mental-health harm towards and predation on minors." (Doc. 72, p. 20). Yet private-message focused platforms like Snapchat, Kik, and Omegle are unregulated. Mr. Tony Allen, the State's expert, noted this issue as well. When testifying during the

---

[21] One shortcoming of this data is that it reports the number of total incidents but does not report the number of incidents in relation to the number of users. Naturally, platforms with more users may have more suspected incidents of sexual exploitation, but it is possible that smaller platforms present greater risk on a per-user basis.

27

preliminary injunction hearing, he stated that he did not "want to be unkind to the people who drafted [Act 689]," but at least some exempt platforms are ones that adult sexual predators commonly use to communicate with children, including Kik, Google Hangouts, and interactive gaming websites and platforms. (Doc. 45, pp. 67:17–70:19).

The State attempts to justify this exclusion using Snapchat as the prototype. For self-identified minors, Snapchat does not "promote connecting with people that you wouldn't know in real life already." (Doc. 72-3, p. 11:5–6 (Boyle Depo.)). Thus, minors are only discoverable by other Snapchat users with whom they share mutual friends or contacts. *Id.* at 14:8–14. Public content on Snapchat is also limited, and instead Snapchat is primarily used for the "private conversations and interactions" that the State purports to be concerned with.

The State invites the Court to contrast Snapchat with Nextdoor, pointing out that Nextdoor lacks "an extensive process confirming the user actually is who they say they are." (Doc. 72, p. 21). Notably, there is no evidence that Snapchat has such a process. "To make matters worse," the State says, "inappropriate and/or sexual messages between users would only be flagged [on Nextdoor] if one of the users involved self-reports the conduct." *Id.* But Snapchat uses roughly the same system. Boyle Decl. ¶ 6. Indeed, Snapchat's entire structure seems designed for the undetected exchange of sexually explicit materials because pictures and videos automatically delete after being opened. *Id.* ¶ 4.

The Act also exempts YouTube, "the most popular online activity" and "most widely used" platform among children. *See Children and Parents: Media Use and Attitudes*

28

*Report 2022* at 2, 23, Ofcom (Mar. 30, 2022) (cited in Declaration of Tony Allen ¶ 85 (Doc. 34-1)).[22] And it exempts platforms that generate less than $100 million annually. So a large platform that may have a lower percentage of "harmful" content and robust tools for taking that content down must verify the ages of its users, while a small platform that may have relatively more "harmful" content and no tools for taking that content down need not. This "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown*, 564 U.S. at 802.

For the platforms regulated by Act 689, the only constraint on minors is a one-time parental veto. Once a child receives a parent's blanket consent, the Act does nothing to protect users who have now been reliably identified as minors. The State points to "excessive data collection, which [social media platforms] use to deliver harmful content and troves of paid advertising." *See* Doc. 72, p. 17. But the Act does not bar data collection from identified minors and instead seems to provide platforms with more accurate age data to feed to algorithms and advertisers because of the age-verification requirement. The Act also does not require regulated entities to screen the content that is shown to known minors by, for example, requiring platforms to hide obscene content. Thus, once a minor has parental permission to make an account, they can find, or even be recommended, harmful content.

The State's briefing also indicates that time spent on social media is highly correlated with the risk of adverse mental health effects. (Doc. 72, p. 14). But the Act does

---

[22] https://www.ofcom.org.uk/__data/assets/pdf_file/0024/234609/childrens-media-use-and-attitudes-report-2022.pdf [https://perma.cc/PA87-5PAD].

not require regulated entities to offer or inform parents about time restriction settings for minors' accounts. And still, the State has failed to present any evidence that a parent's involvement in account creation signals an intent to be involved in the child's online experiences thereafter. *See* Doc. 44, p. 46–47. If the legislature's goal in passing Act 689 was to protect minors from materials or interactions that could harm them online, there is no evidence that the Act will be effective in achieving that goal.

"The [Arkansas] Legislature is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802*.* "That is not how one addresses a serious social problem." *Id.* "Because a 'law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited,' [Act 689] fails strict scrutiny." *Reed*, 576 U.S. at 172 (citation omitted) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002)).

The Court also concludes that Act 689 is seriously overinclusive. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citing *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 808–810 (1984)). Rather than targeting content that is harmful to minors, Act 689 simply impedes access to content writ large.

Arkansas's imposition of an age-verification requirement for account creation is maximally burdensome. It erects barriers to accessing entire social media platforms rather than placing those barriers around the content or functions that raise concern. It

not only hinders adults' ability to speak and receive protected speech online, it excludes minors whose parents do not consent (or cannot prove their consent) from "the vast democratic forums of the Internet." *Reno*, 521 U.S. at 868.

Minors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them, like school shootings and school choice. The State does not have "the power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3. "Such laws do not enforce parental authority over children's speech . . . ; they impose *governmental* authority, subject only to a parental veto." *Id.*

In *Packingham*, the Court observed that it was possible for a state to "enact specific, narrowly tailored laws" targeted to "conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor"; but it would be unconstitutional for a state to unduly burden adult access to social media. 582 U.S. at 106–07. There, the state of North Carolina had made it a crime for a registered sex offender to access social media sites where minors were permitted. If a statute barring registered sex offenders from using social media is not narrowly tailored, the Court does not see how a statute barring minors from social media fares any better.

Age-verification requirements are also more restrictive than policies enabling or encouraging users (or their parents) to control their own access to information, whether through user-installed devices and filters or affirmative requests to third-party companies. "Filters impose selective restrictions on speech at the receiving end, not universal restrictions at the source." *Ashcroft v. ACLU*, 542 U.S. 656, 657 (2004). And "[u]nder a

31

filtering regime, adults . . . may gain access to speech they have a right to see without having to identify themselves[.]" *Id.* Similarly, the State could always "act to encourage the use of filters . . . by parents" to protect minors. *Id.*; *see also Playboy Ent. Grp.*, 529 U.S. at 809–10, 815 (finding that voluntary, "targeted blocking" of certain content by viewers "is less restrictive than banning" the same content).

Act 689 is also overinclusive as to the State's interest in "giv[ing] parents more control over what social-media platforms their children are using." (Doc. 72, p. 18). "Not all of the children who are forbidden to [make social media accounts] on their own have parents who care whether they [use social media]." *Brown*, 564 U.S. at 804. As in *Brown*, the State has presented no evidence that the Act "meet[s] a substantial need of parents who wish to restrict their children's access to [social media] but cannot do so." *Id.* at 803. The State attempts to distinguish *Brown* by pointing out that, unlike the video game industry's uniform rating system, "regulated social media companies have no system writ large that self-polices their services." (Doc. 72, p. 19). However, NetChoice points to myriad avenues for parents to control their children's social media use. *See infra* section II.D. The fact that these tools do not operate "writ large" proves nothing. Most minors cannot access social media without a parent-funded device and internet connection, and "parents who care about the matter" have many tools at their disposal to restrict and monitor their children's internet use. *Brown*, 564 U.S. at 803. "Filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id.*

To the extent that parents are not aware of these tools, notice to parents of their availability is a much less restrictive means of promoting the State's interest, and the

State has offered no evidence to prove this alternative ineffective. *Playboy Ent. Grp.*, 529 U.S. at 823. "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804. "This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.*

The State describes its age-verification requirement as "simple." (Doc. 72, p. 1). Well spotted. But "[t]he First Amendment does not permit the State to sacrifice speech for efficiency." *Becerra*, 585 U.S. at 775 (quoting *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988)). The Court finds that Act 689 is a content-based restriction on speech that is not narrowly tailored to serve a compelling government interest. Act 689 therefore violates the First Amendment.

The State argues that NetChoice's First Amendment claim nonetheless fails on the merits because "the record is far too underdeveloped for the Court" "to determine 'which of the law['s] applications violate the First Amendment.'" (Doc. 72, p. 24 (quoting *Moody*, 603 U.S. at 725)). However, because the Court has found that Act 689 is a content-based restriction, the State bears the burden of showing the Act meets strict scrutiny. The State failed to do so, and a content-based restriction, insufficiently tailored to target a compelling government interest, is presumptively unconstitutional in all applications. The State has pointed to no applications of the Act that could be considered "plainly legitimate" and the Court is aware of none. By barring access to all content on regulated platforms, including that which is neither unprotected nor harmful, based on the content and speakers represented on those platforms, the Act is unconstitutional in all conceivable

applications.

### 2.    *Void for Vagueness:  NetChoice Members' Claim*

NetChoice also moves for summary judgment on its claim that Act 689 violates the due process rights of its members because pivotal terms are unconstitutionally vague. NetChoice argues that the Act is unconstitutionally vague because it is unclear which of its members are subject to the Act's requirements. The State responds that the Act is not unconstitutionally vague "because *some* of [NetChoice's] members' conduct is clearly proscribed" and "'primary purpose' is not vague." (Doc. 72, pp. 22–23 (emphasis added)).

As the Supreme Court explained in *Grayned v. City of Rockford*:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

408 U.S. 104, 108 (1972) (footnotes omitted).

A regulation "violates the first essential of due process of law" by failing to provide adequate notice of prohibited conduct. *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (citations omitted). A court should find a regulation unconstitutional if it "forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.*

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the

enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). "[E]conomic regulation is subject to a less strict vagueness test" as are "enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99. "Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* at 499.

Here, Act 689 must meet "a more stringent vagueness test" because it both contains criminal penalties, Ark. Code. Ann. § 4-88-1403(b)(1), and interferes with the right of free speech, *see infra* section IV.C.1. "When speech is involved, rigorous adherence to th[e]se requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012). Indefinite statutes "abut[ting] upon sensitive areas of basic First Amendment freedoms" may force the entities regulated "to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). "Free speech may not be so inhibited." *Id.*

"It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate*

*Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) (striking down city ordinance imposing misdemeanor penalty on movie theaters for showing films "unsuitable for minors" as impermissibly vague); *see also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 497 (1952) (invalidating state law banning motion picture distributors from distributing "sacrilegious" movies due to vague standards); *Winters v. New York*, 333 U.S. 507, 518–19 (1948) (finding unconstitutionally vague a state law regulating the distribution of certain commercial publications).

Act 689 is unconstitutionally vague because it fails to adequately define which entities are subject to its requirements, risking chilling effects and inviting arbitrary enforcement. A "social media company" is defined as "an online forum that a company makes available for an account holder" to "[c]reate a public profile, establish an account, or register as a user for the *primary purpose* of interacting socially with other profiles and accounts," "[u]pload or create posts or content," "[v]iew posts or content of other account holders," and "[i]nteract with other account holders or users, including without limitation establishing mutual connections through request and acceptance." Ark. Code. Ann. § 1401(7)(A) (emphasis added). Act 689 does not define "primary purpose"—a term critical to determining which entities fall within its scope.

Worse, Act 689 is ambiguous as to *whose* "primary purpose" is being considered— the user in creating the account or the company in making the forum available. "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact *but rather because it is unclear as to what fact must be proved*." *Fox*, 567 U.S. at 253 (emphasis added) (citing *United States v. Williams*, 553 U.S. 285, 306 (2008)). Even

if the Court agreed that "primary purpose" is an acceptable "qualitative standard," *see Johnson v. United States*, 576 U.S. 591, 604 (2015), the Act does not identify whose primary purpose "courts, juries, and regulators" should look to in conducting their "standard factual inquiry." (Doc. 72, p. 23). Companies must choose between risking unpredictable and arbitrary enforcement (backed by civil penalties, attorneys' fees, and criminal sanctions) and implementing the Act's costly age-verification requirements, at a minimum chilling their users' constitutionally protected speech and at a maximum putting themselves out of business in the process. *See* Harriman Decl. ¶ 34 (attesting that "Arkansas may be an unviable market" if Nextdoor is forced to implement third-party age verification). Such ambiguity renders a law unconstitutional. Left to deal with the uncertainty, platforms may choose to "restrict[ ] their conduct to that which is unquestionably safe," possibly by ending operation in the state altogether.

Other provisions of Act 689 are similarly vague. The Act defines the phrase "social media platform" as an "internet-based service or application . . . [o]n which a *substantial function* of the service or application is to connect users in order to allow users to interact socially with each other within the service or application"; but the Act excludes services in which "the *predominant or exclusive function* is" "[d]irect messaging consisting of messages, photos, or videos" that are "[o]nly visible to the sender and the recipient or recipients" and "[a]re not posted publicly." Ark. Code Ann. §1401(8)(A)–(B) (emphasis added). Again, the statute does not define "substantial function" or "predominant . . . function," leaving companies to guess whether their online services are covered. Many services allow users to send direct, private messages consisting of texts, photos, or

videos, but also offer other features that allow users to create content that anyone can view.   Act 689 does not explain how platforms are to determine which function is "predominant," leaving those services to guess whether they are regulated.

The State argues that Act 689's definitions are clear "because any person of ordinary intelligence can tell that [Act 689] regulates Meta, Twitter [now X], and TikTok." (Doc. 72, p. 22). The Court is less concerned with the straightforward applications of the Act and more concerned with the NetChoice members who are not certain whether they are regulated, namely Snapchat, Nextdoor, and Pinterest.

The State asserts that Snapchat is exempt, Nextdoor is not, and no mention of Pinterest is made at all. (Doc. 72, pp. 20–21). Snapchat, the State says, is exempted from the Act because it's "different from a traditional social media platform." (Doc. 72, p. 20 (quoting Doc. 72-3, p. 10:18–21 (Boyle Depo.)). The features the State points to—no public commenting, connections recommended based on contacts in one's phonebook, curated but user-generated public content—are not related to any particular exemption. Snapchat features both public "stories" and private messaging. *See* Boyle Decl. ¶ 4. A "substantial function" of Snapchat is social interaction. Snapchat believes it is unregulated because its "predominant purpose is as a direct messaging service" but nonetheless fears being dragged into litigation if it does not comply with the age-verification requirement. *Id.* at ¶ 8.

NetChoice also points to uncertainty with respect to Nextdoor and Pinterest. The State does not explain why Nextdoor falls within the Act's purview. Nextdoor users may passively "receive updates from nearby neighbors, businesses, and public services," or

38

they may interact socially by connecting with other users, joining groups, or exchanging direct messages. *See* Harriman Decl. ¶ 4; Doc. 72-2, p. 14:14–15:9 (Knapp Depo.). Pinterest describes itself as "a visual discovery engine for finding ideas like recipes, home and style inspiration, and more." *All About Pinterest* (Doc. 66, p. 153). But Pinterest, too, has some social features: users can follow other users, comment on Pins, and send messages. *Id.* pp. 153–56. It is unclear to the Court whether the "the primary 'end to be attained' of a profile" on either of these platforms is social interaction as opposed to say, finding a reliable plumber or planning a wedding. (Doc. 72, p. 23 (quoting *Purpose*, Merriam-Webster Dictionary[23])).

Snapchat provides the prime example of the arbitrary decisionmaking the Act invites. As the Court noted in its preliminary injunction order, the State's attorney asserts that Snapchat is exempted from the Act's requirements, while both a co-sponsor of the Act as well as the State's own expert witness contend that Snapchat is regulated. *See* Doc. 44, pp. 33–34. The State is correct that courts, not experts, are tasked with interpreting statutes. However, due process requires that the legislature, not the Court, provide "explicit standards for those who apply the law" so that "arbitrary and discriminatory enforcement" may be avoided. *Grayned*, 408 U.S. at 108. Here, three people possessing, the Court assumes, at least ordinary intelligence—and ostensibly all on the enforcement side—cannot agree whether the Act covers Snapchat. Snapchat is right to be worried about the risk of litigation.

---

[23] https://www.merriam-webster.com/dictionary/purpose [https://perma.cc/K98B-A8YS].

Arkansas "cannot give the Judiciary uncut marble with instructions to chip away all that does not resemble David" while leaving Arkansans to bear constitutional deprivation in the meantime. *Percoco v. United States*, 598 U.S. 319, 337 (2023) (Gorsuch, J., concurring in the judgment). That is precisely what the State has asked this Court to do; Act 689 is unconstitutionally vague.

### D.    Irreparable Harm

Because Act 689 abridges the First Amendment rights of Arkansans who use social media and contains terms too vague to be reasonably understood, NetChoice members and their users will suffer irreparable harm if the Act goes into effect. Because it is unclear which NetChoice members are subject to regulation, some members would be forced to choose between risking enforcement penalties—civil and criminal—and implementing age-verification requirements that burden their users' First Amendment rights. Other members, those that are clearly regulated, would be pressed into service as the private censors of the State. No legal remedy exists to compensate Arkansans for the loss of their First Amendment rights. *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990).  "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

### E.    Balance of the Equities and the Public Interest

When the government opposes the issuance of an injunction, the final two factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*,

556 U.S. 418, 435 (2009). The balance of the equities and public interest decidedly favor NetChoice: "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). Act 689 is a content-based restriction on speech, and it is not targeted to address the harms the State has identified. Arkansas takes a hatchet to adults' and minors' protected speech alike though the Constitution demands it use a scalpel.

## V.    CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Amended Motion for Summary Judgment (Doc. 66) is **GRANTED**. Act 689 of 2023, the "Social Media Safety Act," is **PERMANENTLY ENJOINED**.

**IT IS SO ORDERED** on this 31st day of March, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE