UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**NETCHOICE, LLC**                                                                                    **PLAINTIFF**

**v.**                               **CASE NO. 5:23-cv-05105-TLB**

**TIM GRIFFIN, in his official capacity**
**as Attorney General of Arkansas**                                              **DEFENDANT**

<u>**PLAINTIFF'S BRIEF IN OPPOSITION TO**</u>
<u>**DEFENDANT'S MOTION TO ALTER OR AMEND JUDGMENT**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

LEGAL STANDARD .......................................................................................................... 3

ARGUMENT ...................................................................................................................... 3

    I.      The Judgment Is Well Within The Court's Authority ............................................ 3

    II.     The Recent Amendments To Act 689 Provide No Basis For Relief Under
           Rule 59(e) ......................................................................................................... 10

CONCLUSION ................................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

*Am. Meat Inst. v. Pridgeon*,
   724 F.2d 45 (6th Cir. 1984) .................................................................................... 4

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021) ................................................................................................ 3

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   591 U.S. 610 (2020) ................................................................................................ 6

*Chafin v. Chafin*,
   568 U.S. 165 (2013) ......................................................................................... 11, 12

*Daghlian v. DeVry Univ., Inc.*,
   582 F.Supp.2d 1231 (C.D. Cal. 2007) .................................................................... 4

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ................................................................................................ 9

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ......................................................................................... 11, 12

*Fund for Animals v. Williams*,
   246 F.Supp.2d 27 (D.D.C. 2003) .......................................................................... 11

*Fund for Animals v. Williams*,
   311 F.Supp.2d 1 (D.D.C. 2004) ............................................................................ 11

*Hobbs v. Jones*,
   412 S.W.3d 844 (Ark. 2012) ............................................................................... 5, 7

*Knox v. SEIU, Loc. 1000*,
   567 U.S. 298 (2012) .............................................................................................. 11

*Leavitt v. Jane L.*,
   518 U.S. 137 (1996) ................................................................................................ 5

*McGhee v. Ark. State Bd. of Collection Agencies*,
   289 S.W.3d 18 (Ark. 2008) ..................................................................................... 5

*MKB Mgmt. Corp. v. Stenehjem*,
   795 F.3d 768 (8th Cir. 2015) .................................................................................. 5

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) .............................................................................................. 10

*Nordgren v. Hennepin County*,
   96 F.4th 1072 (8th Cir. 2024) ................................................................ 1, 3, 4, 11

*Sekhar v. United States*,
   570 U.S. 729 (2013) ................................................................................... 7

*U.S. Term Limits, Inc. v. Hill*,
   872 S.W.2d 349 (Ark. 1994) ...................................................................... 8

*U.S. Term Limits, Inc. v. Thornton*,
   514 U.S. 779 (1995) ................................................................................... 8

*United States v. Sineneng-Smith*,
   590 U.S. 371 (2020) ................................................................................... 5

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ................................................................................. 11

**Statutes**

47 U.S.C. §230 ................................................................................................ 8

2025 Ark. Laws Act 900 ........................................................................... 6, 13

Ark. Code §4-88-104 .................................................................................... 10

Ark. Code §4-88-1401 ................................................................................... 6

Ark. Code §4-88-1402 ............................................................................ 1, 2, 8

Ark. Code §4-88-1403 ............................................................................ 2, 7, 9

Ark. Code §4-88-1404 ............................................................................... 2, 8

# INTRODUCTION

Defendant's motion to alter or amend the judgment should be rejected out of hand. Rule 59(e) provides "a mechanism for the district court to correct its own mistakes"—not an opportunity to "raise arguments that could have been made prior to the issuance of judgment, re-argue the merits of claims, or suspend a judgment's finality without specifically identifying for the court a manifest error of law or fact that needs correcting." *Nordgren v. Hennepin County*, 96 F.4th 1072, 1077 (8th Cir. 2024). Defendant's motion defies these well-settled principles at every turn. The state raises a novel severability argument, re-hashes a meritless third-party standing argument, and makes a half-hearted plea to vacate the judgment based on statutory amendments that had not been enacted when the judgment was issued, will not take effect for two more months, and do not even repeal many of the statutory provisions that this Court held unconstitutional. Because the state fails to identify anything remotely approaching "a manifest error of law or fact," *id.*—on the contrary, the Court's legal analysis was spot-on, and its final judgment was a routine exercise of the judicial power to say what the law is and to enjoin unconstitutional state action—Defendant's Rule 59(e) motion should be denied.

# BACKGROUND

In April 2023, Arkansas enacted the Social Media Safety Act ("Act 689" or "the Act"), which dramatically restricts minors' ability to engage in core First Amendment activities on several of the most popular online fora. The Act provides that "[a] social media company shall not permit an Arkansas user who is a minor to be an account holder on the social media company's social media platform unless the minor has the express consent of a parent or legal guardian." Ark. Code §4-88-1402(a). To implement this restriction, it directs social media companies to "use a third-party vendor to perform reasonable age verification before allowing access to the social

media company's social media platform." *Id.* §1402(c)(1). It then provides that "[a] commercial entity or third-party vendor shall not retain any identifying information of an individual after access to the social media platform has been granted." *Id.* §1404(a); *accord id.* §1403(a)(2) (imposing same restriction on "social media compan[ies]" that "perform[] a reasonable age verification"). Violations are punishable with both civil and criminal penalties. *Id.* §1403.

In June 2023, NetChoice sued to challenge the Act on behalf of its members. Dkt.2 ¶6 ("Compl."). In its complaint, NetChoice asked the Court to declare "that [Act 689] on its face violates the United States Constitution and is therefore void and unenforceable," and to enjoin Defendant from "enforcing or otherwise bringing suit against NetChoice and its members under [the Act]." *Id.* at 33; *see id.* ¶¶2-3, 5-6, 52. NetChoice maintained its position that *every provision* of the Act is unconstitutional throughout the entire case. NetChoice moved to preliminarily enjoin the state from enforcing Act 689 in its entirety, Dkt.17; the Court granted that request, Dkt.44 at 49-50 ("PI.Op."); and the state never argued that the preliminary injunction was overbroad. Similarly, at summary judgment, NetChoice made clear that it was seeking "a declaratory judgment that Act 689 is facially unconstitutional," full stop, and asked the Court to "convert its preliminary injunction" (which covered all of the Act) "into a permanent injunction." Dkt.55 at 3.

On March 31, 2025, this Court granted that relief. *See* Dkt.77 ("Op."). As the Court explained in its summary-judgment opinion, Act 689 triggers "intermediate scrutiny at a minimum" because it burdens vast amounts of expressive activity by "all Arkansans." Op.20-21. Moreover, "[b]ecause [the Act] draws both content-based and speaker-based distinctions," it triggers "strict scrutiny," under which the State has the burden of demonstrating that it is "narrowly tailored to serve compelling state interests." Op.24. Act 689 abjectly fails any form of heightened scrutiny, however, because it is not remotely tailored to the state's asserted interest in protecting

2

minors. *See* Op.24-33; *accord* PI.Op.41-48. The Court thus concluded that the Act "is unconstitutional in all conceivable applications," Op.33-34, and is unconstitutionally vague to boot, Op.34-40. Upon finding that NetChoice readily satisfies all requirements for obtaining injunctive relief, Op.40-41, the Court declared Act 689 unconstitutional and permanently enjoined Defendant from enforcing it, Dkt.78.

On April 28, Defendant filed a Rule 59(e) motion, Dkt.82, arguing for the first time ever in this litigation that only a handful of the Act's provisions should have been declared unconstitutional, and that "the judgment should be revised" so that it "enjoins Defendant from enforcing only those specific provisions," Dkt.83 at 9-10 ("Br.").

## LEGAL STANDARD

"Rule 59(e) was adopted as a mechanism for the district court to correct its own mistakes shortly after entering judgment." *Nordgren*, 96 F.4th at 1077. "It is limited to correcting 'manifest errors of law or fact' or as a way for a party to provide the court with newly discovered evidence." *Id.* Accordingly, a motion to alter or amend the judgment "cannot be used as a vehicle to tender new legal theories, raise arguments that could have been made prior to the issuance of judgment, re-argue the merits of claims, or suspend a judgment's finality without specifically identifying for the court a manifest error of law or fact that needs correcting." *Id.*

## ARGUMENT

**I.     The Judgment Is Well Within The Court's Authority.**

Upon holding Act 689 unconstitutional, this Court "correctly entered judgment in favor of the [plaintiff] and permanently enjoined the Attorney General from" enforcing the invalid statute. *Cf. Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2021) (recognizing this as the

proper outcome when a state law is "facially unconstitutional" under the First Amendment). There is absolutely no reason for the Court to alter or amend that judgment.

Defendant principally argues severability, asserting that "not … every single provision" of the Act is unconstitutional and that "state officials" may still be able to "enforce[]" some parts of the Act after the unconstitutional provisions have been excised. Br.7-8. As the Eighth Circuit has made clear, however, Rule 59(e) "cannot be used as a vehicle" for the state's severability argument, because that argument "could have been made prior to the issuance of judgment" but was not. *Nordgren*, 96 F.4th at 1077. That alone is reason enough to deny Defendant's motion. *See, e.g.*, *Am. Meat Inst. v. Pridgeon*, 724 F.2d 45, 47 (6th Cir. 1984) (defendants "effectively waived their argument on severability" by presenting it for the first time in a post-judgment motion); *Daghlian v. DeVry Univ., Inc.*, 582 F.Supp.2d 1231, 1257-58 (C.D. Cal. 2007) (party's "fail[ure] to raise" severability argument "in opposing summary judgment" was a sufficient ground for rejecting it on a motion for reconsideration).

To the extent the Court nevertheless considers the substance of Defendant's contentions, they are utterly without merit. Likely anticipating its glaring forfeiture problem, the state repeatedly suggests that "NetChoice did not challenge every provision" of the Act. Br.8; *see* Br.1, 5-7. Nonsense. NetChoice made crystal clear, at every phase of the litigation, that it was challenging the Act in its entirety. *See, e.g.*, Compl.¶¶2-5, 35-52; Dkt.18 at 1-3, 15; Dkt.55 at 1-3. This Court repeatedly recognized as much. *See* PI.Op.49-50; Op.3, 41. So did Defendant. *See* Dkt.34 at 4, 22-23; Dkt.72 at 25-26. Indeed, the state continues even now to describe NetChoice's lawsuit as a "broad facial challenge to Act 689." Br.2. If the state thought that some portion of the Act could survive independently from its content- and speaker-based definitions of "social media company" and "social media platform" and its haphazard imposition of age-verification and

4

parental consent requirements, it was the state's obligation to make that argument. *See MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 776 n.6 (8th Cir. 2015) ("[W]e decline to consider whether H.B. 1456's heartbeat testing requirement is severable from its abortion restriction because the State has not argued for severability."). This Court had no duty to raise severability *sua sponte*, and it did not commit any error (let alone a "manifest error") by limiting its analysis to the arguments the parties actually made. "[C]ourts normally decide only questions presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) (brackets altered).

In all events, none of Act 689 can be salvaged. "To determine whether the invalidity of part of an act is fatal to the entire legislation," Arkansas courts "look to whether a single purpose is meant to be accomplished by the act, and whether the sections of the act are interrelated and dependent upon each other." *Hobbs v. Jones*, 412 S.W.3d 844, 855 (Ark. 2012).[1] When, as here, a statute "does not contain an express severability clause," it "suggests that the legislative intent was to pass the act as a whole." *Id.* at 856. And "when portions of an act are mutually connected and interwoven, severability is not appropriate." *McGhee v. Ark. State Bd. of Collection Agencies*, 289 S.W.3d 18, 27 (Ark. 2008). That is precisely the situation here.

Start with §1401. Defendant asserts, with no analysis, that only part of the statutory definition of "social media company" should be declared unconstitutional. *See* Br.9-10 (requesting that §1401(7)(ii)-(iv) be left in place). But the various elements of the Act's definition of "social media company"—including its many exceptions—are unquestionably "interrelated and dependent upon each other," *Hobbs*, 412 S.W.3d at 855. Indeed, the state's proposal would transform the Act from a law covering a handful of large entities that generate over $100 million

---

[1] Arkansas law governs the question whether the Act is severable. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) ("Severability is of course a matter of state law.").

annually into a law covering the entire universe of "online forum[s]" that allow users to "[u]pload or create posts or content"; "[v]iew posts or content of other account holders"; and "[i]nteract with other account holders or users." Ark. Code §4-88-1401(7)(A)(ii)-(iv).

The content-based exceptions that this Court held invalid are anything but minor details; they are central to how Act 689 functions. More than half of the Act's text is devoted to defining "social media company" and "social media platform" and carving out exceptions to those definitions. And the exceptions are not "relatively narrow exception[s]" to a "broad … restriction." *Cf. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 633 (2020) (plurality opinion). They are massive exceptions that have the practical effect of narrowing the law's operative restrictions to a handful of disfavored websites. Indeed, the state previously told this Court that the Act's definitions of "social media company" and "social media platform" were carefully calibrated to "target[] the types of social media that are most likely to lead to predators contacting minors while leaving others unregulated." Dkt.72 at 20 (citing Ark. Code §4-88-1401(7)-(8)). There is no reason to conclude that the Arkansas legislature would have wanted the law to apply to all manner of online services—everything from LinkedIn to ESPN to Amazon to SSRN—in the event that its detailed, content-based coverage formula was found unconstitutional. *See, e.g.*, Ark. Code §4-88-1401(7)(B)(iv), (8)(B)(iv)-(v), (xii) (exception for "job posting and application services" websites, "[n]ews, sports, entertainment" websites, "[o]nline shopping or e-commerce" websites, and "[a]cademic or scholarly research" websites). That is presumably why the legislature carved them out in the first place and declined to include a severability clause. And in marked contrast to Act 689, the new legislation amending the Act *does* include a severability clause. *See* 2025 Ark. Laws Act 900 ("Act 900"), §7.

6

What is more, the state's proposal would not even fix the constitutional problems this Court identified. To the contrary, severing the content-based exceptions to the Act's definition of "social media company" would make the law's tailoring problems even more glaring, as the law would burden access to *even more* speech—not just on websites like Facebook, Instagram, and Nextdoor, but on LinkedIn, ESPN, Amazon, and SSRN too. The state does not even try to explain how its interest in protecting minors from the purported "harms" of social media could justify restricting access to such a wide array of websites. And even if the Court were to rewrite the law to eliminate the gaping content-based exceptions to the definition of "social media company," as Arkansas suggests, the law would still burden a massive amounts of speech, "privilege[] institutional content creators" over "the speech of users of online services," Op.24, receive "intermediate scrutiny at a minimum," Op.21, and abjectly fail narrow tailoring, *see* Op.24-34; *accord* PI.Op.41-48. Severance is no solution when it "has no practical effect on the statute's unconstitutionality." *Hobbs*, 412 S.W.3d at 856.

The state concedes that "the Court's constitutional analysis" is fatal to all of §1402. Br.10. But it nevertheless asks the Court to leave most of §1403 in force, *see* Br.10, on the theory that NetChoice did not challenge the bulk of §1403, and/or that this Court's ruling covers almost none of §1403. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). Subsection (a) makes a "social media company… liable if [it] fails to perform a reasonable age verification." Ark. Code §4-88-1403(a)(1). The law's age-verification requirements are at the core of NetChoice's challenge, and this Court expressly held them unconstitutional. *See, e.g.*, Op.3, 19-21, 30-31, 33, 37-38. Subsection (b) authorizes enforcement of §1402, which the state concedes this Court held unconstitutional, Br.9-10. And subsection (c) authorizes monetary penalties, damages, and attorney's fees for violations of "this subchapter," i.e., Act 689. There is

7

no colorable argument that any of these provisions "is complete in itself and capable of being executed wholly independent of that which was [held unconstitutional]." *Cf. U.S. Term Limits, Inc. v. Hill*, 872 S.W.2d 349, 358 (Ark. 1994), *aff'd sub nom. U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995).[2]  This Court was entirely correct to declare all of §1403 unconstitutional, as that was the only way to remedy the injuries NetChoice asserted.

The state also argues that §1404 is severable. Br.6, 9-10. Wrong again. Section 1404 is inextricably linked to—indeed, serves no purpose without—§1402, which the state admits the judgment properly covers. The two provisions work in tandem: Section 1402 requires "[a] social media company" to "use a third-party vendor to perform reasonable age verification *before allowing access* to the social media company's social media platform," Ark. Code §4-88-1402(c)(1) (emphasis added), and §1404 prohibits the "third-party vendor" (or other "commercial entity") from "retain[ing] any identifying information of an individual *after access to the social media platform has been granted*," *id.* §4-88-1404(a) (emphasis added); *see id.* §1404(b) (creating liability for knowing violations of this information-retention prohibition). As this Court aptly put it during the preliminary-injunction hearing, §1404 "requires that personally identifying information *that might be accumulated secondary to [age] verification* … not be retained." PI.Hr'g.Tr.10:4-6 (emphasis added).

Underscoring the point, the Act elsewhere provides that "*[i]f* a social media company performs a reasonable age verification, the social media company shall not retain any identifying information of the individual after access to the social media platform has been granted." Ark.

---

[2] The same goes for §1401(1)-(6) and (9), which contain definitions that have no independent effect; §1403(d), which contains speaker-based carveouts to the Act's unconstitutional imposition of liability on "social media company[ies]"; and §1403(e), which limits an internet service provider's liability for third-party content, *cf.* 47 U.S.C. §230.

8

Code §4-88-1403(a)(2) (emphasis added). Once the age-verification process is held invalid, there is no information to collect when granting "access" to a covered service, rendering §1404's prohibition on retaining such information is a nullity. In all events, NetChoice *specifically alleged* that §1404 would be unconstitutional even if "misread as a sweeping prohibition on retention of 'any identifying information' about any 'individual' (whether a teen or adult) who is granted access to a social media platform,'" and even if it were decoupled from "the content-, viewpoint-, and speaker-based elements" of the Act's definition of "social media platform." Compl.¶43. The state never argued for this broader (mis)reading or even hinted that §1404 is severable from the rest of the Act; it cannot use a Rule 59(e) motion to advance these arguments; and §1404 would still be unconstitutional standing alone. Section 1404 is properly encompassed by the judgment.

Defendant's assertion that "NetChoice does not have standing to challenge the entire Act," Br.1, is another non-starter. For one thing, it is an argument that Defendant already presented (twice) and the Court rejected (twice). *Compare* Dkt.34 at 4-6, *and* Dkt.72 at 2, *with* PI.Op.21-29; Op.16. And rightly so, as Defendant's argument that "NetChoice did not establish standing to challenge [§1404] on First Amendment grounds," Br.6, is entirely incorrect. NetChoice plainly has standing to challenge §1404, as it directly regulates NetChoice members. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (when a regulation "require[s] or forbid[s] some action by the plaintiff," "standing is usually easy to establish"). While that alone suffices to defeat Defendant's argument, NetChoice did *not* assert First Amendment injury solely on "the rights of platform users." *Contra* Br.6. To the contrary, NetChoice emphasized repeatedly that the Act "restricts [NetChoice members'] First Amendment rights to disseminate both their own content and third-party content to those who would like to use their services." Dkt.40 at 2; *see* Compl.¶¶6, 38-39, 43, 48; PI.Hr'g.Tr.77:11-78:4; *accord Moody v. NetChoice, LLC*, 603 U.S. 707, 728-32

9

(2024). The complaint directly challenges §1404, *see* Compl.¶43, and while NetChoice's summary-judgment briefing did not focus on §1404 in particular (because the state never disputed that it is inextricably intertwined with the Act's unconstitutional age-verification and parental-consent requirements, *see supra* pp.8-9), NetChoice plainly had standing to challenge that provision and successfully did so.

Finally, the injunction does not "seek[] to effectively strike [Act 689] from the books," Br.7. As the state elsewhere concedes, *see* Br.5, the injunction is properly directed at "Defendant, his employees, agents, and successors in office, and all persons acting in concert with them." Dkt.78. It is also properly "tailored to [the] precise harm proven"—enforcement of any aspect of the Act's non-severable scheme for restricting constitutionally protected expression. *Contra* Br.7. And to the extent that the Attorney General "does not enforce" §1403(b)(1) or (c), as the state now belatedly claims, Br.7—*but see* Ark. Code §4-88-104 (broadly authorizing "civil enforcement of the provisions of [chapter 88]" by the Attorney General)—he suffers no harm, let alone any "manifest injustice," if he is prohibited from enforcing provisions that he would not enforce anyway.

In sum, Defendant's request to narrow the scope of the judgment is both improper, as it rests on arguments that could have been presented earlier or were presented and rejected, and entirely meritless.

## II.   The Recent Amendments To Act 689 Provide No Basis For Relief Under Rule 59(e).

Defendant's request to "alter or amend the judgment in light of … the General Assembly's enactment of Act 900 of 2025," Br.8, is weaker still. Defendant argues that relief is warranted because NetChoice's claims "will soon become moot." Br.9. That argument is wrong in both its premise and its conclusion.

At the outset, whatever impact Act 900 may have on this case, it has not had it yet, as the law will not take effect until August 3, 2025 (90 days after the Arkansas legislature ended its regular session for 2025). To deprive NetChoice of relief from provisions that remain on the books *now* based on allegations that this case could become moot *in the future* would be to commit a manifest injustice, not correct one. Any prospect of potential future mootness cannot possibly justify relief under Rule 59(e), as it is not an argument that there was any error in the Court's final judgment of March 31, 2025. *See Nordgren*, 96 F.4th at 1077 (Rule 59(e) provides a "mechanism for the district court to correct its own mistakes"). Indeed, the principal case on which the state relies for this novel anticipatory-mootness argument, *Fund for Animals v. Williams*, 311 F.Supp.2d 1 (D.D.C. 2004), is one that had become moot several weeks *before* judgment was entered, not one in which the defendant vaguely suggested, with no supporting argument, that a law enacted well *after* judgment was entered would cause the case to become moot several months down the line. *Compare id.* at 6 (concluding that the case "was rendered moot" by intervening agency action "in *January 2003*" (emphasis added)), *with Fund for Animals v. Williams*, 246 F.Supp.2d 27, 48 (D.D.C. 2003) (summary-judgment order issued on *February 25, 2003*).

At any rate, the state's contention that "NetChoice's claims will soon become moot" is meritless. A "case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). The test for mootness is not the same as for Article III standing in the first instance. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 719-20 (2022); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189-92 (2000). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 307-08 (2012) (brackets omitted). And the state bears the "'heavy burden of persua[ding]' the

11

court that the challenged conduct cannot reasonably be expected to start up again." *Laidlaw*, 528 U.S. at 189 (brackets in original).

The state cannot begin to meet that burden here. Nothing in Act 900 repeals the age-verification and parental-consent requirements that the Court held unconstitutional and enjoined the state from enforcing. Those provisions will still remain on the books—and would still impose burdens on NetChoice members, if not for the permanent injunction—even after Act 900 goes into effect. Indeed, the very fact that the state is asking this Court to vacate the judgment (and lift or narrow the injunction) so it can begin enforcing the age-verification and parental-consent requirements imposed by Act 689 is proof positive that NetChoice's challenge to those provisions is not moot.

To be sure, Act 900 amends various provisions defining covered entities so that its age-verification and parental-consent requirements apply to a wider array of websites. But to the extent the state thinks that amending those definitional provisions will fix the constitutional problems with the age-verification and parental-consent requirements, that is a merits argument about whether those provisions are now (or, more aptly, will in a few months become) constitutional, not an argument that NetChoice's present lawsuit challenging those still-existing provisions is (or will eventually become) moot. *See Chafin*, 568 U.S. at 174 (warning parties against "confus[ing] mootness with the merits").

The state's argument that the judgment impermissibly prohibits it "from enforcing the amended law," *see* Br.9, fails for much the same reason. The judgment does not enjoin the state from enforcing Act 900. It enjoins the state from enforcing provisions of the Arkansas Code that were enacted into law by Act 689 and that Act 900 has not repealed. If the state really thinks that, by deleting the definition of "social media platform" and making various other tweaks to the

12

statute, Act 900 will cure the constitutional problems identified by the Court (it will not[3]), then the state should have made that merits argument in its motion. The state cannot secure vacatur by unilaterally declaring that it has mooted challenges to still-extant provisions of Arkansas law.

## CONCLUSION

Defendants' motion to alter or amend the judgment should be denied.

---

[3] The amended version of the law still "takes a hatchet to adults' and minors' protected speech alike though the Constitution demands it use a scalpel," Op.41. Act 900's definition of "covered social media platform" exacerbates the First Amendment problems by expanding the law's coverage to all manner of online services (apparently including, for example, Apple's iMessage app and the New York Times app). *See* Act 900, §1 (amending Ark. Code Ann. §4-88-1401(5)(A)). Act 900 also imposes new content- and speaker-based restrictions on protected speech that are not remotely tailored to achieving any legitimate state interest. *See id.* §2 (adding new Ark. Code Ann. §4-88-1402(d)). On top of that, Act 900 compounds the vagueness problems; among other things, the amended statute continues to impose liability on "social media companies" even though Act 900 deletes the statutory definition of that term. NetChoice is therefore preparing a new lawsuit asking the Court to enjoin the amended statute, too.

13

Date: June 2, 2025

Respectfully submitted,

Marshall S. Ney, Ark. Bar No. 91108
Katherine C. Campbell, Ark. Bar No. 2013241
Friday, Eldredge & Clark, LLP
3350 S. Pinnacle Hills Pkwy, Suite 301
Rogers, AR 72758
Telephone: (479) 695-6049
Facsimile: (501) 244-5389
mney@fridayfirm.com
kcampbell@fridayfirm.com

Paul D. Clement (admitted *pro hac vice*)
Erin E. Murphy (admitted *pro hac vice*)
James Y. Xi (admitted *pro hac vice*)
Joseph J. DeMott (admitted *pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com

*Counsel for Plaintiff*